FC45almH

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   ERICA ALMECIGA,

4                   Plaintiff,

5           v.                              15 Civ. 4319 (JSR)

6   CENTER FOR INVESTIGATIVE
    REPORTING, INC.,
7
                    Defendant.
8
    ------------------------------x
9
                                         December 4, 2015
10                                       12:35 p.m.
    Before:
11
                     HON. JED S. RAKOFF,
12
                                         District Judge
13
                         APPEARANCES
14
    THE LANDAU GROUP, PC
15       Attorneys for Plaintiff
    BY:  KEVIN LANDAU
16       ZACH LANDAU

17  DAVIS, WRIGHT, TREMAINE, LLP
         Attorneys for Defendant
18  BY:  THOMAS BURKE
         ALISON SCHARY
19

20

21

22

23

24

25

FC45almH

1              (Case called)

2              THE DEPUTY CLERK:  Will the parties please identify

3    themselves for the record, and will everybody else be seated?

4              MR. K. LANDAU:  Good afternoon, your Honor.  Kevin

5    Landau on behalf of the plaintiff.

6              MR. Z. LANDAU:  Zach Landau.

7              PLAINTIFF:  Erica Almeciga.

8              MR. BURKE:  Thomas Burke from Davis, Wright, Tremaine

9    on behalf of Center for Investigative Reporting, defendant.

10             MS. SCHARY:  And Alison Schary from Davis, Wright,

11   Tremaine on behalf of Center for Investigative Reporting.

12             THE COURT:  Are the other people in the courtroom

13   witnesses?

14             MR. BURKE:  Yes, your Honor.  If I may introduce Bruce

15   Livesey, Steve Talbot, both on behalf of CIR.

16             THE COURT:  And what about the other gentleman?

17             MR. K. LANDAU:  Your Honor, Mr. Isaac Duarte on behalf

18   of plaintiff.

19             THE COURT:  So, I'm not going to, on my own motion,

20   exclude any witnesses but if either counsel wants them excluded

21   I will exclude them.

22             MR. BURKE:  No, your Honor.

23             MR. K. LANDAU:  Your Honor, I believe Mr. Talbot is

24   representing one of the defendants as a corporate

25   representative?

FC45almH

1          MR. BURKE:  No.

2          MR. K. LANDAU:  Oh, he is not.  Okay, then yes, we

3     would like to request sequestration.

4          THE COURT:  That includes the gentleman who is here

5     for you as well.

6          MR. K. LANDAU:  Yes.

7          THE COURT:  So, those people need to go and any other

8     witness needs to go into the witness room.  My courtroom deputy

9     will show you where that is right now.  The other gentleman who

10    just came in, I don't know if he is a witness or not.  No?

11    Very good.

12          All right.  So, let me first state this is really a

13    combined evidentiary hearing; it is both a hearing on the Rule

14    11 motion brought by the defense but it is also in the nature

15    of a Daubert hearing with respect to the expert witness if the

16    case goes forward.  And I appreciate the efforts that both

17    sides have gone to to make available the relevant people.

18          This has been a difficult schedule, scheduling day for

19    me.  I had planned originally to go to the funeral of my

20    wonderful late colleague Judge Owen and I couldn't even do that

21    because of an ongoing jury trial that is not moving as fast as

22    I hoped and so I need to let you guys know, in advance, that we

23    must end by 4:30 today.

24          I will, when we have concluded today, I will give each

25    side the opportunity to put in written summations so you don't

FC45almH

1    need to worry about the time for oral summations because we

2    will do it by writing.  If you wanted to give an oral opening

3    at which both sides had requested at one point, I am happy to

4    hear you for 10 minutes a side but I wonder, given the time

5    constraints and since, frankly, I think I know what your

6    positions are from the papers, whether we shouldn't just move

7    directly into the evidentiary hearing.

8          But, does anyone feel the need for an opening

9    statement?

10          MR. BURKE:  The Center for Investigative Reporting

11    defendants do not.

12          Your Honor, there is one housekeeping matter which I

13    think will also go with respect to speed.

14          THE COURT:  Okay.

15          MR. BURKE:  I have talked with Mr. Landau about that.

16    We have stipulated to the authenticity of the evidence that was

17    submitted in connection with the motion and the opposition

18    papers.  To save the Court time, CIR has marked its exhibits in

19    the order that they were filed.  As a suggestion, for the

20    purposes of this hearing only, we might ask that the Court

21    accept all of this evidence into the record reserving

22    objections as to evidence either for later in the day, which

23    seems unlikely, or post-hearing briefing, if the Court requests

24    that.

25          THE COURT:  Well, I'm perfectly happy to have people

FC45almH

reserve any and all objections to evidence that's received

today for purposes of a trial if the case goes to trial but I'm

not prepared to let you say, after today is over, even though

we didn't object at the time the evidence was offered we now

object to its consideration in this hearing.  So, as far as I'm

concerned, when a piece of evidence is offered today, if you

have an objection, state it, I will rule.  But, you won't be

able to reserve that objection for purposes of this hearing if

you don't state it.

          MR. BURKE:  Understood.

          THE COURT:  All right.  Very good.

          Now, I'm sorry.  Did plaintiff's counsel want an

opening statement or not?

          MR. K. LANDAU:  Your Honor, in the interest of time,

that's fine.

          THE COURT:  Okay.

          So, I think the first witness on your list was the

gentleman from Nepal and in an excess of liberality I permitted

him to testify by telephone.  So, let's see if we can get him

on the telephone.

          MR. BURKE:  Your Honor, for this witness is it

appropriate for us to sit at the table --

          THE COURT:  Why don't counsel and the Court, we will

all gather at the speakerphone right now.

          MR. BURKE:  All right.

FC45almH

```
 1              THE COURT:  Mr. Hooper, this is Judge Rakoff.  Can you
 2     hear me?
 3              THE WITNESS:  Yes, I can.
 4              THE COURT:  Very good.  I'm going to swear you in to
 5     testify, so please raise your right hand.
 6      JOSIAH HOOPER,
 7          called as a witness by the Defendant,
 8          having been duly sworn, testified as follows:
 9              THE COURT:  Please, tell us what you do for a living.
10              THE WITNESS:  I am a freelance television producer.
11              THE COURT:  And are you familiar with the plaintiff
12     here, Ms. Almeciga?
13              THE WITNESS:  Yes, I am.
14              THE COURT:  And how did you come to know her?
15              THE WITNESS:  During the production of a documentary
16     film.
17              THE COURT:  And have you been furnished with a copy of
18     a purported release that she signed?
19              THE WITNESS:  I don't have it in my possession.
20              THE COURT:  Have you seen it previously?
21              THE WITNESS:  Yes, I have.
22              THE COURT:  Were you present -- I'm sorry.
23              Did you see her sign it?
24              THE WITNESS:  I was in the room when she signed it.
25              THE COURT:  And at what stage of the documentary
```

FC45almH

1    production was this?

2              THE WITNESS:  This was during the filming of the first

3    two interviews which were with Rosalio Reta and then with

4    Ms. Almeciga.  So, we had just finished filming their

5    interviews --

6              THE COURT:  And who --

7              THE WITNESS:   -- that day.

8              THE COURT:  And who presented the release to

9    Ms. Almeciga?

10             THE WITNESS:  I believe it was Bruce Livesey, my

11   colleague on the shoot.

12             THE COURT:  And was this in a conference room or where

13   was it?

14             THE WITNESS:  Yes, this was in the conference room of

15   the hotel we were staying at in Woodville, Texas.

16             THE COURT:  And what, if anything, do you recall being

17   said in connection with this signing?

18             THE WITNESS:  Nothing.

19             THE COURT:  So, by nothing you mean you don't recall

20   anything or do you mean that to the best of your recollection

21   nothing was said?

22             THE WITNESS:  To the best of my recollection nothing

23   was said.

24             THE COURT:  All right, so he just put the release in

25   front of her and she just signed?

FC45almH                         Hooper - direct

1        THE WITNESS:  Yes.  To my recollection, yes.

2        THE COURT:  And how far away from her were you when

3   she signed?

4        THE WITNESS:  I couldn't have been more than 10 feet.

5   I would have been putting camera equipment away.

6        THE COURT:  Okay.

7        Let me turn it over to counsel for any questions they

8   may have.  We will start with defense counsel.

9   DIRECT EXAMINATION

10  BY MR. BURKE:

11  Q.  Mr. Hooper, when did you first meet Ms. Almeciga?

12  A.  Sorry.  You have to speak up just a little bit.

13  Q.  Mr. Hooper, when did you first meet Ms. Almeciga?

14  A.  When we picked her up from the airport en route to

15  Woodville, Texas.

16  Q.  Before you met her in Texas, had you ever met her before?

17  A.  No, I had not.

18  Q.  Had you ever seen Ms. Almeciga's signature before she

19  signed the release?

20  A.  No, I had not.

21  Q.  Did you ever see Ms. Almeciga again in person?

22  A.  No.  That was the only time I ever met her.

23  Q.  When she signed the release, was there anyone else in the

24  room other than Ms. Almeciga and Mr. Livesey and yourself?

25  A.  No, there was not.

FC45almH                          Hooper - direct

1    Q.  After the release was signed, what happened to it

2    physically?

3    A.  I put it in with my files and brought it back to California

4    with me and took it to the office of the Center for

5    Investigative Reporting.

6    Q.  Did you ever see the release again after that?

7    A.  I think I may have seen it along with all the other

8    releases just in terms of handing them all over and going over

9    them when we added new releases to the files, but I don't

10   recall having to pull it out and look at it necessarily, so.

11          To my recollection, I may have seen it once after

12   that.

13   Q.  Did Ms. Almeciga ever raise any concerns to you personally

14   about not being identified or having her face recorded?

15   A.  No, she did not.

16   Q.  Did Ms. Almeciga ask you to promise not to identify her in

17   any way?

18   A.  No, she did not.

19   Q.  When you were in Woodville, Texas, did you participate in

20   the interview with Mr. Reta?

21   A.  Yes, I did.

22   Q.  Did Mr. Reta also sign a standard CIR release?

23   A.  Yes, he did.

24   Q.  Did you see him sign that release?

25   A.  I don't recall whether I saw him sign it.  It was passed to

1    a guard and brought to him and he signed it and it was returned

2    to us.

3    Q.  At any time did Mr. Reta ask you to agree not to show

4    Ms. Almeciga's face?

5    A.  No, he did not.

6    Q.  During any time during your interview again now with

7    Ms. Almeciga, did she ever express any concerns to you about

8    her safety?

9    A.  No, she did not.

10   Q.  Did she appear interested in being interviewed?

11   A.  Yes, she did.

12         MR. BURKE:  I have no further questions.

13         THE COURT:  All right.  Now we will have questions by

14   plaintiff's counsel.

15   CROSS EXAMINATION

16   BY MR. K. LANDAU:

17   Q.  Mr. Hooper, can you hear me?

18   A.  Yes, I can.

19   Q.  Okay.

20         Good morning, sir.  My name is Kevin Landau, I am one

21   of the attorneys for the plaintiff Erica Almeciga.  You have

22   indicated that --

23   A.  Good morning.

24   Q.  You indicated that you were in the room at the time of the

25   purported release being presented to Ms. Almeciga; is that

FC45almH                          Hooper - cross

1   correct?

2   A.  Yes, I was.

3   Q.  Okay.

4           Do you recall if she was standing or sitting when this

5   purported release was being handed to her?

6   A.  I think she was sitting.

7   Q.  Okay.

8           Do you recall that you previously had a deposition

9   with co-counsel on October 30th, 2015?

10  A.  Yes, I did.

11  Q.  And do you recall having stated similarly under oath, and

12  the question was:

13  "Q  Do you recall if she was standing or sitting when she was,

14  when this release was being handed to her?"

15          And at the time of that deposition you answered:

16  "A  No.

17          THE COURT:  Let me see that.

18  A.  I don't recall.  I may have said no.

19  Q.  Okay.

20          Do you recall if Ms. Almeciga is right-handed or

21  left-handed?

22  A.  No, I don't.

23  Q.  Okay.

24          Was she wearing glasses?

25  A.  I don't recall.

FC45almH                          Hooper - cross

1    Q.  Okay.

2         Do you recall the color of the pen that was being

3    used?

4    A.  No, I do not.

5    Q.  Do you recall who handed Ms. Almeciga the pen to sign the

6    purported release --

7         THE COURT:  Whoa, whoa.  That assumes that someone

8    handed her a pen.

9         MR. K. LANDAU:  Pardon me.

10   Q.  Do you recall if she had used your pen, her pen, or

11   Mr. Livesey's pen?

12   A.  No, I don't recall.

13   Q.  Okay.

14        You indicated that you were putting away camera

15   equipment; is that correct?

16   A.  That's right.

17   Q.  And during the time of you putting the camera equipment

18   away, was your back to both Mr. Livesey and Ms. Almeciga?

19   A.  No, it was not.

20   Q.  It was facing them; is that correct?

21        THE COURT:  What was.  You mean he was facing them?

22   Q.  You were facing them?

23   A.  Yes.

24   Q.  The entire time?

25   A.  No, I don't recall if it was the entire time but I don't

FC45almH                         Hooper - cross

1     keep my back to people when I'm cleaning up equipment.

2     Q.  So, do you recall if Bruce had filled out any portion of

3     the release?

4     A.  I don't recall for sure but I think parts of the release

5     may have been filled out by Bruce.

6     Q.  I'm sorry.  You don't recall you said?

7           THE COURT:  He said he doesn't recall but he thinks

8     part of it may have been filled out by Bruce.

9           MR. BURKE:  Correct.

10    BY MR. K. LANDAU:

11    Q.  And you recall in your deposition of October 30th, 2015,

12    and I am reading verbatim the answer:

13    "A  I would assume that Erica did though Bruce may have filled

14    out part of it for her.  I don't recall."

15          THE COURT:  I think that's the same.

16    Q.  Okay.

17          And you also indicated during that same answer that

18    you did not stand over her, being Ms. Almeciga, while she did

19    it, and that you were collapsing the equipment and everything.

20          Do you recall having made those comments?

21    A.  Yes, I do.

22    Q.  You had referred to other -- I'm sorry.  Forgive me.  I

23    have a question.

24          MR. K. LANDAU:  Sure.

25          THE COURT:  So, I think you said you were standing

FC45almH                    Hooper - cross

1   about 10 feet away?

2            THE WITNESS:  Yeah.  I would have been kind of within

3   a 10-foot radius.

4            THE COURT:  And there was no conversation that you

5   recall; do I have that right?

6            MR. BURKE:  You mean at the time of the release

7   signing?

8            THE WITNESS:  You know --

9            THE COURT:  Go ahead.  Go ahead with what you were

10   about to say.

11            THE WITNESS:  Yes, there would have been casual

12   conversation going on for sure.

13            THE COURT:  So, how do you know that what Mr. Livesey

14   was handing her to sign was the release?

15            THE WITNESS:  Because it is something we make sure we

16   do either at the beginning or the end of an interview.  It is

17   one of the most important things besides recording the video

18   and audio, to make sure we get a signed release.  So, some of

19   that conversation could have been Bruce would say we should

20   have her sign the release now and any other casual -- she was

21   quite comfortable so we may have also had ongoing conversation

22   with Mr. Reta, about their correspondence that we just filmed,

23   the letters that he had written, the photographs.  Things like

24   that.  But I know that he gave her a release for her to sign

25   because that's one of the important parts of our job while we

FC45almH                          Hooper - cross

1    were in the field.

2              THE COURT:  All right.

3              Go ahead.

4    BY MR. BURKE:

5    Q.  There was additional handwriting and descriptive terms that

6    was noted on this release.  Do you recall that there was

7    additional writing on the release?

8              MR. BURKE:  Objection.  Vague.

9              MR. K. LANDAU:  I can rephrase.

10             THE COURT:  No.  I will allow it.  The objection is

11   overruled.

12             THE WITNESS:  Yes, I believe there was comments or a

13   description of her -- which is pretty common for our associate

14   producer for people who don't come in the field are responsible

15   for logging and basically importing this footage into the

16   computer which is common practice and so that people who are

17   familiar with individual people who have been interviewed for

18   our documentaries, so they can find them and confirm that these

19   are the people and that we have the releases, etc.

20   BY MR. K. LANDAU:

21   Q.  You said that this is common practice?

22   A.  Yes.  To take notes on releases, it can be, yes.

23   Q.  It can be or it is?

24   A.  It is.

25             THE COURT:  So, the comments of the sort you are just

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

FC45almH                          Hooper – cross

1   talking about that were on the release were put there by whom?

2              THE WITNESS:  One of our associate producers and I

3   can't be sure which one.  We had a handful of different people,

4   I think at least three people working on it, so it could have

5   been any of our associate producers who work in the other room.

6              THE COURT:  Well, what I'm getting at is if I

7   understood your testimony a minute ago, you saw her sign the

8   release that the given to her by Mr. Livesey, yes?

9              THE WITNESS:  Yes.

10              THE COURT:  And then at some point the release was

11   given to -- excuse me?

12              At some point.

13              THE WITNESS:  I was in the room.

14              THE COURT:  Yes.

15              At some point the release was given to you, yes?

16              THE WITNESS:  That's correct.

17              THE COURT:  Was that right after it was signed?

18              THE WITNESS:  Yeah, that would have been right after

19   it was signed.

20              THE COURT:  So when were these additional writings

21   added?

22              THE WITNESS:  Would have been back in the offices of

23   CIR.

24              THE COURT:  Okay.

25              THE WITNESS:  In the edit room.

FC45almH                         Hooper - cross

1   BY MR. K. LANDAU:

2   Q.  You indicated that during your deposition testimony that

3   you believe it was Rachel deLeon that had wrote the descriptive

4   language?

5   A.  Yes.

6   Q.  And that she apparently wrote this descriptive language six

7   to eight months after the interview?

8   A.  Yeah.  I can't be completely sure when she did it.

9   Q.  And she was not in Texas with you --

10  A.  No, she was not --

11          THE COURT:  I'm going to put you on hold just for one

12  minute, Mr. Hooper.  We will be right back.

13          I'm going to obviously let you ask whatever questions

14  you want but I have to say my own impression is that this

15  witness is, given the limited participation he had, is of not

16  as important as the witnesses who are outside.  So, I just --

17          MR. K. LANDAU:  He is.

18          THE COURT:  He is?

19          MR. K. LANDAU:  We are getting there.

20          THE COURT:  Okay.

21          MR. K. LANDAU:  We will get there.

22          THE COURT:  We are back.  Can you hear us?  Okay, we

23  are back.  Can you hear us now again?

24          THE WITNESS:  Yes, I can.

25          THE COURT:  Go ahead.

FC45almH                          Hooper - cross

1   BY MR. K. LANDAU:

2   Q.  You indicated that during your deposition testimony that

3   descriptive language is -- strike that.

4          You had been involved with producing stories for HBO

5   as well, correct?

6   A.  Yes, I have.

7   Q.  And you indicated that you had something like a hundred

8   releases signed; do you recall that?

9   A.  Yes.

10  Q.  Okay.

11          And do you recall that you had indicated that out of

12  the releases that were executed for HBO, not one of them

13  contained descriptive language?

14          MR. BURKE:  Objection.  Relevancy.

15  A.  No, I wouldn't have said that.

16  Q.  What would you have said then?

17          MR. BURKE:  Objection, again.  Relevancy.

18  A.  Well, what I said in response to -- what?  I'm sorry.

19          THE COURT:  I think --

20          MR. K. LANDAU:  I can rephrase.

21          THE COURT:  Yes.

22  BY MR. K. LANDAU:

23  Q.  How many -- roughly, how many releases that were executed

24  with your involvement with HBO, for instance, would have

25  contained handwriting, descriptive language similar to the one

FC45almH                          Hooper - cross

1   that appears on the CIR release?

2            MR. BURKE:  Objection.  Relevancy; and vague as to

3   time.

4            THE COURT:  The objection to relevancy is overruled.

5   It is a little vague but I will allow it and the witness can

6   give some parameters, if he wishes.

7            THE WITNESS:  Yeah.  Yeah, the HBO work was different

8   and, like, documentary work you work for different companies,

9   it is different work everywhere so I wasn't even part of the

10  post-production process for HBO.  So, once I got all these

11  releases signed they were then sent back to Los Angeles and if

12  there was any descriptive writing, that would have been done in

13  the edit room so that people who weren't in the field were able

14  to identify people on screen doing logging and transcribing

15  work, etc.  I wouldn't know about it because I didn't see those

16  releases after they --

17  Q.  So is to your knowledge there was no descriptive writing?

18           THE COURT:  No, no, no.  That's not a fair statement.

19  Q.  So you don't know whether there was or wasn't descriptive

20  writing?

21           THE COURT:  That's a fair statement.

22           THE WITNESS:  That's correct.

23  Q.  Traditionally, is the descriptive writing supposed to be

24  accurate?

25           THE COURT:  Wait a minute.  Now I think it is verging

FC45almH                    Hooper – cross

1    into relevancy because he doesn't have any knowledge of this.

2              MR. K. LANDAU:  I will rephrase.

3    BY MR. K. LANDAU:

4    Q.  The purpose of the descriptive writing is to be accurate as

5    to the subject being interviewed; is that correct?

6    A.  Yes.

7    Q.  Okay.

8              And with respect to the CIR release, is it your

9    testimony that that descriptive writing was, indeed, accurate?

10   A.  You have to rephrase that.  I don't think I follow.

11             THE COURT:  Don't understand the question, counsel,

12   because as I understand his testimony -- but let me make sure.

