FCM5almH                        hearing

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   ERICA ALMECIGA,

4                   Plaintiff,

5           v.                          15 Civ. 4319 (JSR)

6   CENTER FOR INVESTIGATIVE
    REPORTING, INC.,
7
                    Defendant.
8
    ------------------------------x
9
                                        December 22, 2015
10                                      11:45 a.m.
    Before:
11
                        HON. JED S. RAKOFF,
12
                                        District Judge
13
                        APPEARANCES
14
    THE LANDAU GROUP, PC
15       Attorneys for Plaintiff
    BY:  KEVIN LANDAU
16       ZACH LANDAU

17  DAVIS, WRIGHT, TREMAINE, LLP
         Attorneys for Defendant
18  BY:  THOMAS BURKE
         ALISON SCHARY
19

20

21

22

23

24

25

FCM5almH

1          (Case called)

2          MR. K. LANDAU:  Good morning, your Honor.  Kevin

3    Landau on behalf of plaintiff.

4          MR. Z. LANDAU:  Zach Landau on behalf of plaintiff.

5          THE MARSHAL:  Erica Almeciga.

6          MR. BURKE:  Thomas Burke of Davis, Wright, Tremaine on

7    behalf of defendant.

8          MS. SCHARY:  Alison Schary also from Davis, Wright,

9    Tremaine on behalf of defendant.

10          THE COURT:  This is a continuation of the evidentiary

11    hearing.  Let's get the plaintiff back on the stand.

12          MR. BURKE:  Your Honor, if we could, we would like to

13    exclude Mr. Duarte from the plaintiff's testimony.

14          THE COURT:  Excuse me?

15          MR. BURKE:  We would like to exclude Mr. Duarte.

16          THE COURT:  Yes, so he should stay in the witness

17    room.

18     ERICA ALMECIGA,

19        called as a witness by the Plaintiff,

20        having been duly sworn, testified as follows:

21          THE COURT:  Why don't you state, again, your name for

22    the record.

23          THE WITNESS:  Erica Almeciga.

24          THE COURT:  And that's A-L-M-E-C-I-G-A?

25          THE WITNESS:  Correct, your Honor.

1              THE COURT:  Go ahead, counsel.

2    CROSS EXAMINATION

3    BY MR. BURKE:

4    Q.  Ms. Almeciga, I would like to show you a collection of

5    court documents premarked as Exhibit 26.  You filed these in

6    Massachusetts during the period 2008 through the fall of 2015

7    and they were previously provided to your counsel.

8              If I could approach, your Honor?

9              THE COURT:  Yes.

10             MR. K. LANDAU:  Your Honor, we are going to state an

11   objection for the record.  These documents --

12             THE COURT:  Whoa, whoa.  Excuse me.  I haven't seen

13   them yet.

14             MR. K. LANDAU:  Okay.

15             THE COURT:  Did the witness get a copy?

16             THE WITNESS:  No, your Honor.

17             THE COURT:  Hang on just a minute.

18             (Pause)

19             THE COURT:  Go ahead.

20             MR. K. LANDAU:  Thank you, your Honor.

21             We are going to object to the proposed Exhibit 1 from

22   the defense as to the Massachusetts court documents.  These

23   were never included in their original motion, nor were they

24   provided to us prior to the final 10 minutes of the deposition

25   with the handwriting expert on Friday.  There haven't been any

1   type of analysis conducted nor have there been any type of

2   certified copies presented.  I am not certain who Universal is.

3   I would imagine that it is not the Commonwealth of

4   Massachusetts.

5           So, on the basis of zero notice, it was not produced

6   during discovery, and was not provided to the handwriting

7   expert for her analysis nor to the defendant with any

8   reasonable time to review and compare based upon what was

9   actually filed versus what --

10          THE COURT:  Okay.  Let me hear from defense counsel.

11          MR. BURKE:  Your Honor, this is cross-examination.

12  These are documents that plaintiff filed in Massachusetts.  If

13  she looks at them and says that's not her signature --

14          THE COURT:  I agree with you that because it is

15  cross-examination no notice was required, but whether or not

16  they'll be received is a different issue because they're not,

17  on their face, at least self-authenticating.

18          MR. BURKE:  Your Honor, we are prepared, if need be,

19  we are prepared to ask the Court to take judicial notice of

20  these documents.  We are prepared to file --

21          THE COURT:  I doubt very much I can take judicial

22  notice but, anyway, proceed, and we will see where we wind up.

23  BY MR. BURKE:

24  Q.  Ms. Almeciga, will you please review the documents that

25  have been marked as Exhibit 1?

1   A.  Sure.  Okay.

2   Q.  Do you recognize these documents?

3           MR. K. LANDAU:  Objection, your Honor.

4           THE COURT:  Overruled.

5   A.  Some of them, yes, I do.

6   Q.  Would you just identify, starting on the first page, can

7   you just walk through and let me know if there is any page that

8   you don't recognize as either your signature or your

9   handwriting?

10  A.  Sure.

11  Q.  Thank you.

12          Would you go ahead from the start, from the first

13  page?

14  A.  Okay, page 1, yes, is my signature.

15  Q.  And on page 2?

16  A.  Page 2, yes, I did file that.

17  Q.  Okay, and that's your signature and your handwriting?

18  A.  Yes, it is.

19  Q.  On page 3 then, has the Commonwealth of Massachusetts on

20  the top; is that your handwriting?

21  A.  That is my printing, yes.

22  Q.  Is that your signature?

23  A.  I do not see a signature on that page.

24          THE COURT:  Yes.  It is really a --

25          MR. BURKE:  Oh, that's correct.

1        THE COURT:  It is a printed name, it is not a

2   signature.

3        MR. BURKE:  That's correct.

4   Q.  The next page, is that your handwriting?

5   A.  Yes, sir.

6   Q.  The next page which has Answer Form on the top, is that

7   your handwriting as well?

8   A.  Yes, sir.

9   Q.  And continuing on that document, is that your handwriting

10  on the next page?

11  A.  Continuing on past answer form?

12  Q.  Yes, it is one past the answer form.

13       THE COURT:  It is the page that begins at the very

14  top:  If the landlord is a corporation...

15  A.  Okay, I see it.  Thank you.  Yes.

16  Q.  That's your handwriting?

17  A.  Yes.

18  Q.  Were you seven months pregnant at that period of time?

19  A.  No, sir.

20  Q.  Okay.

21       The next page, it says discrimination, we will skip

22  that.  The page after that, bad conditions in my home and other

23  claims?

24  A.  You want me to skip that?

25  Q.  No.

1          THE COURT:  Well, let's -- I think a faster way to do

2     this is, Ms. Almeciga, what is the first page that you don't

3     recognize?

4          MR. BURKE:  Very good.

5          THE WITNESS:  Give me one second, please.

6          THE COURT:  Take your time.

7          THE WITNESS:  The first page I do not recognize is, it

8     has an 18 in the corner, filed June 16, 2008.

9          THE COURT:  Let me just see which page you are

10    referring to.  Ah.  Okay. so -- I'm sorry.  Let me see it

11    again.

12         MR. BURKE:  I'm sorry, your Honor.  We should have

13    numbered these.

14         THE COURT:  You should have numbered these.

15         MR. BURKE:  That's my mistake.

16         THE COURT:  But, so giving this back to the witness.

17    So, the page that she is referring to, which I am going to do

18    it this way.  So, the first 16 pages she says she recognizes.

19    The next page, which bears the number at the top left of 18 but

20    unless I have miscounted it really in this package it is number

21    17 but, in any event, which appears to be an affidavit from

22    the -- it's labeled Commonwealth of Massachusetts, the trial

23    Court, probate of family court filed June 16, 2008, and it is a

24    three-page document.  Now, looking at the third of those three

25    pages, Ms. Almeciga, there purports to be your signature there.

1    Is that your signature?

2              THE WITNESS:  No, your Honor.  That is not my

3    signature.

4              THE COURT:  Okay, so that's not your signature.  Okay.

5              Let's continue on then.  How about after that

6    document, are there any of the other pages that you do not

7    recognize?

8              THE WITNESS:  I do not recognize, it is tabled no. 21

9    in the right-hand corner and there is no number in the second

10   page.

11             THE COURT:  Right, okay.  That, for the record, is

12   again labeled at the top the Trial Court of Probate of Family

13   Department.  So, the signatures there is not your signature?

14             THE WITNESS:  No, sir.

15             THE COURT:  Now, the next page after that appears to

16   bear the signature again of -- is that your signature?

17             THE WITNESS:  That is my signature.

18             THE COURT:  That is your signature?

19             THE WITNESS:  That is my signature.

20             THE COURT:  So that would be, for the record -- let's

21   go back a step to the previous page.

22             Do you have that?

23             THE WITNESS:  Yes, I do.

24             THE COURT:  Okay.

25             So, down there under "mother" there is a signature

1    that is not your signature?

2            THE WITNESS:  That is not my signature, your Honor.

3            THE COURT:  But on the next page there is also the

4    heading under Mother there is a signature that is your

5    signature?

6            THE WITNESS:  That is not my signature.

7            THE COURT:  Oh, neither of them.

8            THE WITNESS:  I have never seen this document.

9            THE COURT:  So neither.  You don't recognize either of

10   those signatures?

11           THE WITNESS:  No, sir.  I do not.

12           THE COURT:  Okay.  That's very good.

13           The next page, Stipulation of the Parties, do you

14   recognize that document?  Do you recognize that document, the

15   one marked Stipulation of the Parties?

16           THE WITNESS:  Yes.  That one I do recognize.

17           THE COURT:  Okay.  Now, there is a signature there

18   Erica Roberts; is that your signature?

19           THE WITNESS:  Yes.

20           THE COURT:  Then, next page after that, another

21   Commonwealth of Massachusetts Trial Court Document, and this

22   one talks about emergency custody and there is a signature

23   there.  Is that your signature?

24           THE WITNESS:  Yes, your Honor.  It is.

25           THE COURT:  Okay.  And the page of that, also Motion

1   for Emergency Custody, this is page 2 of the same document; is

2   that your signature again.

3           THE WITNESS:  Yes, your Honor.  It is.

4           THE COURT:  And finally, page 3 of that same document.

5           THE WITNESS:  Yes, your Honor; it is.

6           THE COURT:  Very good.

7   BY MR. BURKE:

8   Q.  I want to show you one more in the sequence.  This is a

9   document that is not in the other ones.  I have premarked it as

10  Exhibit 6.

11          If I may approach?

12          THE COURT:  Yes.

13          By the way, the Court will receive in evidence all the

14  pages where the witness said she recognized them and recognized

15  her signature, those pages of Exhibit 1.  The Court will

16  receive, for a limited purpose only, the pages she said she did

17  not recognize or that was not her signature.  The Court will

18  receive those only for the purposes of possible future

19  handwriting comparisons or analysis but for no other purpose.

20          MR. BURKE:  Thank you, your Honor.

21          MR. K. LANDAU:  Your Honor, with respect to Exhibit 6,

22  same objection; however, this document was never presented to

23  plaintiff's counsel.  This is the first time we are seeing

24  this, so continuing objection.

25          MR. BURKE:  Again, your Honor --

FCM5ALMH                    Almeciga - cross

1          THE COURT:  See, I don't understand that.  If these

2   were being offered for purposes other than impeachment I would

3   understand that objection but this is -- counsel has phrased it

4   as cross-examination but I think the more technical point is

5   when you are seeking to impeach a witness' credibility with

6   reference to previous statements she has made about her

7   handwriting and so forth, there is no requirement to produce to

8   your adversary documents in advance.  In fact,

9   cross-examination and impeachment would be seriously eroded if

10  one had to produce, in advance, documents that were going to be

11  used solely for that purpose.  So, since that is the purpose

12  that was proffered they will be received for that purpose.

13          Now, if they were being offered for their truth there

14  would be a different issue and we might -- these are not --

15  putting aside the fact they weren't produced to you is also the

16  problem that they are not certified and I don't agree at all

17  with defense counsel that I can take judicial notice of them

18  but that's not the purpose they're being presented.

