UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
ERICA ALMECIGA,

                                    Case No. 15-CV-04319

              Plaintiff,

                                    Hon. Jed S. Rakoff

     -   against -

CENTER FOR INVESTIGATIVE
REPORTING, INC.,
BRUCE LIVESEY, JOSIAH HOOPER,

              Defendants.
---------------------------------------------------------------X

## PLAINTIFF ERICA ALMECIGA'S SUMMATION/SUPPLEMENTAL MEMORANDUM OF LAW IN OPPOSITION TO CIR DEFENDANTS MOTION FOR SANCTIONS

Kevin A. Landau
The Landau Group, PC
1221 Ave. of the Americas, 42nd Floor
New York, New York 10020
212.537.4025

*Attorneys for Plaintiff Erica Almeciga*

**TABLE OF CONTENTS**

PAGE(S)

Table of Authorities Cited      ii-iii

I.      CIR DEFENDANTS' MOTION FOR SANCTIONS
LACKED A REASONABLE BASIS IN FACT AND LAW,
AND MUST BE DENIED IN ITS ENTIRETY.      1

a.   Summary Of Testimony By Josiah Hooper, Bruce Livesey
And Bruce Talbot In Support of Plaintiff's Claims.      3

(i)      Bruce Talbot's Testimony Was Inconsistent With That
Of Livesey's And Hooper And Undermines CIR Defendant's
Basis For Bring Their Rule 11 Motion.      3

(ii)      Testimony On The Contents Of The Release, Misspellings,
When It Was Filled Out/Crossed Out, And By Whom:      7

(iii)      Hooper's Testimony Revealed That He Had Entered Into
Multiple Oral Agreements With Subjects He Interviewed For
The Stories Relative To Protecting And Concealing Their Identities
For The Story That Aired
(Similar To The Oral Agreement Alleged By Plaintiff).      8

(a) Plaintiff's Testimony.      8

(b) Hooper's Testimony.      8

(iv)      Brief Summary Of The Testimony And Evidence Presented
By Plaintiff At The Evidentiary Hearing In Support Of Her Claims.      9

II. THE RELEASE CONTRACT ADVANCED BY CIR DEFENDANTS IS
UNENFORCEABLE AS A MATTER OF LAW BECAUSE IT LACKS
CONSIDERATION.      11

III. THE TESTIMONY AND REPORTS OF PLAINTIFF'S
HANDWRITING EXPERT, WENDY CARLSON, ARE
ADMISSIBLE UNDER FRE 702 AND APPLICABLE CASE LAW.      13

IV. CONCLUSION.      16

# TABLE OF AUTHORITIES CITED

**PAGE(S)**

*Abramowitz v. New York University Dental*,
110 A.D.2d 343, 346 (2nd Dept. 1985)                                             12

*Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990)                      1

*Corto v. Fujisankei Communications Intern., Inc.*,
177 A.D.2d 397 (1st Dept. 1991)                                                  7

*Daniel Goldreyer, Ltd. v. Van de Wetering*,
217 A.D.2d 434, 438–39 (1st Dep't.1995)                                          11

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993)                      13

*Draper and Kramer, Inc. v. Baskin–Robbins, Inc.*,
690 F.Supp. 728, 732 (N.D.Ill. 1988)                                            3, FN2

*Elbit Systems Ltd. v. Credit Suisse Group*,
 842 F.Supp.2d 733, 739 (S.D.N.Y. 2012)                                         12-13,FN4

*Golden Pac. Bancorp v. F.D.I.C.*, 273 F.3d 509, 515 (2d Cir.2001)              12

*Greenberg v. Hilton Int'l Co.*, 870 F.2d 926 (2d Cir.1989)                      2

*Gross v. Sweet,* 49 N.Y.2d 102, 108 (1979)                                      11

*Indus. Tech. Ventures LP v. Pleasant T. Rowland Revocable Trust*, 08 Civ.
6227(CJS)(MWP), WL 777313, at *7 (W.D.N.Y. Mar. 8, 2012)                         3

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999)                              13

*Lee v. Grand Sichuan*, WL 199512; No.12–CV–08652 (S.D.N.Y. 2014)                3

*O'Brien v. Alexander*, 101 F.3d 1479, 1489 (2d Cir.1996)                        1

*Oliveri v. Thompson*, 803 F.2d 1265, 1279 (2d Cir.1986)                         2

*Principe v. Assay Partners*, 154 Misc.2d 702, 708 (1st Dept. 1992)             3

*Rodick v. City of Schenectady*, 1 F.3d 1341, 1350 (2d Cir.1993)                1

*Rogow v. U S*, 173 F.Supp. 547, 551 (S.D.N.Y. 1959)                            12-13, FN3-4

*Roth v. Isomed, Inc.,* 746 F.Supp. 316, 319 (S.D.N.Y.1990)                      11

*Samuels v. Wilder*, 906 F.2d 272, 274 (7th Cir.1990)                                    2

*Sassower v. Field*, 973 F.2d 75, 81 (2nd Cir. 1992)                                     2

