UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT NEW YORK

———————————————————— x

ERICA ALMECIGA,                      :
                                     :
            Plaintiff,               :
                                     :
      - against -                    :     Case No.: 1:15-cv-04319-JSR
                                     :
CENTER FOR INVESTIGATIVE             :
REPORTING, INC., UNIVISION           :     Hon. Jed. S. Rakoff
COMMUNICATIONS, INC., UNIVISION      :
NOTICIAS, BRUCE LIVESEY, JOSIAH      :
HOOPER,                              :
                                     :
            Defendants.              :
———————————————————— x

## SUMMATION MEMORANDUM
## IN SUPPORT OF CIR'S MOTION FOR SANCTIONS

Thomas R. Burke (*pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
505 Montgomery Street, Suite 400
San Francisco, CA  94111
Phone:  (415) 276-6552
Fax:  (415) 489-9052

Alison Schary
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Avenue NW, Suite 800
Washington, DC  20006
Phone:  (202) 973-4248
Fax:  (202) 973-4448

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ............................................................................................1

ARGUMENT ..................................................................................................................4

      I.     The Evidence Shows that Plaintiff Willingly Participated in the Interview Without Restrictions and Signed a Standard Release for her Appearance .............4

      II.    Plaintiff's Testimony to the Contrary – the Sole Factual Evidence She Has Offered – Is Not Credible .......................................................................................7

      III.   The Testimony of Plaintiff's Proffered Expert Is Not Admissible Under Rule 702 .........................................................................................................12

CONCLUSION................................................................................................................15

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579 ............................................................................................................12, 15

*DiBella v. Hopkins*,
   403 F.3d 102 (2d Cir. 2005) .................................................................................................12

*Kumho Tire Co., Ltd. v. Carmichael*,
   526 U.S. 137 (1999) .........................................................................................................12, 15

**Rules**

Rule 11 ..............................................................................................................................................3

Rule 12(c) ..........................................................................................................................................3

Rule 702 .................................................................................................................................2, 12, 14

## PRELIMINARY STATEMENT

CIR did not bring this motion lightly.  Plaintiff has accused CIR and journalists Bruce Livesey and Josiah Hooper (collectively "CIR") of serious ethical misconduct, impugning their integrity as investigative journalists.  CIR has provided Plaintiff and her counsel with multiple opportunities to withdraw these claims, providing evidence that should have raised serious red flags as to Plaintiff's credibility and triggered her counsel's duty to take a hard, objective review.  Instead, at every turn, Plaintiff and her counsel have doubled down with increasingly dubious theories to paper over the gaping holes in her story – and increasingly strident accusations of unethical behavior by CIR.

Each time she has been presented with inconvenient evidence, Plaintiff has responded with a litany of excuses – she was "hacked," she was robbed, her identity was stolen, her emails burned in a fire, she never saw the court papers she filed in custody proceedings involving her children, someone else must have posed as her to file a restraining order against a third party in some inexplicable plot of "revenge."  But after nearly two days of an evidentiary hearing, Plaintiff has offered ***no evidence*** to support any of these theories.  Nor has she even attempted to explain – in her papers or in court – how these various conspiracy theories would account for the signed release in CIR's possession.  Instead, the evidence consistently supports what CIR has said all along: that Ms. Almeciga eagerly participated in an interview in August 2012, signed a release for her appearance with no mention of any restrictions, and only came up with this story of an oral agreement and a forged signature years later, when her public association with Mr. Reta started to become a liability for her in custody proceedings.

