UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------x
ERICA ALMECIGA,                          :
                                         :
                                         :    15-cv-4319 (JSR)
        Plaintiff,                       :
                                         :    OPINION AND ORDER
        -v-                              :
                                         :
CENTER FOR INVESTIGATIVE REPORTING,      :
INC., UNIVISION COMMUNICATIONS, INC.,    :
UNIVISION NOTICIAS, BRUCE LIVESEY, and   :
JOSIAH HOOPER,                           :
                                         :
        Defendants.                      :
                                         :
----------------------------------------x



JED S. RAKOFF, U.S.D.J.

        Before the Court is the motion of defendant Center for

Investigative Reporting, Inc. ("CIR"), for judgment on the

pleadings, as well as CIR's Rule 11 motion for sanctions against

plaintiff Erica Almeciga and her counsel. Subsumed within

defendant's Rule 11 motion is a Daubert motion to exclude the

testimony of plaintiff's handwriting expert, Wendy Carlson. On March

31, 2016, the Court issued a bottom-line Order granting CIR's motion

for judgment on the pleadings and dismissing the Amended Complaint

with prejudice against all defendants (including defendants Livesey

and Hooper). This Opinion and Order explains the reasons for that

ruling, addresses CIR's remaining motions, and directs the entry of

final judgment. In particular, the Court grants defendant's motion

to exclude Carlson's "expert" testimony, finding that handwriting

analysis in general is unlikely to meet the admissibility

                                  1

requirements of Federal Rule of Evidence 702 and that, in any event, Ms. Carlson's testimony does not meet those standards. Additionally, because the Court finds that plaintiff has fabricated the critical allegations in her Amended Complaint, the Court imposes sanctions, though because of her impecunious status, the sanctions are non-monetary in nature. The Court declines, however, to impose sanctions on her counsel.

## I.   Defendant CIR's Rule 12(c) Motion for Judgment on the Pleadings

A Rule 12(c) motion is governed by the same standard as that of motions to dismiss under Rule 12(b)(6). See Cleveland v. Caplaw Enters., 448 F.3d 518, 521 (2d Cir. 2006). Accordingly, to survive a motion for judgment on the pleadings, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). As a result, for purposes of deciding defendant's Rule 12(c) motion, the following allegations drawn from plaintiff's Amended Complaint are assumed to be true.

Defendant CIR is an investigative reporting organization that produces reports in various media formats on such subjects as criminal justice, money and politics, and government oversight. See Amended Complaint ("Am. Compl.") ¶ 2, ECF No. 50. In August 2012, CIR entered into a partnership with Univision Communications, Inc. ("Univision") pursuant to which "CIR agreed to provide Univision

with access to CIR stories and documentaries focusing on Latin America." Id. ¶ 4. Plaintiff Erica Almeciga alleges that in March 2012 defendant Bruce Livesey, a producer for CIR, contacted plaintiff in connection with a story on which Livesey was working regarding plaintiff's romantic partner at the time, Rosalio Reta. Id. ¶¶ 5, 9-13. Reta was and remains an inmate at Woodville Penitentiary in Texas and was a former member of the Los Zetas Drug Cartel, id. ¶¶ 8-9, a drug trafficking organization that is "among the most brutal in all of Mexico" and "among the most violent in the world," id. ¶ 27.

Almeciga travelled to Woodville, Texas to meet with Livesey and his co-producer, defendant Josiah Hooper, for an interview on August 14, 2012. Id. ¶ 15. According to the Amended Complaint, Almeciga's participation in the interview was "conditioned upon the explicit requirement" that defendants conceal her identity, id. ¶ 14, which defendants orally agreed to do, id. ¶ 16. Around the same time, Almeciga was interviewed by the Canadian Broadcasting Corporation (CBC)[1] for a different story about Reta, which ultimately aired in June or July 2012 with Almeciga's face concealed "per the Plaintiff's demand." Id. ¶ 11. In that interview, a reporter stated that the network could not show Almeciga's face "for her own safety." Id. ¶ 12.

---

[1] The Amended Complaint appears to misidentify the broadcaster as the "Canadian Broadcast Channel." Am. Compl. ¶ 11.

Sometime in late 2013, CIR and Univision posted the CIR video report about Reta and the Los Zetas cartel (the "CIR Report") to their respective YouTube channels. Id. ¶¶ 19-20. The CIR Report, entitled "I was a Hitman for Miguel Treviño," id. ¶ 5, has since been viewed over 250,000 times on CIR's YouTube channel and over 3,000,000 times on Univision's YouTube Channel. Id. ¶¶ 29-30. Plaintiff was featured in the report without her identity concealed. Plaintiff claims that, as a result of this alleged breach of contract, she has "endured public humiliation, demeaning and often threatening remarks from the viewers, as well as the overwhelming fear that [the] Los Zetas cartel . . . may take retribution against her." Id. ¶ 31. She has "move[d] to different locations in an effort to avoid interaction with outsiders," has "developed paranoia," and "has been treated for depression and Post Traumatic Stress Disorder." Id. ¶ 32.

In August 2014, plaintiff's counsel sent CIR a letter demanding that CIR cease and desist from showing the CIR Report without concealing Almeciga's identity. Id. ¶ 33. In response, defendant produced a standard release form (the "Release") purportedly signed by plaintiff, authorizing CIR to use plaintiff's "name, likeness, image, voice, biography, interview, performance and/or photographs or films taken of [her] . . . in connection with the Project." Id.; Def. CIR's Answer to Am. Compl., Ex. A, ECF No. 48-1. Plaintiff denies having ever seen or signed the Release. See Am. Compl. ¶ 34.

4

On April 23, 2015, plaintiff filed this action in New York Supreme Court against defendants CIR, Livesey, Hooper, Univision, and Univision Noticias, asserting a breach-of-contract claim against CIR, fraud and fraudulent-concealment claims against CIR, Livesey, and Hooper, and a negligence claim against Univision. Plaintiff subsequently added unjust enrichment claims against CIR and Univision in the operative Amended Complaint filed on July 24, 2015.

On June 4, 2015, CIR, with the consent of Hooper and Livesey, removed the action to this Court, asserting that the Univision defendants, both of which are citizens of New York, were fraudulently joined, and that, without them, the Court had diversity jurisdiction. On June 26, the Univision defendants moved to dismiss the claims against them, and, on July 1, plaintiff moved to remand. The Court denied plaintiff's motion, finding that the Univision defendants were not properly joined under 28 U.S.C. § 1441(b)(2) because plaintiff's claims against Univision failed as a matter of law. See Memorandum Order dated Aug. 17, 2015, at 6-16, ECF No. 49. For the same reason, the Court granted the Univision defendants' motion to dismiss with prejudice. Id. at 16.

CIR then filed the instant Rule 12(c) motion, contending that plaintiff's breach of contract claim must be dismissed because it is barred by New York's Statute of Frauds and that plaintiff's remaining fraud claims and unjust enrichment claim must be dismissed because they are duplicative of her barred breach of contract claim and impermissibly attempt to circumvent the Statute of Frauds.

5

New York's Statute of Frauds renders "void" any oral contract that "[b]y its terms is not to be performed within one year from the making thereof or the performance of which is not to be completed before the end of a lifetime." N.Y. Gen. Oblig. Law. § 5-701(a)(1). Put differently, if a contract is not capable of complete performance within one year, it must be in writing to be enforceable.

Here, the alleged oral agreement entered into by plaintiff and defendants was by its (alleged) terms intended to apply in perpetuity. Plaintiff does not plead that defendants' agreement to conceal Almeciga's identity was in any way limited in duration; indeed, reading such a limitation into the agreement would frustrate its purpose given the severe consequences of breach that plaintiff alleges. See Robins v. Zwirner, 713 F. Supp. 2d 367, 375 (S.D.N.Y. 2010) (where oral agreement was premised on third party "never learning" of a given fact, the agreement "could not be fully performed within one year" and was therefore barred by the Statute of Frauds).

Plaintiff, misapprehending the Statute of Frauds, argues that the "contract at issue was not only 'capable' of being performed within one year, but that the contract was actually performed by Plaintiff within one year of its making." Pl. Erica Almeciga's Mem. of Law in Opp. to CIR Defs. Mot. for J. on the Pleadings ("Pl.'s Opp.") at 3, ECF No. 59. On plaintiff's view, the fact that plaintiff upheld her end of the bargain to participate in the

6

interview (within one year) precludes any Statute of Frauds argument. Id. at 4. Plaintiff thus appears to be laboring under the mistaken impression that the Statute of Frauds is concerned with partial performance of an oral contract. It is not. Rather, it requires that an oral agreement be capable of complete performance within a year to be enforceable.

New York law is well settled on this point. See, e.g., Cron v. Hargro Fabrics, Inc., 91 N.Y.2d 362, 368 (1998) (the Statute of Frauds "relates to the performance of the contract and not just of one party thereto"); Guilbert v. Gardner, 480 F.3d 140, 151 (2d Cir. 2007) ("[F]ull performance by all parties must be possible within a year to satisfy the Statute of Frauds." (internal quotation marks omitted)). "[T]he fact that the plaintiff has fully completed her performance under the contract as that contract is described by her is of no moment" where "the defendant's performance . . . will continue in perpetuity," as it would here under the alleged contract. Myers v. Waverly Fabrics, 475 N.Y.S.2d 860, 861 (1st Dep't 1984), aff'd in part sub nom. Meyers v. Waverly Fabrics, Div. of F. Schumacher & Co., 65 N.Y.2d 75 (1985). Nor would it matter if defendants had performed for a year or more after entering into the alleged agreement and then breached. The dispositive point is that defendants could not complete their performance within one year since their obligation was an ongoing one.[2]

---

[2] Plaintiff further contends, somewhat bizarrely, that there was no oral confidentiality agreement between the parties. See Pl.'s Opp.

Turning to plaintiff's fraud claim (Count Two), under New York law plaintiff must plead: "(1) a material misrepresentation or omission of fact (2) made by defendant with knowledge of its falsity (3) and intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff." Crigger v. Fahnestock & Co., 443 F.3d 230, 234 (2d Cir. 2006).

However, New York law bars fraud claims that "arise[] out of the same facts as plaintiff's breach of contract claim, with the addition only of an allegation that defendant never intended to perform the precise promises spelled out in the contract between the parties." Telecom Int'l Am., Ltd. v. AT & T Corp., 280 F.3d 175, 196 (2d Cir. 2001). In such circumstances, "the fraud claim is redundant and plaintiff's sole remedy is for breach of contract." Id. (internal quotation mark omitted). In other words, a plaintiff may not "bootstrap a breach of contract claim into a fraud claim by simply including in his complaint an allegation that defendant never

---

at 5 ("Plaintiff did not allege an oral confidentiality agreement, therefore, CIR's argument relative to a non-existent oral confidentiality agreement is baseless and frivolous."). Plaintiff's argument is undermined by the heading of the very section of her brief in which this argument appears: "Ms. Almeciga's Oral Agreement with CIR is not Barred by the New York Statute of Frauds." Id. at 3 (emphasis added). Plaintiff does not contend that there was any written agreement between the parties. To the extent plaintiff's dispute is with the characterization of the alleged oral agreement to conceal plaintiff's identity as a "confidentiality agreement," that characterization has no bearing on the application of the Statute of Frauds to the alleged agreement. Because the alleged oral agreement at issue is not capable of complete performance within one year, plaintiff's breach of contract claim is barred by the Statute of Frauds as a matter of law and is therefore dismissed.

intended to uphold his end of the deal." Sudul v. Computer
Outsourcing Servs., 868 F. Supp. 59, 62 (S.D.N.Y. 1994). Nor are
plaintiffs permitted to "avoid the statute of frauds by calling the
breach of contract claim a fraud claim." Massey v. Byrne, 977
N.Y.S.2d 242, 243 (1st Dep't 2013); see also Gora v. Drizin, 752
N.Y.S.2d 297, 298-99 (1st Dep't 2002) ("Defendant cannot avoid [the
Statute of Frauds] by recharacterizing the claim as one for fraud
. . . .").