13             Mr. Hooper, let me make sure I understand your

14   testimony.  After the release was signed it was given to you

15   and you transferred it, along with a bunch of other releases,

16   to other people who may or may not have added descriptions to

17   various of the releases.

18             Do I have that much right?

19             THE WITNESS:  Yeah, that's right.

20             THE COURT:  And you understood that the reason that

21   was being done was so that the people at the other end could

22   identify which release corresponded to which person who had

23   been interviewed, yes?

24             THE WITNESS:  Correct, yes.  The description would

25   have to make sense to them.  That way, I would know who it was

FC45almH                         Hooper - cross

1   based on having met them and interviewed them.

2            THE COURT:  And you have no knowledge as to whether,

3   in any given case, the person making the writing, the

4   description writing, had an accurate basis for their

5   information or an inaccurate basis for their information or

6   anything else about it, true?

7            THE WITNESS:  Yeah.  I would know that they were

8   basing it on the frame which had the image of the subject so

9   they would be basing it on one -- one setup we call it, like

10  one head and shoulders shot of somebody.

11           THE COURT:  Right, so that if someone for example --

12           THE WITNESS:  On the day of the interview.

13           THE COURT:  So, if someone is in a frame and it was of

14  an African American but it turns out the person was really a

15  Latino, they might write down African American when in fact

16  that would not be accurate, true?

17           THE WITNESS:  Yes.  That could happen.

18           THE COURT:  Okay.

19  BY MR. K. LANDAU:

20  Q.  Mr. Hooper, do you recall who crossed out the August 14th

21  date on the release and changed it to August 15th?

22  A.  No, I don't.

23  Q.  Do you recall having interviewed a gentleman from Laredo?

24  A.  Yes.  I have interviewed a couple of people in Laredo.

25  Q.  Okay.

FC45almH                          Hooper - cross

1          This person in particular was -- his identity was

2     concealed?  Do you recall?

3     A.  You would have to be more specific.

4     Q.  Okay.

5          Well, during your deposition had advised that there

6     was a gentleman you had interviewed in Nuevo Laredo, Mexico?

7     A.  That could be spate from Laredo, but yeah.  Yes.

8          I interviewed a bunch of people in Laredo and Nuevo

9     Laredo.

10    Q.  I'm sorry.  What was the last part?

11         MR. BURKE:  People in Laredo and in Mexico.

12         THE COURT:  Yes.

13         MR. K. LANDAU:  Oh, okay.

14    Q.  And you indicated during your deposition that he did not

15    sign a release because you did not ask him to sign one?

16    A.  I indicated that he was someone who did not want his

17    identity known not only to the people who might see the

18    documentary but to me, and so he was someone whose identity I

19    was not willing to even acknowledge myself so I did not ask him

20    for a release.

21    Q.  Okay.

22    A.  He was a young man who was a shadow in the documentary.

23    Q.  During the interview was he facing the camera?

24    A.  Yes, he was.

25    Q.  You indicated that during post-production when you are

FC45almH                    Hooper - cross

1   editing it is when you apply the shadow or the fogging or some

2   type of concealing of a person's identity?

3             MR. BURKE:  Objection.  Misstates his testimony.

4             THE COURT:  Well, in addition, there shouldn't be any

5   reference to deposition testimony unless it's inconsistent with

6   something he is saying here.  So, if you want to know --

7             MR. K. LANDAU:  I can rephrase.

8             THE COURT:  Yes.

9             MR. K. LANDAU:  Absolutely.

10  BY MR. K. LANDAU:

11  Q.  The shadowing or fogging or general concealing of a

12  person's identity --

13  A.  This is a matter for filmmakers.

14  Q.  Can I just finish the question?  Sir, can I finish the

15  question and then you can answer?

16  A.  Okay.

17  Q.  Is it true -- we will make it easy.

18            Is it true that shadowing or fogging or concealing a

19  person's identity takes place during the editing process or the

20  post-production process?  Yes or no.

21  A.  It is a matter of preference for filmmakers like myself and

22  I think a lot of filmmakers prefer to do it during production

23  because it looks much more dramatic and stylized, where if you

24  do it afterwards it just kind of looks pixelated so it is kind

25  of taking away from part of my craft because I'm a videographer

FC45almH                    Hooper - cross

and cinematographer.  So, that is not true.  So, the young man

in Nuevo Laredo we did the shadowing in the field in the

apartment where we interviewed him using lights --

THE COURT:  Could you repeat the very last thing you

said because our court reporter had trouble picking it up.

THE WITNESS:  We use lights to create a silhouette of

the subject so they're in shadow.  We might use a light behind

them.  Lights behind them and none front.  A black silhouette.

THE COURT:  Okay.

Q.  Okay.  Sir, I'm going to look for the point in the

deposition where it is different from your testimony, so give

me a moment.

THE COURT:  Well, maybe it is and maybe it isn't.

Counsel, maybe I should have made this clear.  Since

both sides already have depositions, if that becomes critical

to some issue in this case the -- of course in your written

summations you can draw my attention to that but I am not so

much concerned in this hearing with the question of, though I

know it is important to the litigation, of shadowing, lack of

shadowing, practices, non-practices, and so forth.  My focus at

this hearing is much more on the release and you have had a

deposition on other issues and they are perfectly relevant but

I just want to narrow the framework a little bit.

MR. K. LANDAU:  And I will be very quick.

THE COURT:  Okay.

FC45almH                         Hooper - cross

1          MR. K. LANDAU:  Just a few more questions and then I'm

2     done.

3          THE COURT:  Go ahead.

4          MR. K. LANDAU:  So, your Honor, off the record real

5     quick?

6          Do you prefer we skip over that series of questions?

7          THE COURT:  Fine.

8          MR. K. LANDAU:  Back on.

9     BY MR. K. LANDAU:

10    Q.  Mr. Hooper, you indicated -- strike that.

11         You had interviewed a detective Robert Garcia, I

12    believe is his name?  Is that correct?  Did I get his name

13    correct?

14    A.  Yes.  That is correct.

15         And you had concealed his face but released his name,

16    is that correct?

17    A.  That's correct.

18    Q.  Did you have a written contract to do so?

19    A.  He signed a release form.

20    Q.  He signed a release.

21         But did you have a separate written contract that

22    stipulated to concealing his identity but releasing his name?

23    Or was that just an oral agreement that you guys had?

24    A.  No.

25    Q.  Was that just an oral agreement?

FC45almH                        Hooper - cross

A.  Yes, that was an agreement that he was not going to --

Q.  So it was an oral agreement, correct, not in writing?

A.  He tells me he does not want his face to be seen so he
can't be identified physically but he is okay releasing his
name and profession, etc.

Q.  And just for clarification, there was no nothing in writing
that was executed between the two of you, that was just simply
something that you discussed and you agreed possible, correct,
other than the release?

A.  That's correct.

Q.  Was there any descriptive handwriting, written, anything on
the release that would have suggested it?

        THE COURT:  No, no, no.  I can read the release for
myself.

        MR. K. LANDAU:  Okay.

        THE COURT:  I understand your point.

        MR. K. LANDAU:  All right.  No further questions.
Thank you.

        THE COURT:  Anything else?

        MR. BURKE:  No, your Honor.

        THE COURT:  So, Mr. Hooper, thank you very much.  I'm
sure, I don't know what time it is there, but I will bet it is
not your normal waking hours, so thank you so much for making
yourself available and we will terminate the conversation now.

        THE WITNESS:  Thank you.

FC45almH                          Livesey - direct

1           THE COURT:  Bye-bye.

2           (phone testimony concluded)

3           THE COURT:  Let's call the next witness who is?

4           MS. SCHARY:  Mr. Livesey.

5           THE COURT:  While Mr. Livesey is taking the stand, do

6    we have the original releases?

7           MS. SCHARY:  I have them right here and can

8    authenticate them with the witness.

9           Would you like me to bring them up?

10          THE COURT:  Yes, please.

11    BRUCE ROBERT LIVESEY,

12         called as a witness by the Defendant,

13         having been duly sworn, testified as follows:

14    DIRECT EXAMINATION

15    BY MS. SCHARY:

16    Q.  Good afternoon, Mr. Livesey.  Can you please tell me what

17    your occupation is?

18    A.  I'm a journalist and television producer.

19    Q.  How long have you worked as a journalist?

20    A.  For more than 30 years.

21    Q.  Are you currently employed full time with a news

22    organization?

23    A.  Yes.  I work for an online newspaper called The National

24    Observer.

25    Q.  During your career as a journalist, how many different

FC45almH                        Livesey - direct

1   articles would you estimate that you personally authored?

2   A.   There are hundreds.

3   Q.   Have you authored any books?

4   A.   Yes.   I wrote a book about financial fraud in Canada's

5   financial district called "Thieves of Bay Street."  It was

6   about financial fraud in Canada's financial industry.  It was

7   published by Random House.

8   Q.   I would like to show you what was previously marked as

9   Exhibit 43 for identification.

10           If I could approach the witness?

11           THE COURT:  Yes.   This is Defendant's Exhibit 43?

12           MS. SCHARY:  Yes.

13   Q.   Did you prepare this document?

14   A.   Yes.

15   Q.   What is it?

16           THE COURT:  It is not admissible, that's what it is,

17   and I don't really want to waste time on these kinds of

18   background stuff.

19           MS. SCHARY:  Okay.  We will move on then.

20           THE COURT:  Well, let me take the liberty of asking

21   some questions.

22           MS. SCHARY:  Sure.

23           THE COURT:  Do you know the plaintiff here,

24   Ms. Almeciga?

25           THE WITNESS:  Yes.

FC45almH                              Livesey – direct

1              THE COURT:  How did you first meet her?

2              THE WITNESS:  She contacted me by phone in February of

3    2012.

4              THE COURT:  And what did she say and what did you say?

5              THE WITNESS:  She introduced herself as the wife of

6    Mr. Rosalio Reta, and the upshot of the conversation was that

7    she was asking if I might be interested in doing a second

8    interview with Mr. Reta.

9              THE COURT:  Did there come a time when there was a

10   filmed interview of her?

11             THE WITNESS:  Yes.

12             THE COURT:  And what was your role in that?

13             THE WITNESS:  I conducted -- I ran and conducted the

14   interview.

15             THE COURT:  And what do you want to mark the release

16   as?

17             MS. SCHARY:  We are going to mark the release of

18   Ms. Almeciga as Defendant's Exhibit 2 as it was previously

19   marked.

20             THE COURT:  I will give the original to the witness

21   and if you can give me a copy?

22             MS. SCHARY:  No problem.

23             THE COURT:  Let me show you Defendant's Exhibit 2 for

24   identification; is that the release you are referring to?

25             MR. K. LANDAU:  Your Honor --

FC45almH                          Livesey - direct

1          THE COURT:  I'm sorry?

2          MR. K. LANDAU:  I'm sorry.  I would just like to state

3     an objection for the record.

4          First off, we have never, to this date, seen the

5     original.  I was advised a few days ago that an original is in

6     the possession of defense counsel now.  I don't know, we

7     haven't seen it, but the copy that was originally received has

8     black ink, blue ink, and it is much easier to distinguish

9     between several different people's handwritings.  It looks as

10    if this -- we don't have any authentication purposes as to it

11    being true and accurate.

12         THE COURT:  Well, I'm sorry, it is going to be

13    received.

14         MR. K. LANDAU:  Sure.

15         THE COURT:  But, just you will want to take a look at

16    it which you are more than welcome to, we will take a very

17    short break right before 2:00 and you can look at it then but,

18    just for the record, because I think the point you make is

19    relevant, it appears to be entirely in blue ink except for

20    the -- that is to say the handwritten portions of it, except

21    for the comments, the description of comments that we were

22    referring to in a previous witness' testimony that begins with

23    the word "Latina female."  And that latter part is in black

24    ink.

25         All right.  So, let's go back a step.  Were you

FC45almH                        Livesey - direct

1    present when this document was signed?

2                THE WITNESS:  Yes.

3                THE COURT:  And was that before or after you had

4    filmed Ms. Almeciga?

5                THE WITNESS:  It was afterwards.

6                THE COURT:  Immediately after?

7                THE WITNESS:  Yes.

8                THE COURT:  Tell us what happened.

9                THE WITNESS:  So, we did an interview with her in a

10   motel room in Woodville, this was in August of 2012.  We

11   conducted the interview and afterwards we presented this

12   release to her and asked her to sign it, and she signed it.

13               THE COURT:  And when you say we presented it, who

14   presented it?

15               THE WITNESS:  Well, I presented it -- I was working

16   with Josiah Hooper who was the cameraman on this particular

17   shoot.

18               THE COURT:  Well, physically, where were you when she

19   signed the release?

20               THE WITNESS:  We were in the small room where we

21   conducted the interview so we had her sign it there.

22               THE COURT:  And who handed her the release?

23               THE WITNESS:  I did.

24               THE COURT:  And what, if anything, did you say?

25               THE WITNESS:  I said here is a release for the

FC45almH                          Livesey - direct

1    interview.  And there wasn't much discussion about it.  She

2    signed it.

3              THE COURT:  And did you say anything about the

4    release?

5              THE WITNESS:  Not really.  My -- I mean she didn't ask

6    any questions about it.  It's -- the writing indicates that we

7    have permission to use her interview --

8              THE COURT:  No, I know what it says.  I am asking what

9    you said to her, if anything.

10             THE WITNESS:  I think it was more -- because

11   usually -- usually when releases like this are signed there is

12   not much discussion.  It is sort of understood this is a

13   formality.

14             THE COURT:  Well, that may be but my question is -- if

15   you don't remember, you don't remember.

16             THE WITNESS:  Right.

17             THE COURT:  But, if you do remember, what, if

18   anything, did you say other than here is a release, please

19   sign, or words to that effect.

20             THE WITNESS:  I don't recall any other conversation,

21   your Honor.

22             THE COURT:  And do you have a recollection whether she

23   read it?

24             THE WITNESS:  No.  Right now, no, I don't.

25             THE COURT:  Is it your best recollection that she

FC45almH                          Livesey - direct

 1    signed it more or less immediately?

 2                THE WITNESS:  Yes.

 3                THE COURT:  And what did you then do with it?

 4                THE WITNESS:  I gave it to Josiah Hooper.

 5                THE COURT:  Okay.

 6                And was that the last time you saw it?

 7                THE WITNESS:  Yes.

 8                THE COURT:  All right.

 9                Separate and apart from the release, did you have any

10    conversation with her at any time about concealing her

11    identity, not using her name or anything like that?

12                THE WITNESS:  No.  I mean there was a conversation

13    where -- with her two years later after the story had been

14    broadcast but not at that time.

15                THE COURT:  I mean at the time.

16                THE WITNESS:  At the time, no.

17                THE COURT:  All right.

18                All right, counsel.  Anything else?

19    BY MS. SCHARY:

20    Q.  Mr. Livesey, have you ever seen Ms. Almeciga's signature

21    before she signed the release?

22    A.  No.

23    Q.  Never met her before?

24    A.  No.

25    Q.  Ever seen her again until today?

FC45almH                          Livesey - direct

1   A.  No.

2   Q.  When you were in Texas did you also interview Mr. Reta?

3   A.  Yes.

4   Q.  Where did you do that interview?

5   A.  At the prison near Woodville.

6   Q.  And did Mr. Reta sign a written release in connection with

7   his interview with you?

8   A.  Yes.

9   Q.  And I would like to --

10          THE COURT:  I'm sorry.  Before you got to that.

11          MS. SCHARY:  Oh sure.

12          THE COURT:  Counsel, my fault.

13          Going back to the release for Ms. Almeciga, the

14   information that's there other than her signature, was that

15   filled out by her, by you, by some third-party?

16          THE WITNESS:  I filled out the top.  I filled out

17   where it says "print name" and the date.  The signature and

18   address was filled out by her.

19          THE COURT:  So, under "person appearing" you wrote

20   Eryca spelled E-R-Y-C-A?

21          THE WITNESS:  Uh-huh.

22          THE COURT:  And under the print name at the bottom you

23   had Erica spelled E-R-I-C-A.

24          THE WITNESS:  Yes.

25          THE COURT:  How come?

FC45almH                        Livesey - direct

          THE WITNESS:  I must have had a mental confusion.  I
would have filled this out before -- yeah.  I must have just
simply got confused about how Erica was spelled.

          THE COURT:  How did you know how she spelled it either
way?

          THE WITNESS:  I might have -- possibly, again, I have
to recall.  In our e-mail exchanges I would have seen how it's
spelled.

          THE COURT:  And, by the way, it was a hyphenated name
Almeciga-Reta; did she say she was married to Mr. Reta?

          THE WITNESS:  She indicated that she was the wife of
Mr. Reta.  I -- yeah.

          THE COURT:  Ms. Almeciga, how do you spell your first
name?

          PLAINTIFF:  E-R-I-C-A.

          THE COURT:  So it is an I, not a Y?

          PLAINTIFF:  Correct.

          THE COURT:  Go ahead.

BY MS. SCHARY:

Q.  Mr. Livesey, you had just mentioned a conversation after
the report was published that you had with Ms. Almeciga.  Can
you describe that conversation?

A.  Sorry.  Say that again?

Q.  In your testimony just now you mentioned that the only time
that you spoke with Ms. Almeciga, the only time she had raised

FC45almH                          Livesey - direct

1   a concern was after this was published.  Do you recall when

2   that conversation took place?

3   A.  I think this was in June of 2014.

4   Q.  And do you recall -- and can you tell the Court what people

5   said in that conversation?

6   A.  So, she contacted me and I called her as a result of her

7   e-mailing me and the conversation was that she was upset that

8   the story from the previous year had used her face without it

9   being covered and that this had become a problem for her

10  because she was in the middle of a custody battle with one of

11  her former partners of over one of her children and she

12  appeared to be using the fact that he had this relationship

13  with Mr. Reta as, I guess, ammunition in the custody battle

14  because of his notoriety as a former hitman.  And so this was

15  my impression -- what she indicated -- with why she was upset.

16  Q.  Is this the first time she raised this concern about seeing

17  her face in the CIR Report to you?

18  A.  To me, yes.

19  Q.  Okay.

20         And what would you have done at the time if

21  Ms. Almeciga had told you that she wanted her identity to be

22  concealed in the final video?

23         THE COURT:  Hypothetical sustained.

24         MS. SCHARY:  You can answer.

25         THE COURT:  No.  No, he can't.

FC45almH                         Livesey - direct

1              MS. SCHARY:  Oh.

2              THE COURT:  This is not a deposition.

3              MS. SCHARY:  I thought you said -- okay.

4    BY MS. SCHARY:

5    Q.  Ms. Almeciga did not ask you to blur her face, correct?

6    A.  No.

7    Q.  When you, in the past, have you interviewed subjects who

8    have asked for their faces to be concealed in an interview?

9    A.  Yes.

10   Q.  And what do you do in that situation?

11   A.  We do it.

12   Q.  And how do you do it?

13   A.  There is two ways to do it.  One, you should be interviewed

14   normally but then in post-production you blur it out; or the

15   sort of preferable way is you light the actual interview where

16   the subject is in the dark so they can't be identifiable.

17   Q.  And in this interview was the subject interviewed in any

18   sort of special light like you just described?

19   A.  No.

20   Q.  We have discussed before that you had also interviewed

21   Mr. Reta while he was in the prison.  Did Mr. Reta sign any

22   release in connection with his interview?

23   A.  Yes.

24              THE COURT:  Let me hand you --

25              What are you marking this one as?

FC45almH                         Livesey - direct

1              MS. SCHARY:  This one is Defendant's Exhibit 33.

2              THE COURT:  Do you have a copy for the Court?

3    BY MS. SCHARY:

4    Q.  Mr. Livesey, can you take a look at the document just

5    handed to you by the Court?

6    A.  Uh-huh.

7    Q.  Can you recognize this document?

8    A.  Yes.

9    Q.  What is it?

10   A.  This is the release of Mr. Reta.

11   Q.  Just for the record, are you looking at the original right

12   now?

13   A.  Yes.

14   Q.  May I ask the Court to provide the copy as well so you can

15   compare?

16             THE COURT:  Well, I have just compared it.  It is a

17   good copy.

18             MS. SCHARY:  Thank you, your Honor.

19             THE COURT:  But of course, again, over the break we

20   will let plaintiff's counsel take a look at the original.  It

21   is the same situation with respect to the color of ink.

22             Go ahead.

23   BY MS. SCHARY:

24   Q.  Did you fill out any of the information on this release?

25   A.  Yes.  I filled out everything with the exception of

FC45almH                    Livesey - cross

1   signature.

2   Q.  Did you write the --

3   A.  Oh, sorry.  With the exception also, there is some written

4   handwriting at the bottom which I did not fill out.

5   Q.  Just for clarification, is the handwriting at the bottom a

6   description of the witness?

7   A.  Yes.

8   Q.  Thank you.

9           No further questions.

10          THE COURT:  Okay.  Cross-examination.

11  CROSS EXAMINATION

12  BY MR. K. LANDAU:

13  Q.  Mr. Livesey, good afternoon, sir.

14  A.  Good afternoon.

15  Q.  You have been a journalist for how many years now?

16  A.  More than 30.

17  Q.  And you have given, I would suspect, numerous releases to

18  numerous subjects; is that correct?

19  A.  Yes.  I mean, because I work in Canada and largely for

20  Canadian television outlets we don't require releases.  It is

21  only when we are working for American programs that we might,

22  so.

23  Q.  Okay.

24          And have you worked for several American programs?

25  A.  I have worked for -- I worked for a production company in

FC45almH                          Livesey – cross

1    Toronto that produced a TV series for American network and I

2    worked, in this case, with the CIR.