19          So, with respect to Exhibit 6, just to move this

20  along, is that your signature?

21          THE WITNESS:  No, your Honor.  I don't recognize this

22  document at all.

23          THE COURT:  Okay.  So that will be, again, only

24  received for the very limited purposes of possible future

25  handwriting comparison.

1        MR. BURKE:  Your Honor, would I note that Exhibit 6 is

2    a certified copy of a court document so to be distinguished I

3    would have the Court observe from the other documents that are

4    Exhibit 1.

5        THE COURT:  Well, it does, although this is not an

6    original but presumably you have -- do you have an original

7    certified copy?

8        MR. BURKE:  We do.

9        THE COURT:  So, for what purpose do you want me to

10   receive it?

11       MR. BURKE:  It's impeachment, your Honor.  But if she

12   says that that's not her signature, I simply want to ask a few

13   questions about it.

14       THE COURT:  Okay.  Ask her some questions about it.

15   I'm not receiving it yet for other than the limited purpose

16   previously indicated.

17       MR. BURKE:  I understand.

18       (Defendant's Exhibits 1 and 6 received in evidence)

19   BY MR. BURKE:

20   Q.  Ms. Almeciga, would you look at the document that's been

21   marked Exhibit 6 and please review it?

22   A.  Okay.

23   Q.  Were you the tenant at 39 Avenue 3 in Brockton, Mass?

24   A.  Yes.

25   Q.  And was your rent $950 a month?

1    A.  Yes, sir.

2    Q.  In reviewing this document, is the information on it

3    accurate?

4    A.  No, sir.

5    Q.  What is not accurate about it?

6    A.  The landlord's name is not correct.

7    Q.  Okay.

8         Who was the landlord?

9    A.  Nuno Montrond and Peter Brandao.

10   Q.  Okay.

11        Is there anything else that's not correct?

12   A.  The signature is not correct and the printing of my name is

13   not correct.  Where the name and phone number is put in is not

14   my writing whatsoever.

15   Q.  I would like to turn your attention back to Exhibit 1 and

16   on the document, the first document that you said you did not

17   sign, it's the typed document, it is dated June 16th, 2008, the

18   title of the document is Defendant's Affidavit.  Would you read

19   through that?

20   A.  Give me one moment, please, just to find it?

21   Q.  Sure.  Sure.

22        THE COURT:  I think --

23        MR. BURKE:  I'm not going to spend much more time on

24   this, your Honor.

25        THE COURT:  Because otherwise I think we are going to

1    have to somehow renumber these so that --

2               MR. BURKE:  We could also do that during the break, if

3    that would be convenient for the Court.

4               THE COURT:  Well, that's convenient, but I'm not sure

5    we are taking a break.

6               MR. BURKE:  We could do it while -- we can do that

7    while where in process, your Honor --

8               THE COURT:  All right.

9               MR. BURKE:  -- with my left hand.

10              THE COURT:  Anyway, this is the document he is

11   referring to.  Yes, you have got it?

12              THE WITNESS:  I am just trying to understand what it

13   is you would like me to review on this document.

14   BY MR. BURKE:

15   Q.  Well, I am going to lead you but I'm going to ask you if

16   the information that is in here is accurate.  Because I know

17   that you have testified that that is not your signature but I

18   just want to see if the information that is attributed to you

19   is in fact accurate.

20   A.  It actually is not accurate.

21   Q.  What is not accurate about it?

22   A.  Please look at no. 16.

23   Q.  Okay.  Is there anything else that's not accurate about it?

24   A.  Please, give me a moment.

25   Q.  Sure.

FCM5ALMH                    Almeciga – cross

1          THE COURT:  Let me, just so that I am clear, do you

2    have children?

3          THE WITNESS:  Yes, I do, your Honor.

4          THE COURT:  And how many?

5          THE WITNESS:  I have three.

6          THE COURT:  And this says in the first paragraph that

7    you were the primary caretaker for your children until December

8    2005; was that true?

9          THE WITNESS:  That is not correct.

10          THE COURT:  Okay, because you were the primary

11    caretaker for less time or more time?

12          THE WITNESS:  For more time.

13          THE COURT:  Okay.  Then it says in January 2007 the

14    children's father Rob and I stipulated that he would have

15    primary physical custody and I would have parenting time twice

16    a week and every other weekend; is that true?

17          THE WITNESS:  That is correct.

18          THE COURT:  So, this is in connection with a matter

19    that was brought against you, it says, by Kimberly Wallace.

20    Who is Kimberly Wallace, if you know?

21          THE WITNESS:  That is my children's aunt.

22          THE COURT:  Okay.  Did she bring an action against

23    you?

24          THE WITNESS:  I do not recall this.  I don't recall

25    this document whatsoever, or this action.

FCM5ALMH                    Almeciga - cross

1          THE COURT:  Okay.

2          MR. K. LANDAU:  Your Honor?  Ms. Almeciga may not

3   understand the term "action."

4          THE COURT:  Yes, that's a good point.

5          Do you recall whether the aunt brought a lawsuit

6   against you?

7          THE WITNESS:  A lawsuit?  No.

8          THE COURT:  Go ahead, counsel.

9   BY MR. BURKE:

10  Q.  Ms. Almeciga, I'm going to be done with that exhibit for

11  the moment.

12  A.  Okay.

13  Q.  Let me ask you, during your interview with CIR you never

14  expressed any concerns about your personal safety, did you?

15  A.  That I do not recall.

16  Q.  And during your interview with CIR you never told

17  Mr. Livesey or Mr. Hooper that you didn't want to be

18  interviewed, did you?

19  A.  No, I did not.

20  Q.  At your deposition you testified that you had an oral

21  agreement with Mr. Livesey that your face would be blacked out,

22  correct?

23  A.  That is absolutely correct.

24  Q.  And under this supposed agreement your face was to be

25  blacked out permanently for uses?  Is that correct?

1  A.  Yes, sir.  That is correct.

2  Q.  But there was nothing in the supposed agreement to prevent

3  CIR from using your full name as part of this news reporting,

4  correct?

5  A.  The agreement was that they were supposed to keep my

6  identity completely concealed.

7  Q.  But your name wasn't part of that understanding, correct?

8          MR. K. LANDAU:  Objection.  Asked and answered.

9          THE COURT:  Well, tell me a little bit more about this

10  oral agreement.  When was this reached?

11         THE WITNESS:  The agreement was reached when the

12  interview was set up.  It was agreed upon that my name -- my

13  name being used was never ever mentioned.  The only thing that

14  was mentioned was if my face was going to be shown, I was not

15  okay with that so I asked them, was there a way to keep my face

16  from being shown as a previous interview had done?  And he said

17  absolutely.

18         THE COURT:  Okay.  And who was he?

19         THE WITNESS:  Bruce Livesey.

20         THE COURT:  When you say your name was never

21  mentioned, meaning it didn't come up in the conversation either

22  way?

23         THE WITNESS:  Correct.

24         THE COURT:  Okay.  Go ahead, counsel.

25  BY MR. BURKE:

FCM5ALMH                    Almeciga - cross

Q.  I'm going to go back to the agreement.  You testified that

the discussion about your name was not a part of the agreement,

correct?

A.  Correct.

Q.  How could your identity be protected under this supposed

agreement if CIR was free to use your full name as a part of

its reporting?

A.  It was never asked me if my name could be used.

Q.  But it is not a part of the agreement, correct?

A.  It was never asked so it -- no.

         THE COURT:  Are you saying -- what I understand is

that you thought it was implicit in the agreement.

         THE WITNESS:  Could you please explain implicit to me,

please?

         THE COURT:  Implicit, yes.

         Your request was to keep your identity -- actually,

maybe we should -- do you remember the words, approximately, of

this conversation that you had with Mr. Livesey?

         THE WITNESS:  Pretty much, yes.

         THE COURT:  All right.  So, tell us what you said and

what he said.

         THE WITNESS:  What I had asked him was is it a

guarantee that my safety would come first?  I would appreciate

that my face and my voice -- he said that he could make my

voice kind of sound like digitized is I believe the word that

1    he used, was digitized, and that he could blur out my face and

2    there would be no issues.  Nothing was ever mentioned about my

3    name being used.

4             THE COURT:  So maybe this is a question really for

5    your counsel.  Is it your position that implicit in that

6    conversation was an agreement not to use her name?  Or not?  Is

7    that your position or not?  I'm asking plaintiff's counsel.

8             MR. K. LANDAU:  Oh, yes.  Absolutely.

9             MR. BURKE:  I knew that wasn't for me.

10            THE COURT:  It was a soft ball question.

11            So, I'm not sure that -- I mean, you are free to ask

12   this witness anything more, but I think the issue to the extent

13   the name is involved it is a legal issue, not a factual issue,

14   so to speak.  The question is assuming arguendo that

15   conversation took place, assuming arguendo it is a binding

16   contract, assuming arguendo that she did not sign the release,

17   did that conversation include not just her voice and her face

18   but also implicitly her -- any other aspect of her identity

19   such as her name.  That's the legal question.

20   BY MR. BURKE:

21   Q.  Ms. Almeciga, you have what you called at your deposition a

22   "public figure Facebook page" in which there are many pictures

23   of you and your face is not obscured.  That's correct, isn't

24   it?

25   A.  That is correct.

1   Q.  If you are scared of being seen publicly why post pictures

2   of your face and your body on Facebook?

3   A.  I model.  I'm a model.

4   Q.  And so you're not concerned about having your face out

5   there publicly?

6   A.  My face has already been seen by millions of people.

7   Q.  You submitted a declaration in connection with this

8   proceeding that your apartment was burgled in August of 2012;

9   is that correct?

10  A.  I'm sorry, could you repeat that?  I didn't quite hear you.

11  Q.  Yes.

12          You have submitted a declaration in connection with

13  this proceeding that your apartment was burgled in August of

14  2012; is that correct?

15  A.  Yes, sir.

16  Q.  And you testified that you began receiving calls and people

17  were speaking badly about you -- that's your phrasing --

18  starting in 2010; isn't that correct?

19  A.  No, sir.  Not to the best of my recollection.

20  Q.  Reading from your deposition testimony under oath on

21  September 24th at lines 191:20 through 192:10.

22  "Q  I wanted to see if we could bring some precision to an

23  issue we have talked about before.  Do you have an estimation

24  as to when you believe your e-mail and your social media

25  accounts were hacked where false accounts in your name were

1    first put up?

2    "A  It started around 2010.  I started noticing little things

3    and it started getting serious come about 2013.

4    "Q  So it started in 2010?

5    "A  It went on for about three years.

6    "Q  Has it stopped now?

7    "A  As far as I know, yes.  I haven't received anything like as

8    before so I'm going to say yes."

9              THE COURT:  That's different from the -- I don't think

10   that's inconsistent with the testimony she just gave.

11             You were asking about her apartment being burgled.

12             MR. BURKE:  No, I asked a follow up, your Honor, that

13   said you testified you began receiving calls and people were

14   speaking badly about you starting in 2010.

15             THE COURT:  I see.  All right.  Well, in any event,

16   you heard what the testimony was.  Is that accurate, the

17   testimony you gave in the deposition?

18             THE WITNESS:  2010 I don't believe that I would have

19   said that because it didn't start until 2012 when I filed --

20   2013, I believe, when I filed the police report when my

21   information was hacked; my e-mails, my cell phone.

22             MR. BURKE:  Your Honor, the deposition testimony that

23   I read is contradictory.

24             THE COURT:  I will receive it.

25             MR. BURKE:  Yes.

1          THE COURT:  Something I meant to ask you beforehand.

2          THE WITNESS:  Yes, sir?

3          THE COURT:  My understanding is -- and you don't have

4    to go into any details of this -- that you take certain a

5    medications?

6          THE WITNESS:  Yes, sir.

7          THE COURT:  And notwithstanding that, is your mind

8    clear today?