*Startech, Inc. v. VSA Arts*, 126 F.Supp.2d 234, 236 (S.D.N.Y. 2000)                    11

*Storey v. Cello Holdings, LLC*, 347 F.3d 370, 388 (2d Cir. 2003)                        1

*United States v. Badmus*, 325 F.3d 133, 137 (2d Cir.2003)                              14

*U.S. v. Brown*, 152 Fed.Appx. 59, 62 (2nd Cir. 2005)                                 13-15

*United States v. Crisp*, 324 F.3d 261, 270 (4th Cir.2003)                              14

*U.S. v. International Brotherhood of Teamsters, et. al.*,
948 F.2d 1338, 1344 (2d Cir.1991)                                                        2

*United States v. Mooney*, 315 F.3d 54, 61-62 (1st Cir.2002)                            14

*United States v. Prime*, 363 F.3d 1028, 1032-35 (9th Cir.2004)                         14

*U.S. v. Reich*, 420 F.Supp.2d 75 (E.D.N.Y. 2006)                                    15, FN 8

*U.S. v. Starzecpyzel*, 880 F.Supp. 1027 (S.D.N.Y.1995)                               14-15

*United States v. Tarricone*, 21 F.3d 474, 475-76 (2d Cir.1994)                         14

*United States v. Tin Yat Chin*, 371 F.3d 31, 39 (2d Cir.2004)                          14

*Van Brunt v. Rauschenberg*, 799 F.Supp. 1467, 1472 (1992)                               7

## COURT RULES AND STATUTES

Fed.R.Civ.Pro. 11(b)(3)                                                                  1

Fed.R.Civ.P. 11(1) and (3)                                                              16

Fed.R.Evid. 702                                                                       13-14

## OTHER AUTHORITY

New York Lawyer's Code of Professional Responsibility, EC 7-37                        3, FN1

iii

Plaintiff Erica Almeciga ("Plaintiff") respectfully submits this

Summation/Supplemental Memorandum in opposition to Defendants' Center for

Investigative Reporting, Inc., Bruce Livesey ("Livesey"), and Josiah Hooper ("Hooper"),

("CIR Defendants") Motion For Sanctions, as follows:

I.   **CIR DEFENDANTS' MOTION FOR SANCTIONS LACKED A REASONABLE BASIS IN FACT AND LAW, AND MUST BE DENIED IN ITS ENTIRETY.**

The Supreme Court has cautioned that Rule 11 "must be read in light of concerns that it will ... chill vigorous advocacy." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990). Thus, courts must "resolve all doubts in favor of" the party against whom sanctions are sought. *Rodick v. City of Schenectady*, 1 F.3d 1341, 1350 (2d Cir.1993).

"[w]ith regard to factual contentions, 'sanctions may not be imposed unless a particular allegation is utterly lacking in support.' " *Storey v. Cello Holdings, LLC*, 347 F.3d 370, 388 (2d Cir. 2003) (quoting *O'Brien v. Alexander*, 101 F.3d 1479, 1489 (2d Cir.1996)).

In the instant case, CIR Defendants sought sanctions against both Plaintiff, and

Plaintiff's counsel.  In their initial memorandum, CIR Defendants contended that

"Sanctions against Plaintiff [were] appropriate because she has made knowingly false

allegations of fact and pursued claims that she knows to be baseless. See CIR

Memorandum, 9-14-2015, p. 15 (Doc #55) ("Memo. 1").  Further, CIR Defendants

claimed that counsel for Plaintiff failed to undertake a reasonable investigation, and that

sanctions should be assessed against counsel for Plaintiff as well. *Id* at 18. Therefore,

CIR Defendants accused Plaintiff, and her counsel, of violating Fed.R.Civ.Pro. 11(b)(3).

CIR Defendants contentions were baseless, and entirely without merit.

First, Plaintiff supplied CIR Defendants with a substantial amount of evidence to

support the factual contentions of her Complaint prior to the Complaint even being filed.

Further, once the Complaint was actually filed, Plaintiff continued to respond to CIR

1

Defendants allegations through Affidavits, Expert Reports, the Generation Z story (with

Plaintiff's face concealed) and Deposition Testimony (specifically Josiah Hooper's).

(See **Doc # 63**, and **Doc #84**, and the Exhibits attached thereto, incorporated by reference

herein.)  This evidence provided CIR Defendants with more than enough information to

support the factual contentions of Plaintiff's Complaint.  Further, Plaintiff clearly

demonstrated that her claims were not brought for an improper purpose, and were

warranted by existing law. See *Oliveri v. Thompson*, 803 F.2d 1265, 1279 (2d Cir.1986)

("A plaintiff does not have to be prepared to meet a summary judgment motion as soon as

the complaint is filed."); *Samuels v. Wilder*, 906 F.2d 272, 274 (7th Cir.1990) ("Counsel

must investigate, but need not have in hand before filing enough proof to establish the

case.").

        "The Supreme Court has made clear that a district court has inherent authority to
sanction parties appearing before it for acting in bad faith, vexatiously, wantonly, or for
oppressive reasons." *Sassower v. Field*, 973 F.2d 75, 81 (2nd Cir. 1992).