CIR has offered three fact witnesses and copious contemporaneous documentation in support of its motion.  Defendants Livesey and Hooper, who arranged and conducted the interview with Ms. Almeciga, testified consistently that Ms. Almeciga made the initial request

seeking to arrange the interviews for Mr. Reta and herself; that she never raised any concern for her safety and made no request to conceal her identity (and, as captured on camera, vehemently denied that she felt herself to be in any danger); that had she made such a request, it would have been honored with an interview conducted under lighting conditions to conceal her image – or a decision not to use the footage at all (since CIR's focus was securing Rosalio Reta's interview, not Plaintiff's); that she signed the release in their presence and with no questions as to its content; and that the first time she ever asked for her face to be obscured was in June 2014, two years after the interview and almost a year after the report was published.  The testimony of Stephen Talbot (the report's executive producer) and contemporaneous emails produced in this action to further support CIR's account.

Against this robust showing, Plaintiff offers ***no factual evidence*** to support her story. Instead, Plaintiff has offered herself as the sole fact witness in support of her case – and her performance in the courtroom demonstrates that she is not a credible witness.  She gave contradictory and false testimony under cross-examination, and she was forced to admit that she had previously filed false statements in other court proceedings.  If that was not enough, Plaintiff was caught in open court attempting to coach her boyfriend's testimony on the stand.

Plaintiff's proffered document examiner cannot substitute for her lack of evidentiary proof.  As this Court noted at the close of the hearing, handwriting analysis is not limited to experts.  Given that two eyewitnesses have testified to Plaintiff's signature on the release; that she has no plausible rejoinder to similar signatures of hers that appear in court documents filed contemporaneously and prior to the release; and that she has demonstrated her willingness to tamper with testimony in open court about her signature, this is not a case that requires an expert at all.  In any event, Ms. Carlson's proffered testimony does not meet the requirements of Rule

702.  Ms. Carlson has no reliable basis to opine that someone other than Ms. Almeciga must have signed the release (and a third individual must have filed the Georgia documents) – not least of all because she cannot rule out that Plaintiff deliberately disguised the sample signatures she created for Ms. Carlson in hopes of obtaining a favorable opinion.

In sum, Plaintiff's case is legally barred on the merits, as set forth in CIR's still-pending Rule 12(c) motion.  But even if it could survive that motion, Plaintiff has no credibility and her claims of forgery have no evidentiary basis.  It does not take an expert to see that Plaintiff's very distinctive handwriting on the release matches the handwriting in Massachusetts court documents that she acknowledged filing, as well as in older Massachusetts and Georgia documents of which she now feigns ignorance.  And with every red flag, her counsel have failed to conduct a reasonable inquiry into the viability of Plaintiff's claim, as required by Rule 11; instead, they simply took her at her word and doubled down on increasingly dubious allegations. Such behavior is grounds for sanctions.  *See* CIR Sanctions Br. at 12-13, 18-20.  At this point, Plaintiff's false claims have cost CIR hundreds of thousands of dollars in legal fees, cast aspersions upon its journalistic integrity, and squandered the resources of this Court.  CIR requests sanctions terminating this case, accompanied by a published decision making clear that Plaintiff's claims are without credit, as well as costs and fees incurred in defending this action. While CIR recognizes that it is unlikely to recover its significant fees from Plaintiff given her financial situation, CIR believes that any sanction imposed should reflect the seriousness of this matter and deter serial litigants like Plaintiff from abusing the judicial process with false claims.

## ARGUMENT

**I.      The Evidence Shows that Plaintiff Willingly Participated in the Interview Without Restrictions and Signed a Standard Release for her Appearance**

The evidence shows that Plaintiff willingly participated in the interview with CIR. Falsely representing herself as the wife of Rosalio Reta, she reached out directly to Mr. Livesey to arrange an interview.  Tr. (I) 28:23-29:8 (Livesey).[1]  Mr. Livesey and Mr. Hooper – the only two other witnesses to Ms. Almeciga's interview in Woodville – both testified that she never raised any concerns about being identified in the interview, and never requested that her image or identity be concealed in any way.  *Id.* 9:13-18, 10:6-11 (Hooper), 33:9-16 (Livesey).  Plaintiff admits that she never told Mr. Livesey or Mr. Hooper that she did not want to be interviewed. Tr. (II) 16:16-19 (Almeciga).