     Trying to avoid this bar, plaintiff submits that her fraud
claim is premised, not on the same underlying facts as her breach of
contract claim, but rather on the allegedly forged Release. This
characterization is at odds with her Amended Complaint, which, in
pleading the fraud claim, alleges that defendants "provided
Plaintiff and Reta with intentionally misleading information, such
as promises to conceal her identity . . . which the Defendants were
reasonably certain promoted Ms. Almeciga's reliance and ultimate
participation" (Am. Compl. ¶ 53 (emphasis added)) and that
defendants' "promise to Plaintiff that her identity would be
protected, and that her face would not appear in their Report, was
made without any intention of performance" (id. ¶ 54 (emphasis
added)). To be sure, plaintiff also alleges that defendants forged
the Release, id. ¶ 44, and that defendants "benefitted substantially
by using the Release as justification to air the interview of
[p]laintiff without concealing her identity," id. ¶ 46. But that
does not state any cause of action by itself, since, among much

else, plaintiff plainly did not rely in any respect on the Release she maintains she never signed and was a forgery. Rather, the gravamen of her fraud claim is that defendants entered into an oral (contractual) agreement with plaintiff that they had no intention of honoring, which is precisely the sort of duplicative fraud claim that is not cognizable under New York law.

Plaintiff's fraudulent concealment claim (Count Three) must also be dismissed as duplicative of her breach of contract claim. To plead fraudulent concealment under New York law, plaintiff must allege "(1) that the defendant failed to meet its duty to disclose . . . (2) that the defendant had an intent to defraud or scienter, (3) [that] there was reliance on the part of the plaintiff, and (4) damages." Brass v. Am. Film Techs., Inc., 987 F.2d 142, 152 (2d Cir. 1993). "A duty to disclose information can arise under New York law where (1) there is a fiduciary relationship between the parties; (2) one party makes a partial or ambiguous statement that requires additional disclosure to avoid misleading the other party; or (3) one party to a transaction possesses superior knowledge of the facts not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge." Fertitta v. Knoedler Gallery, LLC, 2015 WL 374968, at *11 (S.D.N.Y. Jan. 29, 2015) (internal quotation mark omitted). "However, the intention to breach does not give rise to a duty to disclose. Instead, the duty to disclose must exist separately from the duty to perform under the contract." TVT Records v. Island Def

Jam Music Grp., 412 F.3d 82, 91 (2d Cir. 2005). Here, plaintiff appears to plead that defendants were under a duty to disclose that plaintiff's identity would not be concealed in the CIR Report (i.e., their intention to breach) "based upon their relationship with Ms. Almeciga regarding her appearance in the Report." Am. Compl. ¶ 65. Thus, plaintiff's fraudulent concealment claim is impermissibly duplicative of her breach of contract claim.

Although plaintiff's pleading of her fraudulent concealment claim does not even mention the Release, plaintiff once again pivots in her briefing and argues that defendants were under a duty to disclose to plaintiff their intent to use a forged release to license the CIR Report to Univision as well as their intent to use the Release to avoid litigation with plaintiff. See Pl.'s Opp. at 13. This arguments fails, however, because the Release is simply the mechanism by which defendants allegedly concealed their breach of contract: it cannot support an independent fraud claim under the circumstances. Indeed, it is well settled under New York law that "alleged concealment of a breach is insufficient to transform what would normally be a breach of contract action into one for fraud." Rosenblatt v. Christie, Manson & Woods Ltd., 2005 WL 2649027, at *10 (S.D.N.Y. Oct. 14, 2005) (internal quotation mark omitted); see also, e.g., Compagnia Importazioni Esportazioni Rapresentanze v. L-3 Commc'ns Corp., 2007 WL 2244062, at *6 (S.D.N.Y. July 31, 2007) (dismissing fraud claims on this basis); Ray Larsen Assocs., Inc. v. Nikko Am., Inc., 1996 WL 442799, at *5 (S.D.N.Y. Aug. 6, 1996)

11

(same); Fisher v. Big Squeeze (N.Y.), Inc., 349 F. Supp. 2d 483, 489 (E.D.N.Y. 2004) (dismissing fraudulent concealment claim on this basis where defendants were alleged to have fraudulently calculated profits subject to distribution under contract through the creation of false or misleading financial statements).

The facts of IKEA North America Services, Inc. v. Northeast Graphics, Inc., 56 F. Supp. 2d 340 (S.D.N.Y. 1999) are instructive. There, plaintiff IKEA engaged the defendants (a graphic designer and mass-mailer distributor) to produce a holiday brochure to be mailed to millions of homes throughout the United States and Canada. Id. at 341-42. In response to inquiries as to the status of the project, the defendants assured IKEA and its agent that the project was proceeding apace and created thirteen fraudulent postal register statements purportedly confirming the mailing of nearly 3 million brochures. Id. at 342. Applying the principle that "attempted concealments of contractual breach" do not give rise to independent actions for fraud, the Court granted defendants' motion to dismiss the fraud claims with prejudice. Id. at 342-43. Like the forged postal register statements in IKEA, the alleged forged Release at issue here constitutes, at worst, an attempted concealment of contractual breach. As such, plaintiff's fraud claims are no more than dressed-up breach of contract claims and are hereby dismissed.

With respect to plaintiff's unjust enrichment claim against defendant CIR, plaintiff posits that because there is a "bona fide dispute concerning the existence of the contract at issue . . .

[she] is not required to elect her remedies, and may proceed on her unjust enrichment claim as well as her breach of contract claim." Pl.'s Opp. at 15. While that may be true in the main, there are exceptions, and this case involves one of them: "A party may not circumvent the Statute of Frauds by repleading an already barred breach of contract claim as a claim for unjust enrichment." Four Star Capital Corp. v. Nynex Corp., 183 F.R.D. 91, 108 (S.D.N.Y. 1997); see also Almazan v. Almazan, 2015 WL 500176, at *13 (S.D.N.Y. Feb. 4, 2015) ("[P]laintiffs may not pursue unjust enrichment claims if such claims are based on an oral agreement that is barred by the Statute of Frauds." (internal quotation marks omitted)); KJ Roberts & Co. v. MDC Partners Inc., 2014 WL 1013828, at *12 (S.D.N.Y. Mar. 14, 2014) ("[T]he Statute of Frauds applies to the Alleged Agreement; therefore, Plaintiff cannot use a theory of quantum meruit or unjust enrichment to escape it."), aff'd, 605 F. App'x 6 (2d Cir. 2015). If the law were otherwise, plaintiffs could easily achieve "an end-run around the statute of frauds." Komolov v. Segal, 2013 WL 4411232, at *3 (N.Y. Sup. Ct. Aug. 14, 2013). Plaintiff cites no case in which a court sustained an unjust enrichment claim where a breach of contract claim had been dismissed under the Statute of Frauds.[3] Accordingly, plaintiff's unjust enrichment claim is hereby dismissed.

---

[3] While some lower New York courts have noted in dicta that "the statute of frauds is not necessarily a bar to a cause of action for unjust enrichment," even under that line of case law "seemingly duplicative unjust enrichment claims are only allowed when the

While the Rule 12(c) motion was brought on behalf of defendant CIR, and not defendants Livesey or Hooper (neither of whom had been served at the time the motion was brought), the claims against Livesey and Hooper fail for the same reasons they fail against defendant CIR, and the Court has ample authority in such circumstances to dismiss them as to these defendants as well. See Antidote Int'l Films, Inc. v. Bloomsbury Pub., PLC, 467 F. Supp. 2d 394, 399 (S.D.N.Y. 2006) ("[W]hile dismissing a complaint as to a non-moving defendant is not an ordinary practice, a district court may dismiss claims sua sponte for failure to state a claim, at least so long as the plaintiff had notice and an opportunity to be heard on the issue." (internal quotation marks omitted)). Accordingly, plaintiff's Amended Complaint is dismissed with prejudice as against all remaining defendants.

## II.   Defendant CIR's Rule 11 Motion for Sanctions

Defendant CIR seeks sanctions against plaintiff for allegedly perpetrating a fraud upon the Court, and against her counsel for willfully blinding himself to her misrepresentations. Since the outcome of defendant's Rule 11 motion is affected by the admissibility vel non of the proffered opinion of plaintiff's handwriting expert that the Release was forged, the Court first addresses the admissibility of that expert opinion.

---

plaintiff actually performed services for which it is equitably entitled to compensation (e.g. a situation of detrimental reliance) or where it seeks to recover its related out-of pocket expenses." Komolov, 2013 WL 4411232, at *3. Those exceptions do not apply here.

### A. The admissibility of the proffered expert testimony under Rule 702.

Shortly before the expert disclosure deadline in this case, plaintiff engaged a reputed handwriting expert, Wendy Carlson, to provide an opinion on the authenticity of plaintiff's signature on the Release.[4] The signature on the Release appears as follows:



See Decl. of Thomas Burke dated Sept. 14, 2015 ("Sept. 14 Burke Decl."), Ex. 2, ECF No. 58-2.[5]

On August 18, 2015, plaintiff's counsel sent an email to Carlson asking her to provide a Rule 26 report by the next day that analyzed the Release against purported "known" signatures of the plaintiff. Plaintiff's counsel provided numerous purported "known" signatures to Carlson (all of which were either dated after the initiation of the parties' dispute or were undated), a representative example of which is as follows:

---

[4] A year earlier, plaintiff had obtained a letter, dated August 20, 2014, from Curt Baggett, another purported handwriting expert, that stated that the Release was forged. See Decl. of Thomas Burke dated Sept. 14, 2015, Ex. 14, ECF No. 58-14. However, the letter did not contain any analysis -- it simply recited Baggett's bald conclusion that the Release was forged -- and, for whatever reason, plaintiff did not proffer Baggett as an expert.

[5] The signatures excerpted in this Opinion and Order are excerpted as they appear on actual documents. For that reason, some overlapping text or markings may appear in the excerpted signatures.



Erica Lee Almeciga

Sept. 14 Burke Decl., Ex. 16 ("Carlson Expert Report") at Ex. K1. After comparing these "known" signatures to the signature on the Release, Carlson opined, in an expert report submitted August 20, 2015, that "[b]ased on [her] scientific examination" the signature on the Release was a forgery. Id. at 7.