3    Q.   And what is the purpose of a release?

4    A.   The purpose of a release is basically it's legal permission

5    given by the subject that we can use the interview or content

6    of information they've given us as we feel suitable.

7    Q.   So it is a legally binding document?

8    A.   Yes.  As far as I understand, yes.

9    Q.   Okay.

10            Do you recall how long Mr. Reta was in prison for

11   prior to this interview?

12   A.   Approximately six years.

13   Q.   Do you recall when Erica suggested that she was married to

14   Mr. Reta?

15   A.   It was in February of 2012.

16   Q.   So he was in prison during that time?

17   A.   Yes.

18   Q.   Okay.

19            Did you obtain any type of marriage certificate to

20   verify the accuracy of those statements?

21   A.   No.

22   Q.   Did you do any independent investigation to verify the

23   accuracy of whether or not she was indeed married to Mr. Reta?

24   A.   No.

25   Q.   Did you look at her license?

FC45almH                          Livesey - cross

1  A.  No.

2  Q.  You didn't.  Okay.

3          You indicated this afternoon that you had a mind --

4  whatever -- and you made some type of hand gesture when you

5  were spelling her name both at the top and the bottom which are

6  clearly different.  Do you recall having stated that?

7  A.  Yes.

8  Q.  With a gentleman of your experience, you didn't think that

9  it was important to ensure that the accuracy of the actual

10 signature was correct?

11         THE COURT:  Sustained.

12         MR. K. LANDAU:  Okay.  I can rephrase.

13         THE COURT:  No, no, no.  Don't bother.

14         MR. K. LANDAU:  Okay.

15         THE COURT:  It is not sufficiently material.

16         MR. K. LANDAU:  Okay.

17         THE COURT:  For today's purposes.

18         Everything that you want to inquire into may be

19 material for if the case goes to trial or to summary judgment

20 or anything else but I'm trying to keep the focus fairly narrow

21 for today.

22         MR. K. LANDAU:  Sure.

23 BY MR. K. LANDAU:

24 Q.  With respect to signature itself -- strike that.

25         THE COURT:  I have a question.

FC45almH                          Livesey - cross

1              MR. K. LANDAU:  Okay.

2              THE COURT:  Did you fill in -- let's start with the

3      information at the top.  Did you fill in that information

4      before you gave it to her to sign?

5              THE WITNESS:  Yes.

6              THE COURT:  Now, with respect to the information at

7      the bottom, by which I mean the "print name," the address, and

8      the date, just those three lines, are all these of those your

9      hand printing?

10             THE WITNESS:  I filled in where it says "print name"

11     and I filled in the date.  The signature and address she filled

12     in.

13             THE COURT:  Okay.

14             And did you fill in that "print name" and that date

15     before or after she signed?

16             THE WITNESS:  Before, I believe.

17             THE COURT:  So, essentially you filled in the name,

18     you didn't have the address so you asked her to fill in the

19     address and also to sign it.  Do I have that right?

20             THE WITNESS:  Yes.

21             THE COURT:  All right.

22             Go ahead, counsel.

23     BY MR. K. LANDAU:

24     Q.  Mr. Livesey, it is your testimony you did not have the

25     address prior to the interview?

FC45almH                         Livesey - cross

1    A.  Well, I had -- months earlier -- I happened to be passing

2    through Atlanta and she asked for a copy of the DVD of the

3    original story, the first interview being done with Mr. Reta.

4    Q.  So you did know where Ms. Almeciga lived?

5    A.  I didn't know -- at some point her address, yes, months

6    earlier.

7             THE COURT:  What I understood you to mean, and correct

8    me if I have it wrong, is that at the moment you were giving

9    her this release you didn't remember --

10            THE WITNESS:  No.

11            THE COURT:   -- what her exact address was.

12            THE WITNESS:  No.

13            THE COURT:  So you asked her to fill it in.

14            THE WITNESS:  Yes.

15            THE COURT:  All right.

16   BY MR. K. LANDAU:

17   Q.  You indicated earlier today in your testimony that

18   Ms. Almeciga didn't raise concerns until I think you indicated

19   2014 about her identity being revealed?

20   A.  Yes.

21   Q.  During your deposition you indicated that it was in 2013

22   that she raised those concerns?

23   A.  At the time of the deposition I was a little bit confused

24   about when various stories had run.  A lot of time had

25   transpired but it has since come to my attention since we have

FC45almH                         Livesey - cross

1    been doing this case that it was in fact -- it was in June of

2    2014.

3    Q.   How has it come to your attention?

4    A.   Well, the e-mails that I sent to CIR indicating that she

5    had these concerns relevant from that time period.

6              So, there is an e-mail --

7    Q.   So you are changing your testimony from your deposition?

8              THE COURT:   Sustained.

9    Q.   The date on the release was changed from August 14th to the

10   15th.  Are you the individual that crossed that out and changed

11   the date?

12   A.   Yes.

13   Q.   And why was that?

14   A.   I got the date wrong in my first writing it.

15   Q.   Well, you wrote that before or after the interview?

16   A.   I can't remember.  It was a long time ago.  I mean, you are

17   asking me if I remember that in fact it was the 15th or the

18   14th and whether at what point I remember?  I can't remember.

19   Q.   Out of curiosity, why do you fill out the -- let's start

20   with the top, why do you fill out the top portions?

21   A.   Because it is more practical.

22   Q.   What, for time?  It saves seconds?  Or is it just for

23   accuracy?

24             MR. BURKE:   Objection.

25   A.   Well, for both.  They don't necessarily -- might not

FC45almH                    Livesey - cross

1  remember the date or if they do it is more practical.  More for

2  time.

3  Q.  And how about the bottom, though?  Why do you do that for

4  the bottom?

5  A.  Again, I fill out the things that, you know, like such as

6  the name and the date which I know so there is no debate about

7  it.

8  Q.  Okay.  Is it your testimony that you have never seen Erica

9  sign her name prior to this date?

10  A.  That's correct.

11  Q.  And you weren't concerned that it was a different spelling

12  than what you would have otherwise seen through e-mail or just

13  on the release itself?

14  A.  No.

15  Q.  You weren't concerned about that?

16  A.  I'm not quite sure what you are asking.

17  Q.  Well, it is evident that the signature is spelled

18  E-R-Y-C-A?

19  A.  Yes.

20  Q.  Yet what you printed is E-R-I-C-A.  And you didn't feel

21  that that was important?

22            THE COURT:  No.  I think that's a misleading question

23  because the way it is spelled at the top is E-R-Y-C-A which I

24  think the witness indicated he got from an e-mail or something

25  like that?

FC45almH                    Livesey - cross

1              THE WITNESS:  Yes, possibly.

2              THE COURT:  And that corresponds to the signature.

3              MR. K. LANDAU:  But --

4              THE COURT:  Right, he --

5              MR. K. LANDAU:  He must have also gotten E-R-I-C-A

6     from an e-mail as well.

7              MR. BURKE:  Objection.  Speculation.

8              THE WITNESS:  Listen.  I can't remember why.  Again,

9     it was just --

10             THE COURT:  I'm going to rephrase it.

11             Let's talk about timing.  The lines at the top would

12    have been filled out moments before, hours before, days before?

13             THE WITNESS:  Moments before.

14             THE COURT:  Moments before.

15             So, you didn't fill out the top until after the

16    shooting?

17             THE WITNESS:  Yes.  My recollection was that -- so,

18    we -- that's usually -- yes.  I filled it out after we finished

19    the interview.

20             THE COURT:  The two lines on the bottom that you

21    filled out, the "print name" and the date were filled out at

22    the same time as you filled out the top?

23             THE WITNESS:  I believe so, yes.

24             THE COURT:  All right.

25             And both of these were done before she signed?

FC45almH                        Livesey - cross

1                  THE WITNESS:  I believe so, yes.  Yeah.

2                  THE COURT:  Okay.

3                  Go ahead, counsel.

4    BY MR. K. LANDAU:

5    Q.  Why would you wait until after the interview to have

6    Ms. Almeciga purportedly sign a release?

7    A.  Again, sort of common industry practice that you do that.

8    And it is usually you have a bit more time, these formalities

9    that you are going through.  The cameraman is usually taking

10   his equipment down so you deal with these sort of you might

11   call them bureaucratic things afterwards.  It is just a little

12   more practical.

13   Q.  Do you recall having emailed, I believe it was Mr. Reta, as

14   to the fact that it is difficult to get anyone on camera given

15   this dangerous subject matter?

16   A.  I don't recall specifically a date but I might have

17   indicated that, yes.

18   Q.  And if it is difficult to get anyone on camera, given this

19   dangerous subject matter, then why would you wait until after

20   the interview to get a release?

21   A.  I'm not quite sure I'm following your logic.

22   Q.  Well, wouldn't it be more practical to ensure that the

23   subject is fully aware of whatever it is that this release

24   states prior to them giving any information as opposed to after

25   they already give it?

FC45almH                          Livesey - cross

1              MR. BURKE:  Objection.  Argumentative.

2              THE COURT:  Well --

3              THE WITNESS:  I --

4              THE COURT:  Excuse me.  Excuse me.  Not necessarily on

5    those grounds but on grounds that it calls for a hypothetical

6    and asks his opinion about a hypothetical, the objection is

7    sustained.

8              I do raise, for benefit of both counsel, an issue that

9    I do not want questioning on today at any rate because it is

10   not within the time scope of this hearing, but I have a

11   question in my mind as to whether this is an enforceable

12   release contract.  As I understand it, it is a form that is

13   presented after the fact to the person so they're not -- their

14   agreement is not being sought before they do the filming, it is

15   not explained to them.  It is, at least in this case according

16   to the witnesses' testimony, signed essentially immediately so

17   basically a "sign here" kind of situation.  It's not clear to

18   me that there is any consideration.

19             I raise these as questions and we will have to have it

20   addressed -- not now -- maybe we will include that in the final

21   briefing that we have after the hearing is over.

22             But, go ahead.  Any other questions for this witness?

23             MR. K. LANDAU:  No, your Honor.  Thank you.

24             THE COURT:  Anything else?

25             MS. SCHARY:  I have one, very briefly.

FC45almH                    Livesey - redirect

1              THE COURT:  Yes.

2    REDIRECT EXAMINATION

3    BY MS. SCHARY:

4    Q.  Mr. Livesey, Mr. Landau was asking you about the spelling

5    of plaintiff's name.  I would like to offer to show you what's

6    been marked for identification as Defendant's Exhibit 51.

7              Mr. Livesey, can you identify the document for me?

8    A.  I don't have it.

9    Q.  Sorry.  I thought you were giving it to the witness.

10             Here you go.  Can you please identify the document for

11   the Court?

12   A.  This seems to be a correspondence between me and

13   Ms. Almeciga.

14   Q.  And how -- I am just going to direct your attention to the

15   portion of the e-mail dated Friday, February 8, 2013, 10:26

16   a.m.  Can you tell the Court what the signature by the person

17   sending that e-mail is?

18   A.  It's -- you mean where it says from?

19   Q.  I am directing you to "thanks."

20   A.  You mean it says Eryca Reta.

21   Q.  How is Erica spelled?

22   A.  With a Y.

23             MS. SCHARY:  Thank you.  No further questions.

24             THE COURT:  Are you offering this?

25             MS. SCHARY:  I am offering it into evidence, yes.

FC45almH                         Livesey - redirect

1          THE COURT:  Any objection?

2          MR. K. LANDAU:  No objection.

3          THE COURT:  Received.

4          (Defendant's Exhibit 51 received in evidence)

5          MR. K. LANDAU:  Your Honor, in the interest of time

6    with summation, we will provide correspondence that reflects

7    Ms. Almeciga's name being spelled with an I as well.

8          THE COURT:  Okay.

9          Thank you so much.  You may step down.  Thank you.

10         (Witness excused)

11         MR. BURKE:  Your Honor, as a housekeeping matter,

12   should we do Mr. Talbot now or wait until --

13         THE COURT:  I think we will have to wait.

14         Has the expert arrived?

15         MR. K. LANDAU:  I believe so, your Honor.  Yes.

16         THE COURT:  Is she in the courtroom or in the witness

17   room?

18         MR. K. LANDAU:  No, outside.

19         THE COURT:  She's in the witness room.  Very good.

20         So, this is the only break we are going to have a

21   chance to take between now and 4:30 so make good use of it.  I

22   will ask defense counsel to not only retrieve the exhibits from

23   the previous witness but also to show plaintiff's counsel the

24   originals of the two documents.

25         Very good, we will see you at 2:00.

FC45almH                          Livesey – redirect

1                 (Recess)

2                 THE COURT:  Let's call the next witness.

3                 MR. K. LANDAU:  Thank you, your Honor.

4                 Going out of order --

5                 THE COURT:  Yes.

6                 MR. K. LANDAU:   -- per the schedule, plaintiff would

7        like to call Ms. Wendy Carlson, our expert, to the stand.

8                 THE COURT:  Ms. Carlson?

9                 Someone should take the exhibits from the previous

10       witness.

11        WENDY CARLSON,

12            called as a witness by the Plaintiff,

13            having been duly sworn, testified as follows:

14                THE COURT:  So, Ms. Carlson, thank you for making

15       yourself available, I think you came in from Colorado?

16                THE WITNESS:  Texas.

17                THE COURT:  I have a few questions.  This is, just so

18       you know, the hearing, this is a double-hearing where both the

19       defendants have brought a sanctions motion against the

20       plaintiff that doesn't particularly relate to you other than

21       very peripherally and no one has made any accusations of

22       misconduct with respect to you in any respect, but it is also a

23       Daubert hearing --

24                THE WITNESS:  Okay.

25                THE COURT:  -- because there has been a challenge to

FC45almH                          Livesey - redirect

1     the admissibility of your testimony, and so let me put some

2     basic questions and then I will turn it over to counsel.

3               Who are you?

4               THE WITNESS:  My name is Wendy Carlson.

5     C-A-R-L-S-O-N.

6               THE COURT:  So, tell us a little bit about your

7     background.

8               THE WITNESS:  Where would you like me to begin?

9               THE COURT:  Well, I guess with your basic education

10    before your education in this field.

11              THE WITNESS:  Okay.  I graduated high school in

12    Arvada, Colorado, from there I received my cosmetology license.

13    I also, from that point, went into the field of law and was a

14    receptionist promoted to legal secretary/legal assistant in a

15    handful of law firms in Denver, Colorado.  And, at probably

16    about 10 years into that, I then decided to attend the School

17    of the International -- or the International School of Forensic

18    Document Examination, and that was a two-year apprenticeship

19    and that's where I began doing this.

20              THE COURT:  And approximately when was that?

21              THE WITNESS:  I beg your pardon?

22              THE COURT:  Approximately when was it that you

23    graduated from that?

24              THE WITNESS:  I graduated in 2009.

25              THE COURT:  And you have been working as a document

FC45almH                          Livesey - redirect

1   examiner ever since?

2             THE WITNESS:  Yes, I have.  And I actually was court

3   qualified for the first time in 2008 while I was attending

4   school.

5             THE COURT:  So, do you have your report in front of

6   you?

7             THE WITNESS:  I have it with me, yes.

8             THE COURT:  So why don't you pull that out.

9             So, you were asked to make a comparison between which

10  documents?

11            THE WITNESS:  I was originally asked to make a

12  comparison between the Erica Almeciga-Reta signature on a

13  release and -- if I can look at the title of that I can tell

14  you better -- a standard appearance release with a signature of

15  Erica Almeciga-Reta, and I was asked to compare that to

16  signatures that were submitted to me as purported known

17  signatures and those included five pages of multiple signatures

18  and handwriting.  And subsequently I was asked to do a further

19  comparison on some signatures that apparently have been

20  entitled or described as Georgia documents.

21            MS. SCHARY:  Objection.  This was not included in the

22  witness' submitted report about the Georgia documents.

23            THE COURT:  That's true, and therefore it may not be

24  admissible at trial, but for today's more limited purposes I

25  will allow it to be discussed, fully preserving any objections

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

FC45almH                          Livesey - redirect

1   to its admissibility at trial if there is a trial in this case.

2         But let me go to the first part of the comparison, the

3   comparison between the release and the signatures, the "known

4   signatures" you were provided.  Who provided these materials to

5   you?

6         THE WITNESS:  Mr. Landau; I don't remember if it was

7   specifically Zach or Kevin.

8         THE COURT:  Someone from the plaintiff's law firm?

9         THE WITNESS:  Yes.

10        THE COURT:  And did they tell you that there had been

11  a previous expert who had been retained to make the same

12  comparison?

13        THE WITNESS:  I do have some memory of that, that

14  there was a previous expert.  But I don't know what -- to what

15  extent he worked on this.

16        THE COURT:  And would it have been relevant to you to

17  know what the previous expert had done?  Or was it something

18  that you preferred to be shielded from?

19        THE WITNESS:  Specifically, I prefer not to see

20  another person's report unless I'm actually doing a peer

21  review.  If I am doing an individual examination I would just

22  prefer to do that with my own information.

23        THE COURT:  Did they tell you why they, having had a

24  previous expert, they were now coming to you?

25        THE WITNESS:  I don't recall.  I don't know if the

FC45almH                      Livesey - redirect

1    expert was not available.  I don't recall specifically.

2            THE COURT:  Did they place a time limit on your

3    undertaking your comparison?

4            THE WITNESS:  I believe so.  I believe it was a pretty

5    short time frame.

6            THE COURT:  Did they explain why that was so?

7            THE WITNESS:  That's maybe -- I'm at a loss as to

8    maybe this other expert wasn't available and they needed an

9    answer quickly.  That's all my understanding was.

10           THE COURT:  What, if anything, did they say to you

11   about why they needed you to turn this around so quickly?

12           THE WITNESS:  I don't know.  I would have to look at

13   my file to see if I have an answer for that.

14           THE COURT:  Did you do -- before you made your

15   comparison, did you undertake any investigation to determine

16   whether in fact what was being presented to you as the known

17   signatures were in fact the known signatures of the plaintiff?

18           THE WITNESS:  No, sir.  No, because I did not speak

19   with the plaintiff, I had no contact with her, and I just

20   examined the signatures I was provided to the questioned to

21   determine if it was the same author.

22           THE COURT:  So, if you determined that the release and

23   the known signatures were of different people you would have no

24   knowledge which of those might be a forgery?

25           THE WITNESS:  Correct.  That's correct.  I would have

FC45almH                         Livesey - redirect

1   no knowledge of whether the multitude of purported knowns were

2   actually authentic or if the other was actually authentic.

3           THE COURT:  Right.  So, in your profession when you

4   have wanted to know or be able to verify in some way that the

5   "known" signatures were in fact the signatures of the person

6   they purported to be of?

7           THE WITNESS:  Okay.  What is rest of your question?  I

8   guess I --

9           THE COURT:  The question is, for example, you could

10  have asked the plaintiff to come out and in your presence sign

11  her name, right?

12          THE WITNESS:  I could have.

13          THE COURT:  Or you could have undertaken some other

14  way of ascertaining her known signature by seeing, for example,

15  whether she had ever filed something in court that had been

16  signed that you could then look at or something like that.

17          So, my question is why didn't you undertake those

18  efforts?

19          THE WITNESS:  Generally speaking, when I'm doing an

20  examination I'm really, more than anything, determining if one

21  author signed both questioned and known documents.  As far as

22  it being specifically from a specific person, that does not

23  apply so much, that kind of an ambiguous statement, to outcome.

24  It is a matter if I need to determine authorship.

25          THE COURT:  So, I am looking at the conclusion of your

FC45almH                        Livesey - redirect

1    report on page -- beginning at the bottom of page 7 and you

2    say:  Based on my scientific examination and a lack of

3    agreement of the unique identifiable characteristics in the

4    questioned signature, it is my professional, expert opinion

5    that the Erica Almeciga signature on the questioned document

6    was not signed by Erica Almeciga.

7              Let me stop there.  In fact, you don't know that one

8    way or the other.  It could have been that it was signed, based

9    on what you saw, it could have been that it was signed by the

10   real Erica Almeciga and the ones that you were provided that

11   were "the known signatures" but which you did not independently

12   have any knowledge of whether they were the known signatures,

13   those could have been the forgery, yes?

14             THE WITNESS:  Yes.  Yes.  They were just two different

15   authors is all that --

16             THE COURT:  So all you know, all that you are opining,

17   really, is that the signatures on the "known" and the

18   signatures on the release are not by the same person.

19             THE WITNESS:  Correct.

20             THE COURT:  Now, you say in a number of places in your

21   report that you have made use of scientific principles and also

22   generally accepted questioned document examiner principles and

23   methods.  What are those that you used here?

24             THE WITNESS:  The methodology that I used is the same

25   as used by the FBI and the Secret Service, it is called the

FC45almH                           Livesey - redirect

1    A --

2                 THE COURT:  Well, I don't hold that against you.

3                 THE WITNESS:  It is called the ACEV methodology.  It

4    stands for Analyze, Compare, Evaluate and Verify, and that

5    methodology has been generally accepted in every court of law

6    that I have testified in as well as it was affirmed and

7    accepted in the Court of Appeals in the Pettis case.

8                 THE COURT:  That's useful to know but I'm really --

9    what I want to know is what are those principles?  So the

10   initials are ACEV, yes?

11                THE WITNESS:  Yes.

12                THE COURT:  Okay, so tell me about A, C, and so forth.

13                THE WITNESS:  Sure.

14        The analyze, what I do when I receive the documents,

15   the first thing I do is I take the purported known documents

16   that I received or signatures that I received or handwriting

17   samples, and I do an examination on those.  I am analyzing them

18   to determine the patterns of writing of the author or the

19   repetition because what we are looking at is not necessarily

20   handwriting, it is brain writing, so it is coming from the

21   patterns that have already been established in the person's

22   mind.