9          THE WITNESS:  Yes, my mind is clear.

10         THE COURT:  Okay.  Very good.  I just needed that for

11   the record.

12         Go ahead.

13         MR. K. LANDAU:  Your Honor, just for clarification as

14   to what the nature of the question was, we are going to object

15   based on it being vague.  If it was a specific remark --

16         THE COURT:  If I find it wasn't inconsistent then it

17   will not play any role in any decision I make.  If I do find

18   then we will see what happens.  So, it is harmless in any

19   event.

20         MR. K. LANDAU:  Thank you.

21   BY MR. BURKE:

22   Q.  Ms. Almeciga, you didn't leave Georgia because of any fears

23   that you had after CIR published your interview, did you?

24   A.  That is part of the reason.

25   Q.  You testified at your deposition that you left Georgia

1    because of where your children were and because you "couldn't

2    live with cockroaches," isn't that correct?

3    A.   That is correct.

4    Q.   I would like to show you --

5              THE COURT:   Where do you live now?

6              THE WITNESS:   I currently live -- I'm currently

7    homeless right now.

8              THE COURT:   I was going to say, if you left Georgia to

9    escape cockroaches, New York would not necessarily have been a

10   place you would want to go.

11             Go ahead, counsel.

12             MR. BURKE:   If I could approach, your Honor?

13             THE COURT:   Yes.

14   BY MR. BURKE:

15   Q.   I would like to show you what's been marked as Exhibit 15,

16   we have referred to it as the Georgia documents.  Can I direct

17   your attention to the first page?  Did you sign that document

18   where it says Petitioner?

19   A.   I do not see a signature for petitioner.  I'm sorry.

20             THE COURT:   He means where.

21             THE WITNESS:   Consent to dismiss?

22             THE COURT:   Yes, but if you look underneath it in very

23   small print it says Petitioner.

24             THE WITNESS:   Okay.  I apologize.  No, I did not sign

25   this document.

FCM5ALMH                    Almeciga - cross

1    BY MR. BURKE:

2    Q.  Okay.  And then skip to the third page; do you see the name

3    Petitioner again in the middle of the page, is that your

4    signature?

5    A.  No, sir.  It is not.

6    Q.  Then on the next page after that, also under the word

7    Petitioner, is that your signature?

8    A.  No, sir.  It is not.

9    Q.  And then I believe the next signature is -- it is the

10   second to the last page on the left-hand side near the bottom;

11   is that your signature?

12   A.  Just let me get to it, please?

13   Q.  Yes.

14   A.  No, sir.  That is not my signature.

15   Q.  So you didn't sign your name to any of these documents?

16   A.  No, sir.

17          MR. K. LANDAU:  Objection.  Asked and answered.

18          THE COURT:  No.  I think that is a fair question but

19   the answer is no, so there it is.

20   BY MR. BURKE:

21   Q.  Do these signatures look like your signature?

22          THE COURT:  Sustained.

23          Were you involved in an action in Georgia -- well,

24   first of all, let me go back.

25          Who, if you know, is Rosendo Gutierrez?

FCM5ALMH                    Almeciga - cross

1          THE WITNESS:  Your Honor, I do not know a Rosendo

2    Gutierrez.

3          THE COURT:  Do you know anything about this action?

4          THE WITNESS:  I absolutely do not.

5          Your Honor, if I may?

6          THE COURT:  Sure.

7          THE WITNESS:  This document was filed after my home

8    was broken into and my children's birth certificates, social

9    security cards, my social security card, my passport, along

10   with a number of other things were stolen out of my house which

11   is in a police report.

12         THE COURT:  So -- and I know we are going to hear

13   about that later but I guess my question is why would someone

14   who stole your identity, in effect, bring an action against

15   someone else for stalking?

16         THE WITNESS:  To answer your question, I believe this

17   was revenge.

18         THE COURT:  Revenge?

19         THE WITNESS:  Correct.

20         THE COURT:  And what is your basis for believing that?

21         THE WITNESS:  I was letting a young woman stay with me

22   who she was a minor, she was 17.  Her mother used to kick her

23   out all the time.  She was involved with the man who broke into

24   my apartment who they did meth together.  That is the man who

25   Isaac woke up to who broke into my house standing over him with

1    my bedroom ransacked and I was in Texas at the time of the

2    interview that this actually happened.

3          THE COURT:  So you think she was using your identity

4    to get back at -- you think Mr. Gutierrez was that person?

5          THE WITNESS:  I believe she did this to get back at

6    me.  I don't know.

7          THE COURT:  To get back at you?

8          THE WITNESS:  Mr. Gutierrez.

9          THE COURT:  How does this get back at you?

10         THE WITNESS:  For asking her to leave my home.

11         THE COURT:  But she's not bringing an action against

12   you, she's bringing an action against someone else.

13         THE WITNESS:  Right, but to make it look like I did

14   something I --

15         THE COURT:  Going back to Exhibit 1, if you still have

16   that there.

17         THE WITNESS:  I do, sir.

18         THE COURT:  So now that was an action you brought,

19   yes?

20         THE WITNESS:  Yes.

21         THE COURT:  And who was Nuno Montrond and Peter

22   Brandao?

23         THE WITNESS:  Those were my landlords.

24         THE COURT:  I see.

25         Okay.  Go ahead, counsel.

1  BY MR. BURKE:

2  Q.  Ms. Almeciga, did you ask anyone to sign these documents on

3  your behalf that were filed in Georgia?

4  A.  Absolutely not.

5  Q.  So you didn't file any of the documents that are shown in

6  Exhibit 15 in Georgia?

7          MR. K. LANDAU:  Objection.  Asked and answered.

8          THE COURT:  Yes, I think that's true.  Sustained.

9          MR. BURKE:  I just don't want there to be any

10  ambiguity, your Honor.

11          THE COURT:  I understand, that's why I overruled the

12  previous question to which that objection had been made but

13  here I think there can be no ambiguity.

14  BY MR. BURKE:

15  Q.  Do you recall ever seeking a restraining order against

16  anyone during the time that you lived in Georgia?

17  A.  No, sir.

18  Q.  Look at page 11 of the Georgia documents, it's --

19          THE COURT:  Wait.  Are these in evidence yet?

20          MR. BURKE:  Yes.  No, they're not, your Honor.

21          THE WITNESS:  Could you give me a moment?

22          THE COURT:  Are you offering this?

23          MR. BURKE:  Yes, I am, your Honor.

24          THE COURT:  Any objection?

25          MR. K. LANDAU:  Same objection as previously.  I don't

1  believe these are --

2          MR. BURKE:  We have an endorsed copy, certified copy.

3          MR. K. LANDAU:  Oh you do, yes.

4          THE COURT:  They're received.

5          (Defendant's Exhibit 15 received in evidence)

6          THE WITNESS:  Does it start with, The Court has

7  jurisdiction over this matter because?  Is that the page I'm

8  looking at?  If I counted correctly?

9          THE COURT:  Counsel?

10         MR. BURKE:  Yes.  I'm sorry, I was just counting

11 myself.

12 BY MR. BURKE:

13 Q.  What I am going to do, let me --

14         THE COURT:  If you want to have the witness look at a

15 page, why don't you just identify it by some statement at the

16 top of the page.

17         MR. BURKE:  Correct.

18 BY MR. BURKE:

19 Q.  I would like you to go to the document that begins on -- it

20 begins with respondent's identifying fact sheet, it looks like

21 this.

22 A.  I'm sorry.  I can't see it from here.  I apologize.

23         THE COURT:  Here.  He is referring to this one.

24         THE WITNESS:  Okay.  One moment, please.  May I see

25 that again, your Honor?

1           THE COURT:  Yes.

2           THE WITNESS:  I apologize.  Okay.

3           THE COURT:  It is about two thirds through, I would

4    say.

5           THE WITNESS:  Sorry, I have long nails.  I have it in

6    front of me.

7    BY MR. BURKE:

8    Q.  If you turn to the next page?

9    A.  Yes.

10   Q.  Do you recognize your name there?

11   A.  Yes, I do.

12   Q.  Is that your date of birth?

13   A.  Yes, sir.

14   Q.  And what are the next three names that appear on there?

15   A.  Amaynilee Wallace, Tyler Gill, and Robert Wallace, Jr.

16   Q.  Are those your children?

17   A.  Yes, they are.

18   Q.  Are those the correct spellings of your children's names?

19   A.  Yes, they are, except for Tyler's.

20   Q.  How is Tyler spelled?

21   A.  T-Y-L-E-R, but his last name is Double L.

22   Q.  I see.

23           THE COURT:  So instead of G-I-L it is G-I-L-L.

24           THE WITNESS:  Correct.

25   BY MR. BURKE:

1    Q.  Is the information reflecting date of birth accurate for

2    each?

3    A.  Yes, it is, sir.

4    Q.  If you would turn to the next page, Petition for Relief

5    Under the Stalking Statute.

6    A.  Okay.

7    Q.  In June of 2013 did you live at this address, the 2630

8    Windsor Woods Lane in Georgia?

9    A.  Yes, sir.

10   Q.  And under the phone number which is listed, is that your

11   telephone number that 857-333-4838?

12   A.  No, sir.

13   Q.  So, in June of 2014 you used that cell phone number,

14   correct?

15   A.  I do not recall.

16   Q.  Do you recall testifying about your cell phone number at

17   your deposition?

18   A.  I do.

19           MR. BURKE:  If I can approach, your Honor?

20           THE COURT:  Yes.

21           MR. BURKE:  I believe this is already in evidence, it

22   is Exhibit 51.

23   BY MR. BURKE:

24   Q.  If you could take a look at that.  Would you read

25   underneath it -- well, I will read to expedite.  *Hey Bruce, how*

1  *are you doing? Well, I hope good. Can you please give me a*

2  *call? I need to talk to you?* And then there is 857-333-4838.

3  A.  Yes.  That's a phone that I had borrowed from a friend out

4  there.

5  Q.  Whose friend's phone did you borrow?

6  A.  His name was George.

7  Q.  Is that a one time that you used that telephone?

8  A.  I believe I used this phone a few times.

9  Q.  Okay.

10        Did you use it earlier?  The top e-mail is from

11  February but the e-mail immediately below that is from

12  November, isn't it?

13  A.  I see September immediately below that.

14  Q.  Okay.  Under November 6, 2012, Hi Bruce?

15  A.  Yes, I see that.

16  Q.  Do you see that same telephone number there again?

17  A.  I do.

18  Q.  And what is George's last name?

19  A.  I believe it's Freightman.

20  Q.  But you understand that that's the same phone number listed

21  in the petition that was filed in Georgia just a few weeks

22  later, correct?

23        MR. K. LANDAU:  Actually, your Honor, that is a

24  mischaracterization.  According to the dates in the Georgia

25  documents it indicates June 19, 2013 and the e-mail that

1  counsel was referring to is November 6, 2012.

2           MR. BURKE:  I guess that's my question.

3           THE COURT:  Well, that's a good point and thank you

4  for calling that to my attention except that that, the date

5  you're referring to from 2015 is when Mr. Livesey, as you may

6  recall, recaptured this.  But, if you look below it at the

7  forwarded message it's from Erica Reta to Bruce Livesey dated

8  February 8, 2013, yes?

9           MR. K. LANDAU:  Yes.

10          THE COURT:  And the document --

11          MR. K. LANDAU:  Is six months --

12          THE COURT:  So you are saying it is more than a few

13 weeks, it is a matter of a few months.

14          MR. K. LANDAU:  Yes.  Yes, your Honor.

15          THE COURT:  Okay.  That's fair enough.

16 BY MR. BURKE:

17 Q.  But throughout that time you had access to George's cell

18 phone?

19 A.  If he was present.

20 Q.  Was he regularly around you?

21 A.  Not regularly, no.

22 Q.  Okay.

23          I may have asked this --

24          THE COURT:  So, wait a minute.

25          MR. BURKE:  Yes.

1          THE COURT:  So, why did you say to Mr. Livesey in this

2     e-mail you can call me any time at that number?