        "In deciding whether the signer of a pleading ... has crossed the line between
zealous advocacy and plain pettifoggery, the court applies an objective standard of
reasonableness." *U.S. v. International Brotherhood of Teamsters, et. al.*, 948 F.2d 1338,
1344 (2d Cir.1991). The conduct of the signer is judged at the time of the signing.
*Greenberg v. Hilton Int'l Co.*, 870 F.2d 926 (2d Cir.1989).

        Ms. Schary, counsel for CIR Defendants, in her brief accused  Plaintiff's lawyers

of being " a willingly participant in this fraud." See CIR Memo., 9-14-2015, p. 4 (Doc #

55) ("Memo. 1").  In advancing this baseless theory, the defense failed to provide a legal

or factual basis in support of such outrageous accusations. Counsel for CIR Defendants'

derogatory and offensive tactics and remarks represents an unconscionable litigation

tactic, which has no place in our legal system. [1] See, *Principe v. Assay Partners*, 154 Misc.2d 702, 708 (1st Dept. 1992), where an attorney's conduct in referring to a female colleague in a deposition as "little lady" and "little girl" was not conduct of reasonable attorney warranting sanctions on ground of frivolous conduct.

Counsel for both sides have an obligation to zealously advocate on behalf of their clients. However, this advocacy does not give counsel for CIR Defendants the right to openly accuse counsel for Plaintiff in submissions filed with the Court of violating their professional responsibilities, engaging in fraud and potentially committing criminal acts.[2]

"Thus, where a party's motion for Rule 11 sanctions is not well grounded in fact or law, or is filed for an improper purpose, a court my find itself in the position of imposing Rule 11 sanctions on the moving party and/or her attorney." See *Indus. Tech. Ventures LP v. Pleasant T. Rowland Revocable Trust*, 08 Civ. 6227(CJS)(MWP), WL 777313, at *7 (W.D.N.Y. Mar. 8, 2012) (awarding costs and attorneys' fees against the party filing a Rule 11 motion where the Rule 11 motion was "utterly without support"). See *Lee v. Grand Sichuan*, WL 199512; No.12–CV–08652 (S.D.N.Y. 2014).

### a. Summary Of Testimony By Josiah Hooper, Bruce Livesey And Bruce Talbot In Support of Plaintiff's Claims.

### (i)    Bruce Talbot's Testimony Was Inconsistent With That Of Livesey's And Hooper And Undermines CIR Defendant's Basis For Bring Their Rule 11 Motion..

"When the accused attorney actually prevails on his underlying position, his effort to turn the tables on his accuser has particular strength. It will be a rare case indeed in which such an attorney cannot successfully show that the accusation lacked a reasonable basis in fact and law." *Draper, supra* at 732.

At the evidentiary hearing, Livesey testified that any Release or document that was purportedly handed to Ms. Almeciga was done so after she was interviewed; that

---

[1] "A lawyer should not make unfair or derogatory personal reference to opposing counsel. Haranguing and offensive tactics by lawyers interfere with the orderly administration of justice and have no proper place in our legal system." New York Lawyer's Code of Professional Responsibility, EC 7-37.

[2] "The adversary system's reliance on zealous advocacy entitled LaSalle's attorneys to vigorously assert LaSalle's strained interpretation of the lease. It did not, however, permit the attorneys to accuse opposing counsel of violating their professional responsibilities." *Draper and Kramer, Inc. v. Baskin–Robbins, Inc.*, 690 F.Supp. 728, 732 (N.D.Ill. 1988).

3

there wasn't much discussion about it"; and that it wasn't read by her. See Evidentiary

Hearing Transcripts, 12-4-2015, 10-12: 29; 1-2:31-32. (hereafter, *Id* at __:__, or "HT"),

transcript pages attached hereto as **Exhibit AA**. Livesey reckoned that he waited until

after the interview to have Ms. Almeciga purportedly sign a Release because it was "sort

of common industry practice that you do that" and because "it is just a little more

practical." *Id* at 7-12; 47.

 Conversely, Bruce Talbot testified that it was "really pretty arbitrary" as to the

custom and practice of when a release is shown to the person who is being asked to sign

it: "It is often shown before and sometimes it is after." *Id* at 18-22: 128.  As to whether

anything was explained to Ms. Almeciga (or any subject for that matter) before allegedly

signing a release, or if it was just put in front of her, Talbot stated that it "varies from

interview to interview" and that its "just quite different in every situation." *Id* at 23-25:

128; 1-5:129.

THE COURT:  So if, in this case, it was only presented after to Ms. Almeciga after she
had given the interview and was not in any way shape, shape, or form explained, that
would be contrary, at least to your practice? *Id* at 7-10: 129.

 In response, after equivocating back and forth, Talbot stated that "very, very often

you would not ask them until the interview was completed." *Id* at 17-19: 129.

 Talbot testified that **the release was drafted by a lawyer**, and that the release

form is the kind that is "standard practice in the industry. *Id* at 6-9: 130.