The circumstances of the interview itself support this testimony.  As the interview footage shows, Ms. Almeciga is relaxed on camera and makes no mention of concealing her identity.[2]  Burke Decl. Ex. 3; Tr. (I) 126:2-21, 133:20-134:13 (Talbot).  When Mr. Livesey asks Plaintiff directly whether she is scared of retribution from the cartel for her relationship with Mr. Reta, she responds that she is "not scared about it. … I don't believe I would be even worth their time to come hurt because it's not going to do anything for them."  Tr. (I) 112:24-114:9 (Almeciga); Burke Decl. ¶ 4.  Both Mr. Livesey and Mr. Hooper testified that when an interviewee requests concealment prior to an interview – as Plaintiff claimed in her testimony[3] –

---

[1] As used herein, "Tr. (I)" and "Tr. (II)" refer, respectively, to the transcripts of the evidentiary hearings held on December 4, 2015 and December 22, 2015.

[2] To the contrary, Messrs. Livesey and Hooper are heard on camera repeatedly directing Plaintiff to look at Mr. Livesey when answering, rather than directly at the camera – an instruction that would be unnecessary if they were blurring her face.  *See* Burke Decl. ¶ 4, Ex. 3.

[3] Ms. Almeciga testified that the alleged "oral agreement" to conceal her identity was reached "when the interview was set up." Tr. (II) 17:9-17 (Almeciga).  None of the email correspondence produced in discovery makes any reference to such an agreement or any special conditions

4

they would typically shoot the interview in such a way as to conceal her identity on camera,

rather than digitally obscuring it later.  Indeed, they shot at least two additional interviews for the

same project under specialized conditions to obscure the identity of those interviewees at their

request.  In contrast, Ms. Almeciga's interview was shot in natural light, with the camera focused

on her face and no screen or special backlighting to conceal her appearance.  *Id.* 23:18-24:8

(Hooper), 37:5-19 (Livesey).

Mr. Livesey testified that he presented Ms. Almeciga with CIR's standard release at the

end of the interview.  He watched Ms. Almeciga sign the release and fill in her address.

Mr. Hooper, the only other witness in the room, also observed Mr. Livesey provide

Ms. Almeciga with the release for execution.  After Ms. Almeciga signed the release,

Mr. Livesey gave it to Mr. Hooper, who carried it back to CIR's offices in California along with

the interview footage.  CIR has maintained continuous possession of the original signed release

ever since receiving it from Mr. Hooper, and produced it in court for the evidentiary hearing.[4]

Tr. (I) 6:17-9:12 (Hooper), 30:24-33:7 (Livesey).

Mr. Livesey and Mr. Hooper both testified that before Plaintiff's interview, they had

never seen her signature before.  Tr. (I) 8:18-20 (Hooper), 33:20-22 (Livesey).  Indeed, the three

had never met each other before the Woodville interview.  Accordingly, they would have had no

way to "forge" Plaintiff's signature on the release.  Mr. Talbot testified that he would have been

notified if Messrs. Livesey or Hooper had agreed to any restriction on Ms. Almeciga's interview

– and that none was ever reported to him.  *Id.* 132:4-9, 133:4-16, 134:6-13, 144:16-25 (Talbot).

---

whatsoever for the interview.  In any event, Plaintiff testified both at her deposition and at the
hearing that this alleged agreement was to her conceal her identity "permanently" in any future
use – thus requiring a writing under the Statute of Frauds.  *Id.* 16:24-17:1 (Almeciga); Almeciga
Dep. 134:15-25.

[4] Mr. Reta signed an identical release after the conclusion of his own interview, which CIR
produced in court for this hearing.  Def. Ex. 33 (Burke Supp. Decl. Ex. C).