On December 4, 2015, the Court held a combined evidentiary hearing on CIR's Rule 11 motion and a "Daubert" hearing on the admissibility of Carlson's testimony. See Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). At the hearing, Carlson admitted that she had no basis for knowing (other than the representation of plaintiff's counsel) that the purported "known" signatures she had received were actually plaintiff's, such that she could not definitively state whether the "known" signatures had been forged or whether the Release had been forged. See Transcript dated Dec. 4, 2015 ("Dec. 4 Transcript"), at 55-57, ECF No. 88. For that reason, the Court asked plaintiff to write her signature on a piece of paper 10 times in open court (the "In-Court Signatures"). Id. at 90. Although Carlson observed that plaintiff was writing these signatures "very slow[ly]," id. at 104, nonetheless, at the Court's request and on consent of all involved, Carlson prepared a supplemental report following the hearing, submitted on December 9, 2015, in which she found that the author of the In-Court Signatures

(i.e., plaintiff) was the author of the purported "known" signatures that formed the basis of Carlson's initial expert report, and that, once again, her opinion, "[b]ased on [her] scientific examination," was that the signature on the Release was made by someone other than plaintiff, i.e., was a forgery, see Forensic Handwriting and Document Examiner Expert Report Suppl. ("Supplemental Expert Report") at 8, ECF No. 87.[6]

In order for expert testimony to be admissible under the Federal Rules of Evidence, Rule 702 requires that an "expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," that "the testimony is based on sufficient facts or data" and "is the product of reliable principles and methods," and that "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. "[T]he proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied." United States v. Williams, 506 F.3d 151, 160 (2d Cir. 2007).

While "Rule 702 embodies a liberal standard of admissibility for expert opinions," Nimely v. City of New York, 414 F.3d 381, 395 (2d Cir. 2005), "nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is

---

[6] The In-Court Signatures appear as an exhibit to Carlson's Supplemental Expert Report. See ECF No. 87 at 13.

connected to existing data only by the ipse dixit of the expert."
Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997). Rather, Daubert
has "charged trial judges with the responsibility of acting as
gatekeepers to exclude unreliable expert testimony" and junk science
from the courtroom. Fed. R. Evid. 702 advisory committee's note to
2000 amendment. With respect to expert opinions purporting to offer
scientific conclusions in particular, Daubert states that courts
should ordinarily pay particular attention to whether the expert's
methodology has or can be tested, whether it has been subject to
peer review and publication, whether it has a known error rate,
whether it is subject to internal controls and standards, and
whether it has received general acceptance in the relevant
scientific community. See Daubert, 509 U.S. at 593-94. While expert
testimony that does not fare well under these particular standards
may still sometimes be admissible as non-scientific expert testimony
pursuant to the doctrine of Kumho Tire Co. v. Carmichael, 526 U.S.
137 (1999) (discussed infra), it is the Court's role to ensure that
a given discipline does not falsely lay claim to the mantle of
science, cloaking itself with the aura of unassailability that the
imprimatur of "science" confers and thereby distorting the truth-
finding process.[7] There have been too many pseudo-scientific

---

[7] Courts assessing handwriting expertise under Daubert have cited
this precise concern. See United States v. Starzecpyzel, 880 F.
Supp. 1027, 1029 (S.D.N.Y. 1995) ("The problem arises from the
likely perception by jurors that FDEs [forensic document examiners]
are scientists, which would suggest far greater precision and
reliability than was established by the Daubert hearing. This

disciplines that have since been exposed as profoundly flawed, unreliable, or baseless for any Court to take this role lightly.[8]

Handwriting analysis, or "forensic document examination" as its practitioners prefer to call it, involves the "asserted ability to determine the authorship vel non of a piece of handwriting by examining the way in which the letters are inscribed, shaped and

perception might arise from several sources, such as the appearance of the words 'scientific' and 'laboratory' in much of the relevant literature, and the overly precise manner in which FDEs describe their level of confidence in their opinions as to whether questioned writings are genuine."); United States v. Hines, 55 F. Supp. 2d 62, 64 (D. Mass. 1999) ("[A] certain patina attaches to an expert's testimony unlike any other witness; this is 'science,' a professional's judgment, the jury may think, and give more credence to the testimony than it may deserve.").

[8] The disgraced pseudosciences of phrenology, eugenics, and more recently, "recovered memories" jump to mind, cf. Jed S. Rakoff, Neuroscience and the Law: Don't Rush In, New York Review of Books, May 12, 2016, at 30-32, but there are many other examples as well. To take one, in 2004, the National Academy of Sciences found that comparative bullet-lead analysis, as practiced by the FBI for decades, was unreliable in a number of respects. See Comm. on Sci. Assessment of Bullet Lead Elemental Compositional Comparison, Nat'l Research Council, Forensic Analysis: Weighing Bullet Lead Evidence (2004). A year later, the FBI abandoned the technique, which had helped to convict thousands of persons (though it somehow continued to "firmly support[] the scientific foundation of bullet lead analysis"). See Press Release, FBI, FBI Laboratory Announces Discontinuation of Bullet Lead Examinations (Sept. 1, 2005), available at http://www.fbi.gov/news/pressrel/press-releases/fbi-laboratory-announces-discontinuation-of-bullet-lead-examinations. More broadly, in 2009, the National Academy of Sciences issued a comprehensive report on the forensic sciences in which it reached the troubling conclusion that "[i]n a number of forensic science disciplines, forensic science professionals have yet to establish either the validity of their approach or the accuracy of their conclusions, and the courts have been utterly ineffective in addressing this problem." Comm. on Identifying the Needs of the Forensic Science Community, Nat'l Research Council, Strengthening Forensic Science in the United States: A Path Forward 53 (Aug. 2009), available at https://www.ncjrs.gov/pdffiles1/nij/grants/228091.pdf.

joined, and comparing it to exemplars of a putative author's concededly authentic handwriting." D. Michael Risinger, Handwriting Identification § 33:1, in 4 Modern Scientific Evidence: The Law and Science of Expert Testimony (David L. Faigman et al. eds., 2015-2016) (footnote omitted). Before assessing the discipline under Daubert, some historical context is in order. Unlike, say, physics or chemistry, or even DNA analysis, handwriting identification is not a field that arose from scientific inquiry or that developed independent of the courtroom. It was a purely forensic development, intended to deal with cases like this one in which the question of whether someone authored a particular document might be a dispositive issue in the case, or even make the difference between a guilty verdict or an acquittal. Id. § 33:3 ("[W]hen expert handwriting identification testimony was first declared admissible in America and England, there were no experts. . . . When the legal system agreed to accept such testimony, however, it created a demand which was to be met by people who turned their entire attention to filling it."); Jennifer L. Mnookin, Scripting Expertise: The History of Handwriting Identification Evidence and the Judicial Construction of Reliability, 87 Va. L. Rev. 1723, 1727 (2001) ("Handwriting identification is an unusual form of expert evidence because it was the first kind of expertise that was primarily forensic, invented specifically for use in the legal arena.").

Initially, testimony by putative handwriting experts was met with skepticism by U.S. courts. Through the late 19th century, many

jurisdictions did not admit it at all and the enterprise was viewed with suspicion. See Risinger, Handwriting Identification § 33:3; Hoag v. Wright, 174 N.Y. 36, 42 (1903) ("The opinions of experts upon handwriting, who testify from comparison only, are regarded by the courts as of uncertain value, because in so many cases where such evidence is received witnesses of equal honesty, intelligence, and experience reach conclusions not only diametrically opposite, but always in favor of the party who called them."). To persuade the courts that their expertise was legitimate, the early handwriting experts therefore "claim[ed] the mantle of science":

> The experts argued that they had well-developed methods by which they could distinguish the penmanship of one writer from that of another. Their knowledge, they claimed, resulted not simply from experience or innate talent, but from careful application of well-honed procedures, rigorous attention to methodology, and the precision and detail of measurements. Aspiring handwriting experts thus drew upon the arsenal of scientific methods, but equally important, they invoked the rhetoric of science to buttress their own authority. By proclaiming themselves scientific, they hoped to persuade judges and juries that their conclusions were both objective and warranted.

Mnookin, Scripting Expertise, 87 Va. L. Rev. at 1786-87.

Against this background, the tide shifted in favor of admissibility when Albert Osborn, widely recognized as a progenitor of modern forensic document examination, embarked with John Henry Wigmore (of Wigmore on Evidence fame) on a decades-long campaign to promote handwriting analysis as a scientific endeavor. Risinger, Handwriting Identification § 33:3 ("Osborn's book, Osborn's personality, and Osborn's relationship with Wigmore, are the

cornerstones upon which respect for asserted handwriting identification expertise in the United States was built."). The vision was perhaps best realized when Osborn (among other handwriting experts) testified that the man accused of kidnapping and murdering Charles Lindbergh's baby had written the ransom notes at issue. "Osborn became a celebrity" and the place of handwriting analysis in the courtroom became firmly entrenched: "In the half century after the [Lindbergh case], no reported opinion rejected handwriting expertise, nor was much skepticism displayed towards it." Id. This was despite some highly-publicized instances where handwriting experts got it wrong. Indeed, when the notorious journalist Clifford Irving convinced a book publisher in the early 1970's that Howard Hughes had authorized him to write Hughes's autobiography, it was Osborn's firm that mistakenly authenticated Irving's forgeries of Hughes's handwriting as genuine, concluding that it was "impossible" that anyone other than Hughes could have authored the forgeries. See Robert R. Bryan, The Execution of the Innocent: The Tragedy of the Hauptmann-Lindbergh and Bigelow Cases, 18 N.Y.U. Rev. L. & Soc. Change 831, 844 n.48 (1991). Thereafter, however, Irving confessed that he had forged Hughes's signature and pled guilty to a federal felony arising therefrom. Id.; see also Lawrence Van Gelder, Irving Sentenced to 2 ½ Year Term, N.Y. Times, June 17, 1972, at 1, 34.

In recent years, however, Daubert has spurred some courts to scrutinize handwriting analysis anew, and several district courts

have found testimony from purported handwriting experts inadmissible under Daubert. See, e.g., United States v. Hidalgo, 229 F. Supp. 2d 961, 966 (D. Ariz. 2002) (collecting cases); see also United States v. Hines, 55 F. Supp. 2d 62, 70-71 (D. Mass. 1999) (admitting such testimony "to the extent that [the expert] restricts her testimony to similarities or dissimilarities between the known exemplars and the robbery note" but prohibiting the expert from "render[ing] an ultimate conclusion on who penned the unknown writing"). At least as many courts, however, continue to fully admit testimony by handwriting experts, often invoking the field's historical pedigree and affirming the validity of the field as a general matter. See, e.g., United States v. Crisp, 324 F.3d 261, 271 (4th Cir. 2003) (noting that "handwriting comparison testimony has a long history of admissibility" and finding that the "the fact that handwriting comparison analysis has achieved widespread and lasting acceptance in the expert community gives us the assurance of reliability that Daubert requires"). While the reasoning of cases such as Crisp may be questioned -- since, even if handwriting expertise were always admitted in the past (which it was not), it was not until Daubert that the scientific validity of such expertise was subject to any serious scrutiny -- such pedigree often provided a vehicle for affirming a district judge's admission of handwriting analysis on the ground that it was not an abuse of discretion.[9]

---

[9] In turn, a district judge could rely on such "historic validations" to avoid even inquiring into the scientific validity, vel non, of

In the Second Circuit, however, the issue of the admissibility and reliability of handwriting analysis is an open one. See United States v. Adeyi, 165 F. App'x 944, 945 (2d Cir. 2006) ("Our circuit has not authoritatively decided whether a handwriting expert may offer his opinion as to the authorship of a handwriting sample, based on a comparison with a known sample."); United States v. Brown, 152 F. App'x 59, 62 (2d Cir. 2005) (same). As such, the Court is free to consider how well handwriting analysis fares under Daubert and whether Carlson's testimony is admissible, either as "science" or otherwise.