23                THE COURT:  I saw that in your report.

24        And you're not a neuroscientist, are you?

25                THE WITNESS:  No, I'm not.

FC45almH                    Livesey - redirect

 1          THE COURT:  So, what is the basis for saying that this

 2     is a function of particular patterns in the brain?

 3          THE WITNESS:  There have been studies done with the

 4     brain mapping technology that medical institutes use to show

 5     where in the brain the activity lies for certain functions, and

 6     handwriting and a certain movements, finger movements, are

 7     different within certain areas of the brain so the handwriting

 8     comes from that area of the brain whether it's being written,

 9     you know, by a particular part of the body, the hand or the

10     foot or the mouth, that part of the brain is what lights up to

11     show that the handwriting function comes from that area of the

12     brain.

13          THE COURT:  So, do you know whether those studies have

14     ever been the subject of a Daubert hearing?

15          THE WITNESS:  I do not know that answer.

16          THE COURT:  And, by the way, would it really matter?

17     Isn't your basic premise that when someone writes and

18     particularly when they sign their name they do it in a

19     distinctive way?

20          THE WITNESS:  Generally speaking, yes, because they

21     have --

22          THE COURT:  That could be whether it came from the

23     brain or from -- forgive me -- their rear end.  This is that

24     premise that allows you to make the comparison, right?

25          THE WITNESS:  Right.  And the fact that it is so

FC45almH                          Livesey - redirect

1   practiced -- a person is so practiced in signing their name --

2   it is really automatic like making a fist -- you don't think

3   about it, you just do it.

4                THE COURT:  So, now turning -- how about, before we

5   get back to this so there are cases, of course, where people

6   try to purposely try to forge someone's signature and they're

7   copying from a known signature and so forth.  How do you, under

8   the -- we are still on the A part of the -- how do you

9   distinguish that kind of forgery?

10               THE WITNESS:  Really what the founding fathers -- and

11  I believe it is in my report -- spoke of and agreed to, the

12  founding fathers of document examination agree that a single

13  significant difference within the fundamental structure of the

14  writing would preclude common authorship.

15               THE COURT:  By the way, there were no founding mothers

16  so why should I pay any attention to it?

17               THE WITNESS:  You know, all I know is one of them had

18  to -- you know, was a big time person with the Lindbergh

19  kidnapping.

20               THE COURT:  Mr. Osborn.

21               THE WITNESS:  Yes.

22               THE COURT:  I am old enough to have met Mr. Osborn,

23  so.

24               THE WITNESS:  Yes.

25               THE COURT:  Anyway, getting back to -- I'm not so much

FC45almH                    Livesey – redirect

interested in the history, I'm just saying if you or someone

with similar training is confronted with what appears to be to

the everyday layperson the identical signature to a known

signature, how do you go about determining whether it really is

the known signature or a forgery?

THE WITNESS:  Well, what I do then is in my

examination, it kind of goes into that area of it, what I am

looking for are, again, habits that are repeatedly seen,

patterns within the writing; Does this person make a loop

clockwise or counterclockwise?  What do the ending stroke, the

beginning stroke, the connecting strokes look like?  I am

looking at a portion of one letter to another like ratios.  One

thing that I really find to be very helpful and significant are

the angles in writing.

For example, if I am drawing an angle from the top of

maybe the first initial in the first name to the first initial

in the last name, you sign your name a specific way every time

so that angle is going to be very similar most every time.  If

I sign your name pretending to forge your name, I'm not going

to get those same angles and that's where forgers really mess

up, because forgers are working on what the letters or the

words or the names look like, they're not noticing the space

around it and that's where a lot of mistakes are made, are in

the spacing that surrounds the letters.

THE COURT:  All right.  Now, how do you distinguish

FC45almH                         Livesey - redirect

that situation from the situation where someone -- well, let me

rephrase the question.

        When someone signs their name they don't always sign

it exactly the same, true?

        THE WITNESS:  Correct.  That's true.

        THE COURT:  So, how do you distinguish a situation

where there was a slightly different spacing but it was really

the same person from the one where there was a slightly

different spacing because it was a forgery?

        THE WITNESS:  There are variables within handwriting

so someone is going to sign different every time.  What you

will find is if you have enough samples to use in a comparative

matter, a document examiner is able to find out how large that

variation might be.  Some people have a very small range of

variation so their signature looks very, very similar every

time.  Others, obviously the variation is greater and there is

going to be some differences.  But, in that we are still able

to make a determination as to authorship by the certain

idiosyncrasies that are specific to that particular author,

whether --

        THE COURT:  So, how many -- to do that kind of

comparison how many of the known signatures would you need?

        THE WITNESS:  You know, that's really -- that has been

up for debate for a long time.  I know that a lot of document

examiners, myself included, I would prefer -- I ask for a half

FC45almH                    Livesey - redirect

1   a dozen to a dozen.  That at least gives me a decent sampling.

2   Others request 25 or more.  I feel like if you get too many

3   signatures you have got so much information it is overwhelming

4   and you tend to get lost in it.

5          THE COURT:  Now, I have the impression but correct me

6   if I have this wrong, that what you're chiefly relying on here

7   is not what we would call science in the sense of physic or

8   chemistry or biology, but it is really more experience, both

9   your experience an the experience of examiners before you, so

10  that through that experience you know what to look for like the

11  examples you gave me, in a way that the everyday layperson

12  would not.

13         THE WITNESS:  Correct.

14         THE COURT:  Do I have that right?

15         THE WITNESS:  Yes.

16         THE COURT:  Okay.

17         So, going to the comparison you did here, you first --

18  I'm looking at page 6 of your report and -- by the way, is it

19  fair to say that the comparison between the release and the

20  known signatures, they weren't even close, right?  It was not

21  like an attempted forgery, it was like very different.

22         THE WITNESS:  Yes, correct.

23         THE COURT:  So even a layperson probably could have

24  seen that they were very different, yes?

25         THE WITNESS:  Yes.

FC45almH                          Livesey - redirect

            THE COURT:  So, but you say on page 6 in your

conclusions you say, "The Erica Almeciga-Reta signature on the

questioned document is written with great fluidity and a faster

speed, unlike the known signatures that display a slower, more

methodical and unrefined style of writing."

            So, I have two questions about that.  First is how did

you determine that; and second of all, which way does that cut?

            THE WITNESS:  Well, the first part of the question,

how did I determine it, in my experience and in my instruction

and training, a person who writes with quick speed and great

fluidity, the lines are generally less shaky, they're

generally -- I'm trying to think of how to say this without

just describing my own definition.  It's there is great -- I'm

not saying that right.  There is great rapid movement and you

can see even in the way the Ms and the Ns and the humps and the

pointed portions of the name are formed, there is not a

stopping and starting and pausing, there is no shakiness in the

line, there is no pen globs or ink blobs in the writing and you

will see more slower methodical writing a person draws the pen

slower -- or the write instrument slower so you will see more

ink bleed out of the pen, you will see more shakiness, you will

see more deposits and I guess chattering of the ink more than

anything is a better way to say that.

            THE COURT:  So, in this case the signature on the

release was done with fluidity and speed, yes?

FC45almH                         Livesey - redirect

1          THE WITNESS:  Yes.

2          THE COURT:  The known signatures were done more

3    slowly, more methodically.  Wouldn't that be equally

4    consistent, then, or maybe even more consistent, with someone

5    trying to fake the known signatures so they're going very

6    slowly and trying to make it very different from, as opposed to

7    the release where the person signs -- zip -- doesn't sound like

8    they're trying to commit a forgery?

9          THE WITNESS:  Right.  Yes.  And what are you saying

10   has a good foundation to it and yes you are correct that

11   somebody could potentially forge the known documents.  However,

12   in that the -- again, the unconscious part of the writing will

13   also reveal itself in examination so that person who is

14   attempting to disguise or change their writing, those habits

15   and unconscious things will still appear because they're not

16   aware of them.

17         THE COURT:  Now, you say in the second item here, the

18   first name is misspelled meaning what?

19         THE WITNESS:  Meaning it was spelled differently than

20   what I received as purported knowns.

21         THE COURT:  So, again, you don't know of your personal

22   knowledge whether Ms. Almeciga spells her name with a Y or an

23   I, correct?

24         THE WITNESS:  Not specifically.  I know I received an

25   affidavit with her name spelled as an I and that is to the best

FC45almH                         Livesey - redirect

1    of my knowledge.

2              THE COURT:  Why would someone who is trying to commit

3    a forgery misspell a name?

4              THE WITNESS:  You know, I don't have a reason for

5    that.  I have seen that in a handful of cases and I don't know

6    if it is just out of ignorance or -- I really don't have an

7    answer for that.

8              THE COURT:  They -- I mean, sometimes misspellings can

9    occur by accident but not when you are spelling your own name.

10             THE WITNESS:  Right.

11             THE COURT:  And why would someone who is trying to

12   commit a forgery of the name "Erica" spell it in a very unusual

13   way with a Y as opposed to the ordinary way with an I?

14             THE WITNESS:  Right.  I don't know the answer to that.

15   I have never seen that spelling before.

16             MR. K. LANDAU:  Your Honor, if I may briefly interject

17   for clarification?

18             I don't know if you want us to do a side bar or --

19             THE COURT:  No, go ahead.  If you have questions about

20   any of these things I'm asking you are going to be given a full

21   opportunity to ask questions.

22             MR. K. LANDAU:  Sure.  Okay.  That's fine.

23             THE COURT:  So, in number 4, I can't help but mention

24   this, please forgive me in advance, you say:  The C overlaps

25   the Y, U-L-I-K-E.  So, people do occasionally make

FC45almH                        Livesey - redirect

 1    misspellings.

 2              THE WITNESS:  Right.

 3              THE COURT:  Right, but not usually of their name.  I

 4    understand the difference.

 5              You were saying that you have, more recently done a

 6    comparison between the release document and the, what we have

 7    been calling the Georgia documents meaning certain documents

 8    that were filed, purportedly, by Ms. Almeciga in a court in

 9    Georgia.

10              Is that the comparison you did?  Or did you do that

11    with the known?  Or both?

12              THE WITNESS:  Both.

13              THE COURT:  Both.

14              THE WITNESS:  Yes.

15              THE COURT:  What did you conclude from that

16    comparison?

17              THE WITNESS:  With the Georgia documents?

18              THE COURT:  Yes.

19              THE WITNESS:  That in my opinion this is a third

20    author.

21              THE COURT:  Pardon?

22              THE WITNESS:  That's a third author.

23              THE COURT:  A third author.

24              THE WITNESS:  Yes.  Those signatures do not match

25    either the purported knowns or the release in specificity to

FC45almH                        Livesey - redirect

1      how that was written.  They're different.  There are too many

2      differences to account for similar authorship.

3              THE COURT:  Is it a fair statement that they are at

4      least closer to the release than what we have been calling the

5      known signatures?

6              THE WITNESS:  Yes.

7              THE COURT:  I am incorrigible so I will probably have

8      more questions for you later, but let's turn it over to

9      counsel.  And I am happy to have plaintiff's counsel, if you

10     want to because you are ultimately the party who is introducing

11     this testimony, on the other hand, most of the challenge to

12     this witness has come from your adversary.  If you prefer to

13     have them go first, that's fine with me too.  I will make it

14     your choice.

15             MR. K. LANDAU:  Thank you, your Honor.

16             Preliminarily, at this point, would you prefer that we

17     continue to go through Ms. Carlson's experience or for the

18     purposes of this hearing is she admitted under 702?

19             THE COURT:  Well, I don't know.  For the purposes of

20     this hearing I'm making no findings until I receive summations

21     at the close of all the hearing, so --

22             MR. K. LANDAU:  Could you prefer --

23             THE COURT:  I'm making no determination yet, that's

24     one of the -- they're challenging her qualifications, they're

25     challenging her expertise, they're challenging her methodology

FC45almH                    Livesey - redirect

1    and -- oh, I did forget one question and that's why I thought

2    you might want them to go first, so then you would respond to

3    their views, but I did forget.  We talked about A; take me

4    through C, E and V.

5             THE WITNESS:  The A is analyze.  I examine and analyze

6    the purported knowns to determine that they were authored by

7    the same person, that all the knowns were authored by the same

8    person.  And once I make that determination I then take the

9    questioned signature --

10            THE COURT:  How many knowns were you given?

11            THE WITNESS:  You know, I would have to go through and

12   count.  Let me take a look at my report and see if it breaks it

13   down a little bit.  I have five pages but there were multiple

14   signatures on those five pages, or handwritings.

15            THE COURT:  Go ahead.

16            THE WITNESS:  What I do, how I do that analyze, I

17   analyze all of those known signatures, I vertically enlarge

18   them 200 percent for easier examination.  I do my analysis.  I

19   then take the questioned signature, also enlarge that to 200

20   percent and do the comparison, which is C.  I compare to

21   determine similarities or dissimilarities within the writings

22   and make a determination as to what is really significant, what

23   is just maybe a factor of writing that needs to be taken

24   accounted for.  And then we move to E which is evaluation and I

25   take my findings of similarities and dissimilarities and

FC45almH                    Livesey - redirect

1    evaluate the weight of the evidence that I have and make a

2    determination as to authorship, whether similar authorship,

3    different authorship.

4            In many cases what I do is verification.  I don't do

5    that with every case.  With science I know that every

6    experiment is not verified.  With this case I felt like the

7    differences were so dramatic and striking that I did not do a

8    verification.  I didn't feel it was necessary in this matter.

9            THE COURT:  But what would you mean, in the ordinary

10   case or the less extreme case, by verification?

11           THE WITNESS:  What I would do is I would ask another

12   qualified document examiner -- court-qualified document

13   examiner to do independent review and examination of the

14   documents that I received without knowledge of what my findings

15   are, send those documents to them, have them do an independent

16   examination and once they're finished with it, they would

17   contact me and we would go over findings together to determine

18   what their outcome was.

19           THE COURT:  So now in this case you knew that there

20   had been an earlier expert, yes?

21           THE WITNESS:  Yes.

22           THE COURT:  And in fact it was my understanding it was

23   the guy who you studied under, yes?

24           THE WITNESS:  Yes.

25           THE COURT:  And so, after you had reached your

FC45almH                    Carlson - cross

1    conclusions, why didn't you do that kind of verification with

2    him since he was already familiar with the matters?

3                THE WITNESS:  You know, I think it was such a short

4    time frame that I didn't do that.

5                THE COURT:  All right.

6                Go ahead.  So, we are going to start with questioning

7    by defense counsel.

8                MS. SCHARY:  Okay.

9    CROSS EXAMINATION

10   BY MS. SCHARY:

11   Q.  Ms. Carlson, you said that you had five known signatures;

12   is that correct?

13   A.  I would have to look again.  I had five pages that have

14   known signatures on them.

15   Q.  That's a pretty small number because you said you usually

16   get six to 12; is that right?

17               MR. K. LANDAU:  Objection, your Honor.

18               THE COURT:  Yes.  The question is whether she had five

19   signatures, not whether -- all she said so far is she had five

20   pages.  Do we have those pages?

21               THE WITNESS:  Yes; and there are nine signatures on

22   those five pages.

23               THE COURT:  So nine signatures.  All right.

24               THE WITNESS:  Correct.

25   BY MS. SCHARY:

FC45almH                        Carlson - cross

1    Q.  And none of those signatures are from 2012; isn't that

2    right?

3    A.  That's the best of my knowledge, that they are not from

4    2012.  I believe they're 2014 and then a couple of them I did

5    not know what date they were.

6              MR. K. LANDAU:  Objection.

7    Q.  And you were asked -- sorry.

8              MR. K. LANDAU:  Objection.  Relevance.

9              MS. SCHARY:  And you never asked?

10             THE COURT:  I will allow it.

11             Go ahead.

12             MS. SCHARY:  Overruled?

13             THE COURT:  Yes, I overruled.

14   BY MS. SCHARY:

15   Q.  You never requested that she provide anything from 2012?

16   A.  No.  Not specifically.  I just asked Mr. Landau to provide

17   for me because I did not talk with her specifically, she didn't

18   retain me, Mr. Landau did, and as I was communicating with him

19   I asked him if he would give me probably a half a dozen to a

20   dozen signatures to use.

21   Q.  Well now, look.  Actually at your deposition we talked

22   about the way that you were retained --

23             THE COURT:  No, no.  Just put questions, counsel.

24   Q.  I would like to show you a document that's been previously

25   marked for identification as Exhibit 31.  Ms. Carlson, do you

FC45almH                         Carlson - cross

1   recognize this document?

2   A.  Yes.  Vaguely, yes, I recognize it.

3           MR. K. LANDAU:  Objection, your Honor.  Attorney

4   work-product.  Relevance.

5           MS. SCHARY:  Your Honor, this was provided to us by

6   Mr. Landau at Ms. Carlson's deposition.

7           THE COURT:  First of all, I don't think it is work

8   product but, second of all, assuming it is work product, it was

9   waived if it was provided.  And I think it is relevant so

10  Exhibit 31 is received.

11          (Defendant's Exhibit  31 received in evidence)

12  BY MS. SCHARY:

13  Q.  Ms. Carlson, I'm going to direct your attention to the

14  third paragraph in this e-mail; if you will take a second to

15  read that?

16  A.  Beginning with "Anyway or likewise?"

17  Q.  "Anyway."

18  A.  Yes, I have read it.

19  Q.  Okay.

20          And so my question is, did you request documents from

21  Mr. Landau or did Mr. Landau just send you five documents for

22  you to review asking for a report tomorrow?

23  A.  To my understanding he just sent them to me.  That's my

24  protocol to ask for those, and if he just sent them to me then

25  I was wrong in my statement to you.

FC45almH                     Carlson - cross

1    Q.   Thank you.

2              THE COURT:  So let me just ask a different question.

3    This is an interesting document.

4              In the third paragraph of this e-mail from plaintiff's

5    counsel to you, with a copy to one of his colleagues says,

6    "Anyway, we originally gave the questioned document to

7    Mr. Baggett in August 2014 before we knew you.  The questioned

8    document was a release that defendant CIR forged.  Mr. Baggett

9    compared this document to five documents with Ms. Almeciga's

10   known signatures.  He then wrote up a report which is attached

11   hereto.  This report was supplied to defense counsel before the

12   lawsuit was filed."

13             So, you did have the report of Mr. Baggett, yes?

14             THE WITNESS:  When I went back and reviewed my

15   e-mails, yes, it was attached.  I don't recall reviewing it

16   because I was doing this beginning from scratch, not as a peer

17   review, so I wouldn't have referenced his report.

18             THE COURT:  Bay the way, you had worked previously for

19   this law firm, yes?

20             THE WITNESS:  Yes.  They retained me in one other

21   matter recently.

22             THE COURT:  Yes.  You were a rock star for us in our

23   last case, the inimitable fashion of plaintiff's style, he

24   seems to have thought you did an adequate job.

25             So now he is also telling you how he wants it to come

FC45almH                        Carlson – cross

1    out, right?

2              THE WITNESS:  I understand that, yes.

3              THE COURT:  Okay.

4              Go ahead, counsel.

5    BY MS. SCHARY:

6    Q.  Ms. Carlson, you mentioned that you had testified before

7    that you had an affidavit from the plaintiff spelling her name.

8    Can I direct your attention –– you have your report in front of

9    you –– to Exhibit K-1 to your report?  And that would be known

10   signature 1?

11   A.  Yes.

12   Q.  And I want to give you a second to review this.  Let me

13   know when you have reviewed it and then I would like you to

14   read the second paragraph, please, of the affidavit of Erica

15   Almeciga.

16   A.  The standard appearance release provided for Center for

17   Investigative Reporting and dating August 15th, 2012 is a fake.

18   I have never seen the release before and it does not contain my

19   signature.  The printed handwriting at the top of said document

20   is not my own either.

21   Q.  So, am I correct that the affidavit you are relying on is

22   actually a recitation of the plaintiff's claims in this case?

23   A.  It appears to be.

24             MR. K. LANDAU:  Objection.  Relevance.

25             THE COURT:  Sustained.

FC45almH                         Carlson - cross

1   BY MS. SCHARY:

2   Q.  I'm going to direct your attention, before we were talking

3   about the ACEV method and you said that stands for analyze,

4   compare, evaluate and verify and you didn't verify anything in

5   this case; is that correct?

6   A.  I did not, correct.

7   Q.  Ms. Carlson, did you examine any of the print on the

8   release that you were given?

9   A.  I did examine some of it, yes.

10  Q.  Is that contained in your report?

11  A.  You know?  I would have to review that again.  I'm not sure

12  if I actually referred to that specifically.  I may have

13  referred to that generally in some of my paragraphs.

14  Q.  I'm going to represent to you that it is not contained in

15  your report.  Would that have been something important for you

16  to review in determining the plaintiff's natural handwriting?

17  A.  Not necessarily, because I was asked to examine the

18  signatures, not the printing.

19  Q.  And we were talking before when the Court was asking you

20  questions about somebody perhaps making their own signature

21  look a little different to make the signature look different.

22  You didn't take any steps in this case to assure yourself that

23  Ms. Almeciga did not disguise her signature in the five

24  signatures provided to you; isn't that right?