3          THE WITNESS:  I had actually borrowed that phone, my

4     phone had gotten hacked so I actually borrowed this phone.

5     This was the very first time my phone was hacked and he had two

6     cellular phones, one work phone, one personal phone, and so I

7     could call home to family, I was able to use his phone during

8     the day.

9          THE COURT:  So you had possession of the phone

10    throughout the day during that period?

11         THE WITNESS:  Not -- not for like hours on end but I

12    would ask to borrow it, can I borrow your phone for 30 minutes,

13    can I borrow your phone for 25 minutes.

14         THE COURT:  And then do you recollect at what point

15    you gave it back to him?

16         THE WITNESS:  As far as a date?

17         THE COURT:  Was he living with you?

18         THE WITNESS:  Oh, no.  He was married with children,

19    no.

20         THE COURT:  So, when your apartment was ransacked and

21    goods were taken which was sometime before or after that?

22         THE WITNESS:  I believe that -- my apartment was

23    ransacked while I was in Texas doing this interview in August.

24         THE COURT:  In August?

25         THE WITNESS:  Right.

1              THE COURT:  August of?

2              THE WITNESS:  2012.

3              THE COURT:  So.

4              THE WITNESS:  My phone was one of the items that was

5     stolen.  My phone did not go to Texas with me.

6              THE COURT:  But that was your phone.  I thought this

7     was George's phone.

8              THE WITNESS:  This is George's phone.

9              THE COURT:  George's phone was stolen?

10             THE WITNESS:  Yes, he was a neighbor.  No, my phone

11    was stolen.

12             THE COURT:  So, how did the person who ransacked your

13    apartment or the person who you believe filed this action in

14    Georgia know about the number for George's phone?

15             THE WITNESS:  This number was on my caller I.D. as

16    well as written on -- I'm trying to think what you call where

17    you write, the dry erase board, it was also written.

18             THE COURT:  I see.

19             Counsel?

20    BY MR. BURKE:

21    Q.  Ms. Almeciga, who is the father of your three children?

22    A.  Which two children are we speaking about?

23    Q.  Your three children.  I'm sorry if I misspoke.  Who is the

24    father of your children?

25    A.  Elvis Ruiz is the father of my oldest children.

1   Q.   All right, and that's --

2   A.   That is Tyler's father.  And Robert Wallace is the father

3   of my youngest two.

4   Q.   Is the Robert Wallace that's referenced in Exhibit 1, which

5   is the Massachusetts documents, is that the same Robert

6   Wallace, Sr.?

7   A.   Yes, he is Robert Wallace, Sr., correct.

8   Q.   I would like you to still stay on Exhibit 15 and under Sex

9   next to your date of birth and/or your daughter's date of birth

10  there is to what my mind is --

11  A.   Can I please have a second to get there?

12  Q.   Yes, of course.  I apologize.  It looks like this.

13  A.   Yes.  It is the same page we were on.  You are way ahead of

14  me.

15  Q.   That's a first.

16  A.   Okay.  Got it.

17  Q.   Can you identify what that figure is in the box that has

18  the heading Sex?

19  A.   It looks like a 7 to me.

20  Q.   So that's a 7?

21  A.   That's what I would assume.  I --

22  Q.   Okay.

23           I would like to approach, if I can, and show you what

24  was earlier marked as Exhibit A.  It is Ms. Carlson, the

25  handwriting expert's report, and there is a page that is marked

1    K2?

2    A.  Could you give me the second, please?

3    Q.  Yes.  It is marked K2 on the side?

4    A.  If you can tell me the section, please?

5    Q.  It is six sages in QED, K2?

6    A.  K2.

7    Q.  Do you recognize this?

8    A.  Yes, I do.

9    Q.  What is this?

10   A.  That's -- I wrote my letters out.

11   Q.  And as you go down to F?

12   A.  Yes.

13   Q.  Does that F look like a 7 to you?

14   A.  No, it looks like an F.

15   Q.  So, and I am looking on the left-hand side E, between E and

16   G you have -- is that how you write an F?

17   A.  Yes.  My F swoops down a lot more than what was written on

18   this paper, this looks like a no. 7.  My F swoops down and goes

19   up.

20   Q.  So you are referring to Exhibit 15, the Georgia documents,

21   under the that the -- so that doesn't look like your

22   handwriting too?

23   A.  No, it does not.

24   Q.  Is there anything on the Georgia document Exhibit 15 that

25   looks like your handwriting to you?

1   A.  May I put this down for a minute?

2   Q.  Yes.  Of course.

3   A.  There are some similarities to my handwriting but I did not

4   sign or write this document so my answer is no.

5   Q.  Let's turn to the bottom of page 2 of the Georgia document,

6   Exhibit 15.

7   A.  Okay.

8   Q.  It's the third line from the bottom.  Do you see that -- I

9   will read it:  I am leaving/moving back to Mass on 6/30/13.

10  A.  I see that.

11  Q.  Did you write that?

12  A.  No, I did not.

13  Q.  But in fact you moved back from Georgia back to

14  Massachusetts in late 2013, didn't you?

15  A.  Correct.

16  Q.  And in fact you and Isaac Duarte left Georgia without

17  "saying anything to anyone" on October 24th, 2013, according to

18  your own affidavit, correct?

19  A.  Part of that is correct.

20  Q.  Well, that's from your affidavit.  What part is not

21  correct?

22  A.  He left driving the truck on the 24th.  I flew out on the

23  27th.

24  Q.  But you didn't tell anybody that you were leaving?

25  A.  No, sir.  That's the correct part.

FCM5ALMH                    Almeciga - cross

1    Q.  Don't you find it odd that somebody would know that are you

2    moving to Massachusetts?

3    A.  No.

4             THE COURT:  Although there was no objection, the Court

5    can't help but sustain the objection to that patently improper

6    question.

7             MR. K. LANDAU:  Thank you.

8             MR. BURKE:  Patently?

9             THE COURT:  Patently, yes.  Because her opinion of

10   whether something is odd nor not has no evidentiary value

11   whatsoever.

12            MR. BURKE:  If it is not of evidence to the Court then

13   I am not interested in it.

14            THE COURT:  Then we are in total harmony.

15            MR. BURKE:  Don't ask me to sing.

16   BY MR. BURKE:

17   Q.  Your Honor, it is important for me, even if I have asked

18   this before, I want to make sure that, Ms. Almeciga, you don't

19   know a man by the name of Rosendo Gutierrez?

20   A.  No, sir.  I do not.

21   Q.  Did you ever file for a restraining order against the

22   person with the name of Rosendo Guttierez in Georgia or

23   otherwise?

24   A.  No, sir.  I did not.

25   Q.  When you lived in Georgia did you know anyone with the last

1   name Gutierrez?

2   A.  I was aware of somebody, a younger female with the last

3   name of Gutierrez but not a Rosendo.

4   Q.  And, in Exhibit 15 Mr. Gutierrez is identified as living at

5   2580 Windsor Wood Lane, apartment F, in June of '13.  You lived

6   at 2580 Windsor Wood Lane in apartment J from December of 2011

7   to March of 2013; isn't that correct?

8   A.  No, sir.  That is incorrect.

9   Q.  Your affidavit, paragraphs 4 and 5 and 11 and 12 indicate

10  that what is correct?

11  A.  We moved to 2630 in 2013, I believe.  It was either

12  August --

13              MR. K. LANDAU:  Your Honor, maybe for clarification,

14  if counsel wants to ask the specific dates he can allow the

15  witness to refer to her affidavit, just for needs?

16              MR. BURKE:  I had very specific dates, your Honor.

17              THE COURT:  No, no.  I think you did too but let me

18  see her affidavit.

19              MR. BURKE:  If I may approach, your Honor?  We have

20  premarked it as --

21              THE COURT:  I don't care what it is marked as, just

22  let me see it for a second.

23              So, if you want to take a look for a moment you can

24  stand up.

25              THE WITNESS:  I can stand up?

1          THE COURT:  Yes, absolutely.

2          In this affidavit which you filed a few months ago you

3    say that I moved to Georgia from Massachusetts on December 9,

4    2011; do you see that?

5          THE WITNESS:  That's correct.

6          THE COURT:  Then you say the address was 2580 Windsor

7    Woods Lane, apartment 1, meaning that's the --

8          THE WITNESS:  J.

9          THE COURT:  J; thank you very much.

10          THE WITNESS:  I didn't mean to interrupt.

11          THE COURT:  No, no.  Thank you.

12          Meaning that your initial address in Georgia starting

13    on or about December 9th, 2011, was 2580 Windsor Woods Lane

14    apartment J, yes?

15          THE WITNESS:  Correct.

16          THE COURT:  So, when did you leave that apartment?

17          THE WITNESS:  We moved -- I believe they moved us out

18    after the break-in to the house in 2580, apartment J when I was

19    in Texas at the interview.  The month that we moved in was when

20    the apartment was ready, it was a couple -- I believe it was a

21    couple months after --

22          THE COURT:  Whoa, whoa.

23          Down in paragraph 11 it says:  After the break-in on

24    August 16, 2012, we were offered a new apartment at 2630

25    Windsor Woods Lane, apartment J.

1              THE WITNESS:  Correct.

2              THE COURT:  Is that the one you were just referring

3     to?

4              THE WITNESS:  Yes.

5              THE COURT:  And it says you moved into that one in

6     April 2013, right?

7              THE WITNESS:  Correct.  He had said March, that's

8     where I got confused.

9              THE COURT:  I see.  Very good.

10             THE WITNESS:  So I apologize.

11             MR. BURKE:  Thank you, your Honor.  Did you have

12    anything further?

13             THE COURT:  No.

14    BY MR. BURKE:

15    Q.  Ms. Almeciga, would it surprise you to learn that Rosendo

16    Guttierez shares two of the same cell phone numbers that you

17    have used, according to a database that's used by --

18             THE COURT:  No, no.  That's an even worse question

19    than the last.

20             MR. K. LANDAU:  Objection.

21             THE COURT:  The question is would she be surprised to

22    learn?  That is of course just a form of, since whether she

23    would be surprised or not is of no evidentiary relevance

24    whatsoever, it is a form of counsel testifying and that will

25    not be permitted in my court, ever.

1    MR. BURKE:  Very good, your Honor.

2    BY MR. BURKE:

3    Q.  If Mr. Gutierrez shared the same cell phone number as you,

4    would that be a coincidence to you?

5                MR. K. LANDAU:  Objection.

6                THE COURT:  Sustained.

7    Q.  Ms. Almeciga, in a supplemental submission that your

8    counsel filed on your behalf on November 24th, you claim that

9    while you were living in Georgia you became aware of a girl

10   named Juliee Gutierrez?

11   A.  Correct.

12   Q.  Who is Juliee Gutierrez?

13   A.  I do not know.  I saw her a couple times, I do not know her

14   personally.

15   Q.  And as a part of plaintiff's supplemental submission on

16   November 24th, your counsel attached some tweets from

17   Ms. Juliee Gutierrez from 2012 under the Twitter handle and my

18   apologies Julieebitches is the name of the Twitter handle.

19                Are you familiar with this twitter account?

20   A.  I am not.

21   Q.  Have you ever seen any of the postings on that account?

22   A.  I did not until my lawyer had showed them to me.

23   Q.  Okay.  And I don't want to ask you questions about what

24   your lawyer showed you or didn't show you but I would like to

25   show Exhibit D that was offered by your counsel in their brief.

1             If I could approach?

2             THE COURT:  Yes.

3             MR. BURKE:  It is Exhibit 38.

4             THE COURT:  Counsel, just so you are aware, your

5    examination must conclude by 1:00.

6             MR. BURKE:  Thank you, your Honor.

7             THE COURT:  You may do better than that, but.

8             MR. BURKE:  I will do better than that.

9             THE COURT:  Okay.

10   BY MR. BURKE:

11   Q.  Would you review Exhibit 38, please?

12   A.  Okay.

13   Q.  So, in these tweets Juliee refers to you as her stepmom and

14   her dad's girlfriend, does she not?