THE COURT:  Right.  So you think every day folks will know what is meant by
licensees assigned, designee's derivative work right, title, and interest and terms of that
sort, they're just part of the everyday language of everyday folks? *Id* at 10-13: 130.

THE WITNESS:  Obviously not entirely everyday language but if they have any
questions, we would answer them.  I mean, I think the general understanding is this is --
we say to people in making documentaries, we have to have a signed release form that
you give us your permission to appear in the interview and once you have done that, we

then have the authority to use your image, your audio, in any way that we need to tell this story. *Id* at 14-21: 130.

THE COURT:  Right. Do you know whether any of that was said in this case?
THE WITNESS:  I believe so, yes.
THE COURT:  What is your basis for saying that?
THE WITNESS:  Well, in talking to Josiah Hooper after the fact.  I mean, my job is when a producer comes back –
THE COURT:  So what did Mr. Hooper tell you?
THE WITNESS:  He said that she signed this release form.
*Id* at 4-5: 131. 22-25: 130; 1-5: 131.

THE COURT:  And to the best of your recollection what did he say to you?
THE WITNESS:  He said that she signed this form and that there was no limitation on her agreement to be interviewed.
THE COURT:  And did he say he discussed it with her?
THE WITNESS:  To the best of my memory, yes… *Id* at 19-25: 131.

Talbot testified that Hooper told him that he handed Ms. Almeciga the Release, and explained to her that it was a "standard release form that we need you to sign for us to be able to use the interview…" *Id* at 11-15: 132. Talbot also testified that Hooper "certainly told me this after I asked him about it after she had begun to call CIR. *Id* at 19-22: 132.

The Court asked Talbot if he [Hooper] testified earlier today that he was 10 feet away from her when she signed it, that it was presented by Mr. Livesey, that he said nothing to her, that would be inconsistent with what he told you?" *Id* at 25: 132; 1-4: 133. In response, Talbot testified: "No." (and then proceeded on a diatribe). *Id* at 4: 133.

**Here's the problem, and what demonstrates how reprehensible CIR Defendants actions potentially were, and why this transaction/Release was patently without consideration, unjust, and rife with fraud.**

Talbot testified that once CIR receives a release that they no longer need the interviewee's participation for anything:

5

"There may be some sort of follow-up interview or something that one wants but, no, once the interview has been recorded and the release has been signed, then we go about creating our story." *Id* at 1-6:143.

Further, when questioned on why CIR choose to change and blur Plaintiff's face in the subsequent Generation Z story, Talbot responded that CIR did so because:

[The other story had] "already been seen.  It was out in the public over a year before.  It had had its biggest impact.  The story had gotten out.  So, in whatever smaller version of the story we were doing going forward, in a way it didn't matter that much to us." *Id* at 17-25:136.

It may not have mattered to CIR then (in 2014), but that's not the point.

In 2014, the original story had already been licensed to Univision (as well as others), had been viewed on YouTube by millions of people, and was most likely the most widely viewed story on YouTube that CIR had ever produced (certainly the most successful story of Livesey and Hooper's career).  Therefore, concerns raised by Plaintiff the year before were relevant and may have potentially jeopardized the success of the story, as well as CIR's relationship with Univision. Plaintiff received no benefit from her interview, and instead it caused, and continues to cause her, nothing but great distress and heartache (to the point of living the rest of her life in fear that a ruthless drug cartel is going to take retribution against her), while CIR received only gain or advantage from Plaintiff's interview and from her assistance with procuring the interview of Reta.

Legal consideration does not allow CIR to pick and choose when it will honor a promise, and when it won't, especially a promise that if broken could place one of the subjects it interviews into grave danger and extreme emotional distress.  This is also why CIR Defendants defense – premised on a Release being signed after the subjects interview – is void and unenforceable because it would grant CIR the permission to honor its promises whenever CIR feels like it, and to retain any and all benefits (no matter how

unjust); regardless of the consequences to the promisee (in this case Plaintiff). The law does not permit CIR Defendants to be enriched at Plaintiff's expense, and provides her with the remedy of unjust enrichment.  See e.g. *Van Brunt v. Rauschenberg*, 799 F.Supp. 1467, 1472 (1992); *Corto v. Fujisankei Comm. Int., Inc*., 177 A.D.2d 397 (1st Dept.1991).

Further, in 2013, when it did matter to CIR, CIR Defendants were aware of Plaintiff, and her concerns (possibly 6 to 8 months after her interview and before the story at issue even aired).

For instance, Livesey testified that he had a conversation with Ms. Almeciga after the interview about concealing her identity. *Id* at 12-14: 34. Livesey testified that at his deposition he testified that Ms. Almeciga raised concerns to him in 2013, but that now he recalled that the concerns were raised in 2014. *Id* at 13-25: 44; 1-2:44. However, Talbot testified that Bruce Livesey told him – "when we were reviewing all of this" - that he [Livesey] had had some contact with Ms. Almeciga in 2013. *Id* at 20-25; 145; 1:146.