The evidence also consistently shows that Defendants first learned of Ms. Almeciga's tale of an "oral agreement" to conceal her face when she started calling in June 2014, two years after her interview and nearly a year after the CIR Report was released.  Tr. (I) 35:24-36:18 (Livesey); 127:7-13 (Talbot).  Mr. Livesey testified that when he spoke with Plaintiff by phone at this time, she told him the interview had "become a problem for her because she was in the middle of a custody battle with one of her former partners … over one of her children," who was using her relationship with Mr. Reta as "ammunition" in the custody battle.  *Id.* 35:24-36:18 (Livesey).  In her own testimony, Ms. Almeciga confirmed that her appearance in the CIR Report had been used against her in custody proceedings to suggest that she is affiliated with cartel members.  *Id.* 116:11-25 (Almeciga).[5]

Mr. Talbot testified that he spoke with Ms. Almeciga on or about June 12, 2014, and then again on or about June 17, 2014.  In these conversations, he told Ms. Almeciga that she had signed a release form and that CIR had never been notified of any restriction on the use of her image.  Tellingly, ***Ms. Almeciga never denied to Mr. Talbot that she signed the release***. Instead, when Mr. Talbot asked what Ms. Almeciga wanted to do, she asked if her face could be blurred in *future* uses of her interview.  Even though CIR had no legal obligation to accommodate her request, Mr. Talbot agreed – and based upon their conversation, he considered the matter resolved.  Tr. (I) 134:14-137:22.  Contemporaneous internal emails produced by CIR are consistent with Mr. Talbot's testimony.  Burke Decl. Ex. 9.  For this reason, CIR blurred Ms. Almeciga's face when it used her footage in a second documentary, "Generation Z," released in November 2014.

---

[5] Ms. Almeciga elaborated further at her deposition that the CIR report has been used against her in probate proceedings over custody of her children as well as her boyfriend Isaac Duarte's custody of his own children.  Almeciga Dep. 200:11-201:20.

6

Only a few months after Mr. Talbot's June 2014 conversation with Ms. Almeciga, CIR received a letter from Ms. Almeciga's counsel demanding that CIR contact Mr. Landau to discuss settlement of her claim.  It was only when CIR, through counsel, provided Plaintiff with a copy of the signed release – which she had never denied signing in her conversation with Mr. Talbot – that Plaintiff first alleged the release had been "forged."  When CIR found court documents filed by Plaintiff in Georgia, bearing a remarkably similar signature – and dated nearly a year after the release – Plaintiff claimed she never filed them.  When CIR obtained additional documents filed by Plaintiff in custody proceedings for her own children, again bearing the same distinctive signature, Plaintiff insisted she had never seen them before.

Plaintiff offered no credible explanation, let alone evidence, as to how the Georgia and Massachusetts court documents were filed without her participation or knowledge.  Nor has she explained how it could possibly be that the signatures on these documents are so remarkably similar to her signature on the release.  Did CIR file a restraining order in Plaintiff's name in Georgia, featuring the names and birthdates of her children and details about her impending move to Massachusetts – information it would have no basis to know – in an elaborate cover-up to create a paper trail for its supposedly forged release?  Does Ms. Almeciga have a body double who snuck into the interview room in Woodville to sign the release, and then later also filed a restraining order in her name?  Did this same doppelganger file court papers in 2008 for custody of Ms. Almeciga's children?  As usual, Occam's Razor points to a far more plausible scenario: the signatures look similar because she signed them all.

## II.    Plaintiff's Testimony to the Contrary – the Sole Factual Evidence She Has Offered – Is Not Credible

In contrast to CIR, Plaintiff has offered no documentary evidence to support her version of events.  No contemporaneous emails make any reference whatsoever to an oral agreement to

conceal Plaintiff's identity, nor does the circumstantial evidence support her narrative.  She relies

solely on her own testimony – and as was made clear at the hearing, Ms. Almeciga is not a

credible witness.  She repeatedly offered testimony at odds with the documentary record and

inconsistent with her own deposition testimony.  Most damning of all, she was caught in open

court trying to coach Mr. Duarte's testimony to make it consistent with her own as he attempted

to identify her signature in the Massachusetts documents.