Carlson, like other handwriting experts, purports to use the "ACE-V" methodology in conducting handwriting comparison, an acronym for "Analyze, Compare, Evaluate, and Verify."[10] Carlson Expert Report at 6. In her report, Carlson explains this methodology in largely conclusory terms:

> The identification of any signature or handwriting is based on the agreement, without unexplainable difference, of the handwriting characteristics displayed. These characteristics include the form of the letters, the beginning, connecting, and ending strokes, the proportions of letters, both inter-letter and intra-letter, the slope, size, and curvature of the writing and/or printing, the

---

handwriting analysis. As former federal district judge Nancy Gertner has noted: "[A] busy trial judge can rely on the decades of case law to legitimize decisions rejecting a hearing or motions in limine. And the trial judge can count on the Court of Appeals likely concluding that rejecting the challenge was not an abuse of the judge's discretion." Nancy Gertner, Commentary on the Need for A Research Culture in the Forensic Sciences, 58 UCLA L. Rev. 789, 790 (2011).

[10] The "ACE-V" title was apparently borrowed from other forensic disciplines, though its application varies widely from discipline to discipline.

> spacing and arrangement, the skill of the writer, and line
> quality. The alignment, positioning and outstanding
> significant features are other factors used to analyze,
> compare and evaluate. The elimination of an author is
> based on a lack of some or all of the above-noted
> comparisons.

Id. at 5.

At the Daubert hearing, Carlson elaborated on the ACE-V method

as follows:

> The A is analyze. I examine and analyze the purported
> knowns to determine that they were authored by the same
> person, that all the knowns were authored by the same
> person.
>
> . . .
>
> I then take the questioned signature, also enlarge that to 200
> percent and do the comparison, which is C. I compare to
> determine similarities or dissimilarities within the
> writings and make a determination as to what is really
> significant, what is just maybe a factor of writing that
> needs to be taken accounted for. And then we move to E
> which is evaluation and I take my findings of similarities
> and dissimilarities and evaluate the weight of the
> evidence that I have and make a determination as to
> authorship, whether similar authorship, different
> authorship. In many cases what I do is verification. I
> don't do that with every case. With science I know that
> every experiment is not verified. With this case I felt
> like the differences were so dramatic and striking that I
> did not do a verification. I didn't feel it was necessary
> in this matter.

Dec. 4 Transcript, at 69-70.

> Carlson further explained:
>
> [W]hat I am looking for are, again, habits that are
> repeatedly seen, patterns within the writing; Does this
> person make a loop clockwise or counterclockwise? What do
> the ending stroke, the beginning stroke, the connecting
> strokes look like? I am looking at a portion of one letter
> to another like ratios. One thing that I really find to be
> very helpful and significant are the angles in writing.
> For example, if I am drawing an angle from the top of

maybe the first initial in the first name to the first
initial in the last name, you sign your name a specific
way every time so that angle is going to be very similar
most every time.

Id. at 61.

On its face, this bears none of the indicia of science and
suggests, at best, a form of subjective expertise. Indeed, in her
testimony at the Daubert hearing, Carlson appeared to concede as
much, affirming that what she was "chiefly relying on [] is not what
we would call science in the sense of physic[s] or chemistry or
biology," but rather "experience" such that she knows what "to look
for . . . in a way that the everyday layperson would not." Dec. 4
Transcript, at 63. Yet this did not stop her from stating, in her
second report submitted a few days after this testimony, that her
latest opinions were "[b]ased on [her] scientific examination" and
"scientific methodology." Supplemental Expert Report at 6, 8. It
therefore behooves the Court to examine more specifically whether
the ACE-V method of handwriting analysis, as described by Carlson,
meets the common indicia of admissible scientific expertise as set
forth in Daubert.

The first Daubert factor is whether the methodology has been or
can be tested. See Daubert, 509 U.S. at 590 ("[S]cience . . .
represents a process for proposing and refining theoretical
explanations about the world that are subject to further testing and
refinement." (quoting Brief for American Association for the
Advancement of Science et al. as Amici Curiae 7-8)). To this Court's

26

knowledge, no studies have evaluated the reliability or relevance of the specific techniques, methods, and markers used by forensic document examiners to determine authorship (as opposed to their overall ability to "get it right" -- a subject discussed under the rubric of error rate, _infra_). For example, there are no studies, to this Court's knowledge, that have evaluated the extent to which the angle at which one writes or the curvature of one's loops distinguish one person's handwriting from the next. Precisely what degree of variation falls within or outside an expected range of natural variation in one's handwriting -- such that an examiner could distinguish in an objective way between variations that indicate different authorship and variations that do not -- appears to be completely unknown and untested. Ditto the extent to which such a range is affected by the use of different writing instruments or the intentional disguise of one's natural hand or the passage of time. Such things could be tested and studied, but they have not been; and this by itself renders the field unscientific in nature. See _United States v. Johnsted_, 30 F. Supp. 3d 814, 818 (W.D. Wis. 2013) ("The lack of testing also calls into question the reliability of analysts'[] highly discretionary decisions as to whether some aspect of a questioned writing constitutes a difference or merely a variation; without any proof indicating that the distinction between the two is valid, those decisions do not appear based on a reliable methodology.").

As such, it is hardly surprising that Carlson's expert report reads more like a series of subjective observations than a scientific analysis (e.g., "the 'e', 'c's, upper 'g' loop, and 'a's in the questioned signature are more narrow than the known signatures which display fuller, rounder letters" (Carlson Expert Report at 6)). Indeed, as noted, Carlson herself conceded as much at the Daubert hearing.

To be sure, "no one has ever doubted that there [is] information in a handwriting trace that might be used for attribution of authorship under some circumstances." D. Michael Risinger, Appendix: Cases Involving the Reliability of Handwriting Identification Expertise Since the Decision in Daubert, 43 Tulsa L. Rev. 477, 494 (2007). The rub "is simply that we don't know what those circumstances are, and when humans are or are not good at such attributions, regardless of their own claims at skill." Id. Until the forensic document examination community refines its methodology, it is virtually untestable, rendering it an unscientific endeavor.

The second Daubert factor concerns whether the methodology has been subject to peer review and publication. Of course, the key question here is what constitutes a "peer," because, just as astrologers will attest to the reliability of astrology, defining "peer" in terms of those who make their living through handwriting analysis would render this Daubert factor a charade. While some journals exist to serve the community of those who make their living through forensic document examination, numerous courts have found

28

that "[t]he field of handwriting comparison . . . suffers from a lack of meaningful peer review" by anyone remotely disinterested. United States v. Saelee, 162 F. Supp. 2d 1097, 1103 (D. Alaska 2001) ("[S]ome articles are presented at professional meetings for review [but] there is no evidence that any of these articles are subjected to peer review by disinterested parties, such as academics."). "There is no peer review by a 'competitive, unbiased community of practitioners and academics,'" as would be expected in the case of a scientific field. Hines, 55 F. Supp. 2d at 68 (quoting United States v. Starzecpyzel, 880 F. Supp. 1027, 1038 (S.D.N.Y. 1995)); United States v. Fujii, 152 F. Supp. 2d 939, 940-41 (N.D. Ill. 2000) ("[T]here has been no peer review by an unbiased and financially disinterested community of practitioners and academics . . . .").

Relatedly, as the National Academy of Sciences found in a comprehensive report issued on the forensic sciences in 2009, "there has been only limited research to quantify the reliability and replicability of the practices used by trained document examiners." Comm. on Identifying the Needs of the Forensic Science Community, Nat'l Research Council, Strengthening Forensic Science in the United States: A Path Forward ["NAS Report"] 167 (Aug. 2009). This is hardly surprising given that forensic document examination "has no academic base." Risinger, Handwriting Identification § 33:11 n.5. Indeed, as Carlson testified at deposition, "there are no colleges or universities that offer degrees in forensic document

examination." Decl. of Thomas R. Burke dated Nov. 24, 2015 ("Nov. 24 Burke Decl."), Ex. A at 9, ECF No. 83-1 at 6.

In sum, to the extent the field has been subject to any "peer" review and publication, the review has not been sufficiently robust or objective to lend credence to the proposition that handwriting comparison is a scientific discipline.

Turning to the third Daubert factor, "[t]here is little known about the error rates of forensic document examiners." Saelee, 162 F. Supp. 2d at 1103. While a handful of studies have been conducted, the results have been mixed and "cannot be said to have 'established' the validity of the field to any meaningful degree." Hines, 55 F. Supp. 2d at 69. Certain studies conducted by Dr. Moshe Kam, a computer scientist commissioned by the FBI to research handwriting expertise, have suggested that forensic document examiners are moderately better at handwriting identification than laypeople. For example, in one such study, the forensic document examiners correctly identified forgeries as forgeries 96% of the time and only incorrectly identified forgeries as genuine .5% of the time, while laypeople correctly identified forgeries as forgeries 92% of the time and incorrectly identified forgeries as genuine 6.5% of the time. Risinger, Appendix, 43 Tulsa L. Rev. at 491. Furthermore, forensic document examiners incorrectly identified genuine signatures as forgeries 7% of the time, while laypeople did so 26% of the time. Id.

Although such studies may seem to suggest that trained forensic document examiners in the aggregate do have an advantage over laypeople in performing particular tasks, not all of these results appear to be statistically significant and the methodology of the Kam studies has been the subject of significant criticism.[11] In any event, in contrast to the study cited above (which involved attempted simulations of genuine signatures), the immediate task for the proffered expert in this case, as Carlson implicitly acknowledged at the Daubert hearing, was to determine whether a signature that does not look anything like plaintiff's purported "known" signatures was or was not authored by plaintiff.[12] See

---

[11] For a detailed critique and analysis of the Kam studies (as well as the several other studies that have been conducted), see Risinger, Appendix, 43 Tulsa L. Rev. at 480-94. While some courts have relied on the Kam studies to admit testimony under Daubert, others have found the studies too problematic or inconclusive to have much relevance. See Saelee, 162 F. Supp. 2d at 1102 (finding that, taken together, "the Kam studies did not conclusively establish that forensic document examiners can reliably do what they say they can do"); United States v. Santillan, 1999 WL 1201765, at *4 (N.D. Cal. Dec. 3, 1999) (discounting relevance of Kam study in light of "structural flaws" and "troubling fact[] that Kam refuses to disclose the individual performance data"). However, Kam released a new study in July 2015 that largely confirmed his prior results. See Moshe Kam, Pramod Abichandani, & Tom Hewett, Simulation Detection in Handwritten Documents by Forensic Document Examiner, 60 J. Forensic Sci. 936 (July 2015).

[12] At the Daubert hearing, the following colloquy took place:

> THE COURT: . . . [B]y the way, is it fair to say that the comparison between the release and the known signatures, they weren't even close, right? It was not like an attempted forgery, it was like very different.

> [CARLSON]: Yes, correct.