25  A.  That I did not do anything?  I always am aware of the

FC45almH                        Carlson - cross

1    potential for disguise when I am doing an examination so, yes,

2    I keep that in mind and I do take that into thought when I am

3    doing an examination because I know that is a possibility.  But

4    specifically, to your question, I did not do anything, no.  I

5    don't agree with that, because I do take that into context when

6    I do an examination.

7    Q.  So, what did you do in this case to assure yourself that

8    Ms. Almeciga had not carefully drawn those five signatures to

9    make them look different?

10   A.  Specifically I do my examination and that is just part --

11   it is just -- I almost feel like I would have to teach you two

12   years of what I learned to teach you how to do an examination.

13          It is part of the examination and what I do in

14   comparing the line quality and the signature quality and the

15   proportions and the ratios and the angles and all of those

16   things that I look at in an examination.  That is just part of

17   it is determining whether that is disguised writing and are

18   potentially written by that same person.

19   Q.  Hold on.  You said that you compared the line quality and

20   all of these attributes that you mentioned -- you compared them

21   to what?

22   A.  I am comparing them to one another as well as comparing

23   them to the questioned documents.

24   Q.  So, if Ms. Almeciga created five signatures for you for

25   this case or for the previous expert for this case, they would,

FC45almH                      Carlson - cross

1    theoretically, look similar; isn't that right?

2              MR. K. LANDAU:  Objection.  Argumentative.

3              THE COURT:  It is not argumentative.  I'm not clear

4    where this is going yet but I don't think it is argumentative.

5    Overruled.

6              THE WITNESS:  So, would you reask that, please?

7    BY MS. SCHARY:

8    Q.  Sure.

9              You said that you looked at whether the signatures

10   that you have as purported knowns --

11             THE COURT:  I think it was nine, if I am not mistaken.

12             MR. K. LANDAU:  Correct.

13   Q.  -- all of the signatures that you have as purported knowns,

14   whether they are similar to one another.  My question to you is

15   what did you do to assure yourself that Ms. Almeciga did not

16   disguise all of them?

17   A.  Because, like I said, when a person is writing their name,

18   even if they're attempting to disguise it or what is appearing

19   on the paper and what is appearing in my examination are the

20   subconscious traits and the subconscious characteristics that

21   even the author is not aware of.  So, they couldn't possibly

22   change those things because they don't even know that they're

23   in existence.  When I am doing my examination I find those

24   things and I see that they're in existence and so I'm comparing

25   those subconscious habits and those subconscious

FC45almH                    Carlson - cross

characteristics that the author wouldn't even know about.

THE COURT:  But a little different point.  I just want to make sure I understood your previous testimony.  The claim that there are certain habits in writing your signature that you -- the person -- signing are unaware of because they are only in your subconscious as opposed to your conscious is a psychological and/or neuroscientific theory well beyond your expertise, yes?  This is what you have been told by others and you have accepted it as part of the basis for what you do but it is not that you have ever conducted a psychological test or it is not that you have immersed yourself in the neuroscientific literature or anything like that.

THE WITNESS:  Yes and no to your question.

No, I have not conducted a scientific or neuroscientific test.  Yes, I have experienced these things in the many cases that I have done and in my studies and in my experience and in doing cases that involve disguise or forgery or all the different aspects of handwriting, I pick up on all the little different things.  So, it is not necessarily, no, I didn't do the study to the neuroscientific aspect of it but I have seen these things within my experience of doing this over the last seven to eight years.

THE COURT:  Well, what you mean by that is someone who is trying to do a forgery slips or something like that and makes mistakes even though they're trying to do a perfect

FC45almH                          Carlson - cross

1    forgery repeatedly?

2                THE WITNESS:  Yes.

3                THE COURT:  So how do you know they were a forgery?

4                THE WITNESS:  Again, those minor idiosyncrasies, it

5    may be a hook at the beginning of a letter --

6                THE COURT:  No, no.  You see, it is without

7    independent knowledge that the person was a forger, it is a

8    circular argument.

9                THE WITNESS:  Okay.  I guess if you could clarify?

10               THE COURT:  It may not be worth pursuing but the --

11   so, someone writes out the same signature 10 times.

12   Superficially they all look the same but when you blow them up

13   and look at certain things that you have been trained to look

14   at, you see that they're different.

15               THE WITNESS:  Uh-huh.

16               THE COURT:  That could be because no one can do the

17   exact same thing twice in a row so it could be accidental or it

18   could be because they were trying very hard to do a fake but

19   without realizing it they make mistakes.  That's sort of your

20   hypothesis, or it could be that there were two or more people

21   making these signatures so they really weren't all coming from

22   the same person.  There are many potential possibilities.

23               All I can say is that these signatures are not, when

24   you look closely, they're not really the same.  But if I go

25   further and say they're a forgery, you have to have independent

FC45almH                         Carlson - cross

1    basis for knowing you have to have a known that you know is a

2    known, or you have to have someone confessing from the stand,

3    yes, you got me, I'm a forger, or something like that.  But it

4    is not because the test itself shows that it was a forgery.

5    All it shows is that there were differences in what, to a

6    layman's eye, would appear identical, right?

7              MR. K. LANDAU:  Your Honor, I'm sorry.

8              THE COURT:  Do you want to object to that very short

9    question?

10             MR. K. LANDAU:  Please?  Yes.  I apologize but, yes,

11   objection.  It is a hypothetical and speculation.

12             I think that we have been going around the

13   generalities as opposed to kind of distilling down some of the

14   specifics as to what Ms. Carlson's examination actually

15   entailed and then maybe later on, after we go through the

16   specifics, if there are specific questions related to that,

17   that may be a little bit more productive.

18             THE COURT:  Well, I think your objection has some

19   force in that we want to move things along.  However, as I am

20   sure I don't have to remind counsel, in a Daubert hearing one

21   of the things the Court has to explore is methodology.  But

22   maybe we can narrow it in this sense.

23             My understanding from the witness' testimony earlier

24   is she is not holding herself out as a scientific expert.  She

25   is holding herself out as someone who has practical expertise

FC45almH                    Carlson - cross

1   in this area so that it would be -- her testimony might be

2   admissible under *Kumho Tire* but is not offered under Daubert.

3   But if you are offering her as a scientific expert, then I

4   think we have to get into all of these methodological issues.

5          MR. K. LANDAU:  Your Honor, what we are offering her

6   for under Rule 702 as an expert witness --

7          THE COURT:  I understand you want her as an expert.  I

8   am asking what kind of expert.

9          MR. K. LANDAU:  For the purposes of profession.  She

10  does have the knowledge, skill, experience, and training that

11  allows her to make the conclusion she has made --

12         THE COURT:  That may or may not be but that's still

13  not my question.  This was prompted by her report.

14         In her report she repeatedly uses the time

15  "scientific."  For example, on page 6 under the heading

16  Methodology she states, "The scientific methodology used in

17  this examination consists of the ACEV method which means

18  analyze, compare, evaluate and verify, the same method

19  reportedly used by the FBI, the U.S. Treasury Department, and

20  the U.S. Postal Service in their questioned document

21  laboratories."  And the question I put to her earlier was are

22  we really talking science here?  And, by the way, I have real

23  doubts as to how many scientists at all are employed at the

24  Treasury Department or the postal service.  Or are we talking

25  about, if it still meets all the requirements would be

FC45almH                    Carlson - cross

admissible, are we talking about something that is largely the

product of experience?  Experience not only of herself but

people who came before who passed on to her their experience of

what to look at and how to make distinctions, and I thought she

told me that it's the latter.  And that's fine, but if you are

claiming she is utilizing scientific methodology -- which is

what her report purported to say -- then I can't escape getting

into all these methodological issues.

          MR. K. LANDAU:  Your Honor, to take the former point

first?

          As far as the context of scientific methodology, I

think that there could be a variety of definitions as far as

that's concerned.  There is qualitative methodology,

quantitative, political, social science.

          THE COURT:  Daubert says how to speculate about that

and political science would not make it under Daubert.  Physics

would.  But there is plenty of experts who are offered who are

not purporting to be scientific experts but just experiential

experts.  If you have a lawsuit involving a leaky pipe you

might call an experienced plumber as your expert but he is not

going to say well, I apply Newton's third law and I undertook

and I discounted the effect of relativity or any of that stuff.

He is just going to say I have seen an awful lot of leaky

pipes.

          MR. K. LANDAU:  Of course.  And to that --

FC45almH                          Carlson - cross

                    THE COURT:  Really, I think what the witness told me

is --

                    MR. K. LANDAU:  Yes.

                    THE COURT:    -- she's in that category.

                    MR. K. LANDAU:  Yes.  And to that end, with respect to

the context of that terminology as far as scientific

methodology is concerned, I would suspect that that's the way

it was presented to her and they aren't lawyers.  So, this is a

process that they adhere to and it may have been a connotation

as to what the people used in the field of forensic handwriting

speciality as opposed to the physics.

                    THE COURT:  Not directed at this witness at all but

just as a general proposition, everyone likes to claim the

mantle of science.  I assure you that every decision I make of

even the most trivial sort is based on an incredibly detailed

scientific application but unless you want to, for our

purposes, unless you want to claim that you are offering her as

a scientific expert -- if you are content to just offer her as

an expert based on experience and knowledge and training, all

the things that Rule 702 refer to, that's fine.  Okay?  In

agreement?

                    MR. K. LANDAU:  Yes.  Yes, your Honor.

                    THE COURT:  Very good.  Go ahead, counsel.

                    MS. SCHARY:  Just a couple more questions.

BY MS. SCHARY:

FC45almH                    Carlson - cross

1   Q.  Ms. Carlson, just to revisit something from earlier, you do

2   not have any basis to identify K-1 through K-50 as Erica

3   Almeciga's natural handwriting; isn't that correct?

4           MR. K. LANDAU:  Objection.  That's a

5   mischaracterization of her earlier testimony.

6           THE COURT:  It is a question.  I'm sure this witness

7   can answer it.

8   A.  Anything to identify those signatures as her writing?

9   That's what you're asking me?

10  Q.  Yes.

11  A.  Specifically, no.

12          MS. SCHARY:  Your Honor, I would like to reserve cross

13  as to the Georgia documents until after plaintiff enters that

14  testimony on direct because we don't know what it is going to

15  be since it is not in her report.

16          THE COURT:  Okay.

17          MS. SCHARY:  I would also like to --

18          THE COURT:  Let's hear from plaintiff's counsel and

19  then we will come back to you.

20          MS. SCHARY:  Can I move Exhibit 31 into evidence as

21  well?

22          THE COURT:  I'm sorry.  What was that?

23          MS. SCHARY:  That was the e-mail.

24          THE COURT:  I thought that has already been received.

25          MS. SCHARY:  Thank you.

FC45almH                     Carlson - direct

1          THE COURT:  But it is received again.

2          MS. SCHARY:  Thank you, your Honor.

3          (Defendant's Exhibit  31 received in evidence)

4     DIRECT EXAMINATION

5     BY MR. K. LANDAU:

6     Q.  Ms. Carlson, you indicated that you have been a Court

7     admitted expert since 2008 when you were still in school?

8     A.  Yes.

9     Q.  And without going through your extensive forensic

10    document --

11         THE COURT:  And it is true you were only 13 at the

12    time?

13         MR. K. LANDAU:  Charming.

14    Q.  Without going through the 12 page testimony list in the

15    interest of time, I would like to just highlight a couple of

16    areas with respect to your experience.

17         Roughly how many courts across the country -- strike

18    that.

19         How many states across the country have you been

20    admitted in as an expert?

21    A.  15 states.

22    Q.  And that includes both state and federal courts?

23    A.  Not for each of the 15 states but, yes, I have testified in

24    local, state, and federal courts.

25    Q.  And have they been on a variety of matters such as criminal

1   as well as civil?

2   A.   Yes.

3   Q.   Have you trained government employees ever?

4   A.   Yes.  I actually did train government employees.  I taught

5   the Denver Elections Division five times over the course of

6   four years a course that I co-authored in how to spot a forgery

7   so they knew how to look for suspicious signatures.  We pull

8   those from the ballots for both the local and national

9   elections.  I taught that course to the Colorado Clerk's

10  Association.  I am scheduled to teach it again in Kansas and

11  here in a couple months.

12  Q.   Kansas the state or Kansas, Colorado?

13  A.   I beg your pardon.  Kansas the state.

14          THE COURT:  Is Kansas a state?  From the Wizard of Oz

15  I thought it was a state of mind.

16  BY MR. K. LANDAU:

17  Q.   When was the last time you taught a course in Denver?

18  A.   I believe that was in -- you know, actually, I taught it to

19  the Denver Elections Division in 2014 was the last time I

20  taught it there.  I believe I taught an introductory course of

21  that to the County clerk's association at the beginning of this

22  year if I am not mistaken.

23  Q.   Okay.

24          Roughly how many cases have you testified in -- and

25  I'm not going to hold you to an exact figure, but a fair

1   estimate as to how many cases throughout your career you have

2   testified in as a court-admitted expert?

3   A.  It is 73.  I counted those up.

4           MS. SCHARY:  Your Honor, in the interest of time, we

5   are willing to stipulate to Ms. Carlson' bio which is included

6   in her expert report that she submitted.

7           THE COURT:  Okay.  I have actually read it as well, so

8   that's fine.

9           Let me ask a different question.  I'm sorry, counsel.

10  I keep interrupting you.

11          So, if you hadn't had to get back to plaintiff's

12  counsel in such a tight time frame, would it have been useful

13  to you to have Ms. Almeciga, in your presence, sign her name?

14          THE WITNESS:  It could have been.  I rely,

15  generally -- okay, this is kind of a greater story.

16          I rely generally on what the attorney provides to me.

17  I don't generally rely on the story surrounding the documents

18  because I base my opinion on my examination of the evidence in

19  front of me.  So, as far as her signing in front of me, it

20  could have been useful to see that, yes, she actually signs

21  this way, but as far as it just being is this the same author

22  as this?  No, it wouldn't have been.

23          THE COURT:  So, my vague recollection from years ago

24  when I was a prosecutor was that often when there was a

25  questioned document issue the expert would have the person

FC45almH                         Carlson - direct

1    whose handwriting was in question come in and, right there in

2    front of them, sign their name 10 times or something like that

3    and you could observe, first of all, if they were doing it

4    fluidly or a more slow, rigid way like you described before.

5              THE WITNESS:  Right.

6              THE COURT:  And then you would also have a known for

7    sure.  It might have been altered because the person was trying

8    to, you know, make their signature different than they would

9    have done it but at least you had something to work for that

10   had all of those unconscious items that you mentioned.

11             So, that would have been useful, yes?

12             THE WITNESS:  It could have been.  Generally speaking

13   I prefer to have handwriting or signatures that were done prior

14   to the matter at hand just for the fact that they didn't know

15   their signature was going to be examined so they wouldn't have

16   had any reason to attempt to disguise it.

17             THE COURT:  Right.  But in this case we don't have

18   that other than the ones that -- you don't know whether they're

19   really hers or not.  All that you know is that is

20   representation that was made.

21             THE WITNESS:  Correct.

22             THE COURT:  So, do you think if, for example, now if

23   they were asked to do it there would be a risk that she would

24   not be doing it naturally?  Is that what you are saying?

25             THE WITNESS:  Yes.  Essentially, yes.  Because of the

FC45almH                          Carlson - direct

1   situation is unusual, she may or may not attempt to change her

2   writing, and so with that I prefer to have something written

3   before -- before knowledge of this.

4                THE COURT:  Why don't we see.

5                Ms. Almeciga, do you want to take a seat over there

6   where the jury is?  And I will ask my law clerk to give you a

7   pen and pad.

8                PLAINTIFF:  Would you like me to write on top of here?

9                THE COURT:  I want you to sign your name, in your

10  normal way, 10 times.

11               MR. K. LANDAU:  Should I be asking questions?

12               THE COURT:  I will let her finish this and then you

13  can ask.

14               MR. BURKE:  Your Honor, while that is happening, as a

15  housekeeping matter, is Mr. Livesey excused?

16               THE COURT:  Mr. ?

17               MR. BURKE:  Livesey excused?

18               THE COURT:  Yes.

19               MR. BURKE:  Thank you.

20               THE COURT:  Thank you so much.  My law clerk will take

21  it.  You can go back to counsel table.  Let me just see it.

22               Okay.  So, what I will do is I will have my law clerk

23  make copies of this for me and counsel and we will mark it as

24  Court Exhibit 1 and I will, as soon as we have made copies, I

25  will give the original to Ms. Carlson and we will let you know

FC45almH                        Carlson - direct

1     after I have discussed it with counsel what, if anything, we

2     would like you to do with respect to this.

3               Go ahead, counsel.

4               MR. K. LANDAU:  Thank you.

5               Your Honor, for the record, plaintiff would just like

6     to admit Ms. Carlson's curriculum vitae and testimony list as

7     Exhibit A.

8               MS. SCHARY:  Objection, your Honor.  Are those part of

9     the Rule 26 report?

10              MR. K. LANDAU:  Yes.

11              MS. SCHARY:  If they're part of Rule 26 report they're

12    already in and we're okay with that.

13              THE COURT:  The whole report will be received, not

14    necessarily for its truth, but for the fact that it was her

15    report.

16              MS. SCHARY:  Thank you, your Honor.

17              MR. K. LANDAU:  Yes, and that's included.

18              THE COURT:  Right.  We will call that Plaintiff's

19    Exhibit A.

20              (Plaintiff's Exhibit A received in evidence)

21    BY MR. K. LANDAU:

22    Q.  Ms. Carlson, before we get to the specific analysis that

23    you had conducted, for a point of clarification you advised

24    that among the original signatures that you had received was an

25    affidavit.  Isn't it that true that that affidavit was

FC45almH                    Carlson - direct

1   accompanied by a notary, that it was a notarized signature?

2   A.  Yes.

3   Q.  And a notarized signature of course means what?

4   A.  Generally, a notarized signature is supposed to verify the

5   authenticity of that signature.

6   Q.  Great.

7   A.  That's generally what that means.

8   Q.  And this was also included in your report, the affidavit of

9   Erica Almeciga?

10  A.  Yes.  That is the first page that I included because it

11  contained the signature.

12  Q.  Okay.  And as far as the information that you had, though,

13  the notary was also attached to the document you reviewed?

14  A.  Yes.

15  Q.  Okay.

16          In addition to that document, have you received other

17  notarized signatures from Ms. Almeciga?

18  A.  From her specifically?  I don't believe it was from her

19  specifically.  It was through you I did receive another

20  affidavit with a notarized signature on it.

21  Q.  Okay.

22          And this, of course, was the same affidavit that was

23  attached to plaintiff's response?

24          THE COURT:  Yes.

25          MR. K. LANDAU:  We can mark that Exhibit B and C,

FC45almH                          Carlson - direct

1    respectively?

2              THE COURT:  Just now my law clerk has made copies.

3    Let me give you the original of Court Exhibit 1.

4    BY MR. K. LANDAU:

5    Q.  Ms. Carlson, now moving on to the specifics of the

6    signatures that are of course at issue in this case.  You have

7    prepared a supplemental chart, if you were to help explain in a

8    more efficient fashion the distinctions?

9    A.  Yes.

10             MS. SCHARY:  Objection your Honor.

11             We have never seen this chart before today.  It was

12   not part of the plaintiff's Rule 26 disclosures and if she is

13   going to testify about her analysis, we think it would be

14   appropriate for her to do so in person.

15             MR. K. LANDAU:  Well she's here, so.

16             MS. SCHARY:  We object to the admission into evidence

17   of a chart prepared out of court by the expert that was not

18   submitted as part of her Rule 26 report.

19             MR. K. LANDAU:  Your Honor, I believe earlier you

20   indicated that for the purposes of this hearing you will allow

21   it as far as any challenges at the trial --

22             THE COURT:  I think there is a distinction between

23   what's admissible at trial which will be limited, quite

24   strictly, to what is in her expert report and I will not

25   accept, under the circumstances of this case, any amendment to

FC45almH                           Carlson - direct

1    that report other than on express prior permission of the Court

2    for good cause shown, if there is.  But, for purposes of a

3    Daubert hearing -- which most people call a Daubert hearing but

4    actually Mr. Daubert pronounced it Daubert and he should

5    know -- I think the Court is well within its bounds to accept

6    anything that it thinks will help it to evaluate the

7    admissibility of the testimony.  In fact, the Federal Rules of

8    Evidence, as I am sure counsel knows, say that they do not

9    apply to admissibility.

10           Now, having said all of that, the real complaint that

11   defense counsel has is they're being sandbagged by stuff that

12   they weren't shown.  And since plaintiff's counsel must have

13   known about this, why didn't you provide it to your adversary?

14           MR. K. LANDAU:  Your Honor, we had received this chart

15   yesterday in the evening.  It is primarily for demonstrative

16   purposes.

17           THE COURT:  And what about the Georgia stuff, the

18   report of Ms. Carlson on the Georgia stuff?

19           MR. K. LANDAU:  It is just a chart that --

20           THE COURT:  No, no.  I'm not talking about the chart

21   right now.

22           Did you also do --

23           MR. K. LANDAU:  No --

24           THE COURT:  So she only did an oral report on her

25   results of the Georgia stuff?

FC45almH                    Carlson - direct

1          MR. K. LANDAU:  With the chart for --

2          THE COURT:  I see.

3          MR. K. LANDAU:  -- illustrative purposes.

4          THE COURT:  Was any of that reported to you orally

5     before you received that chart yesterday?

6          MR. K. LANDAU:  No.

7          THE COURT:  Ah.

8          When did you request her to do this?

9          MR. K. LANDAU:  It is an ongoing conversation but it

10    wasn't a comprehensive conversation until we were able to go

11    through it because I'm obviously --

12         THE COURT:  Well, give me a hint.  When did that

13    comprehensive conversation begin?