15   A.  I see an Eric Reta, I don't see Erica written.  And my

16   dad's girlfriend, she's not referring to me.

17   Q.  So, on the second page:  My stepmom is Eric Reta, the one

18   in the green?  Do you think that's referring to an Eric Reta

19   and not to you?

20   A.  I don't recall ever wearing anything green.  I have never

21   seen these.  Do you have a picture?

22   Q.  No.  This is all that your counsel provided in the brief.

23            MR. K. LANDAU:  Objection, your Honor.  If counsel

24   wishes to offer this as an exhibit and then ask a question and

25   doesn't like the answer to it, then at least he can provide the

1  witness with the photo that he is suggesting that refers to

2  her.

3         MR. BURKE:  It was not provided by counsel in the

4  exhibit.  I am simply asking --

5         THE COURT:  Do you want to offer -- putting aside what

6  else may or may not be available, do you want to offer 38 or

7  not?

8         MR. BURKE:  I do.  It was attached to --

9         THE COURT:  Any objection?

10        MR. K. LANDAU:  No objection for the purpose of the

11 exhibit, but this was included in the supplemental briefing in

12 an entirely different context so I am just not quite certain --

13        MR. BURKE:  Your Honor --

14        THE COURT:  38 is received.

15        (Defendant's Exhibit 38 received in evidence)

16 BY MR. BURKE:

17 Q.  I would like to approach with Exhibit 39.  Will you review

18 39, please?

19 A.  I read it.  I just read it.

20 Q.  Do you recognize -- this says:  I consider the lady Erica

21 my dad's been seeing stepmom always, we get along so well.

22        THE COURT:  Are you offering 39?

23        THE WITNESS:  I don't even know --

24        THE COURT:  I'm sorry.

25        Are you offering 39?

1          MR. BURKE:  I am.

2          THE COURT:  Any objection?

3          MR. K. LANDAU:  Objection.  I mean this is --

4          THE COURT:  What's the ground of the objection?

5          MR. K. LANDAU:  Well, I think that it is hearsay

6    and --

7          MR. BURKE:  It's from the same Twitter account as

8    offered by counsel.

9          THE COURT:  That's why I think the objection has been

10   waived.  Received.  39.

11         (Defendant's Exhibit 39 received in evidence)

12         THE COURT:  Go ahead.

13   BY MR. BURKE:

14   Q.  If I can show you --

15         THE COURT:  Did you want to say something about this?

16         MR. BURKE:  Yes, please.

17         THE COURT:  I thought you were starting to say

18   something.

19         THE WITNESS:  Anybody could have put my name in

20   anything.  I don't even know this girl so I don't know.

21         MR. BURKE:  Okay.  If I can approach, your Honor?

22         THE COURT:  Yes.

23   BY MR. BURKE:

24   Q.  Would you please review no. 41?

25   A.  Yes, I just read it.

1    THE COURT:  You are offering 41, counsel is raising

2    the same hearsay objection, the Court is again holding the

3    objection has been waived so 41 is received.

4    (Defendant's Exhibit 41 received in evidence)

5    BY MR. BURKE:

6    Q.  Ms. Almeciga, this says that Erica is pregnant and it is my

7    dad's baby.  Is there any truth to that?

8    A.  No.  I have three children.

9    Q.  Well, that's not talking about your present children.  Did

10   you ever have a child with anyone else?

11   A.  No, I have not.

12   Q.  Were you ever pregnant with someone else's child?

13   A.  No.

14   Q.  Going back to Exhibit 1.

15   A.  Just give me a second?

16   Q.  Yes.  It is the sixth page in, I asked you about it

17   earlier.

18   A.  Is it the starts with the Application for Temporary -- I

19   see it.  It's labeled.  I'm sorry.  Go ahead.

20   Q.  On -- there is a reference in there, I will read it in the

21   record --

22   THE COURT:  What page?

23   MR. BURKE:  It is the sixth page in of Exhibit 1 of

24   the Massachusetts documents.

25   THE WITNESS:  Okay.

FCM5ALMH                    Almeciga – cross

1          THE COURT:  So the page that begins, The landlord is a

2     corporation?

3          MR. BURKE:  Correct.

4          THE COURT:  All right.

5          THE WITNESS:  I see it.  Yes.

6     BY MR. BURKE:

7     Q.  You testified earlier that you were not seven months

8     pregnant when this document was prepared?

9     A.  No, I was not.  My sister was.

10    Q.  Is this your handwriting?

11         THE COURT:  She already testified it was.

12    Q.  All right.

13         Do you see the reference to your being seven months

14    pregnant?

15    A.  I do see that and it might have just been me writing and I

16    was writing so much.

17    Q.  It wasn't true?

18    A.  No, that's not true.

19    Q.  Is Rosendo Gutierrez the individual you referred to --

20    well, nothing further, your Honor?

21         THE COURT:  All right.  So, plaintiff's counsel, you

22    can begin and then we will take our lunch break at 1:00 and we

23    will pick up after that.

24         By the way, just for my, the gentleman who has been so

25    patiently waiting outside and was here last time as well, what

1    is he here to testify about?

2              MR. K. LANDAU:  Your Honor, actually, you wanted him

3    to be present.

4              THE COURT:  Yes, but remind me.

5              MR. K. LANDAU:  He may not even be needed.

6              MR. BURKE:  Your Honor, we don't anticipate he is

7    going to be very long.

8              THE COURT:  Oh, you're going to call him?

9              MR. BURKE:  Well, we plan only to ask him sort of

10   follow-up questions, your Honor.

11             THE COURT:  My only question is --

12             MR. BURKE:  He did submit an affidavit, your Honor.

13             THE COURT:  Yes.  That's right.  Now I remember.

14             MR. BURKE:  Would you like a copy?

15             THE COURT:  No, I can get it, but my question is

16   really for plaintiff's counsel.  If you wanted to take him out

17   of order now I would do that if he is very short, just so that

18   he doesn't have to stick around.

19             MR. K. LANDAU:  They traveled here together.

20             THE COURT:  Pardon?

21             MR. K. LANDAU:  They traveled -- I'm sorry, plaintiff

22   and Mr. Duarte traveled together.

23             THE COURT:  Traveled together.  Okay.  So, that's fine

24   then.  Then let him wait.

25             Go ahead.

1    REDIRECT EXAMINATION

2    BY MR. K. LANDAU:

3    Q.  Ms. Almeciga, there has been some time spent on the

4    documents referred to as the Georgia documents.

5    A.  Correct.

6    Q.  Can you turn to page 2, bottom paragraph?

7    A.  Yes.

8    Q.  Where it begins with, I wish to have the Court dismiss.  Do

9    you see that?  Do you see that section?  It is under no. 3?

10             THE COURT:  I'm sorry?

11             THE WITNESS:  Yes, I do see that.

12             THE COURT:  Got it.

13             THE WITNESS:  Do you see it, your Honor?

14             THE COURT:  Yes, I see.  Yes, and for the record, this

15   is page 2 of Exhibit 15.

16             MR. K. LANDAU:  Yes, my apologies; page 2, Exhibit 15.

17             THE WITNESS:  Okay.

18   BY MR. K. LANDAU:

19   Q.  Defense exhibit.

20             Can you review what is written in the section and

21   identifying anything that is inaccurate?

22   A.  The whole paragraph is inaccurate.

23   Q.  Okay.  So, did you not have a daughter that was born three

24   months premature?

25   A.  No, sir.  I do not.

1  Q.  And she doesn't need to lie because this person doesn't

2  exist?

3  A.  No, sir.

4  Q.  So there has been a lot of time spent referencing the

5  children that are yours, correct?

6  A.  Correct.

7  Q.  And you testified that your house had been burgled right

8  around this time?

9  A.  Correct.

10  Q.  And can you remind me what was taken from your apartment?

11  A.  To the best of my recollection my children's baby books

12  that have their birth certificates, birth certificates, my

13  passport, Isaac's house keys, a number of documents that had to

14  do with other -- a totally different case, letters.

15          I wasn't sure of exactly everything that was missing

16  because I had just come home to the mess.

17  Q.  Okay.

18  A.  But the major stuff.

19  Q.  There has also been some time spent on a phone number with

20  a number of 857-- I believe it was 857-333-4838?

21  A.  Correct.

22  Q.  Do you recall having filed a police report in July of

23  2013 -- July 24th, 2013?

24  A.  Yes, I do.

25  Q.  And what was that police report regarding?

1  A.  I was getting suspicious phone calls with threats, people

2  threatening to destroy my life, people saying -- I'm not sure

3  if I am allowed to use the language in your courtroom.  Am I

4  allowed to use it?

5          THE COURT:  Yes.

6          THE WITNESS:  Okay, that I was a dirty slut and I

7  would pay.  I called the police.  They listened to it.  They

8  could vaguely hear it but they heard enough to take a report.

9  BY MR. K. LANDAU:

10  Q.  Were there any -- strike that.

11          You had referenced this same phone number, the

12  857-333-4838 in that police report; is that correct?

13  A.  Correct.

14  Q.  And for what purpose?

15  A.  That was the number they had somehow got that number, that

16  was the second time that my phone had been hacked.  My phone

17  had been hacked numerous times in Georgia since I had started

18  doing interviews and representing Rosalio during his

19  interviews.  I had started getting the threatening phone calls

20  on that number as well.  That was the phone I was actually

21  borrowing when my first phone got stolen but this number was

22  actually stored into my phone that was stolen.

23  Q.  Okay.  So, you have received phone calls on both your own

24  phone number at this time which was 857-318-3687; is that

25  correct?

A.  Correct.

Q.  And, the phone number that you had borrowed was the 857-333-4838 number?

A.  Correct.

Q.  For how long of a period did you not have or did you get a new number, entirely the 316-3687 phone?

A.  Took me about three weeks close to a month, give or take a couple of days.

Q.  To get a different phone number or a different phone?

A.  A whole new phone and a different phone number.

Q.  Okay.

         THE COURT:  Counsel, we are going to interrupt for lunch at this point but I have allotted a full hour after lunch for any further examination.  Let me mention to counsel, you can think about this over lunch, I want to set a schedule including page limits for your final submissions.  This would include, in effect, a summation with respect to the hearing, it would include any comments, further comments on the additional examination that was done by the expert and the deposition that occurred, I gather, a few days ago as a follow-up, and it could include comments on anything else.  It cannot include new factual material whatsoever.  This is purely argument and legal matters.

         I think because of the fact that this hearing serves several different purposes that I will give you both the

1    opportunity to put in simultaneous initial papers and then

2    simultaneous responses so that there will be two papers from

3    each of you and four papers for me -- I am just lucky.  And I

4    do want to get this all resolved by the end of January while it

5    is all still fresh in my own mind but I am happy, within those

6    limits, if you can reach agreement on dates and reach agreement

7    on page limits, that would be terrific.  So, why don't you talk

8    about that over lunch and you can tell me your verdict when you

9    come back at 2:00.

10              So, we are adjourned to 2:00.  You may step down.

11              THE WITNESS:  Thank you.

12          (Luncheon recess)

13          (Continued next page)

14

15

16

17

18

19

20

21

22

23

24

25

1                    A F T E R N O O N   S E S S I O N

2                            2:20 p.m.

3            THE COURT:  Let's get the witness back on the stand.

4    Okay.

5            MR. K. LANDAU:  Thank you, your Honor.

6    BY MR. K. LANDAU:

7    Q.  Ms. Almeciga, we left off when you were briefly beginning

8    to explain the reason why you informed Mr. Livesey as to the

9    phone number that you were questioned to earlier which I

10   believe was 857-333-4838?

11   A.  Yes.  That phone was easily available to me.  I would

12   always get the messages if they were left and that lasted until

13   about July.

14   Q.  Where did Mr. Livesey live, to your recollection?

15   A.  Canada.

16   Q.  And what type of phone was it?

17   A.  It was a Metro PCS phone.

18   Q.  What does that mean?

19   A.  Metro PCS, it is a month to month.  You pay month to month

20   to keep your service on.