Furthermore, at his deposition, Hooper testified, that he asked for Plaintiff's participation in the story 6 to 8 months after her interview, that he had a phone conversation with Plaintiff after her interview and before the story aired.  See **Ex. B**: **Hooper Dep. Transcript, at 8-18: 68.**

Therefore, CIR Defendants were aware of Plaintiff's concerns, and of the obvious danger and distress that airing her interview with her identity unconcealed could cause, yet still decided to go ahead with the story. This evidences wanton and deliberate conduct for which CIR Defendants are liable in tort (for fraud).

**(ii)    Testimony On The Contents Of The Release, Misspellings, When It Was Filled Out/Crossed Out, And By Whom:**

1.  Livesey testified that he filled out most of the Release, including where it stated print name, and date; that he wrote and spelled the name "Eryca" under "person appearing", however, under "print name", at the bottom of the Release, he spelled "Erica" as "Erica." *Id* at 13-25; 34.  Livesey reckoned that he did this because he must have had some "mental confusion" and "must have just simply got confused   about how Erica was spelled." *Id* at 1-4; 35.  However, Livesey also testified that he "would have filled this [Release] out before…*" Id.* However, Livesey later testified that he did not fill out the top of the Release until "after we finished the interview…" *Id* at 17-19; 46.  Yet Livesey also testified that he filled in the "print name" and "date" before she allegedly signed the Release, but that he did not have Plaintiff's address and asked her to fill it in after the interview. *Id* at 14-16:42; 1-15; 43. Livesey also testified that he crossed out and changed the date on the Release from August 14 to August 15, but could not remember if that was before or after the interview. *Id* at 9-16: 44.

### (iii)   Hooper's Testimony Revealed That He Had Entered Into Multiple Oral Agreements With Subjects He Interviewed For The Stories Relative To Protecting And Concealing Their Identities For The Story That Aired (Similar To The Oral Agreement Alleged By Plaintiff).

#### (a) **Plaintiff's Testimony.**

Plaintiff testified that she had an oral agreement with  Livesey that her face would be blacked out; that the agreement was that CIR Defendants were supposed to keep her identity completely concealed. See **Ex. BB**: Evidentiary Hearing Transcripts, 12-22-2015, at 20-23: 16; 5-6: 17 (hereafter *Id* at _:_  or "HT"). Further, Plaintiff testified that this agreement "was reached when the interview was set up." *Id* at 11:17.

THE COURT:  All right.  So, tell us what you said and what he said.
PLAINTIFF:  What I had asked him was is it a guarantee that my safety would come first?  I would appreciate that my face and my voice -- he said that he could make my voice kind of sound like digitized is I believe the word that he used, was digitized, and that he could blur out my face and there would be no issues. *Id* at 20-25: 18; 1-3: 19.

#### (b) **Hooper's Testimony.**

Hooper testified that a man from Laredo that he interviewed for the stories did not sign a release because: "he was someone who did not want his identity known not only to the people who might see the documentary but to me, and so he was someone whose

identity I was not willing to even acknowledge myself so I did not ask him for a release."

HT, 12-4-2015, 14-20:22.

Further, Hooper testified that he interviewed a detective named Robert Garcia,

and that he concealed his face but released his name, that he signed a release, but that

Hooper did not have a separate written contract that stipulated to concealing his identity

but releasing his name. *Id* at 11-25: 25.

The following colloquy then took place between counsel for Plaintiff and Hooper:

Q: "Was that just an oral agreement?" *Id* at 25:25.
 A.  Yes, that was an agreement that he was not going to --
Q.  So it was an oral agreement, correct, not in writing?
A.  He tells me he does not want his face to be seen so he can't be identified
physically but he is okay releasing his name and profession, etc.
Q.  And just for clarification, there was no nothing in writing that was executed
between the two of you that was just simply something that you discussed and you agreed
possible, correct, other than the release?
A.  That's correct. *Id* at 1-10: 26.

As such, Hooper acknowledged that CIR Defendants had entered into a

substantially similar oral agreements, as with Plaintiff. However, whereas the Man from

Laredo, and Det. Garcia's identities were concealed, and protected, as promised,

Plaintiff's was not, which constitutes a breach of contract.

   **(iv)   Brief Summary Of The Testimony And Evidence Presented By Plaintiff
        At The Evidentiary Hearing In Support Of Her Claims.**

The evidence presented by Plaintiff was exhaustive, and included, among other

things: her own testimony, the testimony of a handwriting expert, Wendy Carlson, and

the testimony of Isaac Duarte.

Plaintiff's testimony at the evidentiary hearing, was consistent, and essentially the

same as she has maintained before this lawsuit was even filed, in affidavits, and

deposition testimony, namely, that she did not sign the Release offered by CIR:

THE COURT: And is it your testimony that you never signed any release or that you may have signed a release but not the one that has been offered by the defense?
Plaintiff: Nothing was ever signed.
THE COURT:  You never signed a release?
PLAINTIFF: No.  See HT, 12-4-2015, 15-21: 114.