Plaintiff's testimony that she did not file the Georgia documents is not credible.  By her

own admission, the Georgia documents reflect her address at the time; the phone number she was

using as her own; her birth date; and the names and birthdates of her three children.  The

restraining order is against a man who lived in the same housing complex.  Tr. (II) 28:19-34:17,

40:2-41:8 (Almeciga).  Moreover, the Erica Almeciga who filed the Georgia documents claimed

that she was moving to Massachusetts in the near future – just as Plaintiff did, allegedly "without

saying anything to anyone."  *Id.* 37:16-25 (Almeciga).  The signatures on these documents look

strikingly like the signature on the release, with the same distinctive capital letters.  Moreover,

the printed handwriting on the Georgia documents looks very similar to the address line on the

release, as well as to Plaintiff's handwriting in court documents she admitted filing.  Def. Ex. 1;

Tr. (II) 4:24-10:6.

None of Plaintiff's proffered justifications for these striking "coincidences" add up – and

in trying to make the pieces fit, she only undercuts her own credibility as a witness.  First,

Plaintiff insisted that she could not have filed the Georgia restraining order because it refers to a

child born three months premature – and she has no such child.  But the allegations contained in

the Georgia documents do not need to be ***true*** for Plaintiff to have filed them – and as she

admitted, Plaintiff has falsely described herself as pregnant in court papers before.  In an answer

to an action for nonpayment of rent, Ms. Almeciga claimed that her landlord "verbally attacked me and caused me stress *while I was 7 months pregnant*." Def. Ex. 1 at 6 (emphasis added). Ms. Almeciga admitted this allegation was false; lamely, she claimed that "it might have just been me writing and I was writing so much." Tr. 47:7-18. Plaintiff also testified that she has never been pregnant in her life other than with the three children that she has; yet Mr. Duarte testified that she had been pregnant with his child in 2014. Tr. (II) 46:6-13 (Almeciga), 68:25-69:19 (Duarte).

Plaintiff twisted herself into similar contortions trying to explain why the phone number on the Georgia documents (857-333-4838) matched the number she provided to Mr. Livesey around the same time. She claimed this number belonged to a neighbor ("George") whose phone she used because her own cell phone had been "stolen" when she left it behind during her trip to Texas for the CIR interview. Tr. (II) 34:4-5 (Almeciga). Yet she and Mr. Duarte both testified that Mr. Duarte called Plaintiff on that same cell phone while she was in Texas (Burke Decl. Ex. 28, ¶ 8; Tr. (II) 67:21-68:8 (Duarte)); and in her affidavit, Plaintiff claimed to borrow a phone with a *different* number (857-318-3698) from her neighbor "George." Burke Decl. Ex. 28, ¶ 19. Plaintiff could not offer any plausible explanation why whoever filed the Georgia documents – if, as she claims, it was not her – would know to list this neighbor's phone number as her own.

Next, Plaintiff posited that the Georgia documents were actually filed by a woman named Julie Gutierrez as "revenge" against Ms. Almeciga. As the Court noted, is not clear why someone would file a restraining order in Plaintiff's name against a third party as a form of "revenge." Tr. (II) 25:12-26:12 (Almeciga). Nevertheless, in her supplemental papers Plaintiff's counsel submitted several posts from Ms. Gutierrez's Twitter account in which Ms. Gutierrez allegedly "revealed Plaintiff's existence and identified her," linking to the CBC interview

featuring Plaintiff.  Pl. Supp. Mem. at 7, Landau Decl. Ex. D.  When shown these documents in

court, Ms. Almeciga claimed she was not familiar with them and that they did not refer to her.