> THE COURT: So even a layperson probably could have

<u>Liberty Media Corp. v. Vivendi Universal, S.A.</u>, 874 F. Supp. 2d 169, 172 (S.D.N.Y. 2012) ("Under Rule 702 and <u>Daubert</u>, the district court must determine whether the proposed expert testimony 'both rests on a reliable foundation and is relevant to the task at hand.'" (quoting <u>Daubert</u>, 509 U.S. at 597)). Put differently, the task at hand, so far as expertise is concerned, is to determine whether plaintiff intentionally disguised her natural handwriting in producing the "known" signatures. And in this respect, the available error rates for handwriting experts are unacceptably high.

For example, in a 2001 study in which forensic document examiners were asked to compare (among other things) the "known" signature of an individual in his natural hand to the "questioned" signature of the same individual in a disguised hand, examiners were only able to identify the association 30% of the time. Twenty-four percent of the time they were wrong, and 46% of the time they were unable to reach a result. <u>See</u> Risinger, <u>Handwriting Identification</u> § 33:34. Similarly, and strikingly, in an unpublished study conducted by the Forensic Sciences Foundation in 1984, participating labs were supplied with three handwritten letters (the "questioned" documents) and handwriting exemplars for six suspects. Two of the three letters were written by one person, who was not among the suspects for whom the examiners had exemplars, and the third letter was written by a

---

seen that they were very different, yes?

[CARLSON]: Yes.

Dec. 4 Transcript, at 63.

suspect who had written his exemplars in his normal hand, but who had tried to simulate the writing of the other two letters when producing his letter. Of the 23 labs that submitted responses, 74% perceived the difference in authorship between the letters, but exactly 0% recognized that the third letter was written by a suspect who had disguised his handwriting. These results suggest that while forensic document examiners might have some arguable expertise in distinguishing an authentic signature from a close forgery, they do not appear to have much, if any, facility for associating an author's natural handwriting with his or her disguised handwriting. See Risinger, Appendix, 43 Tulsa L. Rev. at 549 ("[T]here is absolutely no empirical evidence to support the skill claim in regard to distinguishing between disguised exemplars and normal hand exemplars independent of comparison to some . . . everyday writing pre-existing the obtaining of the demand exemplars.").

As such, the known error rates, as they apply to the task at hand, cut against admission.

As for the fourth Daubert factor, the field of handwriting comparison appears to be "entirely lacking in controlling standards," Saelee, 162 F. Supp. 2d at 1104, as is well illustrated by Carlson's own amorphous, subjective approach to conducting her analysis here. At her deposition, for example, when asked "what amount of difference in curvature is enough to identify different authorship," Carlson vaguely responded, "[y]ou know, that's just a part of all of the features to take into context, so I wouldn't rely

33

on a specific stroke to determine authorship." Decl. of Thomas R.
Burke dated Jan. 21 ("Jan. 21. Burke Decl."), Ex. 2 at 49, ECF No.
95-2 at 43. Similarly, when asked at the Daubert hearing how many
exemplars she requires to conduct a handwriting comparison, Carlson
testified:

> You know, that's really -- that has been up for debate for
> a long time. I know that a lot of document examiners,
> myself included, I would prefer -- I ask for a half a
> dozen to a dozen. That at least gives me a decent
> sampling. Others request 25 or more. I feel like if you
> get too many signatures you have got so much information
> it is overwhelming and you tend to get lost in it.

Dec. 4 Transcript, at 62-63; see also Starzecpyzel, 880 F. Supp. at
1046 (noting that forensic document examiners "lack objective
standards in regard to the number of exemplars required for an
accurate determination as to genuineness").

Nor is there any "agreement as to how many similarities it
takes to declare a match." Hines, 55 F. Supp. 2d at 69; see also
United States v. Rutherford, 104 F. Supp. 2d 1190, 1193 (D. Neb.
2000) ("[The forensic document examiner] testified that unlike
fingerprint identification, there is no specific number of
characteristics an [examiner] is required to find before declaring
that a positive match has been made. Rather, [the examiner]
testified that a match is declared upon the subjective satisfaction
of the [examiner] performing the handwriting analysis based on his
education, training, and experience."). And because there are no
recognized standards, it is impossible to "compare the opinion

reached by an examiner with a standard protocol subject to validity testing." Hines, 55 F. Supp. 2d at 69.

Furthermore, "there is no standardization of training enforced either by any licensing agency or by professional tradition," nor a "single accepted professional certifying body" of forensic document examiners. Risinger, Handwriting Identification § 33:11 n.5. Rather, training is by apprenticeship, which in Carlson's case, took the form of a two-year, part-time internet course, involving about five to ten hours of work per week under the tutelage of a mentor she met with personally when they were "able to connect." Nov. 24 Burke Decl., Ex. A at 13, ECF No. 83-1 at 10.

As for the final Daubert factor -- general acceptance in the expert community -- handwriting experts "certainly find 'general acceptance' within their own community, but this community is devoid of financially disinterested parties." Starzecpyzel, 880 F. Supp. at 1038. Such acceptance cannot therefore be taken for much. A more objective measure of acceptance is the National Academy of Sciences' 2009 Report, which struck a cautious note, finding that while "there may be some value in handwriting analysis," "[t]he scientific basis for handwriting comparisons needs to be strengthened." NAS Report at 166-67. The Report also noted that "there may be a scientific basis for handwriting comparison, at least in the absence of intentional obfuscation or forgery" -- a highly relevant caveat for present purposes. Id. at 167 (emphasis added). This is far from general acceptance.

For decades, the forensic document examiner community has essentially said to courts, "Trust us." And many courts have. But that does not make what the examiners do science.

Of course, just because Carlson's testimony flunks Daubert does not mean it is inadmissible under Rule 702 altogether. If, Carlson has (among other requirements) "technical" or "other specialized knowledge" that "will help the trier of fact to understand the evidence or to determine a fact in issue," her testimony may be admissible. Fed. R. Evid. 702(a). Indeed, the Supreme Court's decision in Kumho Tire "made clear that while [Daubert's] basic requirements of reliability -- as they are now articulated in Rule 702 -- apply across the board to all expert testimony, the more particular [Daubert] standards for scientific evidence need not be met when the testimony offered" is not scientific in nature. United States v. Glynn, 578 F. Supp. 2d 567, 570 (S.D.N.Y. 2008). "[T]he test of reliability is 'flexible,' and Daubert's list of specific factors neither necessarily nor exclusively applies to all experts or in every case." Kumho Tire, 526 U.S. at 141.[13]

---

[13] This dynamic animated Judge Louis Pollak's well-known decisions regarding the admissibility of fingerprinting evidence, in which Judge Pollak initially determined that fingerprinting evidence did not satisfy the scientific strictures of Daubert, but subsequently held that the technique was sufficiently reliable to be admissible as expert testimony under Kumho Tire. See United States v. Llera Plaza, 179 F. Supp. 2d 492, 516-18 (E.D. Pa. 2002); United States v. Llera Plaza, 188 F. Supp. 2d 549, 576 (E.D. Pa. 2002) (granting motion for reconsideration).

But while courts are free under <u>Kumho Tire</u> to apply different factors than are called for by <u>Daubert</u> based on what factors best "fit" the inquiry, "the particular questions that [<u>Daubert</u>] mentioned will often be appropriate for use in determining the reliability of challenged expert testimony." <u>Id.</u> at 152. Here, the Court finds that the <u>Daubert</u> criteria suit the instant inquiry well. <u>See</u> <u>Saelee</u>, 162 F. Supp. 2d at 1101 ("Factors that 'fit' the instant case are whether the theories and techniques of handwriting comparison have been tested, whether they have been subjected to peer review, the known or potential error rate of forensic document examiners, the existence of standards in making comparisons between known writings and questioned documents, and the general acceptance by the forensic evidence community."). It remains the case that the methodology has not been subject to adequate testing or peer review, that error rates for the task at hand are unacceptably high, and that the field sorely lacks internal controls and standards, and so forth. Accordingly, this Court is of the view that, as a general matter, a court should be cautious in admitting testimony from a forensic document examiner even under the flexible approach of <u>Kumho Tire</u> -- particularly when an examiner offers an opinion on authorship -- and should not do so without carefully evaluating whether the examiner has actual expertise in regard to the specific task at hand.

In this case, Carlson's testimony is far too problematic to be admissible under Rule 702 as technical or otherwise "specialized"

expert testimony, even on a <u>Kumho Tire</u> approach, for at least four reasons.

<u>First</u>, as a threshold matter, plaintiff's counsel sought to bias Carlson from the start. In plaintiff's counsel's email to Carlson seeking to retain her, plaintiff's counsel stated flatly that "[t]he questioned document was a Release that Defendant CIR forged" and that a Rule 26 Report (to this effect) was needed from Carlson by the next day. Nov. 24 Burke Decl., Ex. B., ECF No. 83-2. He continued:

> I understand that we are asking a lot, in a short period
> of time, however, this is what we need, and you're the
> expert that we want and feel comfortable working with. You
> were a rock star for us at our last case! We are asking
> the same performance here. Our client was really taken
> advantage of by this Defendant, and it put her, and her
> young children in danger, and we need your help to right
> this wrong. If you need anything else, please let us know.
> We can't thank you enough.

<u>Id.</u>

In the same vein, one of the "known" signatures that plaintiff's counsel provided to Carlson was an affidavit signed by plaintiff reciting her claim that the Release is a "fake" which "does not contain my signature." Carlson Expert Report, Ex. K1. The affidavit concludes with Almeciga's averment that she is "truly disgusted and deeply disturbed with the manner in which CIR has forged these documents. CIR's conduct has destroyed my life!" <u>Id.</u>

Plaintiff's counsel also sent Carlson the letter from plaintiff's prior (uncalled) expert stating that the Release was forged, <u>see</u> Nov. 24 Burke Decl., Ex. B. (though Carlson testified

that she did not recall reviewing it, see Dec. 4 Transcript, at 74).
All of this is contrary to the well-established principle that
experts must, to the maximum extent possible, proceed "blindly,"
that is, without knowledge of the result sought by the party seeking
to retain them. Indeed, even one of the earliest treatises on
handwriting analysis, authored in 1894 by William Hagan, stated that
"[t]he examiner must depend wholly upon what is seen, leaving out of
consideration all suggestions or hints from interested parties [as]
it best subserves the conditions of fair examination that the expert
should not know the interest which the party employing him to make
the investigation has in the result." William E. Hagan, Disputed
Handwriting 82 (1894). Plaintiff's counsel's blatant biasing tactics
compromised Carlson's ability to provide a neutral examination, a
danger made even greater by the highly subjective nature of
Carlson's methodology.

Second, the subjectivity and vagueness that characterizes
Carlson's analysis severely diminishes the reliability of Carlson's
methodology. Carlson describes letters in the questioned signature
as "oversized" and "formed incorrectly;" as characterized by "very
smooth strokes and curves" as opposed to the "very jerky, angular
strokes" of the known signatures; as "more narrow" compared to the
"fuller, rounder letters" of the known signatures; as "too tall when
compared to the respective letters in the known signatures;" as
"very symetrical [sic]" compared to the "wider, distorted loops" of
the known signatures; and so on. Carlson Expert Report at 6;

Supplemental Expert Report at 7. Based on such observations, Carlson concludes that the Release was not signed by Erica Almeciga. But the critical missing link is why any of these observed differences indicate different authorship at all, let alone in a context where someone has potentially disguised his or her handwriting.