14         MR. K. LANDAU:  Probably last week is when she was

15    supplied with the signatures.

16         THE COURT:  Here is what I think makes sense.  I will

17    allow you to put this into evidence assuming it otherwise

18    complies with the rules for today's purposes but only if, and I

19    want Ms. Carlson's agreement on this since she's the victim in

20    some ways, that only if she makes herself available for a

21    deposition on these new matters sometime within the next week,

22    so that before I rule on the admissibility of her testimony I

23    can have whatever further information from her deposition that

24    defense counsel wants to bring to my attention.

25         MR. K. LANDAU:  Your Honor, it should be noted that

FC45almH                          Carlson - direct

1    throughout this litigation defense counsel has not had an

2    expert of their own.

3              THE COURT:  That's true.

4              MS. SCHARY:  Objection.

5              THE COURT:  And so that puts you in a good -- in a

6    strategically better position than you might otherwise be.  So,

7    it is not a matter of a battle of the experts, it is a matter

8    of the admissibility of her testimony.  That's what a Daubert

9    hearing is all about.  And it also bears, again to your

10   benefit, on their sanctions motion because their sanctions

11   motion, in rather sometimes frankly inflammatory language,

12   accuses you and your client of falsification and forgery and

13   other things like that but you have, if her testimony is

14   admissible, at least an expert who is, in certain respects,

15   supportive of your position, which is why we are having the

16   hearing today.

17             So, I want to give you every benefit of even stuff

18   that she's come to do later as a result of that but not unless

19   your adversary gets a chance to put her to a deposition so

20   they're not just having, today, to come up with questions for

21   her.  Okay?

22             MR. K. LANDAU:  Sure.

23             THE COURT:  So now, does that work for you?  Are you

24   available for a deposition in the next week?

25             THE WITNESS:  I'm available Wednesday, Thursday, and

FC45almH                              Carlson - direct

1    Friday.  I have a trial on the first two days of the week.

2                THE COURT:  So, Thursday and Friday?

3                MS. SCHARY:  Your Honor, I don't have my calendar in

4    front of me.  I know I have another deposition on Thursday.

5                THE COURT:  I will tell you what.  I will say that the

6    deposition has to occur before Christmas.

7                MS. SCHARY:  Okay, your Honor.

8                THE COURT:  And you will work out mutually --

9                MR. BURKE:  But, your Honor, where will the deposition

10   take place?

11               MS. SCHARY:  In New York.

12               THE COURT:  Well, if you want to pay for her expenses

13   it should be in New York.  If you want to go out to Denver -- I

14   encourage you to go to Denver at Christmas, it is really -- the

15   state is fantastic.

16               MR. BURKE:  Your Honor, I grew up in Nebraska.  I

17   never enjoy being in Denver at Christmas.

18               THE COURT:  What can I say?  There is each to his own,

19   but.

20               Do you want to do it tomorrow?

21               THE WITNESS:  Or we can do it in Texas, that's where

22   my other office is.

23               THE COURT:  You can do it in Texas.  I don't know that

24   that has any great appeal to anyone.

25               How long are you here?

FC45almH                          Carlson - direct

 1              THE WITNESS:  Just today.

 2              THE COURT:  Pardon?

 3              THE WITNESS:  Just today.

 4              THE COURT:  Are you staying over tonight?

 5              THE WITNESS:  No.

 6              THE COURT:  Do you want to do it by telephone?

 7              MS. SCHARY:  I would prefer not to do it by telephone.

 8              THE COURT:  How long do you want for the deposition?

 9              MS. SCHARY:  I guess it depends on the length of the

10    testimony here.  The last one was done within a couple hours so

11    I assume it would be a half day deposition.

12              Just for the record, I would like to clarify in terms

13    of our objection, I think the record is clear that Mr. Landau

14    had these Georgia documents before he even hired Ms. Carlson

15    and so we particularly object not only to this being raised

16    now, she could have had them in time to -- he had them in hand

17    before he gave her any documents and so he decided to give her

18    them after and now we are going to pay more money to do a

19    second deposition.

20              THE COURT:  All of that is true but the ultimate --

21    these kinds of situations come up all the time.

22              The Court is guided, first and foremost, by the need

23    to determine what the truth is and if there is additional

24    information that will assist the Court at arriving at the

25    truth, I'm not going to allow the adversarial process to stand

FC45almH                      Carlson - direct

1    in the way.  Part of arriving at the truth, however, is giving

2    you a full and fair opportunity to question her about these new

3    materials which you clearly can't do today when this is just

4    being sprung on you.

5            So, that's why we have the deposition so that we are

6    down, I think, to the very narrow question of who should pay

7    travel expenses for that deposition and whether it is her

8    travel expenses to New York or your travel expenses to Denver.

9    It sounds to me that this can be done in one day so there will

10   be no hotel expenses so it would just be flying there or her

11   flying here and flying back, which you did today as well, yes?

12           THE WITNESS:  Yes.

13           MS. SCHARY:  And she has done previously, yes.

14           THE COURT:  So that could be done except on certain

15   airlines that are notoriously late but those are the airlines

16   that I travel on so I will warn you in advance.

17           So, I think probably if you want this admitted, I

18   think you need to pay the cost of one attorney's economy fare

19   travel to Denver and back on a date that they work out with

20   Ms. Carlson.  If they want to take more than one attorney,

21   that's at their expense.  And if, of course, any report has to

22   be made at their expense because it would be made at their

23   expense regardless but I think that is the fair resolution.

24           MS. SCHARY:  Your Honor, we would prefer to do it in

25   New York, so rather than paying my fare out there.

FC45almH                          Carlson - direct

1        THE COURT:  How much did it cost you to come out here?

2        THE WITNESS:  I don't know.  I didn't by ticket.

3        THE COURT:  They bought the ticket?

4        THE WITNESS:  Yes.

5        THE COURT:  How much did it cost?

6        MR. K. LANDAU:  $300 or $400.

7        THE COURT:  Pardon?

8        MR. K. LANDAU:  $300 or $400.

9        THE COURT:  So, it is a burden, but if you want this

10   evidence in that's the burden you are going to have, that's the

11   price.

12        Okay.  Go ahead.

13        MR. K. LANDAU:  Thank you, your Honor.

14        Your Honor, marking as Exhibit D -- Plaintiff's

15   Exhibit D, pardon me, is the chart referenced earlier that you

16   do not have a copy of.

17        MS. SCHARY:  Yes.

18        MR. K. LANDAU:  Titled Differences Between the Erica

19   Almeciga Signatures.  Does the Court have a copy?

20        THE COURT:  No.

21        MR. K. LANDAU:  As well as we can say E for

22   verification purposes, Plaintiff's Exhibit E, which is the

23   color-coded nature of Ms. Carlson's way of reflecting the

24   analysis.

25        THE COURT:  Okay.

FC45almH                         Carlson - direct

1              MS. SCHARY:  With the same objection, your Honor.

2              THE COURT:  Well, he hasn't offered them yet, he has

3     just marked them.

4              MR. K. LANDAU:  I just marked them.

5              THE COURT:  So, go ahead.  Put questions and we will

6     see if they're admissible.

7              MR. K. LANDAU:  Thank you, your Honor.

8     BY MR. K. LANDAU:

9     Q.  Ms. Carlson, did you prepare both the chart labeled

10    Differences Between the Erica Almeciga Signatures as well as a

11    document that lists Q1, K1, K2, K3, K4, K5 that appears to be

12    two pages with a variety of color coding?

13    A.  Yes.

14    Q.  Did you prepare both of these?

15    A.  Yes, I did.

16    Q.  Thank you.

17             Can you take us through, in whatever order you prefer,

18    your analysis?

19    A.  Yes.

20             First of all, to explain this document with all the

21    color on it, that is a copy of what I do in my examinations.

22    It is kind of a rendering of my work sheet as I go through the

23    examination to make my findings.  The chart that I created,

24    part of it is already in the list in my report as far as the

25    differences between the question and purported known

FC45almH                        Carlson - direct

1   signatures.  This chart goes a little further in that I have
2   now included the signatures on the described Georgia documents
3   and --
4   Q.  So, why don't we take them one at a time then.  Based on
5   your analysis, is it easier to just take the signatures and
6   explain the characteristics?
7   A.  Yes, I can do that.  Really, these work sheets I have
8   provided to just show the Court both -- both -- I keep saying
9   both -- the questioned signature as well as the purported known
10   and now as well as the Georgia signatures, and so that way, as
11   we are going through this list of differences, whoever is
12   reading it can look at these colored documents and find those
13   specific items within each of those signatures as we go along.
14          THE COURT:  So, just to narrow this again because I am
15   concerned about the time, we have other witnesses to get to, I
16   take it that -- no, I'm not sure -- withdrawn.
17          Go ahead.  Never mind.  Go ahead.  Just bear in mind
18   that we are already at 3:30.
19   BY MR. K. LANDAU:
20   Q.  So, hopefully we can --
21   A.  That's fine, that's fine.  And again, some of these are in
22   my report so I can go through those quickly.
23          First of all, the thing I have listed is the speed of
24   writing, and you can see in the questioned signature at the top
25   of one page it says Q1, very quick fluid writing, and the known

FC45almH                         Carlson - direct

1    signatures are the purported known which are lined below as

2    slower methodical writing.  And the Georgia signatures which

3    are on the second page, that again is very quick, fluid

4    writing.  The spelling in the name is obviously different.  We

5    don't even need to go through that just because you can see it

6    on the pages.

7              In the bottom of the known signatures you can see K5,

8    there are spellings of both with an I and with a Y, and my

9    understanding was that Ms. Almeciga wrote those out just to

10   show how she would write that name if she were to spell it that

11   way.

12             The next thing I wrote is the angle from the top of

13   the E in Erica to the top of the A in Almeciga, this is one of

14   the angles that I was talking about.  You can see in the

15   questioned signature it didn't really show up so much on these

16   copies because it was cut off.  In the questioned signature the

17   A is taller than the first initial E.  In the known signatures

18   the A is always shorter than the initial E and you can see that

19   with that blue line, again like I said, with that angle from

20   the E to the A it is almost like fence posts because you can

21   see those blue lines out to the left margin showing that angle.

22   In the Georgia signatures those are variable angles.  Some of

23   them are very horizontal, sometimes the A is taller, sometimes

24   the E is taller.  So, there is not consistent pattern with

25   those signatures.

FC45almH                         Carlson - direct

1        The middle bar of the E is longer in both the

2   questioned and the Georgia signatures than the lower bar, and

3   Erica Almeciga's purported known or I am going to say the known

4   signatures, they're the case signatures, the middle bar is

5   actually shorter than the bottom.  And you can see that with a

6   red marking from the middle bar to the bottom bar on her first

7   initial, it is a red pen that I used to mark that angle.

8        The I dot in Erica, there is no I in the questioned

9   signature in the name Erica.  In the known signatures it is

10  either a small arc or maybe a V or X-type formation above the I

11  in her first name.  In the Georgia signatures the I dot is

12  actually a long, horizontal-style slash for the I dot.

13       THE COURT:  So, let me show you -- do you have another

14  copy of that -- I have also furnished, counsel, Court Exhibit

15  1.  You have the original in front of you, correct?

16       THE WITNESS:  Yes.

17       THE COURT:  So, we know that these were Ms. Almeciga's

18  signatures because we all observed her signing it.  By the way,

19  when she signed it, was -- to your observation was that

20  consistent with quick fluid writing or slow methodical writing?

21       THE WITNESS:  No, I would say she was a very slow,

22  methodical writer.

23       THE COURT:  Okay.

24       Now, if you look at the loop in the G, the next to

25  last letter of her name and in the 10 samples we have of her

FC45almH                        Carlson - direct

1  signature made here today, the loop is quite different in many

2  of these signatures, yes?

3          THE WITNESS:  Yes.

4          THE COURT:  So if you hadn't observed her doing that

5  why would you have concluded that these were actually

6  signatures of different people?

7          THE WITNESS:  Because, as I'm looking through them

8  right now without doing a full examination, I can see that the

9  distortions tend to be repetitive in some of these.  She tends

10 to have what I would call dents within those loops and a lot of

11 them appear in a very similar area.  Also, she has got a very

12 pointed tip on the bottom of some of those loops and, in

13 addition to that, I'm also looking at the entire letter, not

14 just necessarily the bottom loop, so I am looking at where she

15 begins the top loop, how it's -- where it begins the creation

16 from the I to the G and it appears that those letters,

17 generally speaking, start about the 12:00 or 1:00 area of her

18 loop.  And so, as I am doing my examination I am not basing my

19 opinion on one specific feature, it's really a culmination of

20 all my findings.

21         THE COURT:  Okay.

22         Go ahead, counsel.

23 BY MR. K. LANDAU:

24 Q.  Thank you.

25 A.  Okay.  The next thing that I wrote was the Y in the first

FC45almH                        Carlson - direct

name.  Yes, there is a Y in the questioned signature, no, there
are no Ys in the Georgia signatures and, again, in the known
signatures, two out of the nine, which I guess this bottom one
got cut off again from the copy, but two of the nine signatures
contained a Y and, again, my understanding was she did that
intentionally to show how she would write it.  The C overlaps
the right side of the Y in the questioned signature.  It does
not, in the known signatures even when she wrote the Ys there
is a good space between the Y and the C and there is no Y in
the Georgia signatures.

          The ending of the name, the A in Erica curves up at
the end in the known signatures and the Georgia signatures but
not in the questioned signature.

          So, this chart is really showing, yes, there are
similarities between some of these but not between the majority
of these and so there really is showing the multitude of
differences in all of these signatures.

          The next thing I was examining was the beginning of
the A in Almeciga --

          THE COURT:  I'm sorry.  Forgive me.

          THE WITNESS:  Yes.

          THE COURT:  In your chart, under Erica Almeciga's six
signatures, those are the entirety of the ones that were
represented to you by counsel to be her known signature?

          THE WITNESS:  Yes.

1          THE COURT:  So that would include -- are we talking

2     about the nine plus the affidavits or the affidavit is part of

3     the nine?

4          THE WITNESS:  One of the affidavits is part of the

5     nine, the second affidavit is not.

6          THE COURT:  So, I notice that in your chart you note

7     that the Y in the first name is included in two of the nine

8     signatures so, assuming these were her known signatures it is

9     clear that she sometimes spells her name with a Y, yes?

10          THE WITNESS:  I'm not sure that she sometimes spells

11     it that way or she just did it as a request to spell it like

12     that person's spells it so we can see.  I don't know how that

13     was created.  But, even in that I see enough differences

14     that --

15          THE COURT:  Well, wouldn't it have been important for

16     you to know which of those two possibilities it was?

17          THE WITNESS:  Yes, it would be, and again I believe

18     part of it was the short time frame that I just --

19          THE COURT:  But before you prepared this chart you had

20     more follow-up time, yes?

21          THE WITNESS:  Yes.

22          THE COURT:  But you didn't ask that.

23          THE WITNESS:  I asked and he did tell me that those

24     were -- oh, as far as if she spells her name that way?  My

25     understanding is that she does not spell her name that way.  My

FC45almH                         Carlson - direct

1    understanding was she did this to show how she would do it if

2    she wrote it that way.

3              THE COURT:  I see.

4              THE WITNESS:  That's what my understanding is.

5              THE COURT:  Okay.

6              Go ahead.

7              THE WITNESS:  The beginning of the A, the capital

8    letter A begins beneath the ending stroke of the A in Erica on

9    the questioned signature and it also begins either under

10   underneath or very close to that ending stroke of the A in

11   Erica on the Georgia signatures, but because the A is written

12   completely differently in like an oversized lower case A it

13   doesn't come -- it doesn't begin underneath the ending of the

14   first name.

15             Another one of the angles is from the A to the L in

16   Almeciga.  In the questioned signature the A is taller than the

17   L.  In the known signatures the A is shorter than the L except

18   for -- oh, I beg your pardon, I am reading that improperly.

19   The A is shorter than the L in the known signatures.  And then,

20   in the Georgia signatures, the A again is taller than the L.

21             The formation of the letter A is different in all of

22   these signatures.  The questioned signature on the release has

23   a pointed and retraced top in the capital letter A in Almeciga.

24   The capital letter A in the known signatures, again is written

25   as an oversized lower case letter so it is rounded, there is no

FC45almH                              Carlson - direct

1    point on top.  In the Georgia signatures some of those letter

2    As are retraced at the top, some of them have loops.  And if

3    you look at that top signature on those Georgia signatures, the

4    top loop is actually almost half the height of that letter A,

5    so, that's a very large, large loop in that signature and

6    that's not seen in any of the other signatures on the other

7    page.  The lower right portion of the letter was also very

8    notable to me.  Again, in the known signatures there is not

9    necessarily a lower right because it is a circular formation.

10             THE COURT:  Well, in the interest -- I see all of this

11   in the chart so in the interest of time, are you offering, now,

12   Exhibit D?

13             MR. K. LANDAU:  Yes, your Honor.

14             THE COURT:  Any objection?

15             MS. SCHARY:  We have the same objection raised prior.

16             THE COURT:  Which is?

17             MS. SCHARY:  That we haven't had a chance -- that we

18   haven't seen it.

19             THE COURT:  It will be received without prejudice.  If

20   there is something that comes out at the deposition that would

21   lead to inadmissibility as opposed to simply questioning of the

22   results but simply admissibility of the exhibit I will consider

23   it, but subject to that contingency, it is received.

24             (Plaintiff's Exhibit D received in evidence)

25             THE COURT:  E was just a short sheet, yes?

FC45almH                         Carlson - direct

1          THE WITNESS:  Yes.

2          THE COURT:  E will be also be received.

3          (Plaintiff's Exhibit E received in evidence)

4          THE COURT:  Anything else?

5          MR. K. LANDAU:  Your Honor, just a couple quick

6    questions.

7    BY MR. K. LANDAU:

8    Q.  Ms. Carlson, is your professional reputation important to

9    you?

10   A.  Yes.

11   Q.  Just because an attorney professes what side of a case they

12   may be on, is that going to sway your testimony one way or the

13   other?

14   A.  No.  No.  I have actually have had to call clients and let

15   them know I don't agree with you, my opinion is different, and

16   that's the end of that as far as my retention.

17          No.  And I believe I have testified to this before, I

18   don't necessarily believe the stories that are told me.  Again,

19   I rely on the evidence in front of me to form my opinion.

20          THE COURT:  Would it be a better practice by attorneys

21   not to indicate in advance how they want you to come out?

22          THE WITNESS:  You know, some attorneys are shocked

23   when I let them know so they don't even know their client is

24   lying to them as well so it's --

25          THE COURT:  Go ahead, counsel.  This was a rhetorical

FC45almH                          Carlson - direct

1  question on my part.  Your objection is noted.

2  BY MR. K. LANDAU:

3  Q.  If you did not believe you would be able to form a

4  professional opinion within 48 hours of receiving the

5  information, would you have so advised?

6  A.  Yes.  Absolutely.  Yes, I would have told you that I needed

7  more information or more documents.

8  Q.  I believe that this was already addressed but this was an

9  e-mail that was provided that had included another document

10  expert's report, correct?

11  A.  Yes.

12  Q.  To your knowledge, the other document examiner's report had

13  come to the same or similar conclusion?

14  A.  You know, I don't even recall that I ever read his report.

15  I don't have it in my file and I don't know that I ever printed

16  it out so I don't know, to be honest.  I really don't know.

17  Q.  Okay.

18          So, any e-mails received by counsel could have just

19  been a recitation of another document examiner's professional

20  opinion as well?

21          MS. SCHARY:  Objection.  Leading and hypothetical.

22          THE COURT:  Sustained.

23          MR. K. LANDAU:  No further questions.

24          THE COURT:  All right.  Anything further from defense?

25  No.

FC45almH                      Almeciga - cross

1          Thank you so much.  I think you should step down.

2          (Witness excused)

3          THE COURT:  I think we should now call Ms. Almeciga

4    because we are running out of time and we need to have her

5    testimony.  We will talk about what we will do with respect to

6    the other witnesses.  So, Ms. Almeciga, come on up.

7          My courtroom deputy will appear as if magic and swear

8    you in.

9    ERICA ALMECIGA,

10        called as a witness by the Plaintiff,

11        having been duly sworn, testified as follows:

12         THE COURT:  I think it makes more sense to have

13   defense counsel question her first and then plaintiff's counsel

14   second given the shortness of time.  So, go ahead.

15   CROSS EXAMINATION

16   BY MR. BURKE:

17   Q.  Is it correct in your interview with Mr. Livesey and

18   Mr. Hooper -- you did have an interview with them, did you not?

19   A.  Yes, I did.

20   Q.  And where was that interview?

21   A.  Woodville, Texas.

22         THE COURT:  Do you want to get closer to the

23   microphone, please?

24   Q.  You told them that you were, "just an everyday normal

25   person who was not scared of being associated with Mr. Reta and

1  his then Zetas connection," didn't you?

2  A.  I do not recall saying that.

3  Q.  You told CIR that you don't think it would be even worth

4  Zetas' time to come and hurt you.  Isn't that right?

5            MR. K. LANDAU:  Objection.

6            THE COURT:  I think this is not --

7            MR. BURKE:  Your Honor, it goes to the state of mind

8  as of the day she signed the release.  Whether she was scared

9  or not is highly relevant to the Court's analysis.

10            MR. K. LANDAU:  But there is no foundation that's been

11  offered.

12            THE COURT:  No, no.  This is in their papers.

13            MR. BURKE:  Your Honor, I can refer the Court to --

14            THE COURT:  You don't have to because I have already

15  read it.