21   Q.  So, why would you elect to use that phone over others that

22   you may have access to?

23   A.  It was easier for me to buy calling cards to get in touch

24   with Mr. Livesey.

25   Q.  Okay.

FCM5almH                    Almeciga - redirect

1              You're originally from Massachusetts; is that correct?

2    A.  Correct.

3    Q.  Yes?

4    A.  Correct, yes.

5    Q.  So you were born in Massachusetts?

6    A.  Yes.

7    Q.  And with the exception of living in Georgia, has there been

8    any other place that you have lived?

9    A.  No.

10   Q.  You were shown earlier, and obviously throughout the

11   litigation, it's Exhibit 2 but there is also Plaintiff's

12   Exhibit, I believe could be A, it's called a Standard

13   Appearance Release.

14              Your Honor, may I approach the witness?

15              THE COURT:  Yes.

16              MR. K. LANDAU:  Thank you.

17   Q.  Have you become familiar with that document?

18   A.  I have.

19   Q.  Is that your signature?

20   A.  No, sir.  It is not.

21              MR. K. LANDAU:  Your Honor, we have no further

22   questions.

23              THE COURT:  All right.  Anything else?

24              MR. BURKE:  No, your Honor.

25              THE COURT:  Very good.  Thank you so much.  You may

1    step down.

2              THE WITNESS:  Thank you, your Honor.

3              (Witness steps down)

4              THE COURT:  Let's call the other witness, then.

5              MR. BURKE:  Your Honor, could we excuse Ms. Almeciga

6    as well during Mr. Duarte's testimony as well?

7              THE COURT:  No, she is a party.

8              Does someone want to go get him?

9     ISAAC DUARTE MORILLO,

10         called as a witness by the Plaintiff,

11         having been duly sworn, testified as follows:

12             THE COURT:  State your full name for the record and

13    spell your last name.

14             THE WITNESS:  Isaac Duarte Morillo.  M-O-R-I-L-L-O.

15             MR. K. LANDAU:  Also, spell Duarte, the whole name.

16             THE WITNESS:  Isaac, I-S-A-A-C, Duarte, D U A R T E.

17             MR. K. LANDAU:  Is that hyphenated,

18    Mr. Duarte-Morillo?

19             THE WITNESS:  Yes.

20    DIRECT EXAMINATION

21    BY MR. K. LANDAU:

22    Q.  Mr. Duarte, would you prefer that I call you

23    Mr. Duarte-Morillo or Mr. Morillo?

24    A.  Mr. Duarte is fine.

25    Q.  Okay.  Sir, you recall having provided plaintiff's counsel

1  with an affidavit in August of this year?

2  A.  Yes.

3          MR. K. LANDAU:  Your Honor, may I mark this Exhibit?

4          THE COURT:  I have a couple of questions.

5          You say in your affidavit that after looking at the

6  signatures that people are claiming belong to Erica I'm a

7  hundred percent confident saying that they are not hers.  I

8  have seen her sign her name thousands of times.

9          How is it that you came to see her sign her name

10 thousands of times?

11         THE WITNESS:  On postal cards.

12         THE COURT:  On what?

13         THE WITNESS:  Postal cards.

14         THE COURT:  Post cards?

15         THE WITNESS:  Yes.  Christmas cards.

16         THE COURT:  Anything else?

17         THE WITNESS:  Her license.

18         THE COURT:  Her license?

19         THE WITNESS:  Yes.

20         THE COURT:  How did you see that?

21         THE WITNESS:  When we went to motor vehicles together.

22         THE COURT:  Pardon?  When you went to the motor

23 vehicles department?

24         THE WITNESS:  Yes.

25         THE COURT:  So, let me show you what is page 1 of

1    Exhibit 1.  Is that her signature?

2                THE WITNESS:  This?  Yes.

3                THE COURT:  Okay.  Let me have it back.  Let me show

4    you what is the fourth page of Exhibit 1 which, for the record,

5    has a no. 6 in the top right-hand corner but it is actually the

6    fourth page; is that her signature?

7                THE WITNESS:  No.

8                THE COURT:  Let me have that back and let me show you

9    what is the page sort of midway in that exhibit which says at

10   the top Request for a Jury Trial.  Is that her signature?

11               THE WITNESS:  Yes.  This one looks more like her

12   signature, yes.

13               THE COURT:  Okay.  And let me show you what's a couple

14   of pages later entitled Complaint for Protection and

15   Harassment.  Is that her signature?

16               THE WITNESS:  No.

17               THE COURT:  Okay.  And I'm going to show you some

18   pages later, the item that has the word Universal at the top

19   followed by the trial court and on the side bears the no. 21;

20   is that her signature?

21               THE WITNESS:  No, sir.

22               THE COURT:  Okay.  All right.

23               Go ahead, counsel.

24   BY MR. K. LANDAU:

25   Q.  Mr. Duarte, do you recall the contents of your affidavit?

FCM5almH                    Morillo - direct

1   A.  Yes.

2   Q.  Do you recall having indicated that your apartment was

3   burglarized?

4   A.  Yes.

5   Q.  In, I believe you indicated on August 16, 2012?

6   A.  Yes.

7   Q.  And a police report, was a police report filed?

8   A.  They called my phone.

9   Q.  But eventually was a police report filed?

10  A.  Yes.  Yes.

11  Q.  Are the contents of your affidavit truthful to the best of

12  your information, knowledge, and belief?

13  A.  Yes, sir.

14         MR. K. LANDAU:  Your Honor, may I approach the

15  witness?

16         THE COURT:  Yes.  By the way, I don't know if defense

17  counsel did this over the break but I think, if not, we need to

18  number the pages in Exhibit 16.

19         MR. BURKE:  We will.

20         THE COURT:  And if you have done that, then supply a

21  copy by no later than tomorrow to the Court, your adversary,

22  and of course you have one yourself, so that we can treat that

23  as one that everyone has agreed is in the same order that we

24  have been questioning the witness about but has numbered pages

25  that we use.

1              MR. BURKE:  Your Honor, you reference Exhibit 16.  Do

2      you mean no. 1?

3              THE COURT:  I thought I said Exhibit 1.  Did I say

4      Exhibit 16?

5              MR. BURKE:  Yes, your Honor.  So, 16 is the

6      Massachusetts collection.

7              MS. SCHARY:  No, 1 is the Massachusetts collection, 15

8      is the Georgia documents.

9              THE COURT:  Well, in any event, all the questions I

10     put to the witness were about Exhibit no. 1.

11             MS. SCHARY:  Yes.

12             MR. BURKE:  Your Honor, can we do that today by just

13     doing it in a hand-numbered fashion?

14             THE COURT:  Well, if you have copies --

15             MR. BURKE:  We do.

16             THE COURT:   -- for everyone, that's fine.

17             Go ahead, counsel.

18             MR. K. LANDAU:  Thank you.

19     BY MR. K. LANDAU:

20     Q.  Mr. Duarte, we understand you are not a handwriting expert;

21     is that correct?

22     A.  That's correct.

23     Q.  The document you have in front of you, can you please read

24     what the caption is?

25     A.  Standard Appearance Release?

1    Q.  Okay.  From your interaction with Ms. Almeciga, does that

2    appear to be Ms. Almeciga's signature?

3              MR. BURKE:  Objection.

4              THE WITNESS:  No.

5              MR. BURKE:  Objection.  Speculation.

6              THE COURT:  Well, he purports to be someone extremely

7    familiar with that signature and so the objection is overruled.

8              MR. K. LANDAU:  We have no further questions, your

9    Honor.

10             THE COURT:  All right.

11   CROSS EXAMINATION

12   BY MS. SCHARY:

13   Q.  Mr. Duarte, did you speak with Ms. Almeciga during the

14   break?

15   A.  Excuse me, sir?

16   Q.  Did you speak with Ms. Almeciga during the lunch break we

17   just had?

18   A.  No.

19   Q.  You did not speak with her at all?

20   A.  No, her attorney.

21   Q.  I'm sorry?

22   A.  No.

23   Q.  You did not speak with Ms. Almeciga at all during the

24   break?

25   A.  No.

1    Q.  You weren't in Texas with Ms. Almeciga in August of 2012

2    when she was interviewed by Mr. Livesey and Mr. Hooper, isn't

3    that correct?

4    A.  I wasn't joining her.

5    Q.  You were not in Texas, correct?

6    A.  No, sir.

7    Q.  So you have no personal knowledge whether Ms. Almeciga

8    signed CIR's release, isn't that right?

9    A.  I wasn't there.

10   Q.  So that's a no?

11   A.  No.

12   Q.  And you have no personal knowledge of any discussions

13   between Ms. Almeciga and Messrs. Livesey and Hooper that would

14   have taken place in Texas in August of 2012?

15   A.  No.

16   Q.  How long have you known Ms. Almeciga?

17   A.  Nine years.

18   Q.  How long of those nine years have you been in a

19   relationship with Ms. Almeciga?

20   A.  About eight.  Eight years.

21   Q.  Is that eight years consecutively?

22   A.  Nine years off and on.

23   Q.  Nine years off and on?

24   A.  Yeah.

25   Q.  So when did that relationship begin?

1   A.  2007.  Yeah.

2   Q.  So, from 2007 to the present you have been in a

3   relationship off and on with Ms. Almeciga.  Do I have your

4   testimony correct?

5   A.  Yes.

6   Q.  How long have you been living with Ms. Almeciga?

7   A.  Like basically all my -- the entire relationship.

8   Q.  Can you list all the addresses where you lived with

9   Ms. Almeciga?

10  A.  I have to think back.  Sorry.

11          MR. K. LANDAU:  Your Honor, I'm going to object.

12          MS. SCHARY:  If the witness has the affidavit in front

13  of him he is welcome to refresh his recollection with that.

14          THE COURT:  I'm sorry.  There was an objection to the

15  question?

16          MR. K. LANDAU:  Yes.

17          THE COURT:  Sustained.

18          MS. SCHARY:  Do you have the affidavit?

19          MR. K. LANDAU:  Yes.

20          MS. SCHARY:  Your Honor, may I approach the witness?

21          THE COURT:  Yes.

22  BY MS. SCHARY:

23  Q.  Mr. Duarte, I'm handing you a document that was marked by

24  Ms. Almeciga's counsel as Exhibit F.  Do you recognize this

25  document?

1    A.  Yes.

2    Q.  And did you draft this document?

3    A.  Yes.

4    Q.  So these are your words that are on this document?

5    A.  Yes.

6    Q.  Did you type it up yourself?

7    A.  I didn't type it myself but that's my -- that's my -- my

8    wording, yes.

9    Q.  Did you tell your wording to somebody else in order to

10   create this affidavit?

11   A.  I was sitting -- I said it to the attorney and that's what

12   I remember --

13            MR. K. LANDAU:  Your Honor, no, that's not accurate.

14            MS. SCHARY:  I don't want to inquire into discussions

15   with counsel.

16            THE COURT:  No, no.  I disagree.

17            First of all, are you his counsel?

18            MR. K. LANDAU:  I am not, your Honor.  No.

19            THE COURT:  So, is that the attorney he is

20   referencing?

21            MR. K. LANDAU:  No.

22            THE COURT:  Oh, it is a different attorney.

23            MR. K. LANDAU:  Well, I don't know, but it's not me.

24            THE COURT:  Let me see the exhibit just for a minute.

25            So, who typed this?

1            THE WITNESS:  Erica.

2            THE COURT:  Okay.  And so you provided the information

3    to her and she typed it?

4            THE WITNESS:  Yes.

5            THE COURT:  And when she was typing it did you discuss

6    with her any of the specifics?

7            THE WITNESS:  I just -- I just tell her what I

8    remember at the time.

9            THE COURT:  Okay.  She was the one who asked you for

10   this, yes?

11           THE WITNESS:  She asked me for it for the affidavit

12   after right now.