 Ms. Carlson's Testimony was exhaustive, and will be more fully analyzed and

explored below. See HT, 12-4-2015, beginning at page 51. Said testimony, included:

 a. A Rule 26 Report, which analyzed, among other things, Plaintiff's known signatures in comparison to the signature on the Release advanced by CIR Defendants. See Carlson's Rule 26 Report (Plaintiff's **Ex. A**, p. 91 of Evidentiary Hearing; attached as Ex. 9 to Plaintiff's initial Response; attached hereto as **Ex. A**);

 b. A Chart analyzing the differences and characteristics between Plaintiff's signature and handwriting and the signature and handwriting on the "Georgia Documents" and the Release. See Chart on Differences Between the Erica Almeciga Signatures. Plaintiff's **Ex. D** at the Evidentiary Hearing (see p.100, 109-110 (received), attached hereto as well as **Ex. D**. In this Chart, Ms. Carlson states 23 different characteristics, and explains the differences between each characteristic on the Release, Erica Almeciga's known signature, and the signature on the Georgia Documents;

 c. Further, on December 9, 2015, the Court Ordered Ms. Carlson to supplement her expert report by: 1) comparing the signatures on the **Court Exhibit 1** (from the December 4, 2015 evidentiary) to the signature on the release form, and 2) comparing the signature on Court Exhibit 1 to the purported 'known' signatures that Ms. Carlson was provided with for purposes of her original expert report. Attached hereto as **Exhibit CC** is the Court's Dec. 8th Order, Carlson's Supplemental Report, which contains her analysis as ordered by the Court and includes **Court Exhibit 1** (the 10 signatures that the Court had Plaintiff sign in Court).  In this Report, Ms. Carlson stated that the Eryca Almeciga-Reta signature on the questioned document (i.e. the Release) was "not made to resemble Erica Almeciga's signature but is remarkably dissimilar, indicating forgery/different authorship." In reaching this conclusion, Ms. Carlson stated 17 differences. See Carlson Supp. Report, p. 6-7.  Further, in this Report, Ms. Carlson compared Erica Almeciga's signature on the known documents (from the Rule 26 Report) to the genuine signatures contained in Court Exhibit 1, and stated that the signatures were authored by the same person who authored the genuine signatures on Court Exhibit 1.  *Id* at 7.  Further, Ms. Carlson noted at least 14 similarities. *Id* at 7-8.

 Finally, Mr. Duarte-Morillo (hereafter, "Duarte") was questioned on various

signatures and handwriting offered by CIR Defendants, as well as the Release at issue.

Mr. Duarte offered an affidavit months prior to the evidentiary hearing.  In both his

affidavit, and at the evidentiary hearing, Mr. Duarte testified that he was familiar with

Ms. Almeciga's signature, and testified that the Release advanced by CIR Defendants did

not appear to be Ms. Almeciga's signature.  See HT, 12-22-2015, 20-25: 60; 1-7: 61.

## II. THE RELEASE CONTRACT ADVANCED BY CIR DEFENDANTS IS UNENFORCEABLE AS A MATTER OF LAW BECAUSE IT LACKS CONSIDERATION.

At the evidentiary hearing on December 4, 2015, the Court requested of the

parties to address whether or not the release contract advanced by CIR Defendants was

even enforceable. The Court stated, in pertinent part, as follows:

"I have a question in my mind as to whether this is an enforceable release
contract…As I understand it, it is a form that is presented after the fact to the person so
they're not – their agreement is not being sought before they do the filming, it is not
explained to them.  It is, at least in this case according to the witnesses' testimony, signed
essentially immediately so basically a "sign here" kind of situation.  It's not clear to me
that there is any consideration. I raise these as questions and we will have to have it
addressed -- not now -- maybe we will include that in the final briefing that we have after
the hearing is over." HT, 12-4-2015, 8-21:48.

The law is well settled that "in order for a promise to be enforceable as a contract,

the promise must be supported by valid consideration." *Startech, Inc. v. VSA Arts*, 126

F.Supp.2d 234, 236 (S.D.N.Y. 2000). Ordinarily, the question of consideration is one of

fact. *Daniel Goldreyer, Ltd. v. Van de Wetering*, 217 A.D.2d 434, 438–39 (1st

Dep't.1995). Consideration is defined as either a bargained for gain or advantage to the

promisee or a bargained for legal detriment or disadvantage to the promisor. *Roth v.

Isomed, Inc.,* 746 F.Supp. 316, 319 (S.D.N.Y.1990).

Under New York law, a release must be construed in accordance with the intent

of the parties who executed it. *Gross v. Sweet,* 49 N.Y.2d 102, 108 (1979). To the extent

that agreements purport to grant exemption for liability for willful or grossly negligent

acts they have been viewed as wholly void. *Id* at 106.

11

"Moreover, because the law looks with disfavor upon agreements intended to absolve a party from the consequences of his wrongdoing, a release which purports to excuse a party from responsibility for misconduct is subject to the closest of judicial scrutiny." *Golden Pac. Bancorp v. F.D.I.C.*, 273 F.3d 509, 515 (2d Cir.2001) (applying New York law) (internal quotation marks omitted). See *Elbit Systems Ltd. v. Credit Suisse Group*, 842 F.Supp.2d 733, 739 (S.D.N.Y. 2012); *Rogow v. U S*, 173 F.Supp. 547, 551 (S.D.N.Y. 1959).[3] Further, it is not sufficient that the terms of the asserted agreement be "unambiguous" in their import, they must be "understandable" as well. *Abramowitz v. New York University Dental*, 110 A.D.2d 343, 346 (2nd Dept. 1985).