*Id.* 42:7-43:22 (Almeciga).  CIR confronted Ms. Almeciga with additional tweets from the same

account (which CIR only learned of through Plaintiff's supplemental papers), describing "Erica

Reta" as Ms. Gutierrez's "stepmom" who was dating her father.  And just a few weeks before the

Georgia documents were filed – against a man named Rosendo ***Gutierrez*** – Julie Gutierrez

tweeted "Erica is pregnant and it's my dad's baby."  Def. Exs. 39, 41.  In sum, the evidence

Plaintiff submitted in her own papers is on all fours with the narrative in the Georgia documents

– that Ms. Almeciga filed a restraining order against someone identified as a partner from a

"prior dating relationship" with the last name of Gutierrez while claiming to be pregnant.

Equally disingenuous are Plaintiff's attempts to dodge a collection of court documents

from various Massachusetts actions bearing her handwriting and signatures.  CIR received these

documents (Def. Ex. 1) from counsel in other actions involving Ms. Almeciga – accordingly,

they were equally (and even more easily) available to Plaintiff and her counsel.  Of the 25 pages

in Exhibit 1, Plaintiff admitted that all but pages 18-21 are her handwriting.  Even among these

pages, the distinctive capital "E" in her name is identical to the same letter in her signature the

release (as well the Georgia documents) – and even to a lay observer, the handwriting throughout

these documents is plainly a match for the author of the Georgia documents and the printed

address on the release.

Plaintiff's insistence that she has "never seen" the documents at pages 18-21 of Exhibit 1

is simply not credible.  These are two documents (Ms. Almeciga's affidavit and a "stipulation of

parties") filed in custody proceedings concerning Plaintiff's children, with filing stamps plainly

visible.  Ms. Almeciga admitted that the two children referenced in the papers (Amaynilee and

Robert Jr.) are her children with her ex-partner, Robert Wallace Sr.; that the plaintiff, Kim

Wallace, is her children's aunt; and that the custody arrangement described in her affidavit is

accurate.  Tr. (II) 15:13-25, 35:2-7 (Almeciga).  Plaintiff did not and cannot explain how anyone

else could file an affidavit and stipulation in her name (identified as the "mother") concerning

custody of her own children.  Equally suspect is Plaintiff's insistence that she never signed a

certificate filed in Massachusetts housing court in May 2014, listing her phone number and her

then-address, and once again bearing a remarkably similar signature to the release.  Def. Ex. 6.

　　　　To the extent that Plaintiff will attempt to rely on Isaac Duarte, his testimony is of no

help to her.  In her papers, Plaintiff describes Mr. Duarte as an "uninterested party" (Pl. Br. at

12); in fact, he is Ms. Almeciga's live-in boyfriend of nine years.  As Mr. Duarte admitted in

cross examination, it was ***Plaintiff*** who drafted the affidavit filed in his name.  Mr. Duarte

admitted he was not in Texas with Ms. Almeciga and has no personal knowledge whether she

signed a release or made any oral agreement with CIR.  Mr. Duarte also admitted he has no

personal knowledge as to whether or not Ms. Almeciga filed the Georgia documents.  Tr. (II)

62:1-24, 66:8-13, 75:16-25 (Duarte).  And although Mr. Duarte claimed to be able to recognize

Ms. Almeciga's signature based on seeing her sign her name "hundreds of times," his professed

familiarity with her signature apparently was not accurate enough for Plaintiff's liking, as the

Court's clerk caught her trying to coach him on the stand as tried to identify her signature in the

Massachusetts documents.  In sum, Mr. Duarte's testimony has no bearing on the issues before

this Court in this motion: whether Plaintiff has falsely claimed that CIR's release is "forged" and

that she had an oral agreement to conceal her identity.  If anything, Mr. Duarte's inability to

correctly identify various permutations of Ms. Almeciga's signature despite nine years of living

together only casts further doubt on her hired expert's ability to succeed where he has failed.