Third, and relatedly, while testimony that accounted for the possibility of disguise and addressed why the "known" signatures were not the product of intentional disguise could at least have potentially assisted the trier of fact, Carlson did not offer such testimony. To the contrary, Carlson confirmed at her deposition that she was "relying on the plaintiff's representations that [the known signatures] are accurate representations of her signature." Nov. 24 Burke Decl., Ex. A at 47 (emphasis added), ECF No. 83-1 at 21; see also id. at 60, ECF No. 83-1 at 29. This is a critical flaw in Carlson's methodology because it assumes away a key issue: whether Almeciga intentionally disguised her handwriting in producing the known samples after this dispute was initiated or whether the known samples accurately represent her actual handwriting. By relying on plaintiff's counsel's representation that the "known" signatures were accurate representations of plaintiff's signature, the result of Carlson's analysis was effectively pre-ordained and her testimony cannot be considered the "product of reliable principles and methods." Fed. R. Evid. 702. In fact, Carlson's testimony has been excluded by at least one other court in part on such a basis. See United States v. LeBeau, 2015 WL 4068158, at *8 (D.S.D. June 10,

2015) ("[Carlson's] analysis and opinions entirely hinge on whether she received an accurate 'known' signature from [the defendant].").

The tainting effect of Carlson's assumption in this regard may be gleaned from what she infers on the basis of her observation that the "signature on the questioned document is written with great fluidity and a faster speed, unlike the known signatures that display a slower, more methodical and unrefined style of writing." Carlson Expert Report at 6. To Carlson, who took on faith that the "known" signatures were accurate representations of plaintiff's handwriting, this discrepancy is evidence that the Release was forged. Yet, at the Daubert hearing, Carlson confirmed that slower, methodical handwriting was "equally consistent . . . or maybe even more consistent[] with someone trying to fake the known signatures," Dec. 4 Transcript, at 65, and she observed that the exemplars written by plaintiff in open court were written slowly, id. at 104. While Carlson further testified that she was able to assure herself that plaintiff did not disguise her handwriting because "subconscious traits and . . . characteristics" will reveal themselves in disguised writing, this testimony cannot be considered of much value in light of Carlson's earlier, contrary deposition testimony and the complete absence of any indication in her reports that she was accounting for the possibility of disguise. Id. at 78.

Fourth, also diminishing Carlson's credibility are a number of striking contradictions between her Report and her in-court testimony. Thus, while Carlson purported to apply the ACE-V method

in her expert report, see Carlson Expert Report at 6, she admitted at the Daubert hearing that she did not have time to obtain a verification of her opinion in this case and that her report was inaccurate in this respect, see Dec. 4 Transcript, at 70-71, 76. Virtually by definition, then, Carlson failed to "reliably appl[y] the principles and methods" in question "to the facts of this case." Fed. R. Evid. 702(d); see also United States v. McDaniels, 2014 WL 2609693, at *5 (E.D. Pa. June 11, 2014) (disqualifying handwriting expert who purported to apply ACE-V method but who failed to provide evidence that she had actually done so).[14] Moreover, in her initial expert report, Carlson stated that the signature on the Release was "made to resemble" plaintiff's. See Carlson Expert Report at 6. But at the Daubert hearing, Carlson took the opposite position. See Dec. 4 Transcript, at 63 (agreeing that the signature on the Release and the known signatures "weren't even close," that the signature on the Release "was not like an attempted forgery," and that the signatures being compared were "very different"). Confirming this reversal, in her Supplemental Expert Report, Carlson describes the signature on the Release as "not made to resemble Erica Almeciga's signature" and as "remarkably dissimilar [to the In-Court Signatures], indicating forgery/different authorship." Supplemental Expert Report at 6 (emphasis added).

---

[14] In her Supplemental Expert Report, Carlson entirely drops the "verification" step from her methodology, and purports to apply the "ACE" methodology. See Supplemental Expert Report at 6.

Several courts that have found themselves dubious of the reliability of forensic document examination have adopted a compromise approach of admitting a handwriting expert's testimony as to similarities and differences between writings, while precluding any opinion as to authorship. See, e.g., Rutherford, 104 F. Supp. 2d at 1192-94. That Solomonic solution might be justified in some circumstances, but it cannot be here where the Court finds the proffered expert's methodology fundamentally unreliable and critically flawed in so many respects. Such testimony would be more likely to obfuscate the issues in this case than to "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). It would be an abdication of this Court's gatekeeping role under Rule 702 to admit Carlson's testimony in light of its deficiencies and unreliability. Accordingly, Carlson's testimony must be excluded in its entirety.

### B. The Rule 11 Motion

Having determined that Ms. Carlson's expert opinion is inadmissible under Rule 702, the Court turns to the merits of defendant's Rule 11 motion.

Rule 11 of the Federal Rules of Civil Procedure requires attorneys filing papers with the court to certify "that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances . . . (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable

43

opportunity for further investigation or discovery." Fed. R. Civ. P. 11(b)(3). If "the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation." Fed. R. Civ. P. 11(c)(1). "[T]he standard for triggering the award of fees under Rule 11 is objective unreasonableness." Margo v. Weiss, 213 F.3d 55, 65 (2d Cir. 2000). In addition, Rule 11 "sanctions may not be imposed unless a particular [factual] allegation is utterly lacking in support." O'Brien v. Alexander, 101 F.3d 1479, 1489 (2d Cir. 1996). Indeed, "Rule 11 sanctions are not warranted where the 'evidentiary support is merely weak and the claim is unlikely to prevail.'" Mealus v. Nirvana Spring Water N.Y. Inc., 2015 WL 4546023, at *6 (N.D.N.Y. July 28, 2015) (quoting Scientific Components Corp. v. Sirenza Microdevices, Inc., 2007 WL 1026411, at *2 (E.D.N.Y. Mar. 30 2007)). And "[e]ven if the district court concludes that the assertion of a given claim violates Rule 11 . . . [t]he decision whether to impose a sanction for a Rule 11(b) violation is . . . committed to the district court's discretion." Perez v. Posse Comitatus, 373 F.3d 321, 325 (2d Cir. 2004).

Separate and apart from Rule 11, a court has the inherent power to impose sanction on a party for perpetrating a fraud on the Court. Such sanctions "are warranted if it is 'established by clear and convincing evidence that [a party] has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial

system's ability impartially to adjudicate' the action.'" <u>New York Credit & Fin. Mgmt. Grp. v. Parson Ctr. Pharmacy, Inc.</u>, 432 F. App'x 25, 25 (2d Cir. 2011) (quoting <u>Scholastic, Inc. v. Stouffer</u>, 221 F. Supp. 2d 425, 439 (S.D.N.Y. 2002)) (internal quotation marks omitted). "Because of their very potency, inherent powers must be exercised with restraint and discretion." <u>Chambers v. NASCO, Inc.</u>, 501 U.S. 32, 44 (1991). Accordingly, "as a general matter, a court should not impose sanctions on a party or attorney pursuant to its inherent authority unless it finds, by clear and convincing evidence, that the party or attorney knowingly submitted a materially false or misleading pleading, or knowingly failed to correct false statements, as part of a deliberate and unconscionable scheme to interfere with the Court's ability to adjudicate the case fairly." <u>Braun ex rel. Advanced Battery Techs., Inc. v. Zhiguo Fu</u>, 2015 WL 4389893, at *17 (S.D.N.Y. July 10, 2015); <u>see also</u> <u>McMunn v. Mem'l Sloan-Kettering Cancer Ctr.</u>, 191 F. Supp. 2d 440, 445 (S.D.N.Y. 2002) ("the essence of a fraud upon the Court" is "when a party lies to the court and his adversary intentionally, repeatedly, and about issues that are central to the truth-finding process").

CIR asserts that sanctions are warranted because the totality of the evidence demonstrates that plaintiff fabricated the key factual allegations underlying her lawsuit -- to wit, that defendants promised to conceal her identity in published footage of her August 2012 interview with them and that she did not sign the Release in connection with that interview.

45

At the evidentiary hearing, defendants Livesey and Hooper both testified that plaintiff never expressed interest in having her identity concealed at the time of the interview, that they never promised to conceal plaintiff's identity, and that plaintiff signed the Release in their presence. See Dec. 4 Transcript, at 6-10 (Hooper), 31-33 (Livesey). The key factual evidence offered in support of plaintiff's claim is thus her own testimony; but, for the following reasons, plaintiff is not a remotely credible witness and her allegations collapse under scrutiny.

As an initial matter, plaintiff's version of events is undermined by her own contemporaneous conduct in connection with the interview. On July 17, 2013, a day after the CIR Report was published, Livesey and Hooper each emailed plaintiff a link to an abridged version of the CIR Report available on YouTube. See Sept. 14 Burke Decl. ¶ 5; see id., Exs. 5, 6. This version of the CIR Report included footage from plaintiff's interview, with plaintiff's name, face, and relationship to Rosalio Reta revealed. Plaintiff responded to these emails separately the next day, asking both Livesey and Hooper to call her (and advising Livesey that it was "important"). Id., Ex. 5. Hooper also sent plaintiff an email on July 17, 2013 in which he "apologize[d] for the misspelling of [plaintiff's] name" in the Spanish version of the Report. Id., Ex. 7. Plaintiff responded to this email on July 21, 2013 asking Hooper

to call her regarding a question she had. Id.[15] Plaintiff was thus plainly aware in July 2013 of the fact that CIR had revealed her identity in connection with the CIR Report. She has never contended otherwise.

Yet, the evidence shows that plaintiff did not raise concerns about the revelation of her identity until almost a year later, in June 2014. See Dec. 4 Transcript, at 35-36 (defendant Livesey testifying that plaintiff first raised concerns in June 2014); id. at 134-35 (Stephen Talbot testifying as to same). Plaintiff's substantial delay in raising any concerns about the revelation of her identity casts significant doubt on her allegation that defendants promised not to conceal her identity, particularly given the severe harm that the breach of that promise has allegedly caused her. See Am. Compl. ¶¶ 31-32.

Even more damning for plaintiff's version of events, on July 22, 2013 a link to the YouTube video of the CIR Report was posted to the Twitter account of ERYCA LEE (@eryca_reta), with the following description: "new interview of myself and my husband Rosalio Reta." Sept. 14 Burke Decl., Ex. 8. Plaintiff has disclaimed any connection to the Twitter account, and the name of the Twitter account in question was subsequently changed from "ERYCA LEE" to "hacked." Sept. 14 Burke Decl. ¶¶ 6-9. But plaintiff has not offered any

---

[15] Whether Livesey and Hooper subsequently called plaintiff in response to her emails (and what may or may not have been exchanged on any such calls) was not a subject of direct testimony.

credible explanation as to why anyone would impersonate her on Twitter -- let alone post a link to the CIR Report -- and the Court finds plaintiff's claim that she did not post the tweet to be dubious. Plaintiff's apparent promotion of the CIR Report on social media is virtually irreconcilable with her claim that her participation in the interview was conditioned on her identity being concealed.