16            Well, all right, on the representation of the

17  relevance I will allow a brief questioning but I do want to

18  keep it focused on the release.  But, I agree with you that her

19  state of mind is relevant.

20            MR. BURKE:  Your Honor, I have one bit of video, it

21  is -- the transcript of this is from Exhibit 4, page 9.  I

22  would like to show that for the witness and for the Court.  It

23  will appear on the screen.

24            THE COURT:  How long is it?

25            MS. SCHARY:  30 seconds.

1              MR. BURKE:  Less than 30 seconds.

2              THE COURT:  All right.  Go ahead.

3              (video file played)

4    BY MR. BURKE:

5    Q.  You don't deny that you told Mr. Livesey and Mr. Hooper

6    what you just heard?

7    A.  No.

8    Q.  That refreshes your recollection?

9    A.  Yes.

10             THE COURT:  By the way, two things.  First of all, are

11   you in fact married to Mr. Reta?

12             THE WITNESS:  No.  In the Spanish culture sometimes

13   when you're dating somebody or talking to somebody, that's --

14   they refer to you as their wife.  It's just a cultural thing.

15             THE COURT:  Okay.

16             And is it your testimony that you never signed any

17   release or that you may have signed a release but not the one

18   that has been offered by the defense?

19             THE WITNESS:  Nothing was ever signed.

20             THE COURT:  You never signed a release?

21             THE WITNESS:  No.

22             THE COURT:  Okay.  Go ahead, counsel.

23   BY MR. BURKE:

24   Q.  After your interview was first published do you know what

25   year that was?

FC45almH                        Almeciga - cross

1  A.  I believe it was 2012.

2  Q.  I will represent to you that it was on July 16th, 2013.

3  A.  Okay.

4  Q.  Does that sound right?

5        MR. K. LANDAU:  No.

6        THE WITNESS:  No.

7        THE COURT:  You're talking about --

8        THE WITNESS:  I'm sorry.

9        THE COURT:  I think the witness may be unclear.  You

10  are talking about when it was shown as opposed to?

11        MR. BURKE:  When it was first broadcast by CIR.

12        THE COURT:  It was filmed in 2012, yes.

13        MR. BURKE:  Filmed in August 2012.

14        THE COURT:  And shown in 2013?

15        MR. BURKE:  Correct; in July 2013.

16        THE COURT:  By the way, because we are not before a

17  jury in a trial, because I'm allowing it for today, but if we

18  were before a jury if anyone start a question and says:  "I

19  represent to you X, Y, or Z," at that point I will have no

20  choice but to impose a minimum of a $10,000 fine on that

21  counsel for putting their credibility in issue.  But, today I

22  will allow it.

23        MR. BURKE:  Your Honor, I was trying to speed the

24  process along.

25        THE COURT:  Very good.

1          MR. BURKE:  More than not.

2     BY MR. BURKE:

3     Q.  After the interview was first published in 2013, the father

4     of your three children began to use the association -- your

5     association with Mr. Reta against you; isn't that correct?

6     A.  No.

7          MR. K. LANDAU:  Objection.  Relevance.

8          THE COURT:  Overruled.

9     Q.  Never happened?

10    A.  No.

11    Q.  Has your association with Mr. Reta had any effect on

12    custody proceedings involving any children whether it's your

13    children, or the children of your fiancee, Mr. Duarte?

14    A.  My children, he is their father, put it in answer to a

15    response that I had put in to a motion that I put into the

16    courts.  In his answer he put in that I was affiliated with the

17    cartel.

18    Q.  Did that have an adverse effect on you?

19    A.  Yes, it did.

20    Q.  And, for your fiancee, Isaac Duarte, that representation is

21    also being used against you in custody proceedings regarding

22    his children, correct?

23    A.  No.  It was, but it is not anymore.

24    Q.  But it has happened before, correct?

25    A.  Yes, it has.

FC45almH                          Almeciga - cross

1    Q.  So, it is your testimony today that you did not sign any

2    release, no release was shown to you by Mr. Livesey or

3    Mr. Hooper in Woodville, Texas?

4               MR. K. LANDAU:  Objection.  Compound question.

5               THE COURT:  Sustained as to form.  Just break it down.

6    BY MR. BURKE:

7    Q.  Did you sign any release at any time that you were in

8    Woodville, Texas?

9    A.  No.

10   Q.  You have used different spellings of your first name Erica,

11   correct?

12   A.  I have.

13   Q.  And you have used different -- have you used the last name

14   Reta before in your signature?

15   A.  Not -- not my written signature, no.

16   Q.  Never in writing?

17   A.  No.  The only time I have ever done that is when I was

18   asked to supply handwriting samples.

19   Q.  Your Honor, I am referring to Ms. Almeciga's September

20   24th, 2015 deposition testimony at 103, line 16, 104:4:

21   "Q  At some point did you start using Reta as your last name?

22   "A  He had me do that because to write to the person you had to

23   be a family member or something, so he just had me put this on

24   the outside of the envelope.  And he would -- I can't speak for

25   Rosalio, but when he would write back to them he would tell

FC45almH                     Almeciga - cross

1   them different.  If you are close to somebody you are, like,

2   considered your wife.  Like, if you asked, say Pablo, if I met

3   a Pablo from a few years ago, Pablo would say, yes, that's my

4   ex-wife.  We were never married, never a possibility, just

5   giving you an example."

6           Do you remember that testimony?

7   A.  I don't recall it, but.

8           THE COURT:  Well, is it correct that when you wrote to

9   Mr. Reta in prison you would use the name Reta on the envelope

10  or on some --

11          THE WITNESS:  I would say there was a couple of times

12  where he would have me send him a letter from somebody else and

13  I would use that, put that last name on this.

14          THE COURT:  Okay.

15          MR. BURKE:  Your Honor, I believe Ms. Almeciga's

16  testimony even today was that her written signature she did not

17  include the last name of Reta.

18          THE COURT:  Well, that's what I'm trying to get at,

19  whether in the sense this is involving the prison she had a

20  written signature using that name or not and I'm still not

21  totally clear on that.  So, maybe you can clarify that for me.

22          THE WITNESS:  What exactly --

23          THE COURT:  So we know that orally you sometimes use

24  the name Reta, yes?

25          THE WITNESS:  It has been a couple years.

FC45almH                         Almeciga - cross

1          THE COURT:  Okay.

2          The question that counsel wanted to know was other

3    than in the handwriting samples, did you ever sign your name or

4    use the name in writing "Reta," as in --

5          THE WITNESS:  As a return last name, yes, but my last

6    name was always hyphenated.

7          THE COURT:  Okay.

8    BY MR. BURKE:

9    Q.  If you weren't married to Mr. Reta, why did you tell CIR

10   that you were?

11   A.  In Spanish culture that's how I was referred to by his

12   family, his friends:  As his wife.

13   Q.  Did you offer that explanation to CIR?

14   A.  I wasn't asked.

15   Q.  So you held yourself out as his wife?

16         MR. K. LANDAU:  Objection.  Asked and answered.

17         THE COURT:  Well, I think I know both sides' positions

18   on that issue so we can move on.

19   BY MR. BURKE:

20   Q.  You talked about correspondence that you had with Mr. Reta.

21   How often did he write to you?

22   A.  Quite a bit.

23   Q.  How many letters would you estimate he sent you, in total?

24   A.  Over the years?  Probably close to -- a few hundred maybe,

25   close to a thousand.  In between somewhere.

FC45almH                         Almeciga - cross

1    Q.  So, what time period would that cover?  How many years?

2    A.  Five.  Five or six.

3    Q.  Okay.  So you would estimate a thousand letters?

4    A.  That would be -- I think that's forcing it a little bit.  I

5    would say under a thousand but it was quite a bit.

6    Q.  But when you were deposed you testified under oath that you

7    only received two or three letters a month from Mr. Reta.  Is

8    that right?

9    A.  Correct.

10   Q.  So that jives with your calculation?

11   A.  Well, there was cards, drawings.  As far as letters when

12   you asked me for a specific I gave you a specific answer.

13   Q.  So was it truthful when you told CIR that you received

14   1,300 letters from Mr. Reta?

15           MR. K. LANDAU:  Objection.  Can we stipulate that

16   there was a lot of letters as opposed to trying to jog her

17   memory?  In the interest of time?

18           THE COURT:  Well, come to side bar for a minute.

19

20

21

22

23

24

25

FC45almH                         Almeciga - cross

1          (At side bar)

2          THE COURT:  So, depending on the answers I may seal

3     this side bar, but from the witness' manner of speaking and her

4     affect, which may just be her manner of speaking and affect,

5     but I wondered, and I don't want to embarrass her by putting

6     these questions to her but I wonder whether plaintiff's counsel

7     knows either whether she's ever had any mental difficulties

8     and/or whether she's ever used serious drugs.

9          MR. K. LANDAU:  I don't -- I don't know if she has

10    either mental, you know, infirmities or used serious drugs.  I

11    know she is on a lot of drugs that --

12         MR. BURKE:  She was on eight medications at her

13    deposition.

14         MR. K. LANDAU:  She also does take heart medication

15    which I don't believe she has --

16         THE COURT:  What kind of medication does she take?

17         MR. BURKE:  There is a whole list.

18         MR. K. LANDAU:  I think I have the list.

19         THE COURT:  What are they for is my point.

20         MR. K. LANDAU:  Antidepressants, maybe like anxiety.

21    She has a lot of different things --

22         THE COURT:  All right.  So, that's what I'm sensing is

23    a side effect of that kind of medication which that puts to

24    rest my concern.  So, I just wanted to know why her affect was

25    the way it was because she seems intelligent, but.

FC45almH                    Almeciga - cross

 1            MR. K. LANDAU:  Yes.  She did indicate this morning
 2      that she doesn't have her heart medication.  I don't know if
 3      that affects how she's shaking or whatever.
 4            THE COURT:  Yes.  Okay.  Well --
 5            MR. BURKE:  Your Honor, I don't wish to extend this
 6      and yet at the same time it's all about her credibility.
 7            THE COURT:  Oh, it is all about her credibility and so
 8      I think we need to continue but I am concerned a little bit
 9      about her.
10            Well, let me throw out some possibilities and you tell
11      me if any of these appeal to you.  One thing is we could just
12      continue to 4:30.  I must end this at 4:30 no matter what.
13      Second, since there is going to be an additional deposition of
14      the expert we could continue the hearing -- I'm not going to
15      put the expert to the problem of coming back.  Whatever comes
16      out of the deposition will be added to the mix but the -- we
17      have the plaintiff's and defendant's witnesses who are here
18      today who could presumably easily be brought back.
19            MR. BURKE:  It's not as easy as it is for Mr. Talbot.
20      He doesn't work for CIR anymore so I guess for the limited --
21            THE COURT:  So that's another possibility, would be to
22      take him now.
23            MR. BURKE:  Correct.
24            MR. K. LANDAU:  And Mr. Duarte will only be five
25      minutes.

FC45almH                        Almeciga - cross

1           THE COURT:  Right.  Okay.  So why don't we do that.

2           MR. K. LANDAU:  He can't keep taking off work.

3           THE COURT:  And we will reconvene the hearing after I

4   receive whatever materials you send me from the deposition.  I

5   still want to get this, as you do, want to get these motions

6   decided sooner rather than later but --

7           MR. K. LANDAU:  Given all of her mental issues, it is

8   difficult for her to come back and forth.

9           THE COURT:  I agree.

10          Well, I think so we can reconvene the hearing with her

11  and continue her testimony then at some future date that we

12  will work out telephonically, just take the two other witnesses

13  today.  Okay?

14          Did you want me to seal the first part of that or not?

15  It maybe doesn't matter since it was part of the deposition

16  anyway.

17          MR. BURKE:  We are certainly not going to be -- I

18  don't exactly see anybody rushing to get it.  I defer to

19  counsel.

20          THE COURT:  If anyone in the future wants that side

21  bar sealed, just let me know.

22          MR. K. LANDAU:  Thank you.

23

24

25

FC45almH                           Almeciga - cross

1          (In open court)

2          THE COURT:  So, Ms. Almeciga, as you know, I have to

3    conclude this by 4:30 today and there are the two other

4    witnesses.  I just learned from counsel that they are not as

5    readily available as you are, so what we are going to do is

6    take those other two witnesses and then we will convene this

7    hearing again after we get the further report from the

8    deposition of the expert and I think that that makes better

9    sense.  So, we will excuse you for now but you will be subject

10   to testimony probably in about a month or so.

11         THE WITNESS:  Okay.  Thank you.

12         THE COURT:  Very good.

13         MR. K. LANDAU:  Your Honor, as far as the subsequent

14   testimony, I believe we discussed that it could be

15   telephonically for the purposes that we had --

16         THE COURT:  We will work all of that out.  I think we

17   don't need to decide that today.

18         So, you can step down.

19         THE WITNESS:  Thank you.

20         (Witness steps down)

21         THE COURT:  Why don't you call your next witness.

22         MR. BURKE:  Calling Steve Talbot.

23    STEPHEN TALBOT,

24       called as a witness by the Defendant,

25       having been duly sworn, testified as follows:

FC45almH                          Talbot – direct

1   DIRECT EXAMINATION

2   BY MR. BURKE:

3   Q.  Mr. Talbot, what is your occupation?

4   A.  I'm a filmmaker and journalist.

5   Q.  Are you currently employed?

6   A.  Yes.

7   Q.  Who do you work for currently?

8   A.  I work for a non-profit in San Francisco called ITVS and

9   they produce the series called "Independent Lens" on PBS.

10  Q.  In a nutshell for the Court's benefit, what is your

11  background?

12  A.  I have been a journalist and a filmmaker for almost 40

13  years, almost all of that time for public television, and most

14  of it with the series "Frontline."

15  Q.  Did you have a role at CIR in connection with the Rosalio

16  Reta and Erica Almeciga interviews that are the subject of this

17  litigation?

18  A.  Yes.

19  Q.  What was that role?

20  A.  I was the senior producer of the project.

21  Q.  What does that mean?

22  A.  Well, a producer is basically the person who is in the

23  field doing interviews, directing the crew, and a senior

24  producer job is to oversee that producer, to double check their

25  work, to work with them in the edit room when the story is

FC45almH                          Talbot - direct

1    being put together.

2    Q.  As a senior producer, did you watch the full video of

3    Ms. Almeciga's interview before it was made public?

4    A.  I would say virtually the full interview, yes.

5    Q.  Did you watch any other interviews?

6    A.  Yes.

7    Q.  Is that a part of something that is a part of your job?

8    A.  Yes.  That's a fundamental part of the job.

9    Q.  How is it fundamental?

10   A.  You are helping the producer and the editor and anyone else

11   who has reported on the project, helping them shape the story.

12   And so, you want to know who the key characters are, what their

13   points of view are and how they relate to each other.

14   Q.  Did Ms. Almeciga appear as an interview -- how did she

15   appear in her interview to you?

16   A.  She appeared very forthright, had a strong story to tell

17   about her husband in prison, was very forthcoming, spoke for a

18   long time in the interview, seemed very willing to want to tell

19   the story.

20   Q.  Did she appear to be nervous to you in any way?

21   A.  No.  Not at all.

22            MR. K. LANDAU:  Objection.  Hearsay.

23            THE COURT:  It is not hearsay.

24            MR. BURKE:  It is not hearsay.

25            THE COURT:  It is --

1            MR. BURKE:  Appearance.

2            THE COURT:  It is opinion but it is lay opinion

3    permissible under the federal rules.

4    BY MR. BURKE:

5    Q.  Before today have you ever personally met Ms. Almeciga?

6    A.  No.

7    Q.  As the senior producer responsible for this reporting, did

8    there come a time it was brought to your attention that

9    Ms. Almeciga was calling CIR and asking that her face be

10   obscured?

11   A.  Yes.

12          About a year or over a year after the original

13   broadcast I was told that she was calling CIR.

14   Q.  Did you talk or did you do some sort of investigation

15   within CIR to find out about what was happening?

16   A.  Absolutely.  I went back to the two producers, Josiah

17   Hooper and Bruce Livesey, went back to the reporters on the

18   story, Daffodil Altan, Andy Becker, went to my own superiors at

19   CIR, went to the editor, looked at footage, and of course one

20   of the first things we did was to pull the standard release

21   form that she had signed.

22   Q.  If I may approach the witness I would like to show the

23   witness the original release which I believe has been marked as

24   Exhibit 2.

25          Showing you what's been marked as Exhibit 2, would you

FC45almH                    Talbot - direct

1   review that and when you are done, tell me what that is.

2   A.  This is the release form that she signed.  This is a

3   standard release form that we use all the time at CIR.  It's

4   industry standard kind of thing we would use at "Frontline."

5   Q.  What do you mean by that?

6   A.  Well, it is sort of an oddity of our profession but if you

7   are in the news business doing nightly news, for instance,

8   interviewing someone, release forms are not required.  They've

9   just never been required in the industry.  It is assumed if you

10  sit down in front of a camera you are doing it of your own

11  volition, but in documentaries there is a tradition of them

12  coming out of Hollywood as well as the new business, it is kind

13  of a mix in some ways, so this standard release form has been

14  traditional within the documentary film business.

15          THE COURT:  So, you weren't present when this was

16  signed, were you?

17          THE WITNESS:  No, sir.

18          THE COURT:  Is it the custom and practice to show this

19  to the person who is being asked to sign it before or after

20  their appearance?

21          THE WITNESS:  It's really pretty arbitrary, believe it

22  or not.  It is often shown before and sometimes it is after.

23          THE COURT:  And is it explained in any way or just put

24  in front of the witness?

25          THE WITNESS:  If they have any questions it's almost

FC45almH                         Talbot - direct

always explained.  Honestly, you know, this varies from

interview to interview.  I have personally done hundreds, maybe

thousands of interviews in my life on camera and to be totally

honest, it's just quite different in every situation.  But

obviously there is an effort on part of any good producer or

reporter to explain.

        THE COURT:  So if, in this case, it was only presented

after to Ms. Almeciga after she had given the interview and was

not in any way shape, shape, or form explained, that would be

contrary, at least to your practice?

        THE WITNESS:  No.  No.  What I'm trying to say is that

in the informal nature of this business when interviewing some

person, often you would start out the interview by saying "Do

we have your permission to do this interview?" and they would

say, "Yes." and then they would sit down and sometimes you

would ask them to sign a standard release form before the

interview began but very, very often you would not ask them

until the interview was completed.  And if they had any

questions, you would answer them.

        And I should also say --

        MR. K. LANDAU:  Objection, your Honor.  Not more than

five minutes previously he said often it is before, sometimes

it is after.  Now he is indicating that --

        THE COURT:  How is that an objection?  That is an

inconsistency that you might well want to inquire about on your

FC45almH                         Talbot - direct

1    examination of the witness but I don't see why it is a ground

2    for an objection.  Overruled.

3            MR. BURKE:  Your Honor, if you had further questions I

4    can pick up from where we were which was we were talking

5    about --

6            THE COURT:  So this was drafted, to the best of your

7    knowledge, by a lawyer, right?

8            THE WITNESS:  Oh yes.  And as I say, this is the kind

9    of release form that is standard practice in the industry.

10           THE COURT:  Right.  So you think every day folks will

11   know what is meant by licensees assigned, designee's derivative

12   work right, title, and interest and terms of that sort, they're

13   just part of the everyday language of everyday folks?

14           THE WITNESS:  Obviously not entirely everyday language

15   but if they have any questions, we would answer them.  I mean,

16   I think the general understanding is this is -- we say to

17   people in making documentaries, we have to have a signed

18   release form that you give us your permission to appear in the

19   interview and once you have done that, we then have the

20   authority to use your image, your audio, in any way that we

21   need to to tell this story.

22           THE COURT:  Right.

23           Do you know whether any of that was said in this case?

24           THE WITNESS:  I believe so, yes.

25           THE COURT:  What is your basis for saying that?

1           THE WITNESS:  Well, in talking to Josiah Hooper after

2   the fact.  I mean, my job is when a producer comes back --

3           THE COURT:  So what did Mr. Hooper tell you?

4           THE WITNESS:  He said that she signed this release

5   form.

6           THE COURT:  And did he say that he explained to her or

7   anything like what you just said?

8           THE WITNESS:  Well, what I was about to say is that

9   it's very typical that if someone says, oh, I object to this

10  certain part of this release form, or I want some sort of

11  limitation on the use of my voice or image for this interview.

12  They often -- I have done this many times -- will write that in

13  on the agreement so that it is an understanding that there is a

14  limitation on it before.  If no one does something then we

15  assume that it is free for us to use in any way.

16          THE COURT:  But mine is a more narrow question.  You

17  talked about this with Mr. Hooper, yes?

18          THE WITNESS:  Yes, sir.

19          THE COURT:  And to the best of your recollection what

20  did he say to you?

21          THE WITNESS:  He said that she signed this form and

22  that there was no limitation on her agreement to be

23  interviewed.

24          THE COURT:  And did he say he discussed it with her?

25          THE WITNESS:  To the best of my memory, yes.  The

FC45almH                    Talbot - direct

issue became -- in my conversation with her later because we
spoke on the phone -- was her request was that her face be
blurred.  That's when I finally had a conversation with her,
two conversations on the phone.  That was her request.  I had
said there is no limitation on this agreement, there is no
understanding on our part that you did make such a request to
Mr. Hooper or Mr. Livesey at the time.  And I double checked
that, of course, with both of them, and they said never, at any
point, did she ever make that request at the time.