13           THE COURT:  Excuse me?

14           THE WITNESS:  She asked me if I can -- if I remember

15   this, what happened.

16           THE COURT:  Right, but you knew that she wanted to use

17   this in her lawsuit, yes?

18           THE WITNESS:   I didn't know.  I didn't knew.

19           THE COURT:  What did you think it was for?

20           THE WITNESS:  I just -- I just remember the incident

21   that happened.

22           THE COURT:  No, no, no.  My question is when she asked

23   you to prepare, to give her the information that she could type

24   down, what did you understand was the purpose of her doing

25   that?

1           THE WITNESS:  For the -- for the trial, I guess.

2           THE COURT:  Yes, for the lawsuit she was involved in.

3    Yes?

4           THE WITNESS:  Yes.

5           THE COURT:  Okay.

6           Go ahead, counsel.

7    BY MS. SCHARY:

8    Q.  Mr. Duarte, did Ms. Almeciga show you this affidavit

9    already typed and ask you if it met your recollection?

10   A.  Yes.

11   Q.  So, Ms. Almeciga wrote this and then asked you if this was

12   accurate; is that correct?

13   A.  Yes.

14   Q.  I'm going to direct you to the first paragraph of your

15   affidavit.  Do you know a man by the name of Rosendo Gutierrez?

16   A.  No.

17   Q.  Did you live at 2580 Windsor Woods Lane in Norcross,

18   Georgia, between December 2011 and April of 2013?

19   A.  Yes, 2580, yes.

20   Q.  What apartment were you living in?

21   A.  Apartment J.

22   Q.  For the entire time from December 2011 until April of 2013?

23   A.  Yes.

24   Q.  I'm going to direct you --

25          THE COURT:  I think this affidavit is probably already

1    before the Court because of the way it was submitted.  Just for

2    the record, F is the letter?

3              MR. BURKE:  Correct.

4              THE COURT:  F is received.

5              Go ahead.

6              (Plaintiff's Exhibit F received in evidence)

7              THE WITNESS:  Correct.

8    BY MS. SCHARY:

9    Q.  I'm going to direct you to paragraph 5 of your affidavit.

10   Do you see this reference to a man named Raul, at least that is

11   the name that everyone in the complex called him.  Do you know

12   Raul's real name?

13   A.  No.

14   Q.  You just now him as Raul?

15   A.  Yes.

16   Q.  Do you know what apartment number he lived in?

17   A.  No.

18   Q.  Do you know what building in the Huntington Ridge

19   Apartments he lived in?

20   A.  No.

21   Q.  And you said that you called Erica 5 a.m. Texas time.  What

22   phone did you call Erica on?

23   A.  My phone number?  I can't remember.  She had a 396 number

24   at that time.

25   Q.  Is 396 the area code?

FCM5almH                    Morillo - cross

1    A.  No, 617 is the area code.

2    Q.  617-396, and you don't remember the last four.

3    A.  Yeah.

4    Q.  Is that a cell phone?

5    A.  Yes.

6    Q.  So she had her cell phone with her in Texas and that's what

7    you called?

8    A.  Yes.

9    Q.  I'm going to direct you to paragraph 14 of your affidavit,

10   there is a discussion here about 13 and 14, the police called

11   you at work and you are describing about how Erica was trying

12   to clean up and make a list of what was missing.

13          Do you see that section in paragraph 14?

14   A.  Yes.

15   Q.  Now, is that sentence about Erica starting to clean up and

16   what Erica did, that's not something you personally observed,

17   right?

18   A.  I was at work.

19   Q.  Right.  So you were not in the apartment personally

20   observing Erica cleaning up and trying to make a list as to

21   what was missing and the rest of that sentence, correct?

22   A.  Yes.

23   Q.  Mr. Duarte, do you have any children with Ms. Almeciga?

24   A.  No.

25   Q.  During the time, the nine years on and off that you have

1    been dating, to your knowledge has she ever been pregnant

2    during that time?

3    A.   She had -- we had a baby but she had a miscarriage.

4    Q.   And when was that?

5    A.   Like two years ago I think it was.  Like a year ago, yeah.

6    Q.   A year ago?  That was 2014?

7    A.   2014, yes.

8    Q.   And it was -- I'm sorry to ask about the personal

9    situation, was it a miscarriage or still born?

10   A.   Yes, miscarriage.

11   Q.   Do you know how far along Ms. Almeciga was at that time?

12           MR. K. LANDAU:  Objection.  Relevance.

13           THE COURT:  No, I'm afraid it is relevant.  Overruled.

14           MR. K. LANDAU:  Okay.

15   A.   It was like two months, three months.

16   Q.   Two or three months?

17   A.   Yes.

18   Q.   Why did you move to Georgia in December of 2011?

19   A.   I had a transfer from work.

20   Q.   Did you move with Ms. Almeciga to Georgia?

21   A.   Yes.

22   Q.   And why did you move back to Massachusetts in October of

23   2013?

24   A.   It was just too stressing in Georgia for me.

25   Q.   What was too stressful in Georgia for you?

1    A.  I don't want to -- it is just after what happened with Raul

2    and all that it was just -- it was just -- it was just too

3    stressful, my items I lost and all that.

4    Q.  And when you are referring to what happened with Raul, are

5    you referring to that you claim that your apartment was broken

6    into in August of 2012 while Ms. Almeciga was in Texas?  Is

7    that what you are referring to?

8    A.  Yes.

9    Q.  So that was in August of 2012.  Why did you not move back

10   then until October of 2013?

11   A.  I had to wait for my transfer.  I wasn't going to just quit

12   my job.

13   Q.  And what is that job?

14   A.  I work for American Airlines.

15   Q.  So American Airlines transferred you from Georgia to

16   Massachusetts?

17   A.  Yes.

18           THE COURT:  What do you do for American Airlines?

19           THE WITNESS:  I bring the planes in.

20           THE COURT:  I'm sorry?

21           THE WITNESS:  I bring the planes in.

22           THE COURT:  Ah-ha.

23   BY MS. SCHARY:

24   Q.  Mr. Duarte, the Court was showing you a document that was

25   previously marked as Exhibit 1 in this case and I will ask the

1    Court's indulgence because these pages still do not have page

2    numbers but they will.  I ask you to look back at that

3    document, please.  Do you have Court Exhibit 1 -- my apologies,

4    Defendant's Exhibit 1?

5    A.  No, I don't.

6              THE COURT:  I don't think he has it.  I was showing

7    him my copy.

8    BY MS. SCHARY:

9    Q.  Now, I'm going to ask you to flip about halfway through

10   this document to the page that starts with affidavit, there is

11   a box at the top left that says Affidavit and then below it

12   says on or about 7/2/15 and then there is a full page of text.

13   I will give you a second to get there.

14   A.  I am trying to look for it.

15   Q.  Sure.  No problem.

16   A.  What does it say?

17   Q.  It says Affidavit in the top left box on the top of the

18   page.  It is after the document that says Complaint for

19   Protection and Harassment.  It is a full page of text, it looks

20   like this.

21   A.  Okay.

22   Q.  Let me know when you are there.

23   A.  Is that the one that --

24             THE COURT:  Actually, I am having trouble finding it

25   too.  Why don't you count what page it is.

1      MS. SCHARY:  Sure.  It is right in the middle.  It

2  looks to be page 15, if my count is correct.

3      THE COURT:  Okay, yes, you are right, it is page 15.

4      MS. SCHARY:  Okay.

5      MR. K. LANDAU:  Your Honor, can I request that counsel

6  move?

7      THE COURT:  Yes.

8      MS. SCHARY:  I'm trying to show so that we can get

9  there more easily.

10      THE COURT:  So, it is near.

11      THE WITNESS:  Yes.

12      THE COURT:  Yes, you have got it.

13      He has it now.

14      THE WITNESS:  Correct.

15  BY MS. SCHARY:

16  Q.  Mr. Duarte, can I direct you to the signature at the bottom

17  of that page?  Does that appear to be Ms. Almeciga's signature?

18  A.  No.

19  Q.  I'm going to ask you to flip to the next page which is a

20  continuation of that document, bottom of the page on this is

21  the affidavit on or about 7/3/15, it is signed at the bottom

22  7/21/15; does that appear to be Ms. Almeciga's signature at the

23  bottom of the page?

24  A.  No.

25  Q.  Now I'm going to ask you to flip to the third to last

1  document in the set here and it says at the top Commonwealth of

2  Massachusetts, the Trial Court Probate and Family Court

3  Department.

4            THE COURT:  There are more than one with that.

5            MS. SCHARY:  Yes, this is the one that says page 1.

6            Are you there, Mr. Duarte?

7            THE WITNESS:  Page 1?

8            MS. SCHARY:  Yes.

9            THE COURT:  It is about five or six pages before the

10  end.

11            MS. SCHARY:  Should be three pages before the end.

12            THE COURT:  Pardon?

13            MS. SCHARY:  Three pages before the end.

14            THE COURT:  No.

15            MS. SCHARY:  Emergency custody of my children.

16            THE COURT:  Oh, I'm sorry.  You are right.  Thank you.

17            THE WITNESS:  Three pages before?  Okay.  This one,

18  sir?

19            THE COURT:  Yes.

20            THE WITNESS:  Okay.

21            THE COURT:  Okay.  You are right, three pages.

22  BY MS. SCHARY:

23  Q.  Mr. Duarte, can I direct your attention about two thirds of

24  the way down on the right you see the signature of an Erica

25  Almeciga.  Does that appear to be Ms. Almeciga's signature?

FCM5almH                    Morillo - cross

1  A.  No.

2  Q.  And I have the same question on the next page.

3          MR. BURKE:  Your Honor, I object.  Mr. Duarte is

4  looking over at Ms. Almeciga.  This is my concern.

5          THE COURT:  That, I didn't notice that, and I will

6  look at that but I have not seen any evidence of that so far.

7  BY MS. SCHARY:

8  Q.  Mr. Duarte, if you could turn to the next page, it says

9  motion for emergency custody of my children, page 2.  Does that

10  appear to be Ms. Almeciga's signature two thirds of the way

11  down the page?

12          THE COURT:  Actually, I will say that my law saw what

13  counsel, defense counsel saw so --

14          MR. BURKE:  Yes, your Honor.

15          THE COURT:  -- Ms. Almeciga, I will ask you to keep

16  your face straight forward.

17          PLAINTIFF:  I'm not looking, your Honor.

18          THE COURT:  Go ahead.

19  A.  Correct.

20  Q.  Mr. Duarte, I will direct you again to the page, Motion for

21  emergency custody of my children, page 2, second to last page

22  of Exhibit 1; does that appear to be Ms. Almeciga's signature

23  on the signature line?

24  A.  No.

25  Q.  And I have the same question for the last page of the

1    document.  Does that appear to be Ms. Almeciga's signature on

2    the signature line?

3    A.  No.

4    Q.  Okay.

5         Mr. Duarte, are you familiar with the documents that

6    have been described in this matter as the Georgia documents?

7    A.  Which document is that?

8         THE COURT:  Don't you show it to him.

9         MS. SCHARY:  Okay.

10        THE COURT:  This is Exhibit 15.

11   BY MS. SCHARY:

12   Q.  Mr. Duarte, this is Exhibit 15, previously marked.  Does

13   the Court need a copy?

14        THE COURT:  No, I have it.

15        MS. SCHARY:  Okay.

16   Q.  Mr. Duarte, have you seen these documents before today?

17   A.  No.

18   Q.  So, Ms. Almeciga didn't discuss with you these documents

19   when she asked you for an affidavit saying that you don't know

20   a man by the name of Rosendo Gutierrez?

21   A.  No.  This is my first time seeing this.

22   Q.  Okay.

23        So you don't know whether or not Ms. Almeciga filed

24   these documents, is that right?

25   A.  No.

1  Q.  You don't know either way?

2  A.  No.

3          MS. SCHARY:  Thank you.  No further questions.

4          THE COURT:  All right.  Anything else?

5          MR. K. LANDAU:  No, your Honor.

6          THE COURT:  Very good.  Thank you so much.  You may

7  step down and leave that stuff there.