In the instant case, CIR Defendants contend that Plaintiff signed the Release advanced by them, which Plaintiff vehemently denies, however, CIR Defendants acknowledge, among other things, the following:

1) That the Release was signed after the interview;
2) That Plaintiff raised concerns to CIR Defendants in 2013 about concealing her identity (possibly before the story at issue even aired);
3) That the Release was drafted by an attorney, and contained terms and language that ordinary lay people would not understand;
4) That nothing was explained to Plaintiff before she allegedly signed the Release;
5) That the majority of information on the Release was written by CIR Defendants (it is unclear from the testimony if this was before or after the interview);
6) That Plaintiff's name was misspelled, the date was crossed out, etc… on the Release;
7) That Plaintiff had absolutely no control or authority over any aspect of the story that was broadcast and licensed by CIR Defendants; and
8) That the story was licensed to Univision, among other media companies, and has been viewed by millions of people to date.

Further, Plaintiff did not receive any compensation for the interview, and is forced to live the rest of her life in fear (that a notorious drug cartel may take retribution against her and her family) because her identity was not concealed in the interview.

---

[3] "The rationale behind the numerous decisions invalidating releases of the kind involved here is based upon the policy of encouraging the exercise of care. The courts seek, also, to protect individuals from the effects of agreements which are rarely considered by the signer with the thoughtfulness and care appropriate to the catastrophic consequences which may result to him and his family." *Rogow, supra* at 552.

Therefore, not only was there a complete lack of consideration, but the entire transaction, which CIR Defendants contend and seem to base their entire defense on, appears to be rife with willful and fraudulent acts, rendering the Release void.[4]

### III.   THE TESTIMONY AND REPORTS OF PLAINTIFF'S HANDWRITING EXPERT, WENDY CARLSON, ARE ADMISSIBLE UNDER FRE 702 AND APPLICABLE CASE LAW.

In the instant case, CIR Defendants contended in reply to Plaintiff's Response to their Motion for Sanctions, that Plaintiff's expert could not offer admissible testimony in connection with CIR Defendants Motion for Sanctions. See Doc # 82, p. 1. This contention is without merit.

In *U.S. v. Brown*, 152 Fed.Appx. 59, 62 (2nd Cir. 2005), the 2nd Circuit Court of Appeals addressed the admissibility of testimony from a handwriting expert under FRE 702, *Daubert* and *Kumho*.

In *Brown*, the defendant submitted that handwriting analysis did not satisfy the requirements for the admission of expert testimony under Fed.R.Evid. 702, *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). In *Brown*, the defendant contended that the Court was obliged to limit the government's handwriting expert to noting similarities between the questioned documents and Brown's exemplar and to preclude the expert from expressing any

---

[4] See, for instance, *Rogow, supra* at 554-55, where a free lance writer was killed when an air force plane on which he was a passenger crashed, and just before he embarked on the flight he signed a release purporting to absolve the government from liability for its own negligence; and the decedent was engaged in gathering material for a documentary air force film. The Court held that the release was not a bar to recovery for the death of the decedent where the evidence established that the services provided by the air force were not gratuitous and where the main benefits resulting from the flight were those flowing to the air force and the decedent benefited only incidentally. *See Elbit Systems Ltd. supra* at 743-744, where a genuine issue of material fact existed as to whether a brokerage account holder knew it had a fraud claim at the time it signed a release with the financial holding company and its wholly-owned subsidiary, a registered broker-dealer, precluding summary judgment for company and subsidiary on fraud claim brought by holder's successor-in-interest.

opinion as to whether Brown was the author of the questioned documents. See *Brown, supra* at 62. The Court noted that similar attacks on handwriting analysis had been rejected by our sister circuits. *Id*; See, e.g., *United States v. Prime*, 363 F.3d 1028, 1032-35 (9th Cir.2004); *United States v. Crisp*, 324 F.3d 261, 270 (4th Cir.2003); *United States v. Mooney*, 315 F.3d 54, 61-62 (1st Cir.2002); *United States v. Jones,* 107 F.3d 1147, 1160-61 (6th Cir.1997).

"While our own court has not addressed the issue, we have routinely alluded to expert handwriting analysis without expressing any reservation as to its admissibility under Rule 702." *Brown, supra* at 62.

The *Brown* Court then cited a litany of 2nd Circuit case law to support this conclusion. See *Id* at 62-63 citing: e.g., *United States v. Tin Yat Chin*, 371 F.3d 31, 39 (2d Cir.2004) (referring to defendant's proffer of a handwriting expert); *United States v. Badmus*, 325 F.3d 133, 137 (2d Cir.2003) (discussing government's use of expert testimony to identify defendant's handwriting on series of documents); cf. *United States v. Tarricone*, 21 F.3d 474, 475-76 (2d Cir.1994).