11

**III.      The Testimony of Plaintiff's Proffered Expert Is Not Admissible Under Rule 702**

The party seeking to introduce and rely on expert testimony bears the burden of establishing that the proposed expert and her testimony meets the requirements of Rule 702 by a preponderance of the evidence.  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593 & n.10; Advisory Committee Notes 2000 Amendment to Rule 702.  This court is the gatekeeper for expert testimony and has wide discretion to exclude expert testimony.  *Daubert*, 509 U.S. at 597; *DiBella v. Hopkins,* 403 F.3d 102, 121 (2d Cir. 2005); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999).  Under *Daubert* and Rule 702, the court first looks to whether the witness is qualified to offer the opinions he or she is proffering, then conducts a two-prong inquiry: (1) whether the expert's opinion is based on a reliable data and methodology; and (2) whether the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. *Daubert,* 509 U.S. at 592-93; *see also* Fed. R. Evid. 702.

Plaintiff has not met her burden under Rule 702 for Ms. Carlson's proffered testimony. In addition to Ms. Carlson's limited qualifications (see Supp. Memo at 2-3), Ms. Carlson cannot offer reliable testimony that would be helpful to this Court on the only issue before it on this motion: whether Ms. Almeciga signed the release or whether (as Ms. Almeciga claims) her signature was "forged."  Ms. Carlson admitted she did not request any samples contemporaneous to the release (which was dated in 2012), nor did she request any samples from court documents or other sources not created specifically for her analysis. Tr. (I) 72:1-16 (Carlson).  Instead, she relied solely upon the Plaintiff's representation that the "known" signatures provided to her were accurate representations of Plaintiff's handwriting.  *Id.* 55:14-56:2.  On top of this, she failed to follow her own purported method (ACE-V) when she did not verify her opinion.  *Id.* 69:3-71:4.

Ms. Carlson's two reports and testimony fail to demonstrate any reliable methodology. She admits that her testimony is based solely on experience, and that she cannot testify to any

scientific basis for her opinions.  Tr. (I) 79:2-84:22 (Carlson).  She presents lists of cherry-picked "similarities" where she finds common authorship and of "differences" where she finds separate authorship, without any reason for focusing on particular attributes or any attempt to weigh similarities and differences against one another – contravening her own professed method.  *Id.* 69:16-70:3.  *See also* Carlson Dep. (II) 81:20-82:17, 88:2-91:11, 93:12-97:11, 101:2-103:12.

Nor can Ms. Carlson rule out whether Plaintiff disguised her handwriting in the comparative samples she created for this case – to the contrary, her testimony only underscores the likelihood of disguise.  Ms. Carlson testified that she prefers to collect handwriting samples from a client that were created "prior to the matter at hand … so they wouldn't have had any reason to attempt to disguise it."  Tr. (I) 89:6-90:3.  Yet in this case, she relied solely on "known" samples created *after* the matter arose, raising the risk of disguise.  Ms. Carlson also testified that "methodical" writing like the purported "knowns" she reviewed – and unlike the "fluid" signatures on the release and the Georgia documents – could be consistent with a person attempting to disguise their own handwriting.  Tr. (I) 65:2-11 (Carlson), Carlson Dep. (II) 42:10-13.  Furthermore, Ms. Carlson testified that a person trying to disguise her signature tends to alter the way she writes capital letters – tellingly, the same letters that Plaintiff has tried to change in her so-called "known" signatures.  Carlson Dep. (II) 12:18-13:11.  Although Ms. Carlson claimed to consider whether a person might be disguising her signature, she articulated no method for ruling out this possibility at her deposition or in response to the Court's questioning.  In fact, Ms. Carlson conceded that she cannot determine on the face of a given sample of handwriting whether or not it has been deliberately disguised.  *Id.* 13:15-21.

In light of these admissions, Ms. Carlson has no reliable methodology to offer the court, and she cannot "assist the trier of fact to understand the evidence or to determine a fact in issue."