Moreover, the signature on the Release very closely matches that of various court filings that CIR located in Georgia and Massachusetts state courts that were purportedly signed by plaintiff, but which she denies signing. The signature on the Release, as noted, appears as follows:



Sept. 14 Burke Decl., Ex. 2.[16]

The signatures on certain Georgia state court documents, which involved a petition for a protective order filed by an Erica

_____

[16] Though plaintiff's first name is spelled with a "y" in the signature on the Release, rather than an "i," plaintiff testified that she has "used different spellings of [her] first name." Dec. 4 Transcript, at 117. Further to this point, plaintiff has never contested that she used the email address eryca2323@gmail.com and spelled her name "Eryca" in corresponding with defendants in this action. See, e.g., Def.'s Ex. 51, ECF No. 95-1 at 34. As for the fact that "Reta" appears as part of plaintiff's last name on the Release but not in other instances, Reta is the last name of the man to whom plaintiff purported to be married in connection with her interview with defendants, so this is not a material discrepancy.

Almeciga against a Rosendo Gutierrez, appear (to take an illustrative few) as follows:



See Sept. 14 Burke Decl., Ex. 15 at 1.



See id. at 3.

    And the signatures on the critical documents filed in Massachusetts state court in 2007 and 2008, in a litigation in which Ms. Almeciga was a defendant, appear as follows[17]:



---

[17] CIR obtained a number of filings in Massachusetts state court that appear on their face to have been signed by plaintiff. Many of these documents have signatures that differ in appearance from the signature on the Release and which resemble the "known" handwriting samples that plaintiff provided to her handwriting expert. Plaintiff admitted to signing these documents. See Transcript dated Dec. 22, 2015, at 7-10, ECF No. 90. However, these particular documents were all filed within the last year, after the initiation of the instant litigation. Plaintiff denied signing the documents from 2007 and 2008 in which the signatures appear similar to the signature on the Release. Id.

<u>See</u> Def.'s Ex. 1 at 19, ECF No. 95-1 at 20.



Def.'s Ex. 1 at 20, ECF No. 95-1 at 21.



Def.'s Ex. 1 at 21, ECF No. 95-1 at 22.

The strong similarities to the naked eye between the signature on the allegedly forged Release, on the one hand, and the signatures on the state court documents, on the other, are significant because plaintiff has represented that she does not sign her name in a manner consistent with the distinctive signature on the Release. Yet plaintiff admitted at the evidentiary hearing that these filings contain at least partially accurate information regarding her address, children, and familial circumstances, and there is no contention that they were filed by some other person actually named

Erica Almeciga. See Transcript dated Dec. 22, 2015 ("Dec. 22
Transcript"), at 15, 29-30, 37, ECF No. 90. While still disclaiming
these are her signatures, plaintiff offers no coherent explanation
for why or how someone would impersonate her in domestic matters in
state courts.[18] Nor does plaintiff explain (1) how the alleged
impersonator could have known that she was intending to move back to
Massachusetts imminently (as is stated in one of the Georgia
documents) when, according to her own testimony, she told no one she
was leaving Georgia,[19] see Dec. 22 Transcript, at 37, or (2) how the
hypothetical impersonator would have known to list a neighbor's cell
phone number that plaintiff occasionally gave out as her own phone

---

[18] With respect to the Georgia state court documents, plaintiff
initially speculated in her papers that these documents -- which
refer to Almeciga having a child with another man -- were somehow
part of a plot to anger Rosalio Reta. See Pl. Erica Almeciga's
Suppl. Mem. of Law in Further Opp. to CIR Defs. Mot. for Sanctions
at 7, ECF No. 84 ("This is not difficult to speculate that the
purpose for such reference is to suggest that Ms. Alemciga [sic] was
not only romantically involved with one of Reta's enemies, but that
she was bearing his children as well . . . What better way to affect
Reta . . . than to break his spirit and place Ms. Almeciga in the
cross-hairs of a scorned ruthless hitman, and the Mexican Mafia; a
gang known for its violence and revenge."). At the evidentiary
hearing, however, plaintiff testified that she believed these papers
were filed as "revenge" by a young woman who lived with plaintiff
for some time until plaintiff asked her to leave her home. See Dec.
22 Transcript, at 25-26. No evidence was adduced at the evidentiary
hearing to support these mutually inconsistent and highly
speculative theories.

[19] The document in question states that Almeciga is "leaving / moving
back to Mass on 6/30/13." Sept. 14 Burke Decl., Ex. 15, ECF 58-15 at
3. In fact, plaintiff testified that she moved to Massachusetts from
Georgia on October 27, 2013. See Dec. 22 Transcript, at 37. The
pertinent point is that it is unexplained how an impersonator would
have known of even a plan to move to Massachusetts when plaintiff,
by her own testimony, disclosed that to no one.

number, see Dec. 22 Transcript, at 30-34. Plaintiff's contentions that she did not author the relevant signatures on the Georgia and Massachusetts state court documents are thus not credible, which casts significant doubt on her contention that the Release was forged.[20]

Plaintiff was also caught in several apparent lies at the evidentiary hearing, which further reinforces this Court's finding that plaintiff is a generally incredible and unreliable witness. For example, one of the documents filed in Georgia state court (which, to reiterate, plaintiff denied filing) is a form titled "Petitioner's Identifying Information," which lists the name, date of birth, sex, and race of each of the protected parties (in this case, plaintiff and her children), in relevant part as follows:

| NAME OF PROTECTED PARTY | DOB | SEX | Race (See below) |
|---|---|---|---|
| ◯ Erica Almeciga | REDACTED 79 | ✝ | PI |
| ◯ A.REDACTED W.REDACTED | REDACTED 02 | ✝ | mR |

---

[20] At the evidentiary hearing, plaintiff's handwriting expert, Carlson, testified that, based on a separate analysis she conducted that was not part of her expert report, the signatures on the Georgia state court documents were authored by someone other than the signatory of the Release and by someone other than plaintiff (i.e., a third author). See Dec. 4 Transcript, at 67-68; see Aff. of Kevin A. Landau dated Jan. 21, 2016, Ex. D, ECF No. 93-4. Though this improbable opinion, if admissible, would under the circumstances cast further doubt on Carlson's credibility and reliability, Carlson's testimony is inadmissible under Rule 702 for the reasons explained above.

Sept. 14 Burke Decl., Ex. 15, ECF No. 58-15 at 11.

On cross-examination, the following colloquy took place between plaintiff and defense counsel:

Q. Can you identify what the figure is in the box that has the heading 'Sex'?

A. It looks like a 7 to me.

Q. So that's a 7?

A. That's what I would assume. I --

Q. Okay.

Dec. 22 Transcript, at 35.

Plaintiff was then confronted with the list of capital and lower-case letters she had submitted to her handwriting expert for purposes of handwriting analysis, which was included as an exhibit to the handwriting expert's report. There, plaintiff wrote out her capital "F" as follows:



Carlson Expert Report, Ex. K2.

The colloquy continued:

Q. Do you recognize this?

A. Yes, I do.

Q. What is this?

A. That's -- I wrote my letters out.

Q. And as you go down to F?

A. Yes.

Q. Does that F look like a 7 to you?

A. No, it looks like an F.

Q. So, and I am looking on the left-hand side E, between E and G you have -- is that how you write an F?

A. Yes. My F swoops down a lot more than what was written on this paper, this looks like a no. 7. My F swoops down and goes up.

Dec. 22 Transcript, at 36.

Despite plaintiff's effort to distinguish the two "F"'s when confronted with the inconvenient fact that she had already represented to her expert and the Court that she writes capital "F"'s in the unusual manner that appears in the Georgia state court documents, any layperson could tell that the "F" on the Georgia document and the "F" provided by plaintiff as a sample of her handwriting are highly similar and highly distinctive. The fact that plaintiff testified under questioning that the "F" on the Georgia document appeared to be a "7" -- even when she had the context that the figure appeared under the heading for "Sex" and even when she, of course, knew that that is how she herself writes a capital "F" -- confirms plaintiff's willingness to testify untruthfully both in general and, critically, with respect to her handwriting.[21]

---

[21] That the highly distinctive "F" appears in the Georgia state court documents is further evidence that, contrary to her denials, plaintiff authored those documents. As noted, these documents are significant because they contain signatures that closely resemble the signature on the Release.

Plaintiff also testified that she has never been pregnant with the child of any man other than the fathers of her three children, which was relevant because both the Georgia and Massachusetts state court documents refer to other pregnancies. See Dec. 22 Transcript, at 46. That testimony was contradicted by her boyfriend (who is not the father of any of plaintiff's children, see id. at 34-35), who, having been called to the stand by plaintiff herself (for other reasons), testified that plaintiff had been pregnant with his child in 2014 but had miscarried. Id. at 68-69.

Moreover, in contrast to defendants, who had no discernible motive to breach a promise to plaintiff to conceal her identity, there is evidence in the record indicating that plaintiff had substantial motive to fabricate her allegations. Defendant Livesey, whom the Court finds credible, testified that when plaintiff contacted him in June 2014 to raise concerns about the revelation of her identity in the CIR Report, plaintiff explained that her association with Reta was being used as "ammunition" in a custody battle over one of her children. Dec. 4 Transcript, at 36. At the evidentiary hearing, plaintiff corroborated that her association with Reta has had an "adverse effect" on her custody proceedings with respect both to her own children and her current boyfriend's children. Id. at 116. She also testified at deposition that she has "been labeled as dangerous when it comes to being around [her] children," as well as her boyfriend's son, because of her association with Reta and CIR's publication of it. Jan. 21 Burke

Decl., Ex. 3 at 200, ECF No. 95-3. at 8. It thus appears likely that plaintiff filed this lawsuit -- which seeks, _inter alia_, to impose a constructive trust "over all film footage and material shot and obtained by CIR in their Report," Am. Compl. ¶ 117(f) -- in an effort to unwind a decision she regrets and to distance herself from Reta.

Given the Court's finding that plaintiff is not remotely credible and the Court's determination that her handwriting expert's testimony does not pass muster under _Daubert_ and _Kumho Tire_, plaintiff is left with virtually no admissible evidence in support of her version of events in the face of a mountain of contrary evidence. Plaintiff's boyfriend, Isaac Duarte-Morillo, submitted an affidavit in which he averred that, "[a]fter looking at the signatures that people are claiming belong to Erica, I am 100% confident in saying that they are not her's [sic]. I have seen her sign her name thousand's [sic] of time's [sic]." Aff. of Kevin A. Landau dated Sept. 25, 2015 ("Landau Aff. dated Sept. 25, 2015"), Ex. 11, ¶ 18, ECF No. 72. Because of revelations at the evidentiary hearing, however, Duarte-Morillo's affidavit and accompanying testimony are of little to no value. At the evidentiary hearing, after Duarte-Morillo testified that the affidavit reflected his "wording" and that he gave this wording to "the attorney," plaintiff's counsel, to his credit, stated that this was "not accurate." Dec. 22 Transcript, at 64. Upon further questioning, Duarte-Morillo testified that he gave the information to _plaintiff_

(and not her attorney) and that <u>plaintiff</u> (and not her attorney) typed the affidavit. <u>See</u> <u>id.</u> at 64-65. Duarte-Morillo then clarified that, in fact, plaintiff showed him the affidavit already typed and asked if the information contained therein was accurate. <u>See</u> <u>id.</u> at 66.