THE COURT:  I understand that but what I am getting at
is a more narrow question.  Did Mr. Hooper say that he had
explained to her what this release was about?

THE WITNESS:  Yes.  He said this is a standard release
form.  We need you to sign this for us to be able to use the
interview.  He could have again, standard industry practice,
could have asked her verbally just to say that on camera.  That
is sometimes done in lieu of signing a document like this.

THE COURT:  And when did he tell you this?

THE WITNESS:  He certainly told me this after I asked
him about it after she had begun to call CIR.

THE COURT:  So --

THE WITNESS:  We --

THE COURT:  Excuse me.

THE WITNESS:  Yes.  Go ahead.

THE COURT:  If he testified earlier today that he was

FC45almH                    Talbot - direct

1    10 feet away from her when she signed it, that it was presented

2    by Mr. Livesey, that he said nothing to her, that would be

3    inconsistent with what he told you?

4             THE WITNESS:  No.  I mean my recollection -- let me be

5    as precise as I can -- is when the producers return from the

6    field I check to make sure that there are signed releases for

7    any interview that's about to be included in the piece and I

8    ask if there is any limitation.  And in this case, because

9    other characters in pieces that we did based on this story were

10   obscured and they were obscured in the field or we discussed

11   afterwards, for various reasons, their personal safety, because

12   they lived in Mexico, because the Zetas are a violent group,

13   should we do anything special to protect someone.  So, that was

14   paramount in my mind and I asked him were there any limitations

15   and there were no limitations.  And he showed me the signed

16   release form.

17            THE COURT:  All right.

18            Go ahead, counsel.

19   BY MR. BURKE:

20   Q.  So, from your experience, even if there had been no signed

21   release, one of the concerns that you had is whether or not the

22   subject matter is comfortable, whether they look as though they

23   are willing to answer the questions during the interview,

24   correct?

25   A.  Absolutely.

1  Q.  And was there any concern, any suspicion that you could see

2  either from -- well, was there any concern about that that was

3  evidenced to you by looking at the raw video before it was

4  broadcast?

5  A.  No.  No.

6  Q.  And was there anything expressed to you, any concerns about

7  her unwillingness or her fear of having her image be a part of

8  that broadcast?

9  A.  No.

10  Q.  And if there had been, what are some of the options that

11  would have happened?

12  A.  We would have had a very serious discussion about doing

13  something to protect her identity.

14  Q.  Let me go and pick up from what the Court was asking about

15  in terms of your discussion with Ms. Reta.  What happened when

16  you talked with her on the telephone?  What did she ask?

17  A.  So, I just checked the dates the other day.  I heard on

18  June 10th that she had called -- been calling the station, two

19  reporters there.  And I went around, gathered everybody up,

20  double-checked everything with people, and then called her back

21  two days later on June 12th.  That was the first time we ever

22  had any communication.

23  Q.  In what year?

24  A.  2014.

25           So, I asked her what the issue was and she began to

1    explain that she wanted her face to be blurred and that it was

2    her understanding that it should have been blurred in the first

3    place.  I said that was news to me because she had signed a

4    release form.  I had never heard anything like this and the

5    producer both denied that she ever made that request.

6          So, then I also said this had been broadcast over a

7    year previously on Univision and it had been seen by a very

8    large audience.  It was the lead story on their nightly news

9    the day after the head of the Zetas, Miguel Treveno, had been

10   arrested in Mexico so it was a very big news story.  Jorge

11   Ramos, their top anchor, introduced the story.  So, many, many

12   people saw this.  It was posted on their website.  Many, many

13   people saw it on their website.  We posted it on our website

14   and YouTube channel.  So, it was very widely seen.  And we

15   heard nothing for over a year.  So, this was a bit of a shock,

16   I must say, when we got this call.

17         But, I said I would discuss this with others at CIR

18   and I would get back to her.

19   Q.  Did you get back to her?

20   A.  I did.

21         After discussing and going through everything with

22   everyone I called her back, I believe on the 17th of June which

23   was the following week, and I said that we were under no legal

24   obligation, no journalistic obligation, no moral obligation to

25   change anything we had done, that she had given us full

FC45almH                        Talbot - direct

1    permission to use this interview in any way we needed to to

2    tell the story.  We felt it was a very important story we were

3    telling but -- and, that the main story had already happened.

4            Honestly, my first reaction was not to change anything

5    because in talking this through with people at CIR we agreed

6    that going forward with a documentary that we were making using

7    some of this same footage we would indeed, at her request, blur

8    her face.  And I asked that if that was fine with her and she

9    said thank you very much, she seemed to be very grateful.  We

10   had a good conversation, I felt.  I said, will that resolve the

11   issue?  And she said yes.

12   Q.  To be clear, when you agreed on behalf of CIR to mask

13   Ms. Almeciga's face for any future broadcast of her interview,

14   did you do this because of any previous agreement between

15   plaintiff and CIR?

16   A.  No previous agreement at all.

17   Q.  So, why did you do it?

18   A.  We did it, first of all, my first impulse was not to do it

19   because I didn't think we had any obligation whatsoever to do

20   it.  But, the fact of the matter was that this story had

21   already been seen.  It was out in the public over a year

22   before.  It had had its biggest impact.  The story had gotten

23   out.  So, in whatever smaller version of the story we were

24   doing going forward, in a way it didn't matter that much to us.

25   The main interview in this story, I must say, was her husband,

FC45almH                          Talbot – direct

1    the former Zeta, who was imprisoned in Texas and had been an

2    assassin by his own account.  That was the key interview in

3    this story.  There were many other interviews with law

4    enforcement officials, with other people in Mexico including

5    another person who had been -- said that he had been recruited

6    by the Zetas as an assassin as a young man.  That was the whole

7    point of the story, that the Zetas were recruiting on both

8    sides of the border for killers.

9              So that was the story.  The story was out, it was

10   over.  So, at that point we thought, all right, if she's upset

11   about this, if she would like her face being blurred going

12   forward, honestly, it doesn't mean that much to us and if it is

13   a courtesy to her and makes her feel better and resolves the

14   issue, then we will do it.

15   Q.  Did you talk with Ms. Almeciga about the release?

16   A.  About the release?  Yes.  And she, in my conversations with

17   her, never denied that she signed this release.

18   Q.  Was it simply that she wanted some remedy going forward?

19   Is that your understanding of what she was asking you?

20   A.  When I asked her What is the issue?  What would you like us

21   to do?  She said I would like you to blur my face in any future

22   version of this story.

23   Q.  How many documentaries have you personally prepared in your

24   career?

25   A.  As producer?  Myself?  Reporter?  Over 40.  And I have

FC45almH                          Talbot - direct

1    probably supervised hundreds.

2    Q.  During the course of this work have you ever masked the

3    identity of anybody you have interviewed?

4    A.  Yes, I have.

5    Q.  Is it difficult to accommodate somebody who wants their

6    identity protected?

7    A.  No.  Not really.

8    Q.  How do you do it?

9    A.  There are two main ways it can be done.  You can do it in

10   the field, and in the case of this documentary, for instance,

11   Josiah protected the identity of this person I just referred to

12   in Mexico, a young boy, who had been recruited as a killer by

13   the Zetas, and he was filmed in such a way to make sure you

14   could not identify his facial features.  And that's done

15   through lighting, through camerawork on the spot.  So, that's

16   the main way, you can do it on the spot.  And it can also be

17   done in post-production in edit where you add effects to blur

18   someone's face or you can alter someone's voice.

19   Q.  I want to go back to your investigation at CIR.

20        THE COURT:  Counsel, I am very concerned that you are

21   not allowing sufficient time for cross-examination of this

22   witness.  Now, if that's your desire or not your desire but if

23   that's the result, that's fine, because we are going to have to

24   continue this hearing subsequently but that will mean that this

25   poor fellow will have to come back.

FC45almH                        Talbot - cross

1          MR. BURKE:  With that, your Honor, I'm done -- with

2     one exception.

3          The release that you have reviewed from Ms. Almeciga,

4     did you see that during your time as a senior producer at CIR?

5     A.  Yes.

6          MR. BURKE:  Okay.

7          THE COURT:  Cross-examination.

8     CROSS EXAMINATION

9     BY MR. K. LANDAU:

10    Q.  Thank you, your Honor.  I will be real quick.

11         You are aware that Ms. Almeciga's identity was

12    concealed in a previous interview with the CBC; is that

13    correct?

14    A.  Only after the fact.  I did not know it at the time, no.

15    Q.  Okay.  And when did you become aware of that?  Before or

16    after this story was broadcast?

17    A.  After it was broadcast.

18    Q.  After, okay.

19         Which organizations was this story licensed to?

20    A.  The principal organization, as I mentioned before, is

21    Univision.

22    Q.  Were there any others?

23    A.  No.  For Univision we did the nightly news story that she

24    appeared in.  We also did, that same week on their equivalent

25    of 60 minutes, *Aqui y Ahora*.

FC45almH                        Talbot - cross

1    Q.  How about Vice, just to kind of expedite?

2    A.  Vice?  No.

3    Q.  Was that licensed?

4    A.  No.

5    Q.  Mother Jones?

6    A.  No.

7    Q.  IFiles is your own?

8    A.  IFiles was the YouTube channel we created.

9    Q.  PBS?  Was it licensed to PBS?

10   A.  No.  It was not licensed to PBS.

11   Q.  So, on YouTube, YouTube plus traditional television, to

12   your recollection whatever was not under the umbrella of CIR,

13   was the primary license of Univision at that point?

14   A.  Yes, because the YouTube channel the iFiles, it is not

15   called Reveal, was in fact CIR.

16   Q.  To your estimate, how many views on YouTube did this story,

17   when Ms. Almeciga's face was not concealed, were seen?

18   A.  Well, if you believe their face counts, their count, it is

19   about a quarter of a million people who have seen it.

20   Q.  Quarter of a million?

21   A.  Yes.

22   Q.  How about Univision?

23   A.  Univision?  Millions probably.  I don't know for a fact

24   but --

25   Q.  If I was to say over 5 million or 6 million would that be a

FC45almH                          Talbot - cross

1   fair statement?

2   A.  I wouldn't know that for certain, but assuming they have a

3   very large television audience and very large website, so in

4   the millions for sure.

5   Q.  Okay.  What year did CIR's online and YouTube division

6   begin?

7   A.  Well, CIR has been online for many, many years but the

8   YouTube channel I actually started for them under a Knight

9   Foundation grant in 2012.

10  Q.  Isn't true that this story garnered more views than CIR was

11  a part of online than any of their other stories?

12  A.  No.  Not at all true.

13  Q.  No.

14  A.  No.  CIR has had stories that have garnered millions of

15  views on YouTube.

16  Q.  Online?

17  A.  Online.

18  Q.  Online.  Okay.

19          THE COURT:  Counsel, I didn't understand what a large

20  part of your adversary's questioning of this witness had to do

21  with this hearing and I certainly don't understand what your

22  questions have to do with this hearing.  This hearing is

23  addressed to just two things:  One, the sanctions motion

24  brought by the defendants claiming that the plaintiff

25  fabricated her contentions in this case regarding whether it

FC45almH                    Talbot - cross

 1    was an oral contract, whether she had or had not signed the

 2    release, all the things like that; and second of all, the

 3    admissibility under a Daubert-type 702 approach of your expert

 4    witness.

 5              Now, we have had questions -- and I don't just blame

 6    you because we have had it from your adversary just a few

 7    minutes ago -- of this gentleman who I will now refer to as the

 8    hostage, but I informed counsel at the very beginning of this

 9    hearing that I had to leave at 4:30, and that is really

10    something I cannot change.  I can stretch it maybe five minutes

11    and that's about it.  If, in fact, you have questions relating

12    to the subject matter of this hearing, I think now is the time

13    for it.

14              MR. K. LANDAU:  Yes, your Honor.

15              Just real quick in answer.  This man was not in Texas

16    so it goes to the motivations of what the state of mind of the

17    producers that physically were there and the type of

18    representations they made to Mr. Talbot.

19              THE COURT:  Okay.  Duly noted.

20              MR. K. LANDAU:  But I will get on to the next topic.

21    BY MR. K. LANDAU:

22    Q.  Sir, are you aware that six to eight months after the

23    interview took place Mr. Hooper and Mr. Livesey contacted

24    Ms. Almeciga?

25    A.  Not specifically.  No.

FC45almH                     Talbot - cross

1   Q.  You indicated that once you receive a release you no longer

2   need the interviewee's participation for anything, correct?

3   A.  There may be some sort of follow-up interview or something

4   that one wants but, no, once the interview has been recorded

5   and the release has been signed, then we go about creating our

6   story.

7   Q.  Earlier you indicated that Mr. Hooper advised you that he

8   had counseled Ms. Almeciga prior to her signing the release?

9   Do you recall that?

10  A.  I'm not sure I said counseled her.  What I said was gave

11  her the release, was available to answer any questions, to

12  explain then that there was no limitation on the agreement.

13  Q.  Well, did he or did he not explain anything to her?

14  A.  I was not there so I can't tell you that for a fact.

15  Q.  Based upon the conversation you had with Mr. Hooper, what

16  did he say?

17  A.  My best recollection of my conversation with him is that he

18  gave her this and said this is the standard release form that

19  you must sign in order for us to be able to use this interview,

20  and she said fine and signed it.

21  Q.  As far as Mr. Livesey, have you had any conversations with

22  him regarding the substance of this hearing?

23  A.  Yes.  I mean, the first thing I did when we got the calls

24  and I rounded everyone up is to ask them about, you know, the

25  release.  Do we have the release?  Number one.  Yes, we did.

FC45almH                         Talbot - cross

1    And was there any limitation ever put on it verbally?  No,

2    there was not any limitation verbally ever.  And so, we should

3    go ahead and use the interview and let's look at it.

4    Q.  Did Mr. Livesey indicate that he had a discussion with

5    Ms. Almeciga prior to her signing -- purportedly signing the

6    release?

7    A.  No.

8    Q.  No.  So, no, you don't recall, or no, he did not have a

9    conversation?

10   A.  I don't think he had a conversation -- I mean, I had a

11   conversation the same way Josiah just explained would have.

12   Here is this document to sign, we need it.  If you want this --

13   he certainly told me that after the fact when we were

14   discussing this, in reference to the calls over a year later,

15   absolutely.

16          THE COURT:  Did these two fellows, at the time of this

17   conversation, did they report to you, in effect?

18          THE WITNESS:  Yes.

19          THE COURT:  And would they have been authorized to

20   have made any oral agreement with her?

21          THE WITNESS:  They would have been authorized if they

22   had then come back to me and said, look, Steve, we got this

23   interview but in this case the person has asked us to do such

24   and such.  And then I would have had to decide, along with

25   others at CIR, whether it was fair to use the interview.

FC45almH                          Talbot - cross

1           THE COURT:  Okay.

2   BY MR. K. LANDAU:

3   Q.  So, based upon that, did Mr. Hooper have the authority to

4   grant the reprieve, so to speak, as far as the identity being

5   concealed to that gentleman in Laredo?

6   A.  Yes.

7   Q.  He did.

8           And did Mr. Hooper have the authority to enter into an

9   oral contract with Detective Garcia as to concealing his

10  identity as well?

11  A.  Yes.  He had that authority throughout.

12  Q.  Okay.

13  A.  That doesn't mean that when it got back and we were

14  determining whether it would be in a documentary or in a news

15  story whether we would use it.  We would always consider what

16  those limitations were.

17  Q.  Similarly, he would have the authority to enter into an

18  oral contract with Ms. Almeciga as to concealing her identity?

19  A.  Yes.

20  Q.  You indicated that Ms. Almeciga only contacted CIR in 2014,

21  correct?

22  A.  Yes.

23  Q.  Were you aware that Ms. Almeciga contacted Mr. Livesey in

24  2013?

25  A.  He told me later when we were reviewing all of this that he

FC45almH                           Talbot - cross

1    had some contact with her before, yes.

2    Q.  You indicated that there is an internal investigation that

3    was conducted as to the veracity of what Mr. Hooper and

4    Mr. Livesey were representing as far as whether or not

5    Ms. Almeciga had informed consent?

6    A.  Yes.

7             MR. BURKE:  Objection.  Mischaracterizes his

8    testimony.

9    A.  Yes, I would not characterize --

10            Sorry.  Sorry, sir.

11            THE COURT:  So, I think he is about to explain so I

12   will allow the Judge here to give his testimony.

13            THE WITNESS:  Thank you, sir.

14            I would not characterize it as an investigation.  It

15   was a review.

16   BY MR. K. LANDAU:

17   Q.  Okay.  Fair enough.

18            So, you oversaw the review?

19   A.  I was the point person in the review.  We -- CIR is a very

20   collegial organization.  It is a very responsible organization.

21   Everyone has been in the news business for a very long time,

22   these are very serious journalists, newspaper people.  We have

23   all taken these issues very, very seriously.  No one wants to

24   make mistakes and we had discussions of this.  It was a, you

25   know, pretty quick discussion in terms of us agreeing that we

FC45almH                         Talbot - cross

1    had done everything right.  Then the discussion was, going

2    forward, are we going to blur this woman's face in any future

3    versions of what we do?

4    Q.  Okay.  To that point --

5              THE COURT:  I am sorry, we really have --

6              MR. K. LANDAU:  Two more questions?

7              THE COURT:  Okay.  Go ahead.

8              MR. K. LANDAU:  Thank you.  Very quickly.

9    Q.  You indicated this was drafted by an attorney which makes

10   it a legally binding document, correct?

11             MR. BURKE:  Objection.  Calls for speculation.

12   A.  It's a scanned --

13             THE COURT:  The first part I will allow, yes; produced

14   by an attorney?

15             THE WITNESS:  Yes.

16             THE COURT:  The question being legally binding is for

17   the Court.

18             MR. K. LANDAU:  Correct.  That question is withdrawn.

19   Q.  As far as ensuring, like you said, the responsibility of

20   CIR and all of your journalists, did you ever think to ensure

21   that the actual signature was the person's legal name?

22   A.  No, we did not check that because we gave -- she told us

23   this was her name, this was the name that was put on the

24   screen.  This is how she signed the document so we took that at

25   face value.

FC45almH                          Talbot - cross

1    Q.  But you didn't know -- you did not conduct any independent

2    investigation or review --

3    A.  As to whether this was her actual name?

4    Q.  Right.

5    A.  No.  She signed the document with this name.  That's how

6    she identified herself to us.  That's names we put on the

7    screen in the story.

8    Q.  So, because there wasn't any type of notarization you

9    didn't feel compelled to ask her for a copy of her drivers'

10   lines or other legal document?

11   A.  To see if that matched her name?

12   Q.  Yes.

13   A.  No.

14   Q.  And to see that that is her signature?

15   A.  No.

16            MR. K. LANDAU:  Thank you.  No further questions.

17            THE COURT:  Thank you very much.

18            (Witness excused)

19            MS. SCHARY:  Your Honor, we have two very brief

20   housekeeping matters.  One, we wanted to confirm for the record

21   that Defendant's Exhibit 2 and Exhibit 33, which are the two

22   releases, that those are submitted and into the record and

23   accepted by Court.

24            THE COURT:  Yes.

25            (Defendant's Exhibits 2 and 33 received in evidence)

1          MS. SCHARY:  And the second one is we just want to

2    advise the Court that we are going to make an objection to the

3    admissibility of Ms. Carlson under Rule 702 and Daubert and we

4    can address that in the submissions after we do the deposition,

5    but I wanted to note that for the record.

6          THE COURT:  Well, I thought that was part of what this

7    hearing was all about.

8          So, first of all, I thank the witness and counsel and

9    Ms. Carlson, who I see is still here, and our illustrious

10   visitors and, unfortunately, every year there is put on, at the

11   court house in the Southern District of New York, something

12   called the Court House Follies which is not available on CIR or

13   anywhere else.  It purports to be an exercise in sophomoric

14   humor but I don't think it is actually that mature -- and I

15   know that because I write much of it and perform some of it and

16   it is about to take place.

17         So, that's why I have got to leave but I thank you all

18   for being here and we will work out the schedule for any

19   further proceeding after the matters concerning Ms. Carlson are

20   taken care of.

21         Thank you very much.

22                              o0o

23

24

25

```
                        INDEX OF EXAMINATION

Examination of:                              Page

JOSIAH HOOPER

Direct By Mr. Burke  . . . . . . . . . . . . . 8

Cross By Mr. K. Landau . . . . . . . . . . . .10

BRUCE ROBERT LIVESEY

Direct By Ms. Schary . . . . . . . . . . . . .27

Cross By Mr. K. Landau . . . . . . . . . . . .39

Redirect By Ms. Schary . . . . . . . . . . . .49

WENDY CARLSON

Cross By Ms. Schary  . . . . . . . . . . . . .71

Direct By Mr. K. Landau  . . . . . . . . . . .86

ERICA ALMECIGA

Cross By Mr. Burke . . . . . . . . . . . . . 112

STEPHEN TALBOT

Direct By Mr. Burke  . . . . . . . . . . . . 125

Cross By Mr. K. Landau . . . . . . . . . . . 139

                        PLAINTIFF EXHIBITS

Exhibit No.                              Received

 A   . . . . . . . . . . . . . . . . . . . .91

 D   . . . . . . . . . . . . . . . . . . . 109

 E   . . . . . . . . . . . . . . . . . . . 110

                        DEFENDANT EXHIBITS

Exhibit No.                              Received

 51  . . . . . . . . . . . . . . . . . . . .50
```

31      . . . . . . . . . . . . . . . . . .73

31      . . . . . . . . . . . . . . . . . .86

2 and 33      . . . . . . . . . . . . . . 148