8          (Witness steps down)

9          MS. SCHARY:  Your Honor, we can discuss the -- we have

10  agreed to a briefing schedule.

11          THE COURT:  Yes.

12          MS. SCHARY:  So, the parties have proposed that the

13  initial summation be 15 pages on Thursday, January 21st, with

14  replies simultaneously filed of 10 pages Thursday, January

15  28th.

16          THE COURT:  Okay.  That's acceptable to the Court,

17  although it does mean that it is unlikely I will get you a

18  decision by January 31st.

19          MS. SCHARY:  We understand.

20          THE COURT:  But it will be not too long thereafter.

21  But that's fine.  Okay.  So, I thank --

22          MS. SCHARY:  Your Honor, just a few housekeeping

23  matters that we just wanted to clarify?

24          THE COURT:  Yes.

25          MS. SCHARY:  First, with respect to Exhibit 1, the

1    Massachusetts documents, for those pages that plaintiff had

2    testified that she did not file, just for the Court's

3    knowledge, we received these late last week from counsel in

4    other matters involving Ms. Almeciga and we would just ask, we

5    think that these documents will help the Court get to the truth

6    of this matter and we would just ask that we have the

7    opportunity to try to get certified copies that we would

8    present to the Court and to counsel to put these properly in

9    evidence before the Court.

10          THE COURT:  Well, I don't see -- so, you may recall

11   the documents that she did identify as hers, which were the

12   bulk of the documents that have been received for all purposes.

13          MS. SCHARY:  Yes.

14          THE COURT:  The documents she said were not hers were

15   served for the limited purpose of any handwriting analysis or

16   comparisons that the Court might want to undertake.

17          What other purpose could they serve?

18          MS. SCHARY:  No.  That is fine, your Honor.  I just

19   wanted to clarify when you said for handwriting analysis, we

20   are fine if they are just accepted for handwriting analysis by

21   the parties, by the Court.  I just wanted to clarify that is

22   not just for the experts.

23          THE COURT:  No, no.

24          MS. SCHARY:  With that caveat that is --

25          THE COURT:  And the reason I overruled your objection

on the question put upon Mr. Duarte's direct examination is

that while an expert in handwriting may or may not bring

certain benefits to the analysis, handwriting is not so

completely beyond the ken of the average layperson that they

can't have helpful lay opinions based on their perceptions of

whether it is the same handwriting or not, if they have an

adequate basis for having such an opinion such as, in this

case, the testimony that he saw the plaintiff's signature

thousands of times.

So, it is admissible and there, by the same token, the

portions of Exhibit no. 1 that were, and I think there was one

other exhibit that were received only for handwriting analysis

purposes, means handwriting analysis by anyone who wants to

offer handwriting analysis though obviously an expert stands in

different shoes and that's a different type of analysis.

MS. SCHARY:  Thank you, your Honor.

Just three more short things?

THE COURT:  Yes.

MS. SCHARY:  One is the defendants would like to seek

attorney fees if the motion is in our favor and we wanted to

know whether the Court would prefer that that application be

made after the Court's decision or as an exhibit to or

something with the summation documents.

THE COURT:  Well, let me ask you this, that putting

aside the merits of that which may or may not be, which I

1    haven't really thought about, Ms. Almeciga, unless I have

2    missed something, doesn't appear to be a person who has any

3    meaningful income.  So, what's the point?

4         MS. SCHARY:  Your Honor, we have sought sanctions

5    against both counsel and Ms. Almeciga, so.

6         THE COURT:  And of course your original sanctions

7    motion was directed against both as well.  I have made no

8    decision but I'm always a bit concerned when sanctions are

9    sought against a lawyer because of the obligation that any

10   lawyer has to be zealous on behalf of his or her client and to

11   accept his or her client's word except in the most extreme

12   circumstances.

13        So, you may convince me otherwise but you start with a

14   considerable hurdle in suggesting that sanctions should be

15   imposed on counsel.  This is assuming, obviously, that you were

16   to win on the merits which you may not win.

17        MS. SCHARY:  Of course.

18        THE COURT:  But the -- and while in appropriate cases

19   sanctions can be imposed on a party as previously mentioned,

20   assuming arguendo that you win on your motion, that you

21   convince me that it warrants sanctions and all the other stuff

22   and you may not convince me of any part of that whatsoever but,

23   even if you did, I think it would be pointless to impose

24   sanctions on Ms. Almeciga and I'm skeptical that you could meet

25   the very high burden of imposing sanctions on counsel.  And

FCM5almH

1  this all assumes that you can prove all the things you claim

2  you are going to prove.

3         So, but if you want to make your motion you can make

4  your motion, or if you want to state for the record you are

5  seeking that as part of the sanctions you feel you are entitled

6  to, I can't stop you from seeking whatever you want.  Good

7  luck.

8         MS. SCHARY:  Just so we would like to then reserve the

9  right to move for fees and we are happy to put in a submission.

10        THE COURT:  That's fine.

11        MS. SCHARY:  And the last two, one was that your Honor

12  had said at the last hearing this is a combined Daubert

13  evidentiary hearing.  Would you like a separate Daubert motion

14  or would you like that to be part of the summations?

15        THE COURT:  No.  I would like everything together

16  because it impacts both ways.

17        MS. SCHARY:  Yes.

18        THE COURT:  If I find that the handwriting expert

19  has -- that her testimony is not admissible, that's the Daubert

20  issue, it is a question of admissibility, not truth or

21  falsehood, just admissibility, that seems to me it would impact

22  both my view of the complaint and the allegations made in the

23  underlying complaint by plaintiff and my view of the sanctions

24  motion brought by you, at least it would make the evidentiary

25  basis for assessing each of those different from what it would

1    be if I determine her testimony is admissible.

2              So, I think it all should be one ball of wax.

3              MS. SCHARY:  Thank you, your Honor.

4              And the last one is both parties have put in a lot of

5    documents attached to various affidavits in this motion.

6              THE COURT:  I think those are all deemed received

7    unless anyone objects.

8              MS. SCHARY:  And we may have an objection to one of

9    those.  Should we address it in our summation?

10             THE COURT:  Well, in fairness to your adversary, tell

11   me which one right now.

12             MS. SCHARY:  It is the affidavit of Mr. Rosalio Reta.

13   Mr. Reta did not testify in court and we have a hearsay

14   objection to it.

15             THE COURT:  So, remind me what he said.

16             MS. SCHARY:  Plaintiff has proffered an affidavit that

17   was allegedly signed by Mr. Reta in prison in or about I think

18   it was December 2014, claiming that there were certain

19   agreements between him and Mr. Livesey concerning his interview

20   and concerning the interview of Ms. Almeciga.  Mr. Reta,

21   obviously, has not testified in person and has not been made

22   available for deposition and so we would ask that it be

23   excluded as hearsay.

24             THE COURT:  Yes?

25             MR. K. LANDAU:  Your Honor, in response to that, we

FCM5almH

1    believe it's most relevant as it speaks to a component of the

2    pre-filing investigation undertaken by plaintiff.

3            THE COURT:  Let me see a copy of this, counsel?

4            MS. SCHARY:  Sure.  Your Honor, I have a copy but it

5    has my handwriting on it.

6            THE COURT:  Well, that makes it more interesting.

7            MS. SCHARY:  If he has a clean copy I am happy to pass

8    up either one.

9            THE COURT:  Okay.  We have a copy.

10           MS. SCHARY:  It is Exhibit 10 to the declaration of

11   Mr. Landau in opposition to CIR's motion.

12           THE COURT:  It says:

13           In late 2012 I was interviewed by Bruce Livesey to do

14   a story for PBS Frontline.  I was told and stated in the

15   contract document I signed it was exclusively for PBS

16   Frontline.  Mr. Livesey then approached my fiancee Erica Lee

17   Almeciga for an interview to give her point of view on my case

18   (involvement with the Los Zetas Cartel) and what she thought on

19   Miguel Angel Treiuno and Morales, my former boss.  I agreed to

20   let Mr. Livesey interview my fiancee, Ms. Almeciga, on one

21   condition (her identity not disclosed), for fear of putting a

22   target on her head.  Mr. Livesey accepted and drew out a

23   contract stating that the interview was to be conducted in a

24   secure area and have my fiancee face blurred out from fear of

25   reprisal.

1          I, Rosalio Reta, Jr., am a witness to all of this and

2    am willing to testify, under oath in court, if called upon, if

3    necessary.  I am also aware of the penalty of perjury.

4          Now, all of that is obviously hearsay.  In addition,

5    when he says Mr. Livesey then approached my fiancee for an

6    interview to give her point of view, that sentence is double

7    hearsay so that would not come in even if he were here in

8    court.

9          Then he says:  I agreed to let Mr. Livesey interview

10   my fiancee.  I am not quite sure what legal relevance that has

11   since I doubt he had any legal ability to say yes or no one way

12   or the other, it was a decision for Ms. Almeciga, not for him.

13         Then it says:  Mr. Livesey accepted and drew out a

14   contract but he doesn't -- Mr. Reta does not attach that

15   contract, nor has anyone else produced that alleged contract.

16         So, I think this is of extremely limited value.  The

17   reason I raise this is the following:  Well normally, of

18   course, this would be -- the affidavit itself would be classic

19   hearsay.  In some sense Mr. Reta is unavailable in that I

20   assume he is still in prison, yes?

21         MR. K. LANDAU:  Yes, your Honor.

22         THE COURT:  And although we could have arranged to

23   have him produced, it seems that was something that neither

24   side requested, if I recall correctly, and it would have been

25   burdensome to say the least.  So, I might have accepted this

1 notwithstanding its initial hearsay problem because -- based on

2 the witness' unavailability, but it is hard for me to see how

3 it's relevant. As I say, some of it is double hearsay so it

4 wouldn't have come in even if he had been here on the stand.

5 Other of it, other portions of it appear to be making assertion

6 that he had the power to determine the conditions under which

7 Ms. Almeciga would or would not submit to an interview which he

8 had no such power and so it is hard to see the relevance. I

9 will do this, however. Since everything else that was

10 submitted by way of exhibits to the papers has been received by

11 the Court without opposition from either side, I will receive

12 this as well for the very limited value it may have, if any, as

13 bearing on this case, but I flag already that I think it has

14 quite modest value, at best.

15 　　　　All right. Anything else?

16 　　　　MR. BURKE: That's it, your Honor. Thank you.

17 　　　　THE COURT: Anything from plaintiff's counsel?

18 　　　　MR. K. LANDAU: No, your Honor.

19 　　　　I don't recall if Ms. Schary had indicated the page

20 limit. Did we indicate that?

21 　　　　MS. SCHARY: Yes; I had said 15 and 10.

22 　　　　THE COURT: I'm sorry, what?

23 　　　　MR. K. LANDAU: For the summation.

24 　　　　THE COURT: Yes, she did.

25 　　　　MR. K. LANDAU: Okay, great. Thank you.

FCM5almH

1           THE COURT:  Very good.  Thanks so much.

2                              o0o

INDEX OF EXAMINATION

Examination of:                                    Page

ERICA ALMECIGA

Cross By Mr. Burke . . . . . . . . . . . . . . . 3

Redirect By Mr. K. Landau . . . . . . . . . .49

ISAAC DUARTE MORILLO

Direct By Mr. K. Landau . . . . . . . . . . .56

Cross By Ms. Schary . . . . . . . . . . . . .61

PLAINTIFF EXHIBITS

Exhibit No.                                    Received

  F   . . . . . . . . . . . . . . . . . . . . . .67

DEFENDANT EXHIBITS

Exhibit No.                                    Received

  1 and 6   . . . . . . . . . . . . . . . . . . .12

  15   . . . . . . . . . . . . . . . . . . . . .28

  38   . . . . . . . . . . . . . . . . . . . . .44

  39   . . . . . . . . . . . . . . . . . . . . .45

  41   . . . . . . . . . . . . . . . . . . . . .46