Prior to *Brown*, and prior to even *Kumho*, this Court had routinely allowed the admission of testimony from a handwriting expert. For instance, in *U.S. v. Starzecpyzel*, 880 F.Supp. 1027, 1045-1046 (S.D.N.Y.1995), this Court conducted an extensive and thorough analysis on the admissibility of a forensic document examiner's ("FDE") testimony under FRE 702. The Court concluded that a Forensic document examiner's testimony as to significant similarities and differences between genuine and challenged exemplars is admissible as nonscientific, or "skilled" testimony under the evidentiary rule regarding admission of expert testimony, as these observations are easily confirmed or

14

rejected by a jury. [5]

Here, as demonstrated above, Plaintiff's handwriting expert, Wendy Carlson, has offered 2 expert reports (one of which was based upon 10 of Plaintiff's signatures, which she signed in Court), a Chart analyzing the differences between Plaintiff's signature and handwriting in comparison to the Release and "Georgia Documents"; she testified for over 2 hours at the evidentiary/Daubert hearing, and 2 depositions.

CIR Defendants chief complaint in their Reply was that Ms. Carlson's testimony could not meet the standard of reliability required by FRE 702 and Daubert. Doc # 82, p. 5.  This argument was principally based on whether or not Ms. Carlson could identity Plaintiff's "true handwriting" based on reliable methods. *Id*.

First, contained in Ms. Carlson's Rule 26 Report, was, among other known signatures and handwriting, a notarized affidavit by Plaintiff that was signed over 6 months before this lawsuit was even filed. Further, and most telling, is that Ms. Carlson's Supplemental Report was based upon 10 signatures from Plaintiff that she signed in Court. Therefore, CIR Defendants cannot reasonably contend that Ms. Carlson's Supplemental Report – based upon 10 of Plaintiff's signatures she signed in Court – is unreliable.  As everyone should recall, CIR Defendants were then able to depose Ms. Carlson relative to this Report.

Third, the Chart set forth by Ms. Carlson at the evidentiary hearing was also subject to deposition.

The other contentions made by CIR Defendants in Reply, such as Ms. Carlson not verifying her opinion, and the methodology she used, are essentially irrelevant and/or

---

[5] "It is axiomatic that a jury is free to accept or reject the opinion of an expert. This is especially true 'in forensic document examination, where ... conclusions are drawn, in large part, on subjective criteria.'" *U.S. v. Reich*, 420 F.Supp.2d 75, 83 (E.D.N.Y. 2006) quoting *Starzecpyzel, supra* at 1048

have been satisfied now based upon the supplemental report Ms. Carlson submitted, and her testimony at the evidentiary hearing.  Further, CIR Defendants failed to have an expert of their own review or analyze any of Plaintiff's handwriting, or the Release in general, and instead simply relied on their own counsel's Affidavit and his representations therein.

Therefore, Plaintiff has offered the testimony, and expert reports, of a handwriting expert as to significant similarities and differences between Plaintiff's known and genuine handwriting and signatures (10 of which were signed in Court) in comparison to the challenged Release and "Georgia Documents."  Plaintiff's expert has expressed an opinion as to whether Plaintiff was the author of the Release (and Georgia Documents).

As such, this testimony is plainly admissible under FRE 702, as these observations can be easily confirmed or rejected by the jury.[6]

### IV.    CONCLUSION

As demonstrated by the foregoing, Plaintiff respectfully submits that CIR Defendants Motion for Sanctions should be denied in its entirety, with prejudice; and that the testimony and reports of Plaintiff's handwriting expert Wendy Carlson be deemed admissible under FRE 702. Further, Plaintiff believes that under the circumstances, sanctions are warranted against CIR Defendants, because their Motion for Sanctions was not well grounded in fact or law, and was filed for an improper purpose, in violation of Fed.R.Civ.P. 11(1) and (3), however, Plaintiff will respectfully defer to the Court's discretion.

Dated: January 21, 2016
        New York, New York

---

[6]  As the Court noted at the evidentiary hearing, "that's the Daubert issue, it is a question of admissibility, not truth or falsehood, just admissibility…" HT, 12-22-2015, 18-25: 80.

16

Respectfully submitted,

**THE LANDAU GROUP, PC**

By: _____

Kevin A. Landau (pro hac vice admitted)
1221 Ave. of the Americas, 42nd Floor
New York, NY 10020
Phone: 212.537.4025/248.671.0884 (fax)
Email: kevin@thelandaugroup.com
*Counsel for Plaintiff Erica Almeciga*

<u>**CERTIFICATE OF SERVICE**</u>

This is to certify that the foregoing papers have been electronically filed with the Clerk of the Court on January 21, 2016. Notice of this filing is sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's ECF System.   23

Respectfully submitted,

**THE LANDAU GROUP, PC**

By: _____

Kevin A. Landau
1221 Ave. of the Americas, 42nd Floor
New York, NY 10020
Phone: 212.537.4025/248.671.0884 (fax)
Email: kevin@thelandaugroup.com
*Counsel for Plaintiff Erica Almeciga*

23