13

Fed. R. Evid. 702.  As the Court noted, anyone can see that the "samples" created by Ms. Almeciga look different from the release.  Tr. (I) 57:7-19, 63:23-25 (Carlson).  The question is whether they were actually authored by different people, or whether Ms. Almeciga simply disguised her handwriting in the samples she provided Ms. Carlson.  By her own admission, Ms. Carlson cannot distinguish between these two possibilities.  Accordingly, her testimony cannot meet the requirements of Rule 702.

Furthermore, Ms. Carlson's belated opinion that the Georgia documents were not signed by the same person as the release does not pass the smell test.  Ms. Carlson showed up in court with a table comparing the release, the Georgia documents, and the signatures provided by Plaintiff across 23 attributes.  Even a cursory glance at this table shows that the release and the Georgia documents share many of these attributes.  At her subsequent deposition, Ms. Carlson was forced to back away from this chart, conceding that the vast majority of these attributes provided no basis for finding separate authors of the release and the Georgia documents.  Carlson Dep. (II) 36:11-70:19.  Instead, Ms. Carlson narrowed the basis of her opinion to only *two factors*: (1) that Ms. Almeciga spelled her name differently in the two documents, and (2) that she felt the capital "A" in the release differed from the Georgia documents.  *Id.* 65:11-66:23, 70:2-19.  Yet as Ms. Carlson conceded, the same person is capable of writing their name different ways (and indeed, the evidence shows Plaintiff has spelled hers in various ways).  As for the capital "A," there is no question that this is among the most distinctive features of Ms. Almeciga's signature – and appears in strikingly similar fashion in both the release and the Georgia documents.  Once again, Ms. Carlson did not obtain any verification for her opinion.  *Id.* 76:7-15.

14

In order for Ms. Carlson to provide a reliable expert opinion that would be helpful to the trier of fact, she must be able to distinguish between natural variation in a person's handwriting and separate authorship (or forgery).  Tr. (I) 62:6-14 (Carlson).  Here, she cannot make that distinction.  For each "difference" she claimed to find between the release and the Georgia documents, she could not rule out whether these were simply a feature of natural variation as opposed to a separate author.  When presented with the Massachusetts court documents, Ms. Carlson agreed that these signatures presented a wide range of variation and admitted that these samples could affect her opinions in this case.  Carlson Dep. (II) 110:23-112:6.

In sum, Ms. Carlson cannot tell whether the handwriting samples Plaintiff created for this case were deliberately disguised, and she cannot reliably distinguish between natural variation and separate authorship when comparing the Georgia documents and the release.  Accordingly, Ms. Carlson cannot offer reliable expert testimony that would be helpful to the Court, in compliance with *Daubert* and *Kumho Tire*.

## CONCLUSION

After copious briefing and several hours of an evidentiary hearing, the evidence consistently shows there was no forged release and no oral agreement to conceal Plaintiff's identity.  Instead, Plaintiff participated willingly in an interview documenting her relationship with Mr. Reta – and later came to regret both when they were used against her in custody proceedings.  In her quixotic crusade to bury this inconvenient information, Plaintiff has cost CIR hundreds of thousands of dollars in legal fees, wasted the resources of this Court, and submitted false testimony under oath.  Plaintiff's counsel have consistently enabled her sanctionable behavior, steadfastly refusing to investigate the numerous red flags in their client's allegations in derogation of their duty as officers of this Court.  CIR asks this Court to put a stop to Plaintiff's abuse of the judicial process and to enter sanctions to the fullest extent possible.

Dated: January 21, 2016

By: /s/ Thomas R. Burke
Thomas R. Burke (*pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
505 Montgomery Street, Suite 400
San Francisco, CA  94111
Phone:  (415) 276-6552
Fax:  (415) 489-9052
thomasburke@dwt.com

Alison Schary
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Avenue NW, Suite 800
Washington, DC  20006
Phone:  (202) 973-4248
Fax:  (202) 973-4448
alisonschary@dwt.com

*Attorneys for Defendants Center for Investigative*
*Reporting, Inc., Bruce Livesey, and Josiah*
*Hooper*