Furthermore, whatever the provenance of the affidavit, Duarte-Morillo failed to correctly identify six different signatures appearing on various of the Massachusetts state court documents as plaintiff's, despite plaintiff having confirmed that these were, in fact, her signatures. <u>See</u> <u>id.</u> at 57-58, 70-75. Thus, Duarte-Morillo's opinion that the Release does not contain plaintiff's signature -- a matter of which he has no firsthand knowledge -- cannot be credited.

Plaintiff also attempted to rely on an unsworn affidavit submitted by Rosalio Reta in which Reta purportedly averred that he "agreed to let Mr. Livesey interview my fiancée Ms. Almeciga on one condition (her identity not disclosed [sic]) for fear of putting a target on her head." Landau Aff. dated Sept. 25, 2015, Ex. 10, ECF No. 71. Reta further purportedly averred that "Mr. Livesey accepted an [sic] drew out a contract stating that the interview was to be conducted in a secure area and have my fiancée [sic] face blurred out for fear of reprisal." <u>Id.</u> As the Court indicated at the conclusion of the evidentiary hearing, these statements are plainly inadmissible hearsay; and, even if they were somehow admissible, they are largely irrelevant given that Reta had no power to

determine the conditions under which plaintiff would or would not submit to an interview and given that Reta did not attach the alleged written contract he entered into with Livesey (which has not been otherwise produced or corroborated through testimony).

Plaintiff also asks the Court to make various inferences in favor of plaintiff's version of events, none of which withstands scrutiny. First, plaintiff makes much of the fact that the CBC aired an interview (shortly before CIR interviewed plaintiff) in which plaintiff's face was concealed for her own safety. Plaintiff asks the Court to infer that she would have requested the same of CIR. But in an email dated June 12, 2014, plaintiff asked a CBC employee involved in the CBC story, inter alia, "What made you decide to interview me in shadow? Which I greatly appreciate." Sept. 14 Burke Decl., Ex. 23. The CBC employee responded, in relevant part, that "we decided that your association with Rosalito [sic] made you vulnerable and that we had an obligation to look out for you as best we could." Id. In other words, contrary to plaintiff's contention in her Amended Complaint that the CBC concealed her identity "per [her] demand," Am. Compl. ¶ 11, this email exchange demonstrates that the CBC made this decision independently and not at plaintiff's request.

Second, plaintiff points to the fact that defendants concealed the identity of an individual and the face of a second individual in the CIR Report, the first of whom did not sign a release and the second of whom did. Plaintiff insists that this somehow supports her allegation that she reached a similar agreement with defendants that

was breached. To the contrary, if anything, these facts indicate that defendants were perfectly willing to conceal an interviewee's identity when the request was made.

Third, plaintiff contends that the fact that CIR concealed plaintiff's identity in a different video report that it posted in November 2014 "plainly establishes that there was an understanding between CIR and Plaintiff that her identity would be concealed." Pl. Erica Almeciga's Mem. of Law in Opp. to CIR Defs. Mot. for Sanctions at 2, ECF No. 63. But it is hardly surprising that, as a "courtesy to her," CIR chose to conceal plaintiff's identity in media content released after plaintiff raised her claims and concerns. Dec. 4 Transcript, at 134-37.

The Court has considered the various other arguments raised and alleged inconsistencies identified by plaintiff and finds them to be without merit.

In sum, in view of all of the evidence adduced through the two-day evidentiary hearing and the copious submissions before the Court, the Court finds by clear and convincing evidence that plaintiff perpetrated a fraud on the Court by pressing critical and serious allegations that she knew to be false. Where a fraud upon the court is shown by clear and convincing evidence, courts consider five factors in fashioning an appropriate sanction: "(i) whether the misconduct was the product of intentional bad faith; (ii) whether and to what extent the misconduct prejudiced the injured party; (iii) whether there is a pattern of misbehavior rather than an

isolated instance; (iv) whether and when the misconduct was corrected; and (v) whether further misconduct is likely to occur in the future." Passlogix, Inc. v. 2FA Tech., LLC, 708 F. Supp. 2d 378, 394 (S.D.N.Y. 2010). Here, all five factors weigh in favor of imposing sanctions on plaintiff: plaintiff's misconduct was the product of intentional bad faith; her misconduct prejudiced defendants; the misconduct was part of an extended and troubling pattern of fabrications and denials; the misconduct has not been corrected; and further misconduct would be likely to occur if the case were to proceed.

There would be little point, however, in imposing a monetary sanction on plaintiff given that she testified that she is homeless and given that she has mental health issues and no apparent source of income. See Dec. 22 Transcript, at 23; Marvello v. Bankers Trust Co., 1999 WL 38252, at *2 n.1 (S.D.N.Y. Jan. 27, 1999) ("Plaintiff is unemployed and appears to be dependent upon public assistance. The imposition of monetary sanctions would therefore be pointless."). CIR is aware that plaintiff is likely judgment-proof but nevertheless seeks its costs and fees incurred in defending this action, which it represents are in the hundreds of thousands. See Summation Mem. in Support of CIR's Mot. for Sanctions at 3, ECF No. 94 ("CIR recognizes that it is unlikely to recover its significant fees from Plaintiff given her financial situation . . . ."). In such circumstances, imposing a monetary sanction on plaintiff that she is unable to pay and that could only be enforced by contempt

60

proceedings would be tantamount to the creation of a debtor's prison -- a shameful practice that the Court is not willing to facilitate.

The Court does, however, find that an appropriate sanction for plaintiff's bad-faith allegations is the dismissal of this action with prejudice, independent of this Court's granting of CIR's motion for judgment on the pleadings. To be sure "dismissal is a harsh sanction to be used only in extreme situations." McMunn v. Mem'l Sloan-Kettering Cancer Ctr., 191 F. Supp. 2d 440, 461 (S.D.N.Y. 2002). But "[w]hen faced with a fraud upon the court . . . such a[] powerful sanction is entirely appropriate." Id. Indeed, where the misconduct at issue is the knowing fabrication of the critical allegations underlying the complaint that plaintiff must prove in order to recover, it would be pointless to allow the case to proceed. Dismissal is virtually required under such circumstances.

CIR also seeks sanctions against plaintiff's counsel, whom they describe as a "willing participant" in plaintiff's fraud on the Court for having "willfully blind[ed] himself to his client's misrepresentations" and unreasonably continuing to press this case in the face of her collapsing allegations. Mem. in Support of CIR's Mot. for Sanctions at 4, ECF No. 55. The motion raises the thorny issue of where vigorous advocacy ends and punishable disregard of the facts begin. As the Advisory Committee has cautioned, Rule 11 "is not intended to chill an attorney's enthusiasm or creativity in pursuing factual or legal theories" and "[t]he court is expected to avoid using the wisdom of hindsight and should test the signer's

conduct by inquiring what was reasonable to believe at the time the pleading, motion, or other paper was submitted." Fed. R. Civ. P. 11 advisory committee's note to 1983 amendment. Moreover, courts have held that attorneys are "entitled to rely on the representations of their client[s], without having to assess [their clients'] credibility." Jeffreys v. Rossi, 275 F. Supp. 2d 463, 481 (S.D.N.Y. 2003); see also Braun ex rel. Advanced Battery Techs., Inc. v. Zhiguo Fu, 2015 WL 4389893, at *16 (S.D.N.Y. July 10, 2015) ("[A]n attorney who relies on a client's verification made under the penalty of perjury is not acting in bad faith; indeed, it is unlikely that such reliance would even rise to the level of objective unreasonableness."); Mar Oil, S.A. v. Morrissey, 982 F.2d 830, 844 (2d Cir. 1993) ("An unfavorable credibility assessment is rarely a sufficient basis for such an award."). While this Court would not frame that principle in such categorical terms and would not exclude the possibility that a lawyer might be subject to sanctions where he knows to a reasonable certainty that his client is lying and yet persists in pursuing a cause of action premised on such lies, this is not such a case.

Specifically, in this case, where plaintiff's version of events was corroborated, at least to some degree, by others, and where plaintiff's counsel had obtained a favorable expert opinion, counsel (barely) satisfied his obligation under Rule 11 to ensure through an "inquiry reasonable under the circumstances" that his client's "factual contentions have evidentiary support." Fed. R. Civ. P.

11(b); Servicemaster Co. v. FTR Transport, Inc., 868 F. Supp. 90, 97

(E.D. Pa. 1994) (Rule 11 motion denied where two experts supported

plaintiff's view of the facts); Wagner v. Allied Chem. Corp., 623 F.

Supp. 1407, 1411-12 (D. Md. 1985) (despite "serious factual

weaknesses with several of the claims," counsel's pre-filing

inquiry, which included consultation with expert, was "within the

range of reasonableness" under Rule 11). To be sure, plaintiff's

allegations and various denials were highly dubious in light of the

contrary evidence that CIR presented to plaintiff's counsel, Duarte-

Morillo's affidavit was biased and weak, Reta's unsworn affidavit

was largely irrelevant, and the handwriting expert who's favorable

opinion counsel sought to procure was no expert at all. But counsel

could not have known what view the Court would take of this evidence

(and of the admissibility of the expert report in particular), and

it cannot be said that plaintiff's allegations were "utterly lacking

in support" under such circumstances. O'Brien, 101 F.3d at 1489.

Counsel's pursuit of this lawsuit in the face of the mounting

evidence indicating his client was lying is certainly questionable

and borders on unreasonable, but the Court does not find that it

quite meets the high standard that must be satisfied to impose

sanctions.[22]

---

[22] CIR also asserts that plaintiff's counsel should be subject to
sanctions for asserting frivolous claims. While plaintiff's claims
and the arguments made in support of them were decidedly weak, the
Court declines to find that they were "frivolous" -- that is, that
they had absolutely no chance of success -- within the strict
meaning of Rule 11. See Mareno v. Rowe, 910 F.2d 1043, 1047 (2d Cir.

Finally, the Court notes that plaintiff's counsel has, somewhat improbably, argued in plaintiff's papers that CIR and defense counsel should be sanctioned for bringing a frivolous Rule 11 motion. Because defense counsel's motion was in fact meritorious, that baseless entreaty is moot.

**CONCLUSION**

In sum, for the foregoing reasons, the Court in its Order dated March 31, 2016, granted defendant CIR's Rule 12(c) motion for judgment on the pleadings and dismissed the Amended Complaint with prejudice as against all defendants. Regarding CIR's Rule 11 motion and accompanying Daubert motion, the Court excludes the reports and testimony of plaintiff's handwriting expert in their entirety for failing to meet the standards of Rule 702 under both Daubert and Kumho Tire. CIR's Rule 11 motion is granted to the extent it seeks dismissal of the action for plaintiff's perpetration of a fraud upon the Court, but denied to the extent it seeks monetary sanctions against either plaintiff or her counsel.

The Clerk of the Court is hereby directed to enter final judgment dismissing plaintiff's Amended Complaint with prejudice and to close this case.

---

1990) ("There is no doubt that the arguments presented by [plaintiff] were not persuasive. Nevertheless, to constitute a frivolous legal position for purposes of Rule 11 sanction, it must be clear under existing precedents that there is no chance of success and no reasonable argument to extend, modify or reverse the law as it stands."). "The positions advanced by [plaintiff] and [her] attorney, however faulty, were not so untenable as a matter of law as to necessitate sanction." Id.

SO ORDERED.

Dated:    New York, NY
          May 6, 2016                    JED S. RAKOFF, U.S.